**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRIDENT HOLDING COMPANY, LLC,** *et al.,* | **Case No. 19-10384 (SHL)** |
| **Debtors.** [1] | **(Jointly Administered)** |

## DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION OF TRIDENT HOLDING COMPANY, LLC AND ITS DEBTOR AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP
James J. Mazza, Jr.
Justin M. Winerman
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700

Paul D. Leake
Jason N. Kestecher
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000

*Attorneys for the Debtors and Debtors-in-Possession*

Dated:      March 25, 2019

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Trident Holding Company, LLC (6396); American Diagnostics Services, Inc. (2771); Community Mobile Diagnostics, LLC (9341); Community Mobile Ultrasound, LLC (3818); Diagnostic Labs Holdings, LLC (8024); FC Pioneer Holding Company, LLC (6683); JLMD Manager, LLC (8470); Kan-Di-Ki LLC (6100); Main Street Clinical Laboratory, Inc. (0907); MDX-MDL Holdings, LLC (2605); MetroStat Clinical Laboratory – Austin, Inc. (4366); MX Holdings, LLC (8869); MX USA, LLC (4885); New Trident Holdcorp, Inc. (4913); Rely Radiology Holdings, LLC (3284); Schryver Medical Sales and Marketing, LLC (9620); Symphony Diagnostic Services No. 1, LLC (8980); Trident Clinical Services Holdings, Inc. (6262); Trident Clinical Services Holdings, LLC (1255); TridentUSA Foot Care Services LLC (3787); TridentUSA Mobile Clinical Services, LLC (0334); TridentUSA Mobile Infusion Services, LLC (5173); U.S. Lab & Radiology, Inc. (4988). The address of the Debtors' corporate headquarters is 930 Ridgebrook Road, 3rd Floor, Sparks, MD 21152.

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## DISCLAIMER

THE DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THE DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THE DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THE DISCLOSURE STATEMENT SINCE THE DATE OF THE DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND ANY PLAN SUPPLEMENT(S) IN THEIR ENTIRETY BEFORE CASTING A BALLOT TO ACCEPT OR REJECT THE PLAN (A "**BALLOT**"). THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED

TO THE DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE SECURITIES DESCRIBED IN THE DISCLOSURE STATEMENT TO BE ISSUED PURSUANT TO THE PLAN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, AS AMENDED, OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW, GENERALLY IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.

THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION COMMENTED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THE DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS SPECIFICALLY INDICATED OTHERWISE.

THE CONSOLIDATED FINANCIAL PROJECTIONS OF THE DEBTORS AND NON-DEBTOR SUBSIDIARIES ATTACHED HERETO AS **EXHIBIT [B]** AND DESCRIBED IN THE DISCLOSURE STATEMENT, HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH THEIR ADVISORS. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE

ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("**GAAP**").

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION. TO THE EXTENT ANY PORTION OF THIS DISCLOSURE STATEMENT CONFLICTS WITH THE PLAN, THE PLAN SHALL GOVERN.

ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES CONTAINED HEREIN ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS OR THE STATUTORY PROVISIONS THEY ARE SUMMARIZING. THE DEBTORS' MANAGEMENT HAS PROVIDED FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

PLEASE REFER TO ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN" FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY EPIQ CORPORATE RESTRUCTURING, LLC, THE DEBTORS' CLAIMS AND SOLICITATION AGENT, NO LATER THAN 4:00 P.M. PREVAILING EASTERN TIME, ON JUNE 6, 2019. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE V OF THE DISCLOSURE STATEMENT (THE "**SOLICITATION PROCEDURES**"). ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS IN THEIR SOLE AND ABSOLUTE DISCRETION.

THE CONFIRMATION HEARING WILL COMMENCE ON JUNE 13, 2019 AT 11:00 A.M. PREVAILING EASTERN TIME, BEFORE THE HONORABLE SEAN H. LANE, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, MANHATTAN

COURTHOUSE, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004-1408. THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES WHO HAVE FILED AN OBJECTION TO THE PLAN, WITHOUT FURTHER NOTICE TO PARTIES-IN-INTEREST. THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING. THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

THE PLAN OBJECTION DEADLINE IS JUNE 6, 2019, AT 4:00 P.M. PREVAILING EASTERN TIME. ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN INTEREST IN ACCORDANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT ORDER**") SO THAT THEY ARE RECEIVED ON OR BEFORE THE PLAN OBJECTION DEADLINE

# EXECUTIVE SUMMARY[1]

On February 10, 2019 (the "**Petition Date**"), Trident Holding Company, LLC ("**Trident**") and certain of its affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Company**"), filed voluntary petitions for relief, thereby commencing cases (together, the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 - 1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Court**" or "**Bankruptcy Court**"). The Debtors continue to operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases are pending in the Bankruptcy Court under Case No. 19-10384 (the "**Chapter 11 Cases**").

The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered. To date, no trustee or examiner has been appointed in these Chapter 11 Cases. On February 20, 2019, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**") pursuant to section 1102 of the Bankruptcy Code [Docket No. 91].

The Debtors submit this disclosure statement (as may be amended, altered, modified, revised, or supplemented from time to time, the "**Disclosure Statement**") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims in connection with (a) the solicitation of acceptances of the Plan and (b) the hearing to consider confirmation of the Plan. In particular, the Disclosure Statements is submitted for purposes of soliciting votes to accept or reject the Joint Plan of Reorganization of Trident Holding Company, LLC and its Debtor Affiliates (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "**Plan**"), a copy of which is attached to this Disclosure Statement as **Exhibit A**.[2]

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 11 Cases. This Disclosure Statement also contains information regarding significant events that have occurred during the Chapter 11 Cases. In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the procedures for voting, which procedures must be followed by the

---

[1] This summary is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the terms and provisions of the Plan, *see* Article IV below.

[2] Capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in the Plan *provided, however,* that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") will have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

Holders of Claims in Classes (each, a "**Voting Class**") entitled to vote under the Plan for their votes to be counted.

Creditors entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan.

**FOR THE REASONS SET FORTH HEREIN, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AND <u>STRONGLY RECOMMEND</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

**A VOTE TO ACCEPT THE PLAN CONSTITUTES YOUR CONSENT TO THE RELEASE SET FORTH IN ARTICLE X OF THE PLAN OF THE PARTIES SPECIFIED IN ARTICLE X OF THE PLAN.**

# TABLE OF CONTENTS

## ARTICLE I

## INTRODUCTION

| | | | |
|---|---|---|---|
| A. | | Confirmation of the Plan | 2 |
| | 1. | Requirements | 2 |
| | 2. | Approval of the Plan and Confirmation Hearing | 2 |
| | 3. | Only Impaired Classes Vote | 2 |
| B. | | Classification Under the Plan | 3 |
| C. | | Voting Procedures, Voting Deadline, and Third-Party Release Opt-Out Procedures | 9 |
| D. | | Liquidation Analysis | 11 |
| E. | | Confirmation Hearing | 12 |

## ARTICLE II

## OVERVIEW OF THE COMPANY'S OPERATIONS

| | | | |
|---|---|---|---|
| A. | | Overview | 12 |
| B. | | The Debtors' Corporate Structure | 12 |
| C. | | Officers and Directors | 13 |
| D. | | The Debtors' Prepetition Capital Structure | 14 |
| | 1. | Priority First Lien Facility | 14 |
| | 2. | First Lien Facility | 15 |
| | 3. | Second Lien Facility | 16 |
| | 4. | Intercreditor Agreement | 16 |
| | 5. | Tranched PIK Notes | 17 |
| | 6. | Original PIK Notes | 17 |
| | 7. | Trade Claims | 17 |
| | 8. | FC Pioneer Units | 17 |
| E. | | The Debtors' Workforce | 18 |

## ARTICLE III

## THE CHAPTER 11 CASES

| | | | |
|---|---|---|---|
| A. | | Summary of Events Leading to the Chapter 11 Filings | 18 |
| | 1. | Challenges Faced by the Debtors and Restructuring Efforts | 18 |
| B. | | Out-of-Court Restructuring Efforts | 20 |
| | 1. | November 2017 Equity Cure | 21 |
| | 2. | Recapitalization Transaction | 21 |
| | 3. | Operational Improvements | 22 |
| C. | | Prepetition Restructuring Negotiations | 23 |
| D. | | Restructuring Support Agreement | 24 |

E.            Commencement of the Chapter 11 Cases ............................................................24
F.            Administration of Chapter 11 Cases ..................................................................24
    1.        Procedural and Administrative Orders..........................................................24
    2.        DIP Financing and Cash Collateral...............................................................25
    3.        Cash Management [Docket No. 9].................................................................26
    4.        Employee Wages and Benefits [Docket No. 10] ..........................................26
    5.        Customer Programs [Docket No. 15].............................................................26
    6.        Taxes and Assessments [Docket No. 11]......................................................26
    7.        Utilities [Docket No. 13]...............................................................................26
    8.        Critical Trade Vendors and Shippers [Docket No. 14]..................................26
    9.        NOL Trading [Docket No. 8].........................................................................27
    10.       Insurance [Docket No. 12] ............................................................................27
    11.       Motion to Reject Certain Leases and Approve Contract Rejection or
              Assumption Procedures [Docket No. 19] ......................................................27
    12.       De Minimis Asset Sales.................................................................................27
G.            Retention of Professionals, Appointment of the Creditors' Committee,
              Interim Compensation Procedures, and Retention of Ordinary Course
              Professionals .................................................................................................27
    1.        Applications for Retention of Debtors' Professionals ...................................27
    2.        Appointment of the Creditors' Committee and Retention of Creditors'
              Committee Professionals ..............................................................................28
    3.        Interim Compensation Procedures ................................................................28
    4.        Ordinary Course Professionals .....................................................................28
H.            Restructuring Paths ........................................................................................28
    1.        Business Plan Development............................................................................28
I.            Analysis of Executory Contracts and Unexpired Leases ......................................29
J.            Employee Compensation Plans........................................................................30
    1.        KEIP/KERP Motion ......................................................................................30
K.            Pending / Potential Litigation .........................................................................30
    1.        Recapitalization Transaction..........................................................................30
    2.        Government Claims .......................................................................................31
    3.        Other Litigation ............................................................................................31
L.            The Claims Process ........................................................................................32
    1.        Schedules ......................................................................................................32
    2.        Bar Dates.......................................................................................................32
    3.        Causes of Action ...........................................................................................33

ARTICLE IV

PLAN SUMMARY

A.            Overview of Chapter 11 ..................................................................................33
B.            Overall Structure of the Plan...........................................................................35
C.            Classification, Treatment, and Voting of Claims and Interests ............................35
    1.        Administrative Expenses and Priority Claims ...............................................37
    2.        Classification, Treatment, and Voting of Claims and Interests ............................40
D.            Acceptance .....................................................................................................45

|    | 1.  | Classes Entitled to Vote ......................................................................... | 45 |
|    | 2.  | Acceptance by Impaired Classes .............................................................. | 45 |
|    | 3.  | Elimination of Classes ............................................................................ | 45 |
|    | 4.  | Special Provision Governing Unimpaired Claims ................................... | 45 |
|    | 5.  | Deemed Acceptance if No Votes Cast ..................................................... | 45 |
|    | 6.  | Cramdown ................................................................................................ | 46 |
| E. |     | Means for Implementation of the Plan ..................................................... | 46 |
|    | 1.  | No Substantive Consolidation .................................................................. | 46 |
|    | 2.  | General Settlement of Claims and Interests ............................................. | 46 |
|    | 3.  | Restructuring Transactions ...................................................................... | 46 |
|    | 4.  | Sources of Cash for Plan Distribution .................................................... | 47 |
|    | 5.  | Exit Liquidity Facility ............................................................................. | 47 |
|    | 6.  | Exit Term Loan Facility ........................................................................... | 47 |
|    | 7.  | New First Lien Facility ............................................................................ | 47 |
|    | 8.  | Authorization, Issuance, and Distribution of New Pioneer Units ........... | 48 |
|    | 9.  | General Unsecured Claims Cash Pool ...................................................... | 48 |
|    | 10. | Exemptions from Securities Act Registration Requirements ................... | 48 |
|    | 11. | Cancellation of Existing Securities and Agreements ............................... | 49 |
|    | 12. | Issuance and Distribution of New Securities; Execution of Plan Documents ................................................................................................ | 49 |
|    | 13. | Continued Corporate Existence ............................................................... | 49 |
|    | 14. | New Corporate Governance Documents ................................................... | 50 |
|    | 15. | Directors, LLC Managers, and Officers of Reorganized Debtors ........... | 50 |
|    | 16. | Corporate Action ...................................................................................... | 50 |
|    | 17. | Effectuating Documents; Further Transactions ....................................... | 51 |
|    | 18. | Employment, Retirement, Indemnification and Other Agreements and Employee Compensation Programs .......................................................... | 51 |
|    | 19. | Preservation Of Causes Of Action .......................................................... | 52 |
|    | 20. | Reservation of Rights ............................................................................... | 52 |
|    | 21. | Exemption from Certain Transfer Taxes and Recording Fees ................. | 53 |
|    | 22. | Insured Claims ......................................................................................... | 53 |
|    | 23. | Intercompany Account Settlement ........................................................... | 53 |
|    | 24. | Closing of Chapter 11 Cases ................................................................... | 53 |
|    | 25. | Private Company ...................................................................................... | 53 |
| F. |     | Unexpired Leases and Executory Contracts ............................................ | 53 |
|    | 1.  | Rejection of Executory Contracts and Unexpired Leases ....................... | 53 |
|    | 2.  | Assumption of Executory Contracts and Unexpired Leases .................... | 54 |
|    | 3.  | Insurance Policies .................................................................................... | 55 |
|    | 4.  | Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases ............................................................. | 56 |
|    | 5.  | Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date ............................................................................................ | 57 |
|    | 6.  | General Reservation of Rights ................................................................. | 57 |
| G. |     | Procedures for Resolving Disputed Claims and Interests ........................ | 58 |
|    | 1.  | Determination Of Claims and Interests ................................................... | 58 |
|    | 2.  | [GUC Administrator ................................................................................ | 58 |

| | | | |
|---|---|---|---|
| | 3. | Claims Administration Responsibility | 59 |
| | 4. | Objections to Claims | 59 |
| | 5. | Disallowance of Claims | 59 |
| | 6. | Estimation of Claims | 60 |
| | 7. | No Interest on Claims | 60 |
| | 8. | Amendments to Claims | 61 |
| H. | | Provisions Governing Distributions | 61 |
| | 1. | Time of Distributions | 61 |
| | 2. | Distribution Agent | 61 |
| | 3. | Currency | 61 |
| | 4. | Distributions on Account of Claims Allowed as of the Effective Date | 61 |
| | 5. | Distributions on Account of Claims Allowed After the Effective Date | 62 |
| | 6. | Delivery Of Distributions | 63 |
| | 7. | Accrual of Dividends and Other Rights | 64 |
| | 8. | Surrender of Securities or Instruments | 64 |
| | 9. | Compliance Matters | 65 |
| | 10. | Claims Paid or Payable by Third Parties | 65 |
| | 11. | Setoffs | 66 |
| | 12. | Allocation of Plan Distributions Between Principal and Interest | 66 |
| I. | | Effect of the Plan on Claims and Interests | 67 |
| | 1. | Vesting of Assets | 67 |
| | 2. | Discharge of the Debtors | 67 |
| | 3. | Release by Debtors | 67 |
| | 4. | Release by Holders of Claims | 68 |
| | 5. | Exculpation and Limitation of Liability | 69 |
| | 6. | Exclusions and Limitations on Exculpation, Indemnification, and Releases | 70 |
| | 7. | Injunction | 70 |
| | 8. | Subordination Rights | 70 |
| | 9. | Protection Against Discriminatory Treatment | 71 |
| | 10. | Recoupment | 72 |
| | 11. | Release of Liens | 72 |
| | 12. | Reimbursement or Contribution | 72 |
| J. | | Conditions Precedent | 72 |
| | 1. | Conditions to Confirmation | 72 |
| | 2. | Conditions to the Effective Date of the Plan | 72 |
| | 3. | Waiver of Conditions Precedent | 73 |
| | 4. | Notice of Effective Date | 73 |
| | 5. | Effect of Non-Occurrence of Conditions to Consummation | 74 |
| K. | | Retention of Jurisdiction | 74 |
| L. | | Miscellaneous Provisions | 76 |
| | 1. | Binding Effect | 76 |
| | 2. | Payment of Statutory Fees | 76 |
| | 3. | Modification and Amendments | 76 |
| | 4. | Confirmation of the Plan | 76 |
| | 5. | Additional Documents | 77 |
| | 6. | Dissolution of Creditors' Committee | 77 |

7.    Request for Expedited Determination of Taxes.....................................77
8.    Revocation, Withdrawal, or Non-Consummation ...............................77
9.    Notices .........................................................................................77
10.   Term of Injunctions or Stays............................................................79
11.   Governing Law ..............................................................................79
12.   Entire Agreement ...........................................................................80
13.   Severability ...................................................................................80
14.   No Waiver or Estoppel.....................................................................80
15.   Conflicts .......................................................................................80

## ARTICLE V

## VOTING PROCEDURES

A.    Classes Entitled to Vote ....................................................................81
B.    Solicitation Procedures ......................................................................82
      1.    Voting Agent.............................................................................82
      2.    Solicitation Package ...................................................................82
      3.    Distribution of the Solicitation Package and Plan Supplement(s)........82
C.    Voting Procedures .............................................................................82

## ARTICLE VI

## STATUTORY REQUIREMENTS FOR PLAN CONFIRMATION

A.    The Confirmation Hearing ..................................................................84
B.    Confirmation Standards .....................................................................84
C.    Liquidation Analysis .........................................................................85
D.    Financial Feasibility..........................................................................86
E.    Acceptance by Impaired Classes .........................................................86
F.    Confirmation Without Acceptance by All Impaired Classes.......................86
      1.    No Unfair Discrimination ............................................................86
      2.    Fair and Equitable Treatment.......................................................87

## ARTICLE VII

## PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.    General ...........................................................................................88
B.    Certain Bankruptcy Considerations ......................................................88
      1.    Undue Delay in Confirmation May Significantly Degrade the Debtors'
            Value ......................................................................................88
      2.    Parties in Interest May Object to Classification of Claims and Interests ...........88
      3.    Risk of Non-Occurrence of the Effective Date .................................89
      4.    Failure to Satisfy Vote Requirements .............................................89
      5.    Debtors May Not Be Able to Secure Confirmation of the Plan ............89

|  | 6. | Conditions Precedent to Consummation of the Plan | 89 |
|  | 7. | The Valuation of the Reorganized Debtors May Not Be Adopted by the Bankruptcy Court | 89 |
| C. |  | Risk Factors That May Affect Recoveries Under the Plan | 90 |
|  | 1. | Debtors Cannot Guarantee What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes | 90 |
|  | 2. | Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Certain Claims | 90 |
|  | 3. | The Priority First Lien Lender Will Control the Reorganized Debtors | 90 |
|  | 4. | Tax Considerations | 90 |
| D. |  | Business Risks | 90 |
|  | 1. | The Debtors May Be Subject To Claims That Will Not Be Discharged in the Chapter 11 Cases | 90 |
|  | 2. | Employee Uncertainty | 91 |
|  | 3. | Healthcare and Other Regulations | 91 |
|  | 4. | Healthcare Reform | 91 |
|  | 5. | Competition and Demographic Trends | 92 |
| E. |  | Risks Associated with Forward Looking Statements | 92 |
|  | 1. | Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed | 92 |
|  | 2. | Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary | 92 |
| F. |  | Disclosure Statement Disclaimer | 93 |
|  | 1. | This Disclosure Statement Was Not Approved by the Securities and Exchange Commission | 93 |
|  | 2. | Reliance on Exemptions from Registration Under the Securities Act | 93 |
|  | 3. | This Disclosure Statement May Contain Forward Looking Statements | 93 |
|  | 4. | No Legal or Tax Advice Is Provided to You by this Disclosure Statement | 94 |
|  | 5. | No Admissions Made | 94 |
|  | 6. | Failure to Identify Litigation Claims or Projected Objections | 94 |
|  | 7. | No Waiver of Right to Object or Right to Recover Transfers and Assets | 94 |
|  | 8. | Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors | 94 |
|  | 9. | Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update | 94 |
|  | 10. | No Representations Outside this Disclosure Statement Are Authorized | 95 |
| G. |  | Liquidation Under Chapter 7 | 95 |

ARTICLE VIII

| A. |  | Consequences to the Debtors | 97 |
|  | 1. | Cancellation of Indebtedness Income | 97 |
|  | 2. | Utilization of NOLs | 98 |
|  | 3. | Excess Loss Accounts | 98 |
| B. |  | Consequences to Claims Holders | 98 |
|  | 1. | Gain or Loss | 98 |

|  | 2. | Market Discount | 99 |
|  | 3. | Allocation of Plan Distributions Between Principal and Interest | 99 |
|  | 4. | Ownership of New Pioneer Units | 100 |
|  | 5. | Exercise, Sale or Other Disposition, or Expiration of Warrants | 100 |
| C. | | FATCA | 101 |
| D. | | Information Reporting and Backup Withholding | 101 |
| E. | | Importance of Obtaining Professional Tax Assistance | 101 |

## ARTICLE IX

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

| A. | Continuation of the Bankruptcy Cases | 102 |
| B. | Alternative Plans of Reorganization | 102 |
| C. | Liquidation Under Chapter 7 of the Bankruptcy Code | 102 |

## ARTICLE X

## RECOMMENDATION AND CONCLUSION

## TABLE OF EXHIBITS[1]

| Exhibit | Title |
|---------|-------|
| A | Joint Plan of Reorganization of Trident Holding Company, LLC and Its Debtor Affiliates |
| B | Financial Projections |
| C | Hypothetical Liquidation Analysis |

---

[1]    Exhibits except for the Plan will be filed as supplements to the Disclosure Statement.

# ARTICLE I

# INTRODUCTION

As noted above, on the Petition Date, the Debtors filed voluntary petitions for relief, thereby commencing the Chapter 11 Cases. The Debtors continue to operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of, and holders of interests in, the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.

The Debtors commenced these Chapter 11 Cases to obtain necessary debtor-in-possession financing and implement a financial and operational restructuring that, among other things, delevers the Company's balance sheet and provides the Company with the financial flexibility to invest in its business to enhance its competitive position.

In connection with the Debtors' entry into the DIP Facility, after extensive arms'-length, good-faith negotiations, overseen by the Debtors' Restructuring Committee (as defined herein), the Debtors entered into a restructuring support agreement (the "**RSA**"), attached as Exhibit C to the *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 And (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507(b) And (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "**DIP Motion**"), with the Company's senior secured lender, SPCP Group, LLC (the "**Priority First Lien Lender**"), pursuant to which the Priority First Lien Lender agreed to support the general terms of a chapter 11 plan, which is expected to leave the Company with a de-levered balance sheet and sufficient liquidity, and better positioned to compete in the highly competitive healthcare services industry.

The Plan contemplates a restructuring pursuant to which (a) Allowed DIP Facility Claims would convert into obligations under the Exit Term Loan Facility; (b) Allowed Priority First Lien Claims would receive (i) $[105] million in obligations under the New First Lien Facility and (ii) 100% of the New Pioneer Units, subject to dilution on account of the Warrants and the MIP (each, as defined below); (c) Holders of First Lien Claims and Second Lien Claims would receive certain Warrants exercisable for up to 5% of the New Pioneer Units (depending on Class acceptance); and (d) Holders of General Unsecured Claims would share a General Unsecured Claims Cash Pool of $100,000.

As set forth in the Plan, the Debtors will emerge from the Chapter 11 Cases with a streamlined and deleveraged capital structure. Thus, the Reorganized Debtors will be well-positioned to continue to implement the operational turnaround efforts begun prepetition to allow the Company to respond to changing industry norms and best prepare the Company for future growth. The contemplated reorganization strengthens the Company, offering benefits and

increased commercial reliability for the Company's customers and trade counterparties. The Debtors intend to emerge from bankruptcy on an expedited timeline within five months following the Petition Date.

As is customary, the RSA contains certain milestones for the advancement of the Chapter 11 Cases, including a milestone that the Company would deliver its business plan within thirty-six days after the Petition Date. In accordance with the RSA milestone, the Company delivered a five-year business plan on March 18, 2019, which serves as the foundation for the valuation dictating the stakeholder recoveries set forth in the Plan.

Based upon an assessment by PJT Partners LP ("**PJT**") of the business plan, PJT believes that the Priority First Lien Lender is not oversecured. In particular, PJT determined that the Company's value does not exceed the combined amount of DIP Claims, Priority First Lien Claims, and capital leases. PJT's evaluation of the Priority First Lien Lenders' undersecured status included analysis of such lenders' claims amounts under the Priority First Lien Credit Agreement, including interest, a 12% ($27.1 million) prepayment fee triggered upon the filing of the Chapter 11 Cases, and other amounts payable thereunder.

The Debtors have also determined that accomplishing an efficient and expeditious resolution of the Chapter 11 Cases is essential to preserving and maximizing the going-concern value of the Debtors' estates and successfully restructuring the Company. The terms of the RSA and the Debtors' postpetition financing arrangements reflect that intention through the inclusion of certain milestones, which set forth an achievable timeline for the Debtors' emergence from Chapter 11. To that end, the Debtors are seeking confirmation of the Plan on the following timeline:

- **Disclosure Statement Order**: entered by May 2, 2019.

- **Confirmation Order**: entered by June 16, 2019.

- **Effective Date of Plan**: occurs by June 21, 2019.

FOR A DESCRIPTION OF THE PLAN AND THE VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AND INTERESTS, PLEASE SEE ARTICLE VII HEREIN.

## A.    Confirmation of the Plan

1.    <u>Requirements</u>. The requirements for confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code. The requirements for the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

2.    <u>Approval of the Plan and Confirmation Hearing</u>. To confirm the Plan, the Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

3.    <u>Only Impaired Classes Vote</u>. Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" under a plan may vote to accept or reject

such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders do not need to vote on such plan.

## B.    Classification Under the Plan

The Plan provides for the resolution of all Claims against and Interests in each of the Debtors in these Chapter 11 Cases. The Plan contains separate classes for Holders of Claims and Interests. For administrative convenience, the Plan organizes the Debtors into Debtor Groups and assigns a letter to each Debtor Group and a number to each Class of Claims or Interests in each Debtor Group. Notwithstanding this organizing principle, the Plan is a separate plan of reorganization for each Debtor. Such groupings shall not affect any Debtor's status as a separate legal Entity, result in substantive consolidation of any Estates, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date. Pursuant to section 1122 of the Bankruptcy Code, set forth below and in Article IV of this Disclosure Statement is a designation of the Debtor Groups and Classes of Claims and Interests. Claims and Interests belonging to a Debtor Group consisting of more than one Debtor shall be deemed to be classified in a single Class for all purposes under the Bankruptcy Code, including voting.

To the extent a Holder has a Claim that may be asserted against more than one Debtor in a Debtor Group, the vote of such Holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor in such Debtor Group. The Plan provides for a single Class of Holders of General Unsecured Claims without regard to Debtor entities at which such Holders hold their Claims.

For purposes of distributions to Holders of General Unsecured Claims, "Pro Rata" shall be determined where (x) the denominator is equal to all Allowed General Unsecured Claims against all Debtors and (y) the numerator is equal to the amount of a particular Holder's Allowed General Unsecured Claim. For voting purposes, the Debtors shall tabulate ballots for Holders of General Unsecured Claims both on a Debtor-by-Debtor basis and on aggregate basis without regard to particular Debtor entities and reserve the right to seek Confirmation of the Plan under either tabulation through accepting Classes or cramdown.

A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II of the Plan. Claims and Interests are classified as follows:

| Letter | Debtor Group |
|--------|--------------|
| A | **Ultimate Holding Company** |
|   | FC Pioneer Holding Company, LLC |
| B | **Intermediate Holding Company** |
|   | Trident Holding Company, LLC |
| C | **Operating Companies** |
|   | American Diagnostics Services, Inc. |
|   | Community Mobile Diagnostics, LLC |
|   | Community Mobile Ultrasound, LLC |
|   | Diagnostic Labs Holdings, LLC |
|   | JLMD Manager, LLC |
|   | Kan-Di-Ki LLC |
|   | Main Street Clinical Laboratory, Inc. |
|   | MDX-MDL Holdings, LLC |
|   | MetroStat Clinical Laboratory – Austin, Inc. |
|   | MX Holdings, LLC |
|   | MX USA, LLC |
|   | New Trident Holdcorp, Inc. |
|   | Rely Radiology Holdings, LLC |
|   | Schryver Medical Sales and Marketing, LLC |
|   | Symphony Diagnostic Services No. 1, LLC |
|   | Trident Clinical Services Holdings, Inc. |
|   | Trident Clinical Services Holdings, LLC |
|   | TridentUSA Foot Care Services LLC |
|   | TridentUSA Mobile Clinical Services, LLC |
|   | TridentUSA Mobile Infusion Services, LLC |
|   | U.S. Lab & Radiology, Inc. |

| # | Designation |
|----|-------------|
| 1 | Priority First Lien Claims |
| 2 | First Lien Claims |
| 3 | Second Lien Claims |
| 4 | Other Secured Claims |
| 5 | Other Priority Claims |
| 6 | General Unsecured Claims |
| 7 | PIK Notes Claims |
| 8 | Intercompany Claims |
| 9 | Other Subordinated Claims |
| 10 | Interests in Debtor Subsidiaries |
| 11 | Interests in Pioneer |

The classification of Claims and Interests (as applicable) under the Plan is as set forth below:

| Class(es) | Claim or Interest | Status | Voting Rights |
|-----------|-------------------|--------|---------------|
| 1B – 1C | Priority First Lien Claims | Impaired | Entitled to Vote |
| 2B – 2C | First Lien Claims | Impaired | Entitled to Vote |
| 3B – 3C | Second Lien Claims | Impaired | Entitled to Vote |

4

| 4A – 4C | Other Secured Claims | Unimpaired | Presumed to Accept |
|---|---|---|---|
| 5A – 5C | Other Priority Claims | Unimpaired | Presumed to Accept |
| 6A – 6C | General Unsecured Claims | Impaired | Entitled to Vote |
| 7A – 7B | PIK Notes Claims | Impaired | Deemed to Reject |
| 8A – 8C | Intercompany Claims | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 9A – 9C | Other Subordinated Claims | Impaired | Deemed to Reject |
| 10A – 10C | Interests in Debtor Subsidiaries | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 11A | Interests in Pioneer | Impaired | Deemed to Reject |

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1B – 1C, 2B – 2C, 3B – 3C, AND 6A – 6C.

The table below summarizes the classification and treatment of Claims and Interests under the Plan. These summaries are qualified in their entirety by reference to the provisions of the Plan. For a more detailed description of the terms and provisions of the Plan, *see* Article IV below.

| Class Description | Proposed Treatment |
|---|---|
| Classes 1B – 1C: Priority First Lien Claims<br><br>Estimated Recovery: [●]%[1] | Except to the extent that a Holder of an Allowed Priority First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Priority First Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority First Lien Claim shall receive its Pro Rata share and interest in (i) the New First Lien Facility, and (ii) 100% of the New Pioneer Units to be issued by Reorganized Pioneer, subject to dilution on account of the Warrants and the Management Incentive Plan. |

---

[1]     The amounts set forth herein are estimates primarily based on the Debtors' books and records and net of amounts paid during the pendency of the Chapter 11 Cases pursuant to Bankruptcy Court orders. Actual Allowed amounts will depend upon, among other things, final reconciliation and resolution of all Claims. Consequently, the actual Allowed Claim amounts and estimated recovery percentages may differ materially from these estimates.

| Class Description | Proposed Treatment |
|---|---|
| Classes 2B – 2C: First Lien Claims<br><br>Estimated Recovery: [●]% | Except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed First Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter:<br><br>***If each of Class 2B, Class 2C, Class 3B, and Class 3C are Accepting Classes,*** each Holder of an Allowed First Lien Claim shall receive its Pro Rata share and interest in 4% of the Warrants.<br><br>***If each of Class 2B and Class 2C are Accepting Classes, but Class 3B and Class 3C are not Accepting Classes,*** each Holder of an Allowed First Lien Claim shall receive its Pro Rata share and interest in 5% of the Warrants.<br><br>***If any of Class 2B or Class 2C are not Accepting Classes,*** Holders of Allowed First Lien Claims shall not receive any distributions on account of such Allowed First Lien Claims. |
| Classes 3B – 3C: Second Lien Claims<br><br>Estimated Recovery: [●]% | Except to the extent that a Holder of an Allowed Second Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Second Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter:<br><br>***If each of Class 2B, Class 2C, Class 3B, and Class 3C are Accepting Classes,*** each Holder of an Allowed Second Lien Claim shall receive its Pro Rata share and interest in 1% of the Warrants.<br><br>***If any of Class 2B, Class 2C, Class 3B, or Class 3C are not Accepting Classes,*** Holders of  Allowed Second Lien Claims shall not receive any distributions on account of such Allowed Second Lien Claims. |

| Class Description | Proposed Treatment |
|---|---|
| Classes 4A – 4C: Other Secured Claims<br><br>Estimated Recovery: 100% | Except as otherwise provided in and subject to Article IX.5 of the Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the option of the Debtors or the Reorganized Debtors and with the consent of the Priority First Lien Administrative Agent, as applicable:<br><br>(i) have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, or otherwise have its Claim rendered Unimpaired, in each case in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default;<br><br>(ii) be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Claim or as soon thereafter as reasonably practicable;<br><br>(iii) receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Other Secured Claim will have agreed upon in writing; or<br><br>(iv) receive delivery of the collateral securing any such Allowed Other Secured Claim;<br><br>*provided*, that Allowed Other Secured Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.  Nothing in Article IV.4 of the Plan or elsewhere in the Plan shall preclude the Debtors (or the Reorganized Debtors) from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien allegedly securing an Allowed Other Secured Claim. |

| Class Description | Proposed Treatment |
|---|---|
| Classes 5A – 5C: Other Priority Claims<br><br>Estimated Recovery: 100% | Except as otherwise provided in and subject to Article IX.5 of the Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or on such other date as agreed between the Debtors (or the Reorganized Debtors), with the consent of the Priority First Lien Administrative Agent, and such Holder of an Allowed Other Priority Claim; and such Holder of an Allowed Other Priority Claim; *provided, however*, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. |
| Classes 6A – 6C: General Unsecured Claims<br><br>Estimated Recovery: less than [1]% | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed General Unsecured Claim:<br><br>*If Class 6C is an Accepting Class*, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share and interest in the General Unsecured Claims Cash Pool.<br><br>*If Class 6C is not an Accepting Class*, Holders of  Allowed General Unsecured Claims shall not receive any distributions on account of such Allowed General Unsecured Claims. |
| Classes 7A – 7B: PIK Note Claims<br><br>Estimated Recovery: 0% | On the Effective Date, all of the Debtors' outstanding obligations under the PIK Notes shall be extinguished, canceled, and discharged, and each Holder of a PIK Note Claim shall receive no distribution on account of such Claim. |
| Classes 8A – 8C: Intercompany Claims<br><br>Estimated Recovery: 0% or 100% | On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among any Affiliate of the Debtors shall be either reinstated, cancelled, released, or otherwise settled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent). |

| Class Description | Proposed Treatment |
|---|---|
| Classes 9A – 9C: Other Subordinated Claims<br><br>Estimated Recovery: 0% | Holders of Allowed Other Subordinated Claims shall not receive any distributions on account of such Allowed Other Subordinated Claims. |
| Classes 10A – 10C: Interests in Debtor Subsidiaries<br><br>Estimated Recovery: 0% or 100% | On the Effective Date, all Allowed Interests in Debtor Subsidiaries shall be either reinstated or cancelled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent). To the extent reinstated, Interests in Debtor Subsidiaries are Unimpaired solely to preserve the Debtors' corporate structure and Holders of those Interests shall not otherwise receive or retain any property on account of such Interests. |
| Class 11A: Interests in Pioneer<br><br>Estimated Recovery: 0% | On the Effective Date, Allowed Class 11A Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors. |

## C.    Voting Procedures, Voting Deadline, and Third-Party Release Opt-Out Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. To ensure your vote is counted, you must (a) complete the Ballot, (b) indicate your decision either to accept or reject the Plan in the boxes provided, and (c) sign and return the Ballot(s) in the envelope provided.

The Plan provides for certain releases by the Debtors, the Reorganized Debtors, and their Estates of certain Released Parties. In addition, the Plan also provides for a third-party release contained in Article X of the Plan. The Ballots also contain an election to opt out of these release provisions contained in Article X of the Plan for those who vote to reject the Plan, and the Notice of Non-Voting Status for those deemed to reject the Plan includes the Release Opt-Out Election Form permitting electing Claims or Interest Holders to choose not to grant the third-party release.

Unless you vote to reject the Plan or are deemed to reject the Plan and indicate your decision to opt-out of the releases described in Article X.4 of the Plan on the Ballot or Release Opt-Out Election Form, or you are solicited to vote to accept or reject the Plan but you do not vote either to accept or to reject the Plan and do not indicate that you opt to not grant the releases provided in the Plan, you will be deemed to consent to such releases. The releases do not apply to Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or intentional fraud. Because the releases are required under the RSA, they comprise an integral and essential component of the Plan. Accordingly, absent the

releases' inclusion in the Plan, the Plan would not have necessary support from certain key constituents, including the DIP Agent and the DIP Lenders. Further, the Debtors believe such releases are consensual in accordance with the opt-out procedures set forth above.

TO BE COUNTED, YOUR BALLOT **WITH YOUR ORIGINAL** SIGNATURE INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN **4:00 P.M. (PREVAILING EASTERN TIME) ON JUNE 6, 2019** (THE "**VOTING DEADLINE**").

The following Ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

i.     any Ballot received after the Voting Deadline (as extended by the Debtors as provided in the Disclosure Statement Order);

ii.    any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

iii.   any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

iv.    any Ballot cast for a Claim (i) scheduled as contingent, unliquidated, or disputed or as zero or as unknown in amount and (ii) for which no proof of claim is timely filed and no Rule 3018(a) Motion has been filed by the Rule 3018(a) Motion Deadline (as such terms are defined in the Solicitation Procedures Motion);

v.     any Ballot that indicates neither an acceptance nor a rejection, or indicates both an acceptance and rejection, of the Plan;

vi.    any Ballot that casts part of its vote in the same Class to accept the Plan and part to reject the Plan;

vii.   any form of Ballot other than the official form sent by Epiq Corporate Restructuring, LLC ("**Epiq**" or the "**Voting Agent**"), or a copy thereof;

viii.  any Ballot received that the Voting Agent cannot match to an existing database record;

ix.    any Ballot that does not contain an original signature if submitted by mail, courier, or hand delivery;

x.     any Ballot that does not contain an electronic signature if submitted through the E-Ballot platform on Epiq's website; or

xi.    any Ballot that is submitted by facsimile, email, or by any means of electronic submission other than the E-Ballot platform on Epiq's website.

In order for the Plan to be accepted by an Impaired Class of Claims, more than one-half in number and at least two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL OR SUBMIT THROUGH THE E-BALLOTING PORTAL THE BALLOT ENCLOSED WITH NOTICE SETTING FORTH THE DEADLINE FOR CASTING BALLOTS EITHER ACCEPTING OR REJECTING THE PLAN, THE DEADLINE FOR FILING OBJECTIONS TO CONFIRMATION OF THE PLAN, AND THE DATE, TIME AND LOCATION OF THE CONFIRMATION HEARING (THE "**NOTICE**"). PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY, AND IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE VOTING AGENT EPIQ, AT (800) 960-1226 OR AT TRIDENT HOLDING COMPANY, LLC, C/O EPIQ CORPORATE RESTRUCTURING, LLC, 10300 SW ALLEN BOULEVARD, BEAVERTON, OR 97005. THE VOTING AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

## D.    Liquidation Analysis

The Debtors have prepared liquidation analysis, attached hereto as **Exhibit [C]** (the "**Liquidation Analysis**") to assist Holders of Claims and Interests in evaluating the Plan. The Liquidation Analysis compares the creditor recoveries to be realized if the Debtors were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code with the distributions to Holders of Allowed Claims and Interests under the Plan. The analysis is based upon the value of the Debtors' assets and liabilities as of a certain date, and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, each analysis is subject to potentially material changes including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided in the Liquidation Analysis.

If these cases were to be converted to chapter 7 cases, the Debtors' Estates would incur the costs of payment of a statutorily allowed commission to the chapter 7 trustee, as well as the costs of counsel and other professionals retained by such trustee. The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimately distribution to unsecured creditors. The Debtors' Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during these Chapter 11 Cases (such as compensation for professionals) which are allowed in the chapter 7 cases. Accordingly, the Debtors believe that holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases.

11

E.       **Confirmation Hearing**

The Court has scheduled a hearing to consider confirmation of the Plan for June 13, 2019 at 11:00 a.m. (prevailing Eastern Time) in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004 (the "**Confirmation Hearing**"). The Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before June 6, 2019 at 4:00 p.m. (prevailing Eastern Time) in the manner described in the Notice accompanying this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by way of announcement of such continuance in open Court or otherwise, without further notice to parties in interest.

**THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

**ARTICLE II**

**OVERVIEW OF THE COMPANY'S OPERATIONS**

A.       **Overview**

Trident is the leading national provider of bedside diagnostic and related services in the United States, with operations in more than 35 states serving more than 12,000 post-acute care, assisted living facilities, and correctional facilities. Trident provides a high volume of services – executing over 1 million transactions per month, ranging from visits by x-ray technicians, ultrasound sonographers, registered nurses, nurse practitioners, and phlebotomists to serve its customers' patients.

Trident offers a full suite of imaging (*e.g.,* x-ray, ultrasound, cardiac monitoring), lab, and clinical services to provide essential bedside diagnostics to patients in skilled nursing facilities, long-term care, assisted living, correctional facilities, hospice, rehabilitation centers, and other patient settings, including patients' homes. Trident generates revenue from three payor types: facility customers (50% of gross revenue), government payors including Medicare and Medicaid (35% of gross revenue), and non-government commercial payors (15% of gross revenue).

B.       **The Debtors' Corporate Structure**

FC Pioneer Holding Company, LLC ("**FC Pioneer**") formed after Formation Capital, LLC (a private equity sponsor of the Debtors) engaged in a series of corporate transactions with FCT Health Holdings, LLC, and Trident Holding Company, LLC, which previously served as the Company's ultimate parent and holding company. In 2016, FC Pioneer was created as an entity after FCT Health Holdings, LLC acquired Schryver Medical Sales and Marketing, LLC. FC Pioneer is the direct or indirect parent company of each of the Debtors, which are all incorporated in the United States. The Company's organizational structure is depicted below:

12



## C.    Officers and Directors

The following persons comprise the Board of Managers of FC Pioneer (the "**Board**"): Brian Beckwith, Adam Abramson, Mark Parrish, Nikhil Chaudhri, Craig Kahler, Alexander Greene, and Andrei Soran. Alexander Greene is an independent director who was appointed to the Board in October 2017, as set forth in further detail below.  FC Pioneer's officers are Andrei Soran (who was appointed in 2018 to transition into his current role as CEO), David F. Smith, III (CFO), Thomas McCaffery (Senior Vice President and General Counsel), and Scott Brown (Vice President and Secretary).

After the Company initiated restructuring efforts in November 2018, the Board also formed a restructuring committee (the "**Restructuring Committee**"). The Board delegated authority to the Restructuring Committee to make recommendations to the full Board regarding implementation of potential restructuring alternatives. FC Pioneer's Restructuring Committee consists of Mark Parrish, Alexander Greene, Craig Kahler, Nikhil Chaudhri, Brian Beckwith, and Andrei Soran.

As the ultimate parent of all the other Debtors subsidiaries, FC Pioneer holds direct authority to remove and appoint all directors, members, and officers of Trident Holding Company, LLC, and indirect authority to appoint all directors, officers, and managers of its other Debtor subsidiaries.

**D.    The Debtors' Prepetition Capital Structure**

As of the Petition Date, each of the Debtors other than FC Pioneer (collectively, the "**Secured Facilities Loan Parties**") are obligated as borrowers or guarantors on three secured credit facilities, referred to as the Priority First Lien Facility, the First Lien Facility, and the Second Lien Facility (each as defined below, and collectively, the "**Secured Facilities**"). Each of the Secured Facilities is secured by a lien on and security interest in substantially all of the Secured Facilities Loan Parties' assets.

Trident Holding Company, LLC has also issued two tranches of promissory notes, referred to as the Tranche A PIK Notes and the Tranche B PIK Notes. Additionally, FC Pioneer, the direct parent of Trident Holding Company, LLC has issued two series of promissory notes, the Tranche C PIK Notes and the Original PIK Notes. The approximate amount of the Debtors' prepetition indebtedness outstanding as of February 8, 2019 in order of lien / structural priority is summarized as follows:



(Debt listed in order of payment priority and is set forth next to applicable issuer / borrower)

| Instrument | Approximate Principal and Accrued Prepetition Interest |
|---|---|
| Original PIK Notes | $79.9 |
| Tranche C PIK Notes | $16.5 |
| **Total** | **$96.4** |

| Instrument | Approximate Principal and Accrued Prepetition Interest |
|---|---|
| Tranche A PIK Notes | $17.1 |
| Tranche B PIK Notes | $19.0 |
| **Total** | **$36.1** |

(Trident Holding Company, LLC is also a guarantor of all the debt set forth below.)

| Instrument | Approximate Principal and Accrued Prepetition Interest |
|---|---|
| Priority First Lien Facility | $257.1 |
| First Lien Facility | $219.7 |
| Second Lien Facility | |
| Tranche A | $18.7 |
| Tranche B | $135.9 |
| Tranche C | $5.5 |
| Tranche E | $15.2 |
| **Total** | **$652.0** |

Amounts are in millions of dollars.

1.    Priority First Lien Facility

On April 30, 2018, New Trident Holdcorp, Inc., Schryver Medical Sales and Marketing, LLC, and Trident Clinical Services Holdings, Inc. (collectively, the "**Secured Facilities Borrowers**") entered into the Priority First Lien Credit Agreement with the Priority First Lien Lender and Silver Point Finance, LLC, as administrative agent (the "**Priority First Lien**

Agent"), pursuant to which the Priority First Lien Lender provided a term loan facility to the Secured Facilities Borrowers (the "**Priority First Lien Facility**") and under which an approximate aggregate amount of $257.2 million remained outstanding as of the Petition Date.[2] The Priority First Lien Facility matures on April 30, 2022 (subject to certain springing maturity events) and immediately prior to the Petition Date accrued interest at a rate of LIBOR + 7.5%, with 4% payable in kind. The principal amount of all outstanding loans and all accrued interest under the Priority First Lien Facility were automatically accelerated upon the filing of the Chapter 11 Cases, including a 12% prepayment fee on the outstanding principal amount of the loans thereunder.

The Secured Facilities Borrowers' obligations under the Priority First Lien Facility are guaranteed by each of the Debtors other than FC Pioneer (the "**Secured Facilities Guarantors**," and together with the Secured Facilities Borrowers, the "**Secured Facilities Loan Parties**"). The Secured Facilities Loan Parties' obligations are secured by first priority liens on, and security interests in, substantially all present and future assets of the Secured Facilities Loan Parties.

2.      First Lien Facility

The Secured Facilities Loan Parties are also party to the First Lien Credit Agreement,[3] dated as of July 31, 2013 (as amended, restated, supplemented or otherwise modified from time to time), with the lenders party thereto (the "**First Lien Lenders**") and Cortland Capital Market Services LLC, as administrative agent (the "**First Lien Agent**" and together with the First Lien Lenders, the "**First Lien Secured Parties**"), pursuant to which the First Lien Lenders provided a term loan facility to the Secured Facilities Borrowers (the "**First Lien Facility**") and under which an approximate aggregate amount of $219.8 million remained outstanding as of the Petition Date. The First Lien Facility matures on July 31, 2022 and immediately prior to the Petition Date accrued interest at a rate of LIBOR + 6%, with 3% payable in kind. The principal amount of all outstanding loans and accrued interest under the First Lien Facility were automatically accelerated upon the filing of the Chapter 11 Cases.

The Secured Facilities Borrowers' obligations under the First Lien Facility are guaranteed by each of the Secured Facilities Guarantors. The Secured Facilities Borrowers' obligations and the guaranty obligations of the Secured Facilities Guarantors are secured by second priority liens on, and security interests in, substantially all present and future assets of the Secured Facilities Loan Parties subordinate to the Priority First Lien Facility. The First Lien Facility is payment and lien subordinated to the Priority First Lien Facility pursuant to the terms of the Priority/First Lien/Second Lien Intercreditor Agreement, dated as of April 30, 2018, by and among the Secured Facilities Loan Parties, the Priority First Lien Agent, the First Lien Agent, and the Second Lien Agent (the "**Intercreditor Agreement**"). Under the Intercreditor Agreement, the First Lien Secured Parties agreed to a "standstill," whereby such parties are

---

[2]    This amount includes a $[27.1] million prepayment fee, triggered upon the filing of the Chapter 11 Cases.

[3]    Each of the First Lien Facility and the Second Lien Facility was subordinated in lien priority and right of payment to the Priority First Lien Facility on April 30, 2018 in connection with the Refinancing Transaction, described below. As a result of that subordination, the First Lien Facility was subordinated to a second lien position and the Second Lien Facility was subordinated to a third lien position.

required to wait at least 180 days after accelerating their loans prior to exercising remedies with respect to the Existing First Lien Collateral (as defined in the Intercreditor Agreement).

3.    Second Lien Facility

The Secured Facilities Loan Parties are also party to the Second Lien Credit Agreement, dated as of July 31, 2013, with the lenders party thereto (the "**Second Lien Lenders**") and Ares Capital Corporation as administrative agent (the "**Second Lien Agent**," and together with the Second Lien Lenders, the "**Second Lien Secured Parties**"), pursuant to which term loans in an approximate aggregate amount of $[175.2] million remain outstanding as of the Petition Date (the "**Second Lien Facility**"). The Second Lien Facility matures on July 31, 2020 (subject to certain springing maturity events) and generally bears interest at a rate of LIBOR + 10%, with half payable in kind.[4]

The Secured Facilities Borrowers' obligations under the Second Lien Facility are guaranteed by each of the Secured Facilities Guarantors. The Secured Facilities Borrowers' obligations and the guaranty obligations of the Secured Facilities Guarantors are secured by third priority liens on, and security interests in, substantially all present and future assets of the Secured Facilities Loan Parties subordinate to the Priority First Lien Facility and the First Lien Facility. The Second Lien Facility is payment and lien subordinated to the Priority First Lien Facility and is lien subordinated to the First Lien Facility pursuant to the terms of the Intercreditor Agreement. Under the Intercreditor Agreement, the Second Lien Secured Parties agreed to a "standstill," whereby they must wait at least 180 days after accelerating their loans prior to exercising remedies with respect to the Second Lien Collateral (as defined in the Intercreditor Agreement).

4.    Intercreditor Agreement

On April 30, 2018, the Priority First Lien Agent, the First Lien Agent (at the direction of 100% of the First Lien Lenders), and the Second Lien Agent (at the direction of Required Lenders (as defined in the Second Lien Credit Agreement)) entered into the Intercreditor Agreement, governing the relationship between the Secured Facilities.

The Intercreditor Agreement restricts the ability of the First Lien Secured Parties and Second Lien Secured Parties to take certain Enforcement Actions (as defined in the Intercreditor Agreement) with respect to their collateral prior to the discharge of the Priority First Lien Facility. With respect to a plan of reorganization, the First Lien Secured Parties and Second Lien Secured Parties may not "support or vote in favor of any plan or reorganization, unless such plan of reorganization is supported by the Priority First Lien Secured Parties" or otherwise results in a discharge of the Priority First Lien Facility.

---

[4]    The Second Lien Facility is further divided into four tranches. On the most junior tranche (consisting of approximately $15 million of term loans), no PIK interest has accrued and cash interest is payable at LIBOR + 9.5%.

Under the Intercreditor Agreement, the First Lien Secured Parties and Second Lien Secured Parties agreed to subordinate their right of payment to the Priority First Lien Secured Parties. The First Lien Secured Parties and the Second Lien Secured Parties also agreed not to challenge in any way the validity of the Priority First Lien Secured Parties' liens and claims, as further described in the Intercreditor Agreement. As a result, unless such provisions are waived by the Priority First Lien Secured Parties, any recoveries by such subordinated parties must be turned over to the Priority First Lien Secured Parties unless such senior claims have been paid in full in cash.

5.      Tranched PIK Notes

Pursuant to an Investment Agreement, dated as of November 29, 2017 (the "**Tranched PIK Note Facility**"), Trident Holding Company, LLC issued the Tranche A PIK Notes and the Tranche B PIK Notes with a maturity date of the later of July 29, 2020 and the maturity date under the First Lien Facility plus 91 days.[5] FC Pioneer issued the Tranche C PIK Notes (together with the Tranche A PIK Notes, and the Tranche B PIK Notes, the "**Tranched PIK Notes**") with a maturity date of the later of December 9, 2022 and the maturity date under the First Lien Facility plus 91 days. As of the Petition Date, the Tranche A PIK Notes and the Tranche C PIK Notes were interest-free, while the Tranche B PIK Notes bear interest at LIBOR + 9.5%, all of which is payable in kind.

All of the Tranched PIK Notes are unsecured, and the Tranche C PIK Notes are subordinate in right of payment to the Original PIK Notes, described below. In connection with their consent to the Recapitalization Transaction (as described below), holders of the Tranched PIK Notes agreed not to exercise any remedies at law or in equity or any rights under the Investment Agreement without the consent of the Priority First Lien Agent.

6.      Original PIK Notes

Pursuant to an Investment Agreement, dated as of December 6, 2016 (the "**Original PIK Note Facility**"), FC Pioneer issued the Original PIK Notes with a maturity date of December 9, 2022. As of the Petition Date, the Original PIK Notes bear interest at a rate of 16.75%. The Original PIK Notes are unsecured but are senior in right of payment to the Tranche C PIK Notes.

7.      Trade Claims

As of the Petition Date, the Debtors estimate that more than $40 million in general unsecured trade claims were outstanding.

8.      FC Pioneer Units

Approximately 551,394 Class A units, approximately 8,191 Class S units, 100 PY Units, and 100 PX Units of FC Pioneer were issued and outstanding as of the Petition Date.

---

[5]   The original maturity date of each of the Tranche A PIK Notes, the Tranche B PIK Notes, and the Tranche C PIK Notes was modified pursuant to an amendment dated April 30, 2018.

### E.    The Debtors' Workforce

With operations across the country, Trident maintains a sizeable workforce. In particular, the Debtors employ approximately 5,600 total employees, approximately 4,500 of whom are full-time employees, 660 are part-time employees, 420 are *pro re nata* employees, and 20 are temporary employees.

Approximately 4,900 of the Debtors' employees are paid on an hourly basis and approximately 700 are paid on a salaried basis. Generally speaking, the salaried employees include senior management, employees in supervisory and departmental management roles, and nurse practitioners. The hourly employees generally include, *inter alios*, the Debtors' laboratory staff, phlebotomists, radiology and ultrasound technicians, couriers, administrative staff, and IT staff.

Approximately 4,200 of the employees are directly involved in the provision of the Debtors' clinical services, such as performing medical tests and imaging scans, administering medication, collecting and processing lab specimens, and dispatching service providers. The remaining approximately 1,400 employees perform back-office, administrative, and business development tasks, such as accounting and billing functions, data processing, records management, sales, quality assurance, departmental and company management, customer service, and IT.

In addition to the employees, the Debtors utilize approximately 200 independent contractors to provide specialized medical services that are critical to the Debtors' operations, such as interpreting x-rays, inserting catheters, and reading EKGs.

### ARTICLE III

### THE CHAPTER 11 CASES

The following is a general summary of the Chapter 11 Cases, including certain events preceding the Chapter 11 Cases, the Debtors' restructuring initiatives implemented, and key transactions executed since the Petition Date.

### A.    Summary of Events Leading to the Chapter 11 Filings

1.    Challenges Faced by the Debtors and Restructuring Efforts

A number of factors have contributed to a decline in Trident's earnings and liquidity, ultimately making a chapter 11 filing a necessary step for Trident to de-lever its balance sheet and implement a restructuring plan with the tools available to it under the Bankruptcy Code. These forces have included:

(a)    General Sector Distress

Trident has suffered ripple effects from the distress faced by skilled nursing facilities ("**SNF**"), which are its primary direct customers. SNF occupancy rates have declined to a multi-year low as a result of structural and reimbursement changes not yet offset by demographic

18

trends. These structural changes include, among other things, patient migration to home health care. The decline in SNF occupancy rates has led to reduced demand for Trident's services. At the same time, Trident has only had limited success reducing costs in response to lower volumes, as volume declines are driven by lower utilization per facility rather than a reduction in the number of facilities served. Because SNFs often face distress themselves, Trident's reliance on these revenue streams created collections risks. In addition, many national SNFs, who wanted to deal with Trident since it was the only national provider, are deconsolidating and turning to more regional providers.

(b)    Reimbursement Rate Pressures

Like many healthcare sector participants, Trident has experienced declining revenues resulting from government-imposed reductions in reimbursement rates. Specifically, as a result of the Protecting Access to Medicare Act of 2014 ("**PAMA**"), the Debtors have faced an 8-10% decline in reimbursements for their lab business in 2018 and 2019, and additional declines are expected through 2020. While profit margins on the Company's lab business have historically been tight, PAMA has eliminated even those minimal profits and caused the Company to reduce its service footprint.

(c)    Intense Capital Requirements

Given liquidity issues, Trident has been unable to invest in capital requirements as it would have desired. As a result of this shortage, Trident estimates that it needs to catch up on approximately $30 million of deferred capital expenditures over the next three to five years. In particular, the Debtors seek to (a) replace their older computed radiography ("**CR**") x-ray technology with newer digital radiography ("**DR**") technology, (b) replace x-ray machines that are greater than 10 years old, and (c) replace x-ray vehicles that are greater than 5 years old. Whereas CR uses a cassette based system, which requires a longer time to view an image, DR uses a digital x-ray to automatically acquire images and transfer them to a computer. To illustrate the need for these upgrades, Trident's reimbursement rates are 7% lower using its current CR rather than DR technology, with additional cuts to reimbursement rates scheduled to occur in the future. Moreover, DR provides for a more efficient workflow, allowing employees to service more customers in the same amount of time. Beyond these technology upgrades, Trident's limited investment ability has forced it to share existing equipment more widely. Due in part to these constraints, the Company was not able to fully capitalize on the relatively-severe 2017-2018 influenza season, which could have provided a needed boost to earnings.

(d)    Billing System Transition

Beginning in 2014, Trident launched an effort to consolidate its various billing software applications into a new, unified system. The first billing center went live on the new system in January 2015. In June 2016, Trident commenced the transition of its largest billing center in Sparks Glencoe, Maryland.  Implementation problems, particularly with payor eligibility testing, hampered the processing of certain third party claims. Because such claims generally become time-barred after six months to one year, many could not be manually reprocessed in time to be paid. These complications also negatively impacted Trident's ability to collect certain receivables.

(e)    Constrained Liquidity and Leverage

In the midst of market and competitive challenges, Trident has significant debt service obligations. Over the course of 2018, Trident paid approximately $26,185,667.75 in cash interest on the Secured Credit Facilities. On January 31, 2019, the Company missed an interest payment of $9,187,477.07 on the Secured Credit Facilities, resulting in an Event of Default on February 8, 2019 after the cure period expired. Moreover, a number of recent customer bankruptcies – including those of Senior Care Centers, LLC, 4 West Holdings, Inc., and Promise Healthcare Group, LLC – have exacerbated the Company's liquidity shortfall by limiting the collectability of amounts owed from these entities. A number of other customers who have not yet filed bankruptcy cases are generally not paying the Debtors within contractual terms due to their own liquidity problems. As a result of these collection difficulties and challenges with the new billing system in the Sparks Glencoe billing center, the Debtors recorded $27.8 million of extraordinary bad debt expense in 2018 and $12.7 million in 2017.

## B.    Out-of-Court Restructuring Efforts

Over the past 18 months, the confluence of the foregoing factors has led the Company to file for chapter 11 to implement a comprehensive restructuring despite the Company's best efforts to address these issues out of court.

In August 2017, the Debtors retained Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**") as their legal advisors and PJT as their financial advisors to advise management and FC Pioneer's Board regarding potential strategic alternatives to enhance the Debtors' liquidity and address their capital structure.

As the Company worked on devising a capital structure solution, it became clear that additional liquidity would be necessary in order to obtain the runway for any longer term solution. As a result, on September 27, 2017, the Company raised approximately $5 million through an asset-based lending facility with certain of its equity sponsors (the "**ABL Facility**"), bearing interest at the applicable federal rate. Under the terms of the ABL Facility, the Company contributed certain accounts receivable to an unrestricted subsidiary, making use of investment baskets in the First Lien Credit Agreement and Second Lien Credit Agreement. The ABL Facility was ultimately repaid in connection with the equity cure transaction, as discussed below, on November 29, 2017.

FC Pioneer also retained Alexander D. Greene as an independent director with significant restructuring experience, and appointed him to the Board in October 2017 to help evaluate potential alternatives.[6] In November 2018, the Board formed the Restructuring Committee to make recommendations to the full Board regarding implementation of potential restructuring alternatives.

---

[6]    After the Company concluded the Recapitalization Transaction (as defined below), the Board terminated Mr. Greene's retention. He was subsequently re-appointed to the Board on November 15, 2018, when a further restructuring action appeared potentially necessary.

1.    November 2017 Equity Cure

Late in 2017, the Company recognized that it would potentially breach the financial covenant under the First Lien Facility and the Second Lien Facility, as its total net leverage ratio was projected to exceed 7.50:1.00. Thus, the Company explored a number of options to deal with the financial covenant default, including a waiver by its secured lenders. Ultimately, because the Company's credit agreements allowed for curing a financial covenant default by an equity contribution, the Company, working with its advisors, negotiated and implemented a transaction whereby certain equity holders and management would make an approximately $16 million capital contribution to the relevant entities.[7] On November 29, 2017, the Company received the capital contribution and provided notice to the First Lien Agent and the Second Lien Agent that the financial covenant default had been cured. Certain members of the Company's management personally contributed to provide funds for the equity cure.

2.    Recapitalization Transaction

As the Company's $70 million first lien revolving credit facility was scheduled to mature in July 2018, Trident engaged in a comprehensive process in early 2018 to maximize its chances of executing an out-of-court workout that would add substantial liquidity to its balance sheet and provide relief from looming debt maturities and covenant tripwires. The Company retained PJT to run a process to address this maturity and the Company's liquidity needs, described in greater detail in the *Declaration Of Mark Buschmann In Support Of DIP Financing Motion* (the "**Buschmann Declaration**"). As a result of that process, the Company entered a consensual out-of-court recapitalization in April 2018 with certain of its existing lenders (the "**Recapitalization Transaction**").

Prior to executing the Recapitalization Transaction, Trident first explored strategic alternatives with several potential partners before negotiating with the Priority First Lien Lender, who at that time was a First Lien Lender, and other stakeholders to structure a comprehensive refinancing transaction that the Debtors hoped would garner overall lender support. Only by creating a proposal that garnered existing lender support could Trident then execute a transaction to obtain new liquidity, pay down existing debt, and extend its debt maturities to obtain runway to execute on a business plan. Absent an attractive proposal, the Company would have been forced to find another solution to its capital structure problems.

After reaching an agreement with the Priority First Lien Lender regarding the Recapitalization Transaction, Trident offered all of the other approving First Lien Lenders the opportunity to participate in the Recapitalization Transaction's benefits, namely debt paydown and interest rate increase. Trident began the solicitation period with the support of lenders holding approximately 49% of the First Lien Facility, and as part of the solicitation process, engaged with every existing First Lien Lender in seeking support for the Recapitalization Transaction. Eventually Trident achieved the required lender support, and the Company entered

---

[7]    As the result of a series of transaction steps, the new money investors ultimately received a non-voting principal participation interest under the Second Lien Facility, which was sold by certain second lien lenders in exchange for mezzanine debt issued by Trident Holding Company, LLC.

into the Recapitalization Transaction with the unanimous consent of the lenders under the First Lien Facility, who accepted an approximately 19% paydown of their then-existing first lien term debt. As a result, such lenders also waived their financial covenants through maturity, extended their maturity date by three years, accepted payment-in-kind for 50% of the interest margin, and subordinated both their liens and claims to the Priority First Lien Facility. In connection with this consent, these lenders also unanimously directed the First Lien Agent to execute the Intercreditor Agreement. Required Lenders under the Second Lien Facility also agreed to accept payment-in-kind for half of their interest, and subordinated both their liens and claims to the new Priority First Lien Facility.

As part of the Recapitalization Transaction, the Priority First Lien Lender extended a $216 million term loan, which Trident used to repay its first lien revolving credit facility that was nearing maturity; to refinance the Priority First Lien Lender's holdings under the first lien term loan; to provide the 19% ($50 million) paydown to other then-existing first lien term lenders; and to provide an additional $40 million in cash to Trident's balance sheet for general corporate purposes and transaction expenses.

3.    Operational Improvements

As the Company and its advisors worked to implement capital structure solutions, Trident's management team also executed on a number of operational initiatives, such as optimized pricing, measures to improve revenue cycle management by increasing collection rates, rationalizing certain services, reducing labor costs, better managing vendor spend, and reducing insurance costs.

Shortly after closing the Recapitalization Transaction, Trident also appointed Andrei Soran to become Chief Operating Officer and transition into Chief Executive Officer to lead the Company's turnaround efforts. Mr. Soran had previously served as Chief Executive Officer of Verity Health Systems until July 2017.

Under Mr. Soran's direction, Trident has begun to implement a strategy pursuant to which it will focus its efforts on its core profitable business, while exiting certain unprofitable markets. As part of its service rationalization process, Trident is evaluating operating in fewer markets. Based on both profitability and strategic considerations, the Company expects to exit certain lines of business in several states in 2019 to ensure that it continues to provide high quality services. Despite its exit from these markets, Trident is expanding its business in other areas to capitalize on opportunities. In particular, it has continued to expand home health services to respond to the shifting of patients from SNFs into home care. Toward this end, Trident conducted successful home health care pilot programs in 2018 in two markets to optimize its Care at Home business model with radiology technicians dedicated to servicing home health patients. Trident hopes to expand this business model to an additional seven markets in 2019.

The Company has also focused on operational changes to enhance its profit. For example, Trident plans to optimize pricing and reorganize its sales force to drive customer wins and mitigate losses. Greater capital expenditures, made possible through implementation of a balance sheet restructuring, would also improve the Company's ability to provide high levels of service to its customers and gain a technological advantage. Trident is also improving its revenue cycle

management processes to eliminate incorrect or time-barred insurance claims that cannot be reimbursed and improve collections from facility clients.

## C.    Prepetition Restructuring Negotiations

In the months leading up to the Petition Date, the Company's liquidity position deteriorated. The Company projected that it would not be able to make a $9.18 million interest payment due at the end of January 2019.

As a result, on November 13, 2018, the Company initiated restructuring discussions to broker a potentially consensual restructuring with its secured lender constituents. On that date, the Board also formed the Restructuring Committee to make recommendations to the full Board regarding potential restructuring alternatives. In November 2018, Trident also retained a health care restructuring team at Ankura Consulting Group, LLC ("**Ankura**") to serve as financial advisor, working alongside Skadden and PJT throughout the process.

With the authorization of the Restructuring Committee and the Board, beginning in the first week of December 2018, the Company requested that its major lenders[8] and their advisors enter confidentiality agreements to conduct due diligence and negotiate transaction terms. Soon after, the Company's management and professional advisors met, in person or telephonically, with major lenders or their advisors on more than fifteen occasions and populated a data room in response to extensive due diligence requests. The Company provided all lenders who agreed to enter into confidentiality agreements with equal access to management and diligence information, including its financial projections.

After preliminary discussions with its existing lenders during the course of December 2018, the Company sought to begin negotiations by delivering a "strawman" restructuring proposal to major lenders and Revelstoke Capital Partners ("**Revelstoke**"), an equity sponsor and debt holder who expressed an openness to injecting additional capital.[9] Over the course of the following two weeks, the Company received feedback on its "strawman" and counterproposals from each of the Priority First Lien Lender, Revelstoke, and an ad hoc group of creditors under the First Lien Facility (the "**Ad Hoc Group**"). While discussing potential in-court and out-of-court transaction terms, the Company continued its diligence efforts by inviting its lenders to additional management meetings. The parties continued to exchange restructuring proposals during the month of January 2019. Ultimately, the "strawman" proposal did not gain traction, while the Company's business continued to deteriorate.

Simultaneously with the lender diligence process, Ankura, PJT, and members of the Company's management team evaluated the Debtors' cash needs and calculated that $50 million

---

[8]    The Company held discussions with the sole lender under the Priority First Lien Facility, lenders holding over 72% of the loans under the First Lien Facility, lenders holding over 75% of the loans under the Second Lien Facility, as well as significant noteholders under the Original PIK Note Facility and the Tranched PIK Note Facility.

[9]    Revelstoke's representative resigned from FC Pioneer's Board of Managers prior to the initiation of these Chapter 11 Cases.

of DIP funding would provide sufficient liquidity for funding the Chapter 11 Cases. Throughout January and early February 2019, the Company continued to solicit proposals for debtor-in-possession financing. The Company received an offer for a "priming" DIP financing facility from the Priority First Lien Lender, but did not receive any financing proposals from the Ad Hoc Group. After it became apparent that the Priority First Lien Lender was the only party willing to extend additional financing to the Debtors, the Company's continued prepetition negotiations with the Priority First Lien Lender culminated in the Priority First Lien Lender's offer to provide the DIP Facility (as defined herein) and consensual use of cash collateral during these Chapter 11 Cases, as set forth in further detail below.

**D.    Restructuring Support Agreement**

Prior to the Petition Date, in connection with the Debtors' entry into the DIP Facility, the Debtors also entered into the RSA, pursuant to which the Company would deliver its business plan within the first several weeks of the Chapter 11 Cases, and file and seek confirmation of a plan of reorganization. Pursuant to the RSA, the terms of such plan would be consistent with the Restructuring Term Sheet (as defined in the RSA) unless the Debtors determined that the Priority First Lien Lender's prepetition senior secured claims are oversecured. As discussed below, based on business projections set forth in the Business Plan, the Debtors concluded that the Priority First Lien Lender is not oversecured.

**E.    Commencement of the Chapter 11 Cases**

As set forth above, on the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Court. By order dated February 12, 2019 [Docket No. 36], the Debtors' cases are being jointly administered for procedural purposes only. No trustee or examiner has been appointed in the Chapter 11 Cases.

Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors and debtors-in-possession.

**F.    Administration of Chapter 11 Cases**

Upon commencing the Chapter 11 Cases, the Debtors sought and obtained a number of orders from the Bankruptcy Court to ensure a smooth transition of their operations in the chapter 11 environment and facilitate the administration of the Chapter 11 Cases. Certain of these orders are briefly summarized below.

1.    Procedural and Administrative Orders

To facilitate a smooth and efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, the Bankruptcy Court entered the following procedural orders: (a) authorizing joint administration of the Debtors' Estates [Docket No. 36]; (b) authorizing the filing of a consolidated list of the top 30 unsecured creditors [Docket No. 39]; (c) authorizing the retention of Epiq as the Debtors' claims and noticing agent [Docket No. 38], (d) granting the Debtors extensions of time to file their schedules of assets and liabilities and statements of financial affairs [Docket No. 42]; (e) authorizing certain procedures to maintain and protect the confidentiality of patient information as required by the Health Insurance

Portability and Accountability Act of 1996 [Docket No. 40]; and (f) establishing certain notice, case management, and administrative procedures [Docket No. 112].

2.      DIP Financing and Cash Collateral

The Debtors required immediate access to the fresh capital provided by the DIP Facility because the Company had simply exhausted alternative sources of funding as of the Petition Date. Substantially all of the Debtors' assets were encumbered under their existing capital structure, and the Debtors' ability to continue operating required using cash which was subject to the Prepetition Secured Parties' liens. Without immediate access to postpetition financing and cash collateral, the Debtors would have been unable to pay wages or the invoices of vendors critical to operations and unable to continue running their businesses. Accordingly, on the Petition Date, the Debtors filed the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [Docket No. 16] (the "**DIP Motion**," and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith, the "**DIP Documents**"). Through the DIP Motion, the Debtors sought Bankruptcy Court approval (i) of a senior secured, superpriority debtor-in-possession financing facility (the "**DIP Facility**") provided by the Priority First Lien Lender and (ii) to use cash collateral.

On February 12, 2019, the Bankruptcy Court entered an interim order (the "**Interim DIP Order**") approving the DIP Facility on the terms set forth in the debtor-in-possession credit agreement (as amended, modified, or supplemented from time to time, the "**DIP Credit Agreement**") by and among New Trident Holdcorp Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC as borrowers, Trident Holding Company, LLC and each Subsidiary (as defined in the DIP Credit Agreement) of each borrower as guarantors, and the lenders from time to time party to the DIP Credit Agreement, including SPCP Group, LLC (collectively, the "**DIP Lenders**"), and Silver Point Finance, LLC, as administrative agent and collateral agent (in such capacities, including any successors thereto, the "**DIP Agent**") [Docket No. 41]. On March 3, 2019, the Debtors filed the proposed final order approving the DIP Motion (the "**Final DIP Order**") [Docket No. 143], which the Court entered on March 8, 2019 [Docket No. 166].

The DIP Facility provides the Debtors with access to $50 million new money term loans in the form of a two-draw term loan facility, which provides the Company with access to the liquidity it needs to fund these Chapter 11 Cases; implement a financial restructuring; and galvanize its operational turn-around efforts. Pursuant to the terms of the Intercreditor Agreement, junior lienholders are deemed to have consented to the provision of a $50 million DIP Facility by the Priority First Lien Lender. Pursuant to the DIP Credit Agreement, the maturity date for the DIP Facility is July 23, 2019. Further, as is customary, the RSA contains certain milestones (the "**Milestones**") for the Debtors' advancement of the Chapter 11 Cases. Termination of the RSA would constitute an Event of Default under the DIP Credit Agreement.

3.      Cash Management [Docket No. 9]

The Bankruptcy Court authorized the Debtors to continue using their existing cash management system and modified certain operating guidelines and Bankruptcy Code requirements regarding the Debtors' respective bank accounts, business forms, and deposit practices by an interim order granted on February 12, 2019 [Docket No. 37], and final order granted on March 8, 2019 [Docket No. 164].

4.      Employee Wages and Benefits [Docket No. 10]

By interim order granted on February 13, 2019 [Docket No. 63], and final order granted on March 8, 2019 [Docket No. 165], the Bankruptcy Court authorized the Debtors to pay prepetition compensation (including wages, salaries, commissions, and other cash and non-cash compensation claims), prepetition business expenses, prepetition payroll deductions and prepetition withholdings, and prepetition contributions to and benefits under medical, insurance, and retirement benefit plans, of qualified employees. The U.S. Trustee filed an objection to the entry of the final order authorizing payment of certain employee bonus and severance payments [Docket No. 110], and the Debtors filed a reply to the objection on February 27, 2019 [Docket No. 142]. The Bankruptcy Court overruled the U.S. Trustee's objection at the hearing held on March 6, 2019. Subject to certain limitations outlined in the final order, the Debtors are authorized to pay the postpetition employee obligations listed above in the ordinary course and in accordance with their prepetition practices.

5.      Customer Programs [Docket No. 15]

By interim order granted on February 12 [Docket No. 46], and final order granted on March 8, 2019 [Docket No. 170], the Bankruptcy Court authorized the Debtors to honor certain prepetition obligations to customers, including certain refunds due to such customers, and to otherwise continue such customer programs and practices in the ordinary course of business.

6.      Taxes and Assessments [Docket No. 11]

By interim order granted on February 12 [Docket No. 43], and final order granted on March 8, 2019 [Docket No. 167], the Bankruptcy Court authorized the Debtors to, among other things, pay certain prepetition taxes and any tax-related fees, charges, and assessments accrued prepetition.

7.      Utilities [Docket No. 13]

By order granted on March 8, 2019 [Docket No. 169], the Bankruptcy Court established procedures for determining adequate assurance of payment for future utility service in recognition of the impact even a brief disruption of utility services would have on the Debtors.

8.      Critical Trade Vendors and Shippers [Docket No. 14]

By interim order granted on February 12, 2019 [Docket No. 45], and final order granted on March 18, 2019 [Docket No. 219], the Bankruptcy Court authorized the Debtors to pay up to $4 million in the aggregate of the prepetition fixed, liquidated, and undisputed claims of certain

critical vendors, service providers, and shippers that arose in the ordinary course of business, subject to the conditions set forth in the orders.

9.      NOL Trading [Docket No. 8]

As of January 1, 2019, the Debtors had approximately $66 million of net operating losses ("**NOLs**") that were available to offset taxable income. In an attempt to protect these NOLs for potential future use to offset potential taxable income, the Debtors sought and obtained an interim order granted on February 12, 2019 [Docket No. 47], and a final order granted on March 18, 2019 [Docket No. 218], restricting trading of their equity securities.

10.      Insurance [Docket No. 12]

By interim order granted on February 12, 2019 [Docket No. 44] and final order granted March 8, 2019 [Docket No. 168], the Bankruptcy Court authorized the Debtors to maintain their insurance policies and pay their insurance obligations; to renew, revise, extend, supplement, change, or enter into new insurance coverage; and to maintain their premium financing agreements, make all payments thereunder, and continue to grant the premium financing companies security interests in the relevant insurance policies.

11.      Motion to Reject Certain Leases and Approve Contract Rejection or Assumption Procedures [Docket No. 19]

By final order granted on March 8, 2019 (the "**Contract Assumption and Rejection Procedures Order**") [Docket No. 171], the Bankruptcy Court authorized the Debtors to reject certain leases of properties and to establish procedures for rejecting and assuming certain executory contracts and unexpired leases. The Contract Assumption and Rejection Procedures Order also authorized the Debtors to reject four vacant leases and 12 burdensome leases as of the Petition Date. In total, over the course of the Chapter 11 Cases, the Debtors have rejected approximately 20 Executory Contracts and Unexpired Leases.

12.      De Minimis Asset Sales

The Debtors anticipate conducting de minimis asset sales in connection with its prepetition efforts undertaken to focus its efforts on its core profitable business while exiting certain unprofitable markets. Accordingly, the Debtors sought authority to implement streamlined procedures governing abandonment and sale of de minimis assets pursuant to the de minimis sale order entered by the Court on March 8, 2019 [Docket No. 173].

**G.      Retention of Professionals, Appointment of the Creditors' Committee, Interim Compensation Procedures, and Retention of Ordinary Course Professionals**

1.      Applications for Retention of Debtors' Professionals

The Bankruptcy Court approved the Debtors' retention of certain professionals to represent and assist the Debtors in connection with the Chapter 11 Cases. These professionals include, among others: (a) Skadden, Arps, Slate, Meagher & Flom, LLP as counsel for the Debtors [Docket No. 174]; (b) Togut, Segal & Segal LLP as co-counsel for the Debtors [Docket

No. 175]; (c) PJT as investment banker to the Debtors [Docket No. 178]; (d) Ankura as financial advisor to the Debtors [Docket No. 177]; and (e) Epiq as administrative agent to the Debtors [Docket No. 176], in each case by order entered on March 8, 2019.

2.    Appointment of the Creditors' Committee and Retention of Creditors' Committee Professionals

On February 20, 2019, the U.S. Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 91]. The members of the Creditors' Committee are: McKesson Corporation, Quest Diagnostics, Biomerieux, Inc., TSI International (USA), Inc. d/b/a/ Infinx Healthcare, and First Source.

[By orders entered [•], 2019, the Creditors' Committee was authorized to retain: (a) Kilpatrick, Townsend & Stockton LLP as counsel [Docket No. ●] and (b) AlixPartners, LLP as financial advisor [Docket No. ●].]

3.    Interim Compensation Procedures

With respect to the professionals retained by order of the Bankruptcy Court, as applicable, on March 8, 2019, the Bankruptcy Court entered the *Order Granting Debtors' Motion For Entry of an Order Pursuant to Bankruptcy Code Sections 105(a) and 331, Bankruptcy Rule 2016, and Local Bankruptcy Rule 2016-1, Establishing Interim Compensation Procedures and Reimbursement of Expenses of Professionals* [Docket No. 172].

4.    Ordinary Course Professionals

In the ordinary course of business, the Debtors retain various attorneys and other ordinary course professionals  who render a wide range of services to the Debtors in a variety of matters unrelated to these Chapter 11 Cases, including litigation, regulatory, general corporate, and other matters that have a direct impact on the Debtors' day-to-day operations. To prevent disruption to these services, on February 19, 2019, the Debtors filed a motion to authorize the Debtors to employ and pay such professionals utilized in the ordinary course of business [Docket No. 82], which the Bankruptcy Court approved in final order entered on March 8, 2019 [Docket No. 180].

**H.    Restructuring Paths**

1.    Business Plan Development

The RSA requires that the Debtors develop a five year business plan (the "**Business Plan**"), which would serve as the foundation for a chapter 11 reorganization plan, to be delivered to the Priority First Lien Lender within 36 days of the Petition Date (by March 18, 2019).[10] The Business Plan serves as the foundation for the valuation contained in the Debtors' Plan. As set forth in the DIP Motion, unless the Debtors were to determine, based on the valuation based

---

[10]    The Milestones also require the filing of this Disclosure Statement and Plan by March 25, 2019, approval of the Disclosure Statement by May 2, 2019, confirmation of the Plan by June 16, 2019, and for the Effective Date of the Plan to occur by June 21, 2019.

upon the Business Plan, that the Priority First Lien Lender's prepetition senior secured claims of approximately $309.5 million are oversecured, the Debtors are required to proceed toward confirmation of a chapter 11 plan providing: (a) the Priority First Lien Lender with certain takeback debt and 100% of the equity in the Reorganized Debtors; (b) junior lienholders with 5% warrants at a strike price that accrues at a rate of LIBOR plus 9.5% compounded quarterly; and (c) general unsecured creditors with a *pro rata* share of a $100,000 cash pool. If the Debtors had determined that the Priority First Lien Lender's prepetition senior secured claims are oversecured, then the Debtors would have the opportunity to propose a plan providing additional value to junior stakeholders, provided that such plan is acceptable to the Priority First Lien Lender.

The Debtors and their advisors have engaged in diligent postpetition efforts to comply with the Milestones set forth in the DIP Documents, including provision of the Business Plan and the filing of this Disclosure Statement and Plan. Based on business projections set forth in the Business Plan, PJT concluded that the Priority First Lien Lender is not oversecured, and accordingly, the proposed Plan provides for, among other things, the Priority First Lien Lender to receive 100% of the Reorganized Debtors' equity.

## I.    Analysis of Executory Contracts and Unexpired Leases

The Bankruptcy Code authorizes a debtor, subject to the approval of the Bankruptcy Court, to assume, assume and assign, or reject executory contracts and unexpired leases. During the course of the Chapter 11 Cases, the Debtors and their Professionals have evaluated the Debtors' numerous Executory Contracts and Unexpired Leases in the context of their ongoing operational turn-around reorganization efforts.

On March 8, 2019, the Bankruptcy Court approved streamlined procedures to reject or assume Executory Contracts and Unexpired Leases pursuant to the Contract Assumption and Rejection Procedures Order. The Contract Assumption and Rejection Procedures Order authorized the Debtors to reject four vacant leases and 12 burdensome leases as of the Petition Date. Pursuant to the Contract Assumption and Rejection Procedures Order, the Debtors and their Professionals are engaged in analyzing and selecting certain additional burdensome Executory Contracts and Unexpired Leases to be rejected pursuant to the streamlined procedures, as set forth in omnibus notices of rejection that the Debtors anticipate filing with the Bankruptcy Court. In total, over the course of the Chapter 11 Cases, the Debtors have rejected approximately 20 Executory Contracts and Unexpired Leases. Additionally, the Debtors have assumed [●] Executory Contracts and Unexpired Leases pursuant to the Contract Assumption and Rejection Procedures Order. Separately, the Debtors also are seeking approval of the Bankruptcy Court of an extension (through and including the earlier of (i) September 8, 2019 and (ii) the date of confirmation of the Plan) from the Bankruptcy Court of the time within which the Debtors have to assume or reject Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code [Docket No. 250] (the "**Section 365(d)(4) Extension Motion**"). The proposed order granting the Section 365(d)(4) Extension Motion also provides procedures by which the Debtors may extend the section 365(d)(4) deadline beyond the initial extension period upon, *inter alia,* written consent from the applicable landlord(s).

The Debtors continue to assess their options in connection with each of these Executory Contracts and Unexpired Leases, including the potential assumption, rejection, or amendment and assumption thereof – decisions that the Debtors will ultimately make prior to confirmation of the Plan as would be required by the Bankruptcy Code.

**J.    Employee Compensation Plans**

1.    KEIP/KERP Motion

Prior to the Petition Date, after substantial deliberation and consultation with Ankura and with compensation experts from Mercer (US), Inc. ("**Mercer**"), the Debtors developed and approved the Key Employee Incentive Plan (the "**KEIP**") and the Key Employee Retention Plan (the "**KERP**"), which, together, were designed to incentivize the Debtors' senior management team and to retain a group of key employees likely to have the most measurable impact on the Debtors' operational turnaround and restructuring efforts and create additional value for stakeholders. On February 27, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Implementation of the Debtors' Key Employee Incentive Plan and Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 112] (the "**KEIP/KERP Motion**"). The Debtors also negotiated the terms of the KEIP and KERP with the lender under the Debtors' Priority First Lien Facility and DIP Agent prior to commencing these Chapter 11 Cases.

The KEIP is designed to award five of the Debtors' senior executives (the "**KEIP Participants**") variable payouts based on metrics related to the Debtors' revenue, cash receipts, and a permitted variance level for cumulative net operating cash flow projections set out in the DIP budget (the "**KEIP Metrics**"). Prior to the Petition Date, the Debtors, with the assistance of Mercer, also conducted a criticality analysis to identify the approximately 65 non-insider key employees (the "**KERP Participants**") that the Debtors believe are critical to the success of the Debtors' achievement of a smooth and expeditious chapter 11 process and the implementation of their turnaround plan. KERP bonuses range from $5,000 to $55,000 and make up from 5% to 20% of base salary for a given KERP Participant. A initial hearing on the KEIP/KERP Motion was held on March 21, 2019, and an additional hearing is scheduled to be held on April 3, 2019.

**K.    Pending / Potential Litigation**

1.    Recapitalization Transaction

As described above, Trident engaged in a comprehensive process in early 2018 to address upcoming debt maturities. Trident engaged with various stakeholders before reaching the terms of the Restructuring Transactions with the Priority First Lien Lender and then offered all of the other approving First Lien Lenders the opportunity to participate in the Recapitalization Transaction's benefits, namely debt paydown and interest rate increase. The lenders under the First Lien Facility, among other benefits,  accepted an approximately 19% paydown of their then-existing first lien term debt from funds provided by the Priority First Lien Lender as part of the Recapitalization Transaction.

On March 6, 2019, the First Lien Agent filed its *Motion for Entry of an Order Authorizing Document Discovery from the Debtors, Silver Point, and the Sponsors Pursuant to*

*Bankruptcy Rule 2004* [Docket No. 154] (the "**2004 Motion**"). Through the 2004 Motion, the First Lien Agent, acting on behalf of the First Lien Lenders (including the Ad Hoc Group), seeks to investigate various aspect of the Recapitalization Transaction. In connection with these allegations, the 2004 Motion requests document production from the Debtors, certain of the Debtors' equity sponsors, and the Priority First Lien Lender regarding the Recapitalization Transaction's marketing process. The Creditors' Committee filed a joinder to the 2004 Motion [Docket No. 187].

The Debtors filed a response announcing an agreed-upon arrangement governing Rule 2004 discovery and providing the Estates' version of events surrounding the Recapitalization Transaction [Docket No. 206] in the interest of ensuring these Chapter 11 Cases remain on track for expeditious exit from bankruptcy to preserve value for all stakeholders.

Additional parties, including Welltower Inc. [Docket No. 199], Audax Management Company, LLC [Docket No. 200], Formation Capital, LLC [Docket No. 201] (to which Safanad, Inc. filed a joinder [Docket No. 201]), the Priority First Lien Lender [Docket No. 203], and Revelstoke [Docket No. 205] filed objections to the 2004 Motion, and the Creditors' Committee filed a reservation of rights to the same [Docket No. 202]. At a hearing on the 2004 Motion on March 21, 2019, the Priority First Lien Lender announced that it had also reached an agreed resolution with the First Lien Agent regarding the 2004 Motion, and the Bankruptcy Court overruled the remaining objections to the 2004 Motion.

2.      Government Claims

In March 2017, the Debtors received a civil investigative demand (the "**CID**") from the U.S. Attorney for the Eastern District of Pennsylvania, seeking information regarding mobile imaging services provided to various skilled nursing facility customers.  The Debtors substantially completed their response to the CID in May 2018 and have subsequently engaged in document exchanges and discussions with the government. The Debtors recently learned that the investigation was conducted pursuant to a False Claims Act complaint that had been filed under seal by a relator under the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730.  On March 19, 2019, the Debtors were informed that the District Court partially lifted the seal so that the government could share the complaint with the Debtors. On March 21, 2019, the Debtors were informed by the government that the District Court revised its order to further lift the seal to permit the government to share the complaint more broadly. The Debtors are reviewing the complaint, but intend to dispute any alleged claims and assert that any such alleged claims are dischargeable under the proposed Plan and lack merit. To the extent the government determines to bring any claims, the government may assert that certain of such claims are non-dischargeable.

3.      Other Litigation

The Debtors are involved in certain other prepetition lawsuits and matters. As a consequence of the bankruptcy filing, all pending litigation against the Debtors was stayed automatically by Bankruptcy Code section 362 and, absent further order of the Court, no party may take any action in any such litigation to recover on prepetition Claims against the Debtors.

**L.**     **The Claims Process**

1.     Schedules

On February 12, 2019, the Court entered an order granting the Debtors an extension of 30 days until March 26, 2019 to file their schedules of assets and liabilities (the "**Schedules**") and statements of financial affairs (the "**Statements of Financial Affairs**") [Docket No. 42].

[On March [●], 2019, the Debtors filed their Schedules [Docket Nos. ●] and Statements of Financial Affairs [Docket Nos. ●]. Among other things, the Schedules and Statements of Financial Affairs set forth the claims of known creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records. The Debtors retain the right to amend the Schedules and Statements of Financial Affairs during the pendency of the Chapter 11 Cases.]

2.     Bar Dates

(a)     General Bar Date

[Each entity holding or asserting a claim against one or more of the Debtors that arose (or is deemed to have arisen) on or before the Petition Date (including any claims arising under section 503(b)(9) of the Bankruptcy Code) is required to file a proof of claim form so that it is actually received by Epiq on or before [May 3], 2019 at 5:00 p.m. (prevailing Eastern Time) (the "**General Bar Date**").

(b)     Governmental Bar Date

Each governmental unit holding or asserting a claim against one or more of the Debtors that arose (or is deemed to have arisen) on or before the Petition Date must file a proof of claim form so that it is actually received by Epiq on or before August 9, 2019, at 5:00 p.m. (prevailing Eastern Time) (the "**Governmental Bar Date**").

(c)     Amended Schedules Bar Date

In the event a Debtor amends or supplements its Schedules to reduce, delete, change the classification of, or add a Claim, the Debtors shall give notice of any such amendment or supplement to the claimants affected thereby, and such holders must file a proof of claim form so that it is actually received by Epiq on or before the later of (i) 30 days from the date on which such notice is given or (ii) the General Bar Date or the Governmental Bar Date, as applicable (the "**Amended Schedules Bar Date**").

(d)     Rejection Bar Date

If the Debtors reject, pursuant to section 365 of the Bankruptcy Code, any Executory Contract or Unexpired Lease, each person or entity holding or asserting a claim arising from such rejection must file a proof of claim form so that it is actually received by Epiq on or before the later of (i) 30 days after the effective date of rejection of such agreement as provided by an order of the Court or pursuant to a notice under procedures approved by the Court, (b) any date set by another order of the Court, or (c) the General Bar Date (the "**Rejection Bar Date**").]

32

3.     Causes of Action

In accordance with Bankruptcy Code section 1123(b)(3), the Debtors reserve all rights to commence and pursue any and all Causes of Action that are not released under Article X of the Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in a list of retained causes of action to be included in the Plan Supplement. Such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date.

## ARTICLE IV

## PLAN SUMMARY[11]

### A.     Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors, and interest Holders. Chapter 11 also strives to promote equality of treatment for similarly situated creditors and similarly situated interest Holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims and interests. Confirmation of a plan of reorganization makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity Holder in the debtor, whether or not such creditor or equity Holder is impaired under or has accepted the plan, or receives or retains any property under the plan. Subject to certain limited exceptions, and except as otherwise provided in the plan or the confirmation order itself, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for those debts the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the Holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as Unimpaired and, because of such favorable treatment, are presumed to accept the plan. Accordingly, a debtor need not solicit votes from the Holders of claims or equity interests in such Unimpaired classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim

---

[11]    This Section of the Disclosure Statement summarizes the Plan. This summary is qualified in its entirety by reference to the Plan.

against a debtor. Such classes are deemed to reject the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not Unimpaired will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest Holders. In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class. The Debtors believe that the Plan has classified all Claims and Interests in compliance with section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE DEBTORS' PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, ANY PLAN SUPPLEMENT(S), AND THE EXHIBITS AND DEFINITIONS CONTAINED IN EACH DOCUMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON, AMONG OTHER ENTITIES, ALL HOLDERS OF CLAIMS AND INTERESTS, THE REORGANIZED DEBTORS, ALL ENTITIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES-IN-INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

**B.      Overall Structure of the Plan**

As described herein, the Debtors' proposed Plan, a copy of which is attached hereto as **Exhibit A**, is the result of extensive discussions between and among the Debtors, the Priority First Lien Lender, the DIP Agent, the Creditors' Committee, and certain other creditor constituencies.  The Debtors believe that the compromise contemplated under the Plan is fair and equitable and maximizes the value of the Debtors' estates, and provides the best recovery to Holders of Claims.

**C.      Classification, Treatment, and Voting of Claims and Interests**

In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in, the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Plan, though proposed jointly, constitutes a separate plan of reorganization for each Debtor and does not constitute a substantive consolidation of the Debtors' Estates. The Debtor Groups do not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

Claims and Interests belonging to a Debtor Group consisting of more than one Debtor are deemed to be classified in a single Class for all purposes under the Bankruptcy Code, including voting. To the extent a Holder has a Claim that may be asserted against more than one Debtor in a Debtor Group, the vote of such Holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor in such Debtor Group. For consistency, similarly designated Classes of Claims and Interests are assigned the same number across each Debtor Group. The Plan provides for a single Class of Holders of General Unsecured Claims without regard to Debtor entities at which such Holders hold their Claims. For purposes of distributions to Holders of General Unsecured Claims, "Pro Rata" shall be determined where (x) the denominator is equal to all Allowed General Unsecured Claims against all Debtors and (y) the numerator is equal to the amount of a particular Holder's Allowed General Unsecured Claim. For voting purposes, the Debtors shall tabulate ballots for Holders of General Unsecured Claims both on a Debtor-by-Debtor basis and on aggregate basis without regard to particular Debtor entities and reserve the right to seek Confirmation of the Plan under either tabulation through accepting Classes or cramdown.

A Claim or Interest is placed in a particular Class for all purposes, including voting, Confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of voting on the Plan and, to the extent applicable, receiving distributions pursuant to

the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan. UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Court with respect to each Impaired Class of Claims may also vary from any estimates contained in the Plan with respect to the aggregate Claims in any Impaired Class. Thus, the value of property that ultimately will be received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Court.

Claims and Interests are classified as follows:

| Letter | Debtor Group |
|--------|--------------|
| A | **Ultimate Holding Company** |
|   | FC Pioneer Holding Company, LLC |
| B | **Intermediate Holding Company** |
|   | Trident Holding Company, LLC |
| C | **Operating Companies** |
|   | American Diagnostics Services, Inc. |

| # | Designation |
|---|-------------|
| 1 | Priority First Lien Claims |
| 2 | First Lien Claims |
| 3 | Second Lien Claims |
| 4 | Other Secured Claims |
| 5 | Other Priority Claims |
| 6 | General Unsecured Claims |

| | Community Mobile Diagnostics, LLC<br>Community Mobile Ultrasound, LLC<br>Diagnostic Labs Holdings, LLC<br>JLMD Manager, LLC<br>Kan-Di-Ki LLC<br>Main Street Clinical Laboratory, Inc.<br>MDX-MDL Holdings, LLC<br>MetroStat Clinical Laboratory – Austin, Inc.<br>MX Holdings, LLC<br>MX USA, LLC<br>New Trident Holdcorp, Inc.<br>Rely Radiology Holdings, LLC<br>Schryver Medical Sales and Marketing, LLC<br>Symphony Diagnostic Services No. 1, LLC<br>Trident Clinical Services Holdings, Inc.<br>Trident Clinical Services Holdings, LLC<br>TridentUSA Foot Care Services LLC<br>TridentUSA Mobile Clinical Services, LLC<br>TridentUSA Mobile Infusion Services, LLC<br>U.S. Lab & Radiology, Inc. |
| --- | --- |

| 7 | PIK Notes Claims |
| --- | --- |
| 8 | Intercompany Claims |
| 9 | Other Subordinated Claims |
| 10 | Interests in Debtor Subsidiaries |
| 11 | Interests in Pioneer |

1. Administrative Expenses and Priority Claims

   (a) Administrative Claims

Except to the extent that the Debtors (or the Reorganized Debtors) and a Holder of an Allowed Administrative Claim agree to less favorable treatment, a Holder of an Allowed Administrative Claim (other than a DIP Facility Claim, which shall be subject to Article II.2 of the Plan, or a Professional Claim, which shall be subject to Article II.3 of the Plan) shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the Effective Date, (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims, or (c) on such other date as agreed between the Debtors (or the Reorganized Debtors) and such Holder of an Allowed Administrative Claim; *provided, however*, that other than Holders of (i) DIP Facility Claims,  (ii) Professional Claims, (iii) Administrative Claims Allowed by an order of the Bankruptcy Court on or before the Effective Date, or (iv) Administrative Claims that are not Disputed and arose in the ordinary

course of business and were paid or are to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, the Holder of any Administrative Claim shall have filed a proof of Claim form no later than the Administrative Claims Bar Date and such Claim shall have become an Allowed Claim. Except as otherwise provided herein and as set forth in Articles 2.2 or 2.3 of the Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in Exhibit 2.1 to the Plan, with the Claims and Solicitation Agent and served on counsel for the Debtors or the Reorganized Debtors by no later than the Administrative Claims Bar Date. After the Effective Date, the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  In the event that the Reorganized Debtors object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

(b)     DIP Facility Claims

On the Effective Date, the DIP Facility Claims shall be Allowed in full, in the amount of $50 million (less any amounts paid prior to the Effective Date) plus all accrued and unpaid postpetition interest under the DIP Credit Agreement (and any unpaid fees, costs, and expenses). With the consent of the DIP Lenders as provided in the RSA, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Facility Claims, all outstanding DIP Facility Claims shall be automatically converted to and deemed to be obligations under the Exit Term Loan Facility Credit Agreement, and all Collateral (as such term is defined in the DIP Credit Agreement) that secures the obligations under the DIP Documents shall be reaffirmed, ratified, and shall automatically secure all obligations of the Reorganized Debtors under the Exit Term Loan Facility Credit Agreement.

(c)     Professional Claims

*Final Fee Applications.* All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Creditors' Committee must be filed no later than sixty (60) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, the Allowed amounts of all Professional Claims and expenses shall be determined by the Bankruptcy Court.

*Payment of Interim Amounts.* Subject to the Holdback Escrow Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed (and as to which there is no then-existing Court-mandated or Court-ordered prohibition on making payment).  To receive payment on the Effective Date for such unbilled fees and expenses incurred through the Effective Date that have not yet been billed pursuant to the Professional Fee Order, no later than two (2) days prior to the Effective Date, the Professionals (who, in the case of the Creditors' Committee, shall only be permitted to take the actions set forth in Article XIII.6 after the Confirmation Date) shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors. Within fifteen (15) days after the Effective Date, a Professional

receiving payment for the estimated period shall submit a detailed invoice covering such period, subject to any parties' right to object as set forth in the Professional Fee Order.

*Professional Claim Reserve*. On the Effective Date, the Plan Administrator shall fund the Professional Claim Reserve with Cash equal to the aggregate Professional Claim Estimate for all Professionals. The Plan Administrator shall hold the Professional Claim Reserve in trust for all Professionals with respect to whom fees have been held back pursuant to the Interim Compensation Order. Such funds shall not be considered property of the Debtors, the Liquidating Debtors, the Plan Administrator, or the Estates, as applicable. Following any payments from the Professional Claim Reserve as set forth in Section 2.03(b) above, the remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Plan Administrator from the Professional Claim Reserve when such Claims are finally Allowed by the Bankruptcy Court.

*Holdback Escrow Account.*  On the Effective Date, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals.  The Distribution Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtors, the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Distribution Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court. When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors to be used by the Reorganized Debtors in accordance with the Plan.

*Post-Confirmation Date Retention.*  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing and prosecuting or addressing any issues with respect to final fee applications). The Creditors' Committee's Professionals may not be paid for services rendered after the Confirmation Date.

(d)    Priority Tax Claims

On the Effective Date, except to the extent that the Debtors (or Reorganized Debtors) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtors (or the Reorganized Debtors) and such Holder, *provided, however*, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the sole option of the Debtors, Cash in the aggregate amount of such Allowed Priority Tax Claim plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at a rate determined under applicable non-bankruptcy law, payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy

39

Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Allowed Priority Tax Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business as such obligations become due.

2.       Classification, Treatment, and Voting of Claims and Interests

(a)       Class 1: Priority First Lien Claims (Classes 1B and 1C)

*Classification.* Classes 1B and 1C consist of all Allowed Priority First Lien Claims.

*Allowance.* The Priority First Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $[259,387,485.15].[12]

*Treatment.* Except to the extent that a Holder of an Allowed Priority First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Priority First Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority First Lien Claim shall receive its Pro Rata share and interest in (i) the New First Lien Facility, and (ii) 100% of the New Pioneer Units to be issued by Reorganized Pioneer, subject to dilution on account of the Warrants and the Management Incentive Plan.

*Voting.* Classes 1B and 1C are Impaired and Holders of Allowed Priority First Lien Claims are entitled to vote to accept or reject the Plan.

(b)       Class 2: First Lien Claims (Classes 2B and 2C)

*Classification.* Classes 2B and 2C consist of all Allowed First Lien Claims.

*Allowance.* The First Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $[219,815,899.97].[13]

*Treatment.* Except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed First Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter:

i.       ***If each of Class 2B, Class 2C, Class 3B, and Class 3C are Accepting Classes***, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share and interest in 4% of the Warrants.

---

[12]    [This amount includes the prepayment fee and unpaid cash, PIK, and default interest accrued during the case. LIBOR is assumed at 2.5% for the purposes of calculating accrued interest where the future LIBOR rate is not available as of the date of this Disclosure Statement.]

[13]    [Such claim amount is as of Petition Date and does not include interest accrued during the Chapter 11 Cases.]

ii.     ***If each of Class 2B and Class 2C are Accepting Classes, but Class 3B and Class 3C are not Accepting Classes****,* each Holder of an Allowed First Lien Claim shall receive its Pro Rata share and interest in 5% of the Warrants.

iii.    ***If any of Class 2B or Class 2C are not Accepting Classes****,* Holders of Allowed First Lien Claims shall not receive any distributions on account of such Allowed First Lien Claims.

*Voting.* Classes 2B and 2C are Impaired and Holders of Allowed First Lien Claims are entitled to vote to accept or reject the Plan.

(c)     Class 3: Second Lien Claims (Classes 3B and 3C)

*Classification.* Classes 3B and 3C consist of all Allowed Second Lien Claims.

*Allowance.* The Second Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $[175,567,909.46].

*Treatment.* Except to the extent that a Holder of an Allowed Second Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Second Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter:

i.      ***If each of Class 2B, Class 2C, Class 3B, and Class 3C are Accepting Classes****,* each Holder of an Allowed Second Lien Claim shall receive its Pro Rata share and interest in 1% of the Warrants.

ii.     ***If any of Class 2B, Class 2C, Class 3B, or Class 3C are not Accepting Classes****,* Holders of Allowed Second Lien Claims shall not receive any distributions on account of such Allowed Second Lien Claims.

*Voting.* Classes 3B and 3C are Impaired and Holders of Allowed Second Lien Claims are entitled to vote to accept or reject the Plan.

(d)     Class 4: Other Secured Claims (Classes 4A – 4C)

*Classification.* Classes 4A through 4C consist of all Allowed Other Secured Claims.

*Treatment.* Except as otherwise provided in and subject to Article IX.5 of the Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the option of the Debtors or the Reorganized Debtors, and with the consent of the Priority First Lien Administrative Agent, as applicable:

i.      have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, or otherwise have its Claim rendered Unimpaired, in each case in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual

provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default;

ii.       be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Claim or as soon thereafter as reasonably practicable; or

iii.      receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Other Secured Claim will have agreed upon in writing; or

iv.       receive delivery of the collateral securing any such Allowed Other Secured Claim;

*provided*, that Allowed Other Secured Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.  Nothing in this Article IV.4 or elsewhere in the Plan shall preclude the Debtors (or the Reorganized Debtors) from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien allegedly securing an Allowed Other Secured Claim.

*Voting.* Classes 4A, 4B, and 4C are Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

(e)       Class 5: Other Priority Claims (Classes 5A – 5C)

*Classification.* Classes 5A through 5C consist of all Allowed Other Priority Claims.

*Treatment.* Except as otherwise provided in and subject to Article IX.5 of the Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or on such other date as agreed between the Debtors (or the Reorganized Debtors), with the consent of the Priority First Lien Administrative Agent, and such Holder of an Allowed Other Priority Claim; *provided, however,* that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

42

*Voting.* Classes 5A, 5B, and 5C are Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

   (f)  General Unsecured Claims (Classes 6A – 6C)

*Classification.* Classes 6A through 6C consist of all Allowed General Unsecured Claims.

*Treatment.* Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed General Unsecured Claim:

  i.  ***If Class 6C is an Accepting Class***, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share and interest in the General Unsecured Claims Cash Pool.

  ii.  ***If Class 6C is not an Accepting Class***, Holders of  Allowed General Unsecured Claims shall not receive any distributions on account of such Allowed General Unsecured Claims.

*Voting.* Classes 6A, 6B, and 6C are Impaired and Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

   (g)  Class 7: PIK Note Claims (Classes 7A – 7B)

*Classification.* Classes 7A and 7B consist of all Allowed PIK Note Claims.

*Treatment.* On the Effective Date, all of the Debtors' outstanding obligations under the PIK Notes shall be extinguished, canceled, and discharged, and each Holder of a PIK Note Claim shall receive no distribution on account of such Claim.

*Voting.*  Classes 7A and 7B are Impaired, and Holders of Allowed  PIK Note Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed PIK Note Claims are not entitled to vote to accept or reject the Plan.

   (h)  Class 8: Intercompany Claims (Classes 8A – 8C)

*Classification.* Classes 8A through 8C consist of all Allowed Intercompany Claims.

*Treatment.* On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among any Affiliate of the Debtors shall be either reinstated, cancelled, released, or otherwise settled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent).

*Voting.* Classes 8A, 8B, and 8C are either:

i.      Impaired, and Holders of Allowed applicable Class 8 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan; or

ii.     Unimpaired, and Holders of Allowed applicable Class 8 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan.

(i)     Class 9: Other Subordinated Claims (Classes 9A – 9C)

*Classification.* Classes 9A through 9C consist of all Allowed Bankruptcy Code section 510(b) and (c) Claims.

*Treatment.* Holders of Allowed Other Subordinated Claims shall not receive any distributions on account of such Allowed Other Subordinated Claims.

*Voting.* Classes 9A, 9B, and 9C are Impaired, and Holders of Allowed Other Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Other Subordinated Claims are not entitled to vote to accept or reject the Plan.

(j)     Class 10: Interests in Debtor Subsidiaries (Classes 10B – 10C)

*Classification.* Classes 10B and 10C consist of all Allowed Interests in Debtor Subsidiaries.

*Treatment.* On the Effective Date, all Allowed Interests in Debtor Subsidiaries shall be either reinstated or cancelled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent). To the extent reinstated, Interests in Debtor Subsidiaries are Unimpaired solely to preserve the Debtors' corporate structure and Holders of those Interests shall not otherwise receive or retain any property on account of such Interests.

*Voting.* Classes 10B and 10C are either:

i.      Impaired, and Holders of Allowed applicable Class 10 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 10 Claims are not entitled to vote to accept or reject the Plan; or

ii.     Unimpaired, and Holders of Allowed applicable Class 10 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 10 Claims are not entitled to vote to accept or reject the Plan.

(k)     Class 11: Interests in Pioneer (Class 11A)

*Classification.* Class 11A consists of all Interests in Pioneer.

*Treatment.* On the Effective Date, Allowed Class 11A Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors.

*Voting.* Class 11A is Impaired, and Holders of Allowed Class 11A Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Class 11A Interests are not entitled to vote to accept or reject the Plan.

**D.    Acceptance**

1.    Classes Entitled to Vote

Classes 1B, 1C, 2B, 2C, 3B, 3C, and 6A – 6C are entitled to vote to accept or reject the Plan. By operation of law, Classes 4A – 4C, 5A – 5C, 7A, 7B, 8A – 8C, 10A – 10C, and 11A are either deemed to have accepted the Plan or to have rejected the Plan and are not entitled to vote.

2.    Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

3.    Elimination of Classes

To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

4.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

5.    Deemed Acceptance if No Votes Cast

If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims in such Class.

6.      Cramdown

To the extent necessary, the Debtors shall request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify, amend, or withdraw the Plan, with respect to all Debtors or any individual Debtor, or group of Debtors to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**E.      Means for Implementation of the Plan**

1.      No Substantive Consolidation

The Plan is being proposed as a joint plan of reorganization for the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.  The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

2.      General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.

3.      Restructuring Transactions

On or after the Confirmation Date, with the consent of the Priority First Lien Administrative Agent, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, to otherwise simplify the overall corporate structure of the Debtors, or to organize certain of the Debtors under the laws of jurisdictions other than the laws of which such Debtors currently are organized, which restructuring may include one or more mergers, consolidations, dispositions, liquidations, or dissolutions as may be determined by the Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Debtors vesting in one or more surviving, resulting, or acquiring Entities (collectively, the "**Restructuring Transactions**"). In each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting, or acquiring Entity shall perform the obligations of such Debtor pursuant to the Plan to satisfy the Allowed Claims against, or Allowed Interests in, such Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor shall perform such obligations.

In effecting the Restructuring Transactions, with the consent of the Priority First Lien Administrative Agent, the Debtors shall be permitted to (a) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation,

46

or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (b) execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (c) file appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (d) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

4.    Sources of Cash for Plan Distribution

All Cash required for payments to be made under the Plan on the Effective Date shall be obtained first from Cash on hand, second, if necessary, a Capital Raising Transaction, and third, if necessary and if no Capital Raising Transaction has been arranged, the Exit Liquidity Facility.

5.    Exit Liquidity Facility

With the reasonable consent of the Debtors, the Priority First Lien Administrative Agent may arrange for a Capital Raising Transaction to provide the Debtors with sufficient Cash to make payments required to be made under the Plan and to satisfy the Minimum Liquidity Condition Precedent.  If the Debtors reasonably determine an Exit Liquidity Facility is necessary to satisfy the Minimum Liquidity Condition Precedent and the Priority First Lien Administrative Agent elects not to arrange for a Capital Raising Transaction, the Debtors may arrange for an Exit Liquidity Facility, which shall be entered into on the Effective Date. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Liquidity Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

6.    Exit Term Loan Facility

On the Effective Date, all Allowed DIP Facility Claims, shall be automatically converted to and deemed to be obligations under the Exit Term Loan Facility Credit Agreement, and all Collateral (as such term is defined in the DIP Credit Agreement) that secures the obligations of the Reorganized Debtors under the DIP Documents shall be reaffirmed, ratified, and shall automatically secure all obligations under the Exit Term Loan Facility Credit Agreement. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Term Loan Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

7.    New First Lien Facility

On the Effective Date, all Holders of Allowed Priority First Lien Claims shall receive their Pro Rata share and interest in the New First Lien Facility, which shall be junior in lien priority to the Exit Term Loan Facility. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New First Lien Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

47

8.    Authorization, Issuance, and Distribution of New Pioneer Units

On the Effective Date, Reorganized Pioneer shall authorize and issue the New Pioneer Units to Holders of Allowed Priority First Lien Claims.  Distribution of New Pioneer Units hereunder shall constitute issuance of 100% of such New Pioneer Units and in each case shall be deemed issued on the Effective Date, subject to dilution on account of the Warrants and the Management Incentive Plan.  The issuance of New Pioneer Units by Reorganized Pioneer is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.  All of the New Pioneer Units issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

9.    General Unsecured Claims Cash Pool

On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and fund the General Unsecured Claims Cash Pool Account with Cash in an amount equal to the General Unsecured Claims Cash Pool, which shall be held in trust for (i) Pro Rata distributions on account of Allowed General Unsecured Claims as provided herein and (ii) GUC Administrator Costs.

The General Unsecured Claims Cash Pool Account (x) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors or their Estates, (y) shall be held in trust to fund distributions and pay GUC Administrator Costs as provided herein, and (z) shall not be encumbered by any Liens, Claims, or Interests in any way.

10.    Exemptions from Securities Act Registration Requirements

Except with respect to the New Pioneer Units underlying the Management Incentive Plan, the Warrants and all New Pioneer Units issued under the Plan (including any units issued upon the exercise of the Warrants) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. New Pioneer Units issued under the Plan (including any shares issued upon the exercise of the Warrants) in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The New Pioneer Units issued pursuant to section 1145 of the Bankruptcy Code (a) are not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any holder thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the New Pioneer Units from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.  New Pioneer Units issued to holders of Priority First Lien Claims and Warrants issued to holders of First Lien Claims and Second Lien Claims, in each case in exchange for such Claims, shall be issued in reliance on section 1145 of the Bankruptcy Code.  New Pioneer Units underlying the Management Equity Incentive Plan will be issued pursuant to another available exemption from registration under the Securities Act and other applicable law.

11.     Cancellation of Existing Securities and Agreements

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Debtors, on the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, Certificates, Old Securities and other documents evidencing or creating any indebtedness or obligation of or ownership in the Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged.  On the Effective Date, except to the extent otherwise provided in the Plan, all Interests in the Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in Article VI.11 of the Plan shall be deemed null and void and shall be of no force and effect.

12.     Issuance and Distribution of New Securities; Execution of Plan Documents

Except as otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall issue and/or deliver all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan.

13.     Continued Corporate Existence

Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as separate entities, the Reorganized Debtors, with all the powers of a corporation or limited liability company under applicable law in the jurisdiction in which each respective Debtor is incorporated or formed and pursuant to its respective charter, bylaws, limited liability company agreement, partnership agreement or other organizational documents in effect prior to the Effective Date, except to the extent such organization documents are amended and restated by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

Except as otherwise provided in the Plan, the continued existence, operation, and ownership of Affiliates is a material component of the business of the Debtors and the Reorganized Debtors, as applicable, and, as set forth in Article X.1 of the Plan, all of the Debtors' equity interests and other property interests in such Affiliates shall vest in the Reorganized Debtors or their successors on the Effective Date.

14.    New Corporate Governance Documents

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) of the Debtors, which documents shall be in form and substance acceptable to the Priority First Lien Administrative Agent, shall be adopted and amended in a form as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code (including Bankruptcy Code section 1123(a)(6)), with the form and substance of the Pioneer LLC Agreement set forth on Exhibit 6.14.  After the Effective Date, the Reorganized Debtors may amend and restate their respective certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) as permitted by applicable state corporation or business entity law and their respective charters and bylaws or other organizational documents.

15.    Directors, LLC Managers, and Officers of Reorganized Debtors

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed member of Reorganized Debtors' initial board of directors (or other applicable governing body) (and, to the extent such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Plan Supplement or as announced on the record at the Confirmation Hearing.  The number of members of the New Boards and the identities thereof, and any senior officers of the Reorganized Debtors not presently serving in such capacity, shall be determined by the Priority First Lien Administrative Agent, but shall include the Chief Executive Officer of the Reorganized Debtors.

Except as otherwise provided in the Plan Supplement, the officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the Reorganized Debtors on and after the Effective Date.

Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

16.    Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of the Debtors or the Reorganized Debtors or corporate action to be taken by or required of the Debtors or the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, managers, or directors of the Debtors or the Reorganized Debtors.  Such actions may include, (a) the adoption of the Pioneer LLC Agreement and any other new corporate governance documents, (b) the appointment of the New Boards, (c) the issuance and distribution of New Pioneer Units, and (d) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

17.     Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers thereof and members of the New Boards, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable law, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

18.     Employment, Retirement, Indemnification and Other Agreements and Employee Compensation Programs

*Employment Agreements*.  All employment and compensation-related agreements of the Company as of the Petition Date, including any indemnification and severance obligations and guaranteed bonus amounts, and incentive compensation plans related thereto, shall be assumed. The Debtors, with the consent of the Priority First Lien Administrative Agent with respect to Specified Executives, may also enter into new employment arrangements and/or change in control agreements with individuals who will serve as officers of the Reorganized Debtors after the Effective Date.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may adopt, approve, and authorize any new employment arrangements with respect to such officers of the Reorganized Debtors without further action, order, or approval of the New Boards.  To the extent any employment-related agreements contain a sale-related bonus, the Reorganized Debtors shall renegotiate such bonus in good faith based upon the Reorganized Debtors' capital structure.  On and after the Effective Date, Cash and bonus compensation and benefits shall be determined by the New Pioneer Board subject to the terms of the Plan Transaction Documents and any agreements being modified.

*Management Incentive Plan*. After the Effective Date, equity grants under the Management Incentive Plan shall be reserved for directors, managers, officers, and employees of the Reorganized Debtors on terms determined by the New Pioneer Board.  The Reorganized Debtors shall have the right to set additional equity awards for the benefit of members of the New Pioneer Board after the Effective Date.

*Indemnification*. For purposes of the Plan, the respective obligations of the Debtors to indemnify and reimburse any persons who are directors, managers, officers or employees of the Debtors immediately prior to the Effective Date, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable state or non-bankruptcy law, or specific agreements or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on, or after the Petition Date.

*Other Incentive Plans and Employee Benefits*.  On and after the Effective Date, the Reorganized Debtors shall adopt, assume, and honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation,

pursuant to the terms thereof or hereof, including any employee compensation plans, any incentive plan including the Annual Incentive Plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity from and after the Petition Date, and shall honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.   After the Effective Date, the Reorganized Debtors may amend or restate any program of the type described in this paragraph, in accordance with applicable law in the ordinary course of business subject to the terms of Plan Transaction Documents and the terms of the program being amended and restated.

19.    Preservation Of Causes Of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not  released pursuant to Article X.3 of the Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in Exhibit 6.19 of the Plan, and such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date.  The Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.   The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successor holding such rights of action.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.**

20.    Reservation of Rights

With respect to any Cause of Action that the Reorganized Debtors expressly abandon, if any, the Reorganized Debtors reserve all rights, including the right under Bankruptcy Code section 502(d) to use defensively the abandoned Causes of Action as a basis to object to all or any part of a claim against any of the Estates asserted by a creditor who obtains the benefit of the abandoned Cause of Action.  Except as set forth in Article X.3 of the Plan, nothing contained in the Plan shall constitute or be deemed a waiver or abandonment of any Cause of Action that the Reorganized Debtors may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

21.    Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

22.    Insured Claims

Notwithstanding anything to the contrary contained herein, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, and (b) solely for the portion of such Claim that is not paid by the applicable insurance policy, receive the treatment provided for in the Plan for Allowed General Unsecured Claims.

23.    Intercompany Account Settlement

The Debtors and the Reorganized Debtors, and their respective Affiliates will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.

24.    Closing of Chapter 11 Cases

The Debtors or the Reorganized Debtors, as applicable, shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

25.    Private Company

It is anticipated that the Reorganized Debtors shall be private companies as of the Effective Date and shall not register any of their respective equity with the SEC or list such equity on an exchange as of the Effective Date.

**F.    Unexpired Leases and Executory Contracts**

1.    Rejection of Executory Contracts and Unexpired Leases

*Automatic Rejection.* Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 7.1 of the Plan; (ii) has been previously assumed or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the

Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume or reject pending as of the Effective Date; (iv) is an Executory Contract related to any Intercompany Claim; or (v) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements in the Plan.

*Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.* Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

*Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases.* Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Voting Agent no later than 30 days after the later of the Effective Date or the effective date of rejection. Any proofs of Claim arising from the rejection of the Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

*Reservation of Rights.* Notwithstanding anything to the contrary in the Plan, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved in the event that the Debtors (or the Reorganized Debtors) amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

2.      Assumption of Executory Contracts and Unexpired Leases

Upon the occurrence of the Effective Date, each Executory Contract or Unexpired Lease (other than Executory Contracts or Unexpired Leases that (a) have been previously rejected by the Debtors by Final Order of the Bankruptcy Court or have been rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after

the Effective Date or (b) are the subject of a motion to reject pending as of the Effective Date) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in Exhibit 7.1 of the Plan shall be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Reorganized Debtors or their assignee in accordance with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law. With respect to each such Executory Contract and Unexpired Lease, the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contracts and Unexpired Leases may be conditioned upon the disposition of all issues with respect to such Cure. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

*Modifications, Amendments, Supplements, Restatements, or Other Agreements.* Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant hereunder.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed.* Any and all proofs of Claims based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including hereunder, except proofs of Claims asserting Cure amounts, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed and expunged from the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Insurance Policies

Notwithstanding any other provision in the Plan, all insurance policies to which any Debtor is a party as of the Effective Date (including any "tail policy") shall be deemed to be and treated as executory contracts and shall be assumed, or assumed and assigned, by the applicable Reorganized Debtors and shall continue as obligations of the Debtors or Reorganized Debtors in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors, as applicable.

The Debtors or the Reorganized Debtors, as the case may be, shall maintain the D&O Insurance and the EPL Policy providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such

parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors.

4.      Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases

With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure. Such Cure shall be satisfied by the Debtors or their assignee, if any, by payment of the Cure in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court. Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure. The Debtors shall serve a counterparty to an Executory Contract or Unexpired Lease to be assumed hereunder with evidence of adequate assurance upon such counterparty's written request to the Debtors' counsel.

If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

*Cure Notices*. No later than seven (7) days prior to the Confirmation Hearing, and pursuant to the Assumption and Rejection Procedures, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption that will (i) list the applicable Cure, if any, (ii) describe the procedures for filing objections to the proposed assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, (iii) describe the procedures for filing objections to the proposed Cure of the applicable Executory Contract or Unexpired Lease, and (iv) explain the process by which related disputes will be resolved by the Bankruptcy Court. If no objection is timely

received, the non-Debtor party to the assumed contract shall be deemed to have consented to the assumption of the applicable Executory Contract or Unexpired Lease.

*Cure Objections*.    If a proper and timely objection to the Cure Notice or proposed Cure was filed by the Cure Objection Deadline, the Cure shall be equal to (i) the amount agreed to between the Debtors or Reorganized Debtors and the applicable counterparty, or, (ii) to the extent the Debtors or Reorganized Debtors and counterparty do not reach an agreement regarding any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues.    Objections, if any, to the proposed assumption and/or Cure must be in writing, filed with the Bankruptcy Court and served so that they are actually received by the Cure Objection Deadline.

*Hearing with Respect to Objections*.    If an objection to the proposed assumption and/or to the Cure is timely filed and received in accordance with the procedures set forth in Article VII.4(b) of the Plan, and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Debtors or Reorganized Debtors.    Objections to the proposed Cure amount or assumption of an Executory Contract or Unexpired Lease will not be treated as objections to Confirmation of the Plan.

*Reservation of Rights*.    Notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors may amend their decision with respect to the assumption of any Executory Contract or Unexpired Lease and provide a new notice amending the information provided in the applicable notice, subject to the Assumption and Rejection Procedures, and shall serve such notice on the applicable counterparty; *provided*, that notwithstanding anything to the contrary herein, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved with respect to any such amended decision or notice.    In the case of an Executory Contract or Unexpired Lease designated for assumption that is the subject of a Cure objection which has not been resolved prior to the Effective Date, the Debtors may designate such Executory Contract or Unexpired Lease for rejection at any time prior to the payment of the Cure.

5.    Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by the Debtors, and any Executory Contracts and Unexpired Leases assumed by the Debtors, may be performed by the Reorganized Debtors in the ordinary course of business and in accordance with the terms of such Executory Contract or Unexpired Lease.

6.    General Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease on Exhibit 7.1 of the Plan, in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors, or any of its Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of

assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

## G.    Procedures for Resolving Disputed Claims and Interests

### 1.    Determination Of Claims and Interests

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article VI.19 of the Plan, except with respect to any Claim or Interest deemed Allowed under the Plan or pursuant to an order of the Bankruptcy Court.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.  For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Plan.

Nothing contained in Article VIII.1 of the Plan shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors may have against any Entity in connection with or arising out of any Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

### 2.    [GUC Administrator

If Class 6C votes to accept the Plan, the Creditors' Committee shall appoint, as of the Effective Date, a GUC Administrator with duties limited to (a) General Unsecured Claims reconciliation, allowance, and settlement, (b) making distributions to the Holders of Allowed General Unsecured Claims as provided herein, and (c) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the foregoing duties.  The GUC Administrator may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the duties as limited above, including any professionals retained in these Chapter 11 Cases, and the GUC Administrator Costs, including reasonable professional fees, shall be reimbursed solely from the General Unsecured Claims Cash Pool in the ordinary course without further order of the Bankruptcy Court.  Under no circumstances shall the Debtors or the Reorganized Debtors have any liability for the GUC Administrator Costs.

Upon the resolution of all disputed General Unsecured Claims, the GUC Administrator shall be released and discharged of and from further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases.

3.      Claims Administration Responsibility

After the Effective Date, the Reorganized Debtors shall retain responsibility for (a) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors other than General Unsecured Claims, including, without limitation, (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests (other than General Unsecured Claims), (ii) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court (other than General Unsecured Claims), and (iii) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court (other than General Unsecured Claims), and (b) making distributions (if any) with respect to all Claims and Interests (other than General Unsecured Claims). With respect to General Unsecured Claims, the GUC Administrator shall exercise all of the responsibilities set forth in Article VIII.3 of the Plan.

4.      Objections to Claims

Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors or the GUC Administrator without further notice to parties-in-interest). Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Reorganized Debtors or the GUC Administrator effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

5.      Disallowance of Claims

Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, the Creditors' Committee before the Effective Date, the GUC Administrator after the Effective Date, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549,

59

or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and     (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

6.      Estimation of Claims

Before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any purpose permitted thereunder, regardless of whether any party previously has objected to such Claim or Interest, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court has entered a Final Order estimating any contingent or unliquidated Claim for the express purpose of determining what amount of such Claim shall be allowed for purposes of distributions pursuant to section 502(c), that estimated amount shall, unless otherwise ordered by the Bankruptcy Court or agreed between the relevant parties, constitute a maximum limitation on the Allowed amount of such Claim for all purposes under the Plan (including for purposes of distributions), and the Reorganized Debtors or the GUC Administrator may, to the extent applicable, elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

7.      No Interest on Claims

Unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

       8.      Amendments to Claims

On or after the Bar Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

## H.      Provisions Governing Distributions

       1.      Time of Distributions

Except as otherwise provided for in the Plan or ordered by the Bankruptcy Court, distributions under the Plan shall be made on the later of (a) the Distribution Date or (b) on the first Periodic Distribution Date that is at least 30 days after a Claim becomes Allowed; *provided, however*, that the Reorganized Debtors may, in their sole discretion, make one-time distributions on a date that is not a Periodic Distribution Date.

       2.      Distribution Agent

The Distribution Agent shall make all distributions required under the Plan except as set forth in Article IX.4 of the Plan.

       3.      Currency

Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal, National Edition* following the Effective Date.

       4.      Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims on the Distribution Date, subject to the Reorganized Debtors' rights to object to Claims that have not been Allowed; *provided, however*, that (i) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Allowed Priority Tax Claims shall be paid in full in Cash on the Distribution Date or in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(c) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

5.      Distributions on Account of Claims Allowed After the Effective Date

*No Distributions Pending Allowance.*   No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

*Disputed Unsecured Claims Reserve.*   The Debtors or Reorganized Debtors, as applicable, shall withhold and retain from the General Unsecured Claims Cash Pool Account (i) an amount sufficient to pay Holders of Disputed General Unsecured Claims the amount such Holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims, (ii) such lesser amount as estimated or otherwise ordered by the Bankruptcy Court, or (iii) such lesser amount as agreed to between the GUC Administrator and the Holders thereof (such account, the "**Disputed Unsecured Claims Reserve**").  As disputed claims are resolved pursuant to Article IX of the Plan, the GUC Administrator shall direct the Distribution Agent to make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.   Such distributions shall be made on the first Periodic Distribution Date that is at least thirty (30) days after the date on which such a Disputed Claim becomes an Allowed Claim

*Tax Treatment of Disputed Unsecured Claims Reserve.*  All parties to the Plan shall (i) treat the Disputed Unsecured Claims Reserve as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 for U.S. federal income tax purposes, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for all federal, state, and local income tax purposes.  All taxes imposed on assets or income of such Disputed Unsecured Claims Reserve will be payable from the assets of the Disputed Unsecured Claims Reserve.

*Request for Expedited Determination of Taxes.*  The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Disputed Unsecured Claims Reserve filed or to be filed for any and all taxable periods of such reserve.

*Distributions After Allowance*.  Payments and distributions to each respective Holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of the Plan that govern distributions to such Holder of a Claim.  On the first Periodic Distribution Date that is at least 30 days following the date when a Disputed Claim becomes an Allowed Claim, the Distribution Agent shall distribute to the Holder of such Allowed Claim the distribution that such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law; *provided, however*, (i) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Disputed Claims that are Allowed Priority Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic

Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

*Special Rules for Distributions to Holders of Disputed Claims.* Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class; *provided, however*, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law or the Plan.

6.      Delivery Of Distributions

*Record Date for Distributions.* On the Distribution Record Date, the claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Interest is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practicable and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

*Allowed Claims.* Distributions to Holders of Allowed Claims shall be made by the Distribution Agent (i) at the addresses set forth on the proofs of claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, or (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address. The Debtors, the Reorganized Debtors, GUC Administrator, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

*Undeliverable Distributions.* If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent is notified of then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed.

*Reversion*.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors free of any restrictions thereon.  Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.

*De Minimis Distributions*.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has a value less than $[10,000]; *provided* that the Reorganized Debtors shall make, or cause to be made, a distribution on a Periodic Distribution Date of less than $[10,000] if the Debtors expect that such Periodic Distribution Date shall be the final Periodic Distribution Date; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

*Fractional Distributions*.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, and the Distribution Agent shall not be required to make partial distributions or distributions of fractional shares of New Pioneer Units or distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fractional share of New Pioneer Units under the Plan would otherwise be called for, such fraction shall be deemed zero.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

7.       Accrual of Dividends and Other Rights

For purposes of determining the accrual of dividends or other rights after the Effective Date, New Pioneer Units shall be deemed distributed as of the Effective Date regardless of the date on which they are actually issued, dated, authenticated, or distributed; *provided, however*, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of New Pioneer Units actually take place.

8.       Surrender of Securities or Instruments

As soon as practicable after the Effective Date, each Original PIK Noteholder and Tranched PIK Noteholder shall surrender its note(s) to the relevant Investor Representative.  No distributions under the Plan shall be made for or on behalf of such Holder unless and until such note(s) is received by the Investor Representative or the loss, theft, or destruction of such note(s) is established to the reasonable satisfaction of the applicable Investor Representative, which satisfaction may require such Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, the Reorganized Debtors, and the Investor Representative, harmless in respect of such note and distributions made thereof.  Upon compliance with Article IX.8 of the Plan by an Original PIK Noteholder or Tranched PIK Noteholder, such Holder shall, for all purposes under the Plan, be deemed to have surrendered such Claim.  Any Holder that

64

fails to surrender such Original PIK Note or Tranched PIK Note or satisfactorily explain its non-availability to the applicable Investor Representative within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtors (or their property), or the Investor Representatives in respect of such Claim and shall not participate in any distribution under the Plan.  All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtors by the applicable Investor Representative, and any such security shall be cancelled.

9.      Compliance Matters

In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, to the extent applicable, the Debtors, Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

10.     Claims Paid or Payable by Third Parties

*Claims Paid by Third Parties*. The Voting Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Reorganized Debtors.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

*Claims Payable by Insurers*. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy a Claim or otherwise settle an insured Claim, then immediately upon such insurers' payment, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

*Applicability of Insurance Contracts*. Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contracts. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity,

including insurers under any of the Insurance Contracts, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

11.    Setoffs

Except as otherwise expressly provided for in the Plan, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

12.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

I.    **Effect of the Plan on Claims and Interests**

      1.    Vesting of Assets

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estates (including Causes of Action) shall vest in the Reorganized Debtors which, unless otherwise indicated in the Plan, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests. As of and following the Effective Date, the Reorganized Debtors may operate their business and use, acquire, and dispose of property (subject to applicable law) and settle and compromise Claims, Interests, or Causes of Action without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

      2.    Discharge of the Debtors

**Except as otherwise specifically provided in section 1141(d) of the Bankruptcy Code, the Plan or the Confirmation Order, and effective as of the Confirmation Date: (a) the distributions and rights that are provided in the Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, right, or Interest accepted the Plan; (b) the Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.**

      3.    Release by Debtors

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Transaction Documents, for good and**

valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Debtors' restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors, the Estates, all Affiliates or subsidiaries managed or controlled by the foregoing, and each of their predecessors, successors and assigns, subsidiaries, and Affiliates, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, from any and all Claims, Interests or causes of action whatsoever, including any derivative Claims asserted or that could have been asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business, financial or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the DIP Facility Order, the Plan, the RSA (including the term sheet attached thereto), the Plan Transaction Documents, or any related agreements, instruments, or other documents, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided* that nothing in the Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.

4.    Release by Holders of Claims

Effective as of the Effective Date, the Releasing Parties conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties and their respective property from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, any Claims or causes of action asserted on behalf of any Holder of any Claim or any Interest or that any Holder of a Claim or an Interest would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Debtors' restructuring, the

Chapter 11 Cases, or the RSA, the purchase, sale, transfer or rescission of any debt, security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Interest in the Debtors that is treated in the Plan, the business, financial or contractual arrangements between the Debtors and any Released Party, the negotiation, formulation, or preparation of the Plan Transaction Documents or related agreements, instruments or other documents, including the DIP Facility Order, the Plan, the RSA (including the term sheet attached thereto), or any related agreements or instruments, or the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that nothing in the Plan shall be construed to release the Released Parties  from any claims based upon willful misconduct or intentional fraud as determined by a Final Order.

5.      Exculpation and Limitation of Liability

To the maximum extent permitted by applicable law, no Released Party will have or incur, and each Released Party is hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any act, omission, or other Claim in connection with, relating to, or arising out of: the Debtors' restructuring; the Chapter 11 Cases; the filing of the Chapter 11 Cases; formulation, preparation, dissemination, negotiation, pursuit, or filing of the Disclosure Statement, the RSA, the Plan Transaction Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, or the solicitation of votes for, or confirmation of, the Plan; the DIP Credit Agreement; the pursuit of Confirmation; the funding or pursuit of consummation of the Plan; the occurrence of the Effective Date; the administration, consummation, and implementation of the Plan or the property to be distributed under the Plan, including  the issuance of securities under or in connection with the Plan and the distribution of property under the Plan and any other transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof; the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases; or the transactions in furtherance of or contemplated by any of the foregoing; except for intentional fraud or willful misconduct, as determined by a Final Order. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.

6.      Exclusions and Limitations on Exculpation, Indemnification, and Releases

Notwithstanding anything in the Plan to the contrary, no provision of the Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification, or release provision, shall modify, release, or otherwise limit the liability of any Entity not specifically released or exculpated hereunder or pursuant to an order of the Bankruptcy Court, including, without limitation, any Entity who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

7.      Injunction

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a Holder of a Claim against or Interest in the Company, all Entities that have held, hold, or may hold Claims against or Interests in the Company whether or not such parties have voted to accept or reject the Plan and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and causes of action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions in the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

8.      Subordination Rights

Except as otherwise provided in the Plan (including Article [X.8(c)] of the Plan), the allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of

the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise and all Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date.  Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

Except as otherwise provided in the Plan (including Plan Exhibits), the Confirmation Order, or another order of the Bankruptcy Court, the right of the Debtors or the Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination. Unless the Plan (including Plan Exhibits) or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to Article X.8(b) of the Plan unless ordered by the Bankruptcy Court.

Notwithstanding anything in the Plan to the contrary, nothing in the Plan shall impair, prejudice, release, compromise or waive any rights, Claims, Causes of Action, defenses or remedies of any Holder of Priority First Lien Claims arising under the Priority Intercreditor Agreement against (i) any Holder of First Lien Claims unless both Class 2B and Class 2B are Accepting Classes, in which case the Holders of Priority First Lien Claims will solely waive any requirement that Holders of First Lien Claims turn over any recovery received pursuant to Article IV.2 of the Plan, or (ii) any Holder of Second Lien Claims unless both Class 3B and Class 3C are Accepting Classes, in which case the Holders of Priority First Lien Claims will solely waive any requirement that Holders of Second Lien Claims turn over any recovery received pursuant to Article IV.3 of the Plan.

9.      Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another entity with whom such the Reorganized Debtors has been associated, solely because the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

10.     Recoupment

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

11.     Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and its successors and assigns.

12.     Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has filed a noncontingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## J.     Conditions Precedent

1.     Conditions to Confirmation

The following are conditions precedent to the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Article XI.3 of the Plan:

i.      the Bankruptcy Court shall have entered the Disclosure Statement Order.

2.     Conditions to the Effective Date of the Plan

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article XI.3 of the Plan:

i.      the Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be a Final Order;

ii.     the Bankruptcy Court shall have entered the Confirmation Order, and such order shall be a Final Order;

72

<table>
<tr><td>iii.</td><td>the payment by the Debtors of all fees and expenses of the DIP Agent and Priority First Lien Administrative Agent, including Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey, Inc., and Fortgang Consulting LLC;</td></tr>
</table>

iii. the payment by the Debtors of all fees and expenses of the DIP Agent and Priority First Lien Administrative Agent, including Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey, Inc., and Fortgang Consulting LLC;

iv. all Plan Transaction Documents shall be in form and substance reasonably satisfactory to the Priority First Lien Administrative Agent;

v. all conditions precedent set forth in the New First Lien Credit Agreement shall have been satisfied or waived pursuant to the terms thereof;

vi. the organizational documents of the Reorganized Debtors as contemplated herein shall be in form and substance satisfactory to the Priority First Lien Administrative Agent, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws;

vii. all authorizations, consents, certifications, regulatory approvals, rulings, no action letters, opinions, or other documents or actions required by any law, regulation, or order to be received or to occur in order to implement and effectuate the Plan on the Effective Date shall have been obtained (and evidence thereof shall have been delivered to the Priority First Lien Lender) or shall have occurred unless such failure will not have a material adverse effect on the Reorganized Debtors;

viii. after occurrence of the Effective Date and payment of all amounts contemplated in connection therewith (including any Cure Amounts), the Reorganized Debtors shall emerge with a minimum of $10 million of cash or cash equivalents, or shall reasonably expect to build to $10 million of cash or cash equivalents within 60 days of the Effective Date (the "**Minimum Liquidity Condition Precedent**"); and

ix. all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

3. Waiver of Conditions Precedent

The conditions set forth in Articles 11.1 and 11.2 of the Plan may be waived, in whole or in part, by agreement of (a) the Debtors and (b) the Priority First Lien Administrative Agent, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

4. Notice of Effective Date

The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Article XI.2 of the Plan have been satisfied or waived pursuant to Article XI.3 of the Plan.

5.    Effect of Non-Occurrence of Conditions to Consummation

If prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

**K.    Retention of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall, to the fullest extent permissible under applicable law, have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

i.    resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors' amendment, modification, or supplement after the Effective Date, pursuant to Article VIII of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

ii.    adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, the Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

iii.    ensure that distributions to Holders of Allowed Claims are accomplished as provided in the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

iv.    allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

74

v.       hear and determine or resolve any and all matters related to Causes of Action;

vi.      enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

vii.     issue and implement orders in aid of execution, implementation, or consummation of the Plan;

viii.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

ix.      hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under the Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

x.       determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

xi.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

xii.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan and disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

xiii.    hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

xiv.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

xv.      resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

xvi.     hear any other matter not inconsistent with the Bankruptcy Code;

xvii.    hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including the dischargeability of any claim;

xviii.   enter a Final Decree closing the Chapter 11 Cases;

xix.     enforce all orders previously entered by the Bankruptcy Court; and

xx.     hear and determine all matters relating to any Bankruptcy Code section 510(b) Claims.

All of the foregoing applies following the Effective Date; *provided,* that from the Confirmation Date through the Effective Date, in addition to the foregoing, the Bankruptcy Court shall retain jurisdiction with respect to all other matters of the Plan that were subject to its jurisdiction prior to the Confirmation Date; *provided, further*, that the Bankruptcy Court shall not have nor retain exclusive jurisdiction over any post-Effective Date agreement. Nothing contained in the Plan shall be construed to increase, decrease or otherwise modify the independence, sovereignty, or jurisdiction of the Bankruptcy Court.

## L.     Miscellaneous Provisions

### 1.     Binding Effect

Upon the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

### 2.     Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date. The Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed by entry of the Final Decree.

### 3.     Modification and Amendments

The Debtors may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.

### 4.     Confirmation of the Plan

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to amend the Plan to any extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

5.      Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

6.      Dissolution of Creditors' Committee

Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, and the members thereof (solely in their capacities as Creditors' Committee members) shall be released, exculpated, and discharged from all their duties relating to the Chapter 11 Cases in accordance with Article X of the Plan.

7.      Request for Expedited Determination of Taxes

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Debtors filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

8.      Revocation, Withdrawal, or Non-Consummation

*Right to Revoke or Withdraw*.  The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.

*Effect of Withdrawal, Revocation, or Non-Consummation*.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan and any settlement or compromise approved as part of the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be null and void in all respects.  In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

9.      Notices

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

77

**If to the Debtors:**

c/o Trident Holding Company, LLC
930 Ridgebrook Rd., 3rd Floor
Sparks, MD 21152
Attn.: David F. Smith, III (david.smith@tridentusahealth.com)
Chief Financial Officer

with a copy to:

Skadden, Arps, Slate, Meagher &
  Flom LLP
Four Times Square
New York, New York 10036
Att'n:  Paul D. Leake
        Jason N. Kestecher

– and –

Skadden, Arps, Slate, Meagher &
  Flom LLP
155 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
Att'n:  James J. Mazza, Jr.
        Justin M. Winerman

**If to the DIP Agent:**


Silver Point Finance, LLC
c/o Credit Administration Dept.
Attn: Joanna Holte
Two Greenwich Plaza
Greenwich, CT 06830
E-mail: Creditadmin@silverpointcapital.com

Phone: (203) 542-4230

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:   Robert A. Britton
        Alexander N. Woolverton

**If to the Office of the United States Trustee:**

Office of the United States Trustee for the Southern District of New York
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, New York   10014
Att'n:  Brian Masumoto
           Shannon Scott

**If to the Creditors' Committee:**

Kilpatrick, Townsend, & Stockton LLP
1114 Avenue of the Americas
New York, NY 10036

Attn:   David M. Posner
           Gianfranco Finizio

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors and Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

10.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

11.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control).  Corporate governance matters shall be governed by the laws of the state of incorporation of the Reorganized Debtors.

12.     Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

13.     Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (c) nonseverable and mutually dependent.

14.     No Waiver or Estoppel

Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other party, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

15.     Conflicts

In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of the Plan shall govern. In the event that the provisions of the Plan and the provisions of the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

## ARTICLE V

## VOTING PROCEDURES

The following Classes are the only Voting Classes entitled to vote to accept or reject the Plan:

| 1B – 1C | Priority First Lien Claims | Impaired | Entitled to Vote |
|---------|---------------------------|----------|------------------|
| 2B – 2C | First Lien Claims | Impaired | Entitled to Vote |

| 3B – 3C | Second Lien Claims | Impaired | Entitled to Vote |
| 6A – 6C | General Unsecured Claims | Impaired | Entitled to Vote |

If your Claim or Interest is not entitled to vote, you will receive a Notice of Non-Voting Status and the Confirmation Hearing Notice instead of a package containing relevant solicitation materials (the "**Solicitation Package**").

## A.    Classes Entitled to Vote

Under the Bankruptcy Code, acceptance of a plan of reorganization by a Class of Claims is determined by calculating the number and the amount of Claims voting to accept, based on the actual total Allowed Claims voting on the Plan. Acceptance by a Class requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan. In addition, under the Bankruptcy Code, creditors are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no distribution of property under the Plan. The following table sets forth which Classes of Claims will or will not be entitled to vote on the Plan:

| Class(es) | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1B – 1C | Priority First Lien Claims | Impaired | Entitled to Vote |
| 2B – 2C | First Lien Claims | Impaired | Entitled to Vote |
| 3B – 3C | Second Lien Claims | Impaired | Entitled to Vote |
| 4A – 4C | Other Secured Claims | Unimpaired | Presumed to Accept |
| 5A – 5C | Other Priority Claims | Unimpaired | Presumed to Accept |
| 6A – 6C | General Unsecured Claims | Impaired | Entitled to Vote |
| 7A – 7B | PIK Notes Claims | Impaired | Deemed to Reject |
| 8A – 8C | Intercompany Claims | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 9A – 9C | Other Subordinated Claims | Impaired | Deemed to Reject |
| 10A – 10C | Interests in Debtor Subsidiaries | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 11A | Interests in Pioneer | Impaired | Deemed to Reject |

**B.**    **Solicitation Procedures**

1.    Voting Agent

The Debtors retained Epiq to, among other things, act as Voting Agent in connection with the solicitation of votes to accept or reject the Plan.

2.    Solicitation Package

The Solicitation Package, as applicable pursuant to the Disclosure Statement Order, may include the Disclosure Statement Order, the Notice, the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope, and any supplemental solicitation materials the Debtors may file with the Bankruptcy Court.

3.    Distribution of the Solicitation Package and Plan Supplement(s)

Through the Claims and Solicitation Agent, the Debtors intend to distribute the Solicitation Packages within five Business Days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter. The Solicitation Package will be distributed in accordance with the Solicitation Procedures, which shall be attached as Exhibit 5 to the Disclosure Statement Order. The Solicitation Package (except the Ballots) may also be obtained from the Voting Agent by: (a) calling the Debtors' restructuring hotline at (800) 960-1226 (toll free) or +1 (503) 597-7729 (international); (b) visiting the Debtors' restructuring website at: https://dm.epiq11.com/Trident and/or (c) writing to Trident Holding Company, LLC Ballot Processing Center, c/o Epiq Corporate Restructuring, LLC, PO Box 4422 Beaverton, OR 97076-4422. You may also obtain modified copies of any pleadings filed in these Chapter 11 Cases for free by visiting the Debtors' restructuring website at http://dm.epiq11.com/Trident or for a fee via PACER at http://www.nysb.uscourts.gov. The Debtors intend to file a Plan Supplement that includes, among other things, the list of Executory Contracts to be assumed (with associated Cure Amounts, if any), a description of Causes of Action to be retained by the Reorganized Debtors. As the Plan Supplements are updated or otherwise modified, such or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement(s). However, parties may obtain a copy of any Plan Supplement(s) from the Voting Agent by: (a) calling the Debtors' restructuring hotline at (800) 960-1226 (toll free) or +1 (503) 597-7729 (international); (b) visiting the Debtors' restructuring website; and/or (c) writing to Trident Holding Company, LLC Ballot Processing Center, c/o Epiq Corporate Restructuring, LLC, PO Box 4422 Beaverton, OR 97076-4422.

**C.**    **Voting Procedures**

The Voting Record Date[14] is **11:59 p.m. prevailing Eastern Time on [May 3], 2019**. The Voting Record Date is the date for determining (a) which Holders of Claims are entitled to

---

[14]    As defined in the *Debtors' Motion for Entry of an Order (A) Approving the Adequacy of the Debtors' Disclosure Statement and Notice of the Disclosure Statement Hearing; (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Proposed Plan; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto*, filed contemporaneously herewith.

vote to accept or reject the Plan and receive the Solicitation Package in accordance with the Solicitation Procedures and (b) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim. The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan. In order for the Holder of a Claim in the Voting Classes to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by using the return envelope provided by: (a) first class mail; (b) overnight courier; (c) personal delivery, or (d) through online transmission solely via, and in accordance with the instructions set forth on Epiq's E-Ballot platform on the Debtors' case website (http://dm.epiq11.com/Trident), in each case so that such Holder's Ballot is **actually** received by the Voting Agent prior to the Voting Deadline of **4:00 p.m. prevailing Eastern Time on June 6, 2019**. It is important that the Holder of a Claim in the Voting Classes follow the specific instructions provided on such Holder's Ballot and the accompanying instructions.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, SUBJECT TO COURT APPROVAL, THE DEBTORS MAY, IN THEIR SOLE AND ABSOLUTE DISCRETION, REJECT SUCH BALLOT AS INVALID AND DECLINE TO COUNT IT IN CONNECTION WITH CONFIRMATION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT, AS APPROPRIATE, WHEN SUBMITTING A VOTE.

## ARTICLE VI

## STATUTORY REQUIREMENTS FOR PLAN CONFIRMATION

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

**A.      The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, may conduct the Confirmation Hearing to consider Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**B.      Confirmation Standards**

Among the requirements for the Confirmation of the Plan are that the Plan is accepted by all Impaired Classes of Claims and Interests, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan. The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization. The Plan complies with the statutory requirements for Confirmation of the Plan, which are listed below.

     i.       The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

    ii.       The Plan has been proposed in good faith and not by any means forbidden by law.

   iii.       Any payment made or to be made by the proponent, by the Debtors, or by a person issuing securities or acquiring property under a Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

   iv.       The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an Affiliate of the Debtors participating in a joint Plan with the Debtors or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and Holders of Interests and with public policies.

    v.       The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such Insider.

   vi.       With respect to each Holder within an Impaired Class of Claims or Interests, each such Holder (a) has accepted the Plan, or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

  vii.       With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan, or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed herein).

viii.    Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that: (a) with respect to a Claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the Effective Date of the Plan, the Holder of such Claim will receive on account of such Claim Cash equal to the Allowed amount of such Claim; (b) with respect to a Class of Claims of a kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each Holder of a Claim of such Class will receive (i) if such Class has accepted the Plan, deferred Cash payments of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim; or (ii) if such Class has not accepted the Plan, Cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; (c) with respect to a Claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the Holder of such Claim will receive on account of such claim regular installment payments in Cash, over a period not exceeding five years after the date of the order for relief under sections 301, 302, or 303 of the Bankruptcy Code, of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim.

ix.    If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

x.    Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

xi.    All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

xii.    The Plan provides that following the Effective Date of the Plan, subject to the Reorganized Debtors' rights, if any, under applicable non-bankruptcy law, unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall continue to pay all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the debtor has obligated itself to provide such benefits.

## C.    Liquidation Analysis

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Based on the Liquidation Analysis attached hereto as **Exhibit [C]**, the Debtors believe that the value of any distributions if the Debtors' Chapter 11 Cases were converted to cases

85

under chapter 7 of the Bankruptcy Code would not be greater than the value of distributions under the Plan.

As a result, the Debtors believe Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

## D.      Financial Feasibility

Bankruptcy Code section 1129(a)(11) requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Company has prepared certain Financial Projections for the Debtors on a consolidated basis. These Financial Projections and the assumptions upon which they are based, are attached hereto as **Exhibit [B]**. Based on these Financial Projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan and, therefore, that Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## E.      Acceptance by Impaired Classes

The Bankruptcy Code also requires, as a condition to Confirmation, that each Class of Claims or Interests that is Impaired but still receives distributions under the Plan vote to accept the Plan, unless the Debtors can "cram-down" such Classes, as described below. A Class that is Unimpaired is presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless the Plan leaves unaltered the legal, equitable, and contractual rights to which the Claim or Interest entitles the Holder of such Claim or Interest to, or the Debtors cure any default and reinstates the original terms of the obligation.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code: (a) an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than half in number of the voting Allowed Claims have voted to accept the Plan; and (b) an Impaired Class of Interests has accepted the Plan the Holders of at least two-thirds in amount of the Allowed interests of such Class actually voting have voted to accept the plan.

## F.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, even if the Plan has not been accepted by all Impaired Classes, provided that the Plan has been accepted by at least one Impaired Class entitled to vote, excluding any Insider Classes. Section 1129(b) of the Bankruptcy Code permits the Debtors to confirm the Plan, notwithstanding the failure of any Impaired Class to accept the Plan, in a procedure commonly known as "cram-down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class of Claims or Interests that voted to reject the Plan.

1.      No Unfair Discrimination

The test to determine whether the Plan unfairly discriminates applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfies the foregoing requirements for nonconsensual Confirmation.

2.    Fair and Equitable Treatment

The test to determine whether the Plan affords fair and equitable treatment applies to Classes of different priority and status (*e.g.*, Secured Claims versus General Unsecured Claims) and includes the general requirement that no Class of Claims receive more than 100% of the amount of the Allowed Claims in such Class. As to a dissenting Class, the test sets different standards depending on the type of Claims or Interests in such Class. Specifically, in order to demonstrate that the Plan is fair and equitable, the Debtors must demonstrate that:

i.    Each Holder of a Secured Claim either (a) retains its Liens on the property, to the extent of the Allowed amount of its Secured Claim and receives deferred Cash payments having a value, as of the effective date of the chapter 11 plan, of at least the Allowed amount of such Claim, (b) has the right to credit bid the amount of its Claim if its property is sold and retains its Liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receives the "indubitable equivalent" of its Allowed Secured Claim.

ii.   Either (a) each Holder of an impaired Unsecured Claim receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (b) the Holders of Claims and Interests that are junior to the Claims of the rejecting Classes will not receive any property under the Plan.

iii.  Either (a) each Holder of an Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled, or the value of the Interest or (b) the Holder of an Interest that is junior to the rejecting Class will not receive or retain any property under the Plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Classes 7A and 7B, 8A – 8C, 9A – 9C, 10A – 10C, and 11A are not receiving a distribution because there is no Class of equal priority to Classes 7A and 7B, 8A – 8C, 9A – 9C, 10A – 10C, and 11A receiving more favorable treatment, and there are no Classes junior to Classes 7A and 7B, 8A – 8C, 9A – 9C, 10A – 10C, and 11A that will receive or retain any property on account of the Claims or Interests in such Class.

# ARTICLE VII

## PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH IN THIS **ARTICLE VII** AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

## A.      General

The following provides a summary of important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of Claims and Interests that are Impaired and entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

## B.      Certain Bankruptcy Considerations

### 1.      Undue Delay in Confirmation May Significantly Degrade the Debtors' Value

The continuation of the Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, creates a significant risk that the value of the Debtors' enterprises would be substantially eroded to the detriment of all stakeholders. The Debtors' future results are dependent upon the successful confirmation and implementation of the Plan. Failure to obtain this approval in a timely manner could adversely affect the Debtors' ability to maximize value for their estates and all parties in interest. If Confirmation does not occur expeditiously, the Chapter 11 Cases could result in, among other things, lack of access to debtor-in-possession financing and increased Administrative Claims or Professional Claims, among other expenses.

### 2.      Parties in Interest May Object to Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or interest in a particular Class only if such claim or interest is substantially similar to the other claims or interests in such Class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

88

3.      Risk of Non-Occurrence of the Effective Date

Although the Milestones require that the Effective Date must occur within a few days of entry of the Confirmation Order,[15] and the Debtors believe that compliance with the Milestones is feasible and reasonable, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

4.      Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Interests as those proposed in the Plan.

5.      Debtors May Not Be Able to Secure Confirmation of the Plan

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" (discussed in more detail in Article V.6 of the Plan) are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

6.      Conditions Precedent to Consummation of the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

7.      The Valuation of the Reorganized Debtors May Not Be Adopted by the Bankruptcy Court

Parties-in-interest in these Chapter 11 Cases may oppose confirmation of the Plan by alleging that the value of the Reorganized Debtors is higher than estimated by the Debtors and

---

[15]   The Milestones require entry of the Confirmation Order by June 16, 2019 and occurrence of the Effective Date by June 21, 2019.

that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan. At the Confirmation Hearing, the Bankruptcy Court will hear evidence regarding the views of the Debtors and opposing parties, if any, with respect to the valuation of the Reorganized Debtors. Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtors for purposes of the Plan.

## C.    Risk Factors That May Affect Recoveries Under the Plan

1.    Debtors Cannot Guarantee What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes

No less than three unknown factors make certainty in creditor recoveries impossible: (a) how much money or other distributable value will remain after satisfaction of all Allowed Claims that are senior to the Allowed Claims in Voting Classes or unclassified Allowed Claims; (b) the number or amount of Claims in Voting Classes that will ultimately be Allowed; and (c) the number or size of Claims senior to the Claims in the Voting Classes or unclassified Claims that will ultimately be Allowed.

2.    Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Certain Claims

The Claims estimates set forth above are based on various assumptions. The actual amounts of certain Claims may differ significantly from those estimates should one or more underlying assumptions prove to be incorrect. Such differences may adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan.

3.    The Priority First Lien Lender Will Control the Reorganized Debtors

Consummation of the Plan will result in the Priority First Lien Lender acquiring all of the equity of the Reorganized Debtors. Accordingly, the Priority First Lien Lender will exercise a controlling influence over the business and affairs of the Reorganized Debtors.

4.    Tax Considerations

There are a number of material income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims and other interested parties should read carefully the discussion of certain U.S. federal income tax consequences of the Plan set forth herein.

## D.    Business Risks

1.    The Debtors May Be Subject To Claims That Will Not Be Discharged in the Chapter 11 Cases

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. Generally, all claims that arose prior to the filing of the Chapter 11 Cases (a) will be subject to compromise, and/or discharge in the Chapter 11 Cases in any plan of reorganization that may be certified, or

(b) will be discharged in accordance with the Bankruptcy Code and the terms of the plan of reorganization. However, the aggregate amount of such claims that are not subject to treatment under the Plan or that are not discharged may be material. While the Debtors believe that all of the claims subject to ongoing government lawsuits are dischargeable, the government may contest such claims' dischargeability.

2.    Employee Uncertainty

As a result of the Chapter 11 Cases, the Debtors' employees are facing uncertainty. The Debtors' continued operations depends in part on the Company's continued ability to attract, retain, and motivate highly qualified management and clinical personnel. The competition for qualified personnel in the healthcare field is intense and the Company may not be able to attract and retain quality personnel on acceptable terms given the competition for such personnel. A material erosion of the Debtors' workforce during the Chapter 11 Cases could have a material adverse effect on the Debtors' ability to effectively reorganize during the Chapter 11 cases.

3.    Healthcare and Other Regulations

The healthcare industry is heavily regulated by state and federal authorities. Each state in which the Debtors has different regulations, and the Debtors are required to satisfy the regulations of each state where the facilities they service are located. [Additionally, the Debtors and the Reorganized Debtors are required to comply with certain regulatory requirements to implement the transactions contemplated by the Plan and such transactions may require certain regulatory approval.] Regulation of the healthcare industry is constantly evolving. State regulations may in the future adopt new laws, regulations, and/or policies regarding a wide variety of matters related to the healthcare industry, which could directly or indirectly affect the operation and management of the SNFs. The Debtors are unable to predict the content of any new regulations that may affect its business or what impact new regulations may have, including regarding future financial performance.

If the Debtors fail to comply with healthcare and other regulations, the Debtors could face substantial enforcement actions, including civil and criminal penalties and its business, operations and financial condition could be adversely affected. The Debtors are subject to healthcare fraud and abuse laws and patient privacy laws of both the federal government and the states in which it conducts its business. If the Debtors' operations are found to be in violation of certain laws or governmental regulations, the Debtors may be subject to penalties, including civil and criminal penalties, damages, fines, and the curtailment of their operations. Although compliance programs can mitigate the risk of investigation and prosecution for violations of these laws, the risks cannot be entirely eliminated.

4.    Healthcare Reform

The federal and state governments have shown significant interest in pursuing continued healthcare reform. Any government-adopted reform measures could adversely impact the pricing of healthcare products and services and the amount of reimbursement available from governmental agencies or other third party payors. The continuing efforts of the federal and state governments, insurance companies, managed care organizations, and other payors of health care

services to contain or reduce health care costs may adversely affect the Debtors' ability to set prices for their services which the Debtors believe are fair, and the Debtors' ability to generate revenues, receive reimburse for services rendered, and achieve and maintain profitability.

New laws, regulations and judicial decisions, or new interpretations of existing laws, regulations and decisions, that relate to healthcare availability, methods of delivery or payment for products and services, or sales, marketing or pricing, may limit the Debtors' potential revenue, and the Debtors may need to further revise their future business model. The pricing and reimbursement environment may change in the future and become more challenging due to several reasons, including policies advanced by the current executive administration in the United States, new healthcare legislation, or fiscal challenges faced by government health administration authorities.

5.      Competition and Demographic Trends

SNFs face a high level of competition, and the Reorganized Debtors will compete with numerous other companies providing similar healthcare and rehabilitation services. There is no assurance that the Reorganized Debtors will be able to compete successfully and their reputation will develop and continue. Accordingly, the Debtors cannot predict what effect competitive pressures will have on the business going forward.

Further, service providers to SNFs have been and will continue to be impacted by a challenging operating environment. Demographic trends and increased competition from alternative healthcare services, such as home health agencies, community-based service programs, and other alternatives to SNFs have resulted in decreased occupancy and utilization rates. As the SNF industry adapts to these changes, the Company may face erosion of its customer base.

## E.      Risks Associated with Forward Looking Statements

1.      Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects, in all material respects, the financial results of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2.      Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary

Except for historical information, this Disclosure Statement may be deemed to contain "forward-looking" statements. The Company is including this cautionary statement for the

express purpose of availing itself of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.

There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or amount of Claims in the various Classes that might be allowed. The Company cautions each reader of this Disclosure Statement to carefully consider those factors set forth above and the acknowledgements contained in this "Risk Factors" section of this Disclosure Statement. Such factors have, in some instances, affected and in the future could affect the ability of the Company to achieve its projected results and may cause actual results to differ materially from those expressed herein. The Company undertakes no obligation to update any forward-looking statements in this Disclosure Statement.

**F.      Disclosure Statement Disclaimer**

1.      This Disclosure Statement Was Not Approved by the Securities and Exchange Commission

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

2.      Reliance on Exemptions from Registration Under the Securities Act

The securities to be issued pursuant to the terms of the Plan have not been, nor will they be, registered under the Securities Act, or any state or blue sky securities laws. The securities cannot be transferred without registration under the Securities Act or, if applicable, the securities laws of any state or other jurisdiction, unless such a transaction is exempt from registration.

3.      This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

4.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.      No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties-in-interest.

6.      Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file, and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

7.      No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified herein.

8.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

9.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment so that the

94

information provided in this Disclosure Statement and in the Plan is as accurate as possible, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement or other materials included in the Solicitation Package. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel for the Debtors, the counsel for the Creditors' Committee and the U.S. Trustee.

## G.    Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee (or trustees) would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is described herein and attached hereto as **Exhibit [C]**.

## ARTICLE VIII

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain U.S. federal income tax consequences of the Plan to the Debtors and certain Holders of Claims that are impaired under the Plan and entitled to vote to accept or reject the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. The discussion below is not binding upon the Internal Revenue Service ("**IRS**") or any other tax authorities. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances. The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it address all aspects of U.S. federal income taxation applicable to special classes of taxpayers (*e.g*., banks and certain other financial institutions, insurance companies, broker-dealers, tax-exempt organizations, Holders of Claims who are, or who hold their Claims through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction, and persons who acquired their Claims pursuant to the exercise of employee stock options or otherwise as compensation). The following discussion assumes that Holders of Claims hold their Claims as capital assets for U.S. federal income tax purposes. Furthermore, the following discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the exchange consideration in the secondary market.

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) holds Claims, the U.S. federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership participating in the Plan (and its partners) should consult its tax advisors regarding the consequences of participating in the Plan.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (a) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (b) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (c) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (d) the manner in which the Holder acquired the Claim; (e) the length of time that the Claim has been held; (f) whether the Claim was acquired at a discount; (g) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (h) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (i) the method of tax accounting of the Holder; (j) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (k) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

The following discussion is intended only as a summary of certain U.S. federal tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling has been or will be sought from the IRS with respect to any of the tax

aspects of the Plan. The following discussion is for information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Holder's particular circumstances. Accordingly, each Holder is strongly urged to consult its tax advisor regarding the U.S. federal, state, local, and applicable non-U.S. income and other tax consequences of the Plan.

## A.    Consequences to the Debtors

### 1.    Cancellation of Indebtedness Income

As a result of the consummation of the transactions contemplated by the Plan, the Debtors may realize substantial cancellation of indebtedness income ("**CODI**"). In general, absent an exception, a taxpayer will realize and recognize CODI upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. CODI is taxable as ordinary income. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of (x) the issue price of any new indebtedness of the taxpayer issued, (y) the amount of cash paid, and (z) the fair market value of any other consideration given in exchange for such indebtedness at the time of the exchange. There are exceptions to the recognition of CODI. For example, a taxpayer is not required to include CODI in gross income if either the taxpayer is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that case, or the taxpayer is insolvent, as specifically defined for U.S. federal income tax purposes, at the time the CODI is triggered.

However, the Tax Code requires the debtor to reduce its tax attributes—such as NOL carryforwards, current year NOLs, tax credits, and tax basis in assets (collectively, "**Tax Attributes**")—by the amount of the excluded CODI.  In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the CODI of another member.  Under the ordering rules of the Treasury Regulations, generally, the Tax Attributes of a parent debtor corporation (including its NOLs and the stock basis of its subsidiaries) are reduced before those of a subsidiary debtor corporation.  In this regard, the Treasury Regulations adopt a "tier-down" approach such that if the debtor reduces its basis in its stock in a subsidiary, corresponding reductions must be made to the Tax Attributes of that subsidiary.  To the extent that the excluded CODI exceeds the Tax Attributes of the debtor member, the Treasury Regulations require the reduction of certain Tax Attributes (NOLs, but not tax basis in assets) of other members of the consolidated group.  The reduction in Tax Attributes generally occurs after the calculation of a debtor's tax for the year in which the debt is discharged. Subject to the discussion below under the heading "Excess Loss Accounts," excess CODI over the amount of available Tax Attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The Debtors expect to realize CODI as a result of the discharge of obligations pursuant to the Plan, which, under the attribute reduction rules described above, is generally expected to result in a reduction, or possible elimination of Tax Attributes (including NOLs, credits and certain of the Debtors' tax basis in their assets). As discussed below under the heading "Excess Loss Accounts," it is also possible that there will be some amount of currently taxable income as a result of there being an excess loss account in the stock of one or more Debtors and CODI of such a Debtor in excess of available Tax Attributes.

2.      Utilization of NOLs

Under Tax Code section 382, if a "loss corporation" (generally, a corporation with NOLs and/or built-in losses) undergoes an "ownership change," the amount of its pre-change losses (including certain losses or deductions which are "built-in," *i.e.*, economically accrued but unrecognized as of the date of the ownership change) that may be utilized to offset future taxable income generally are subject to an annual limitation. Similar rules apply to a corporation's capital loss carryforwards and tax credits. The Debtors' issuance of New Pioneer Units pursuant to the Plan is expected to result in an ownership change for purposes of Tax Code section 382. Accordingly, assuming that the Debtors emerge with any NOLs following attribute reduction, the Debtors' pre-change losses may be subject to an annual limitation. This limitation applies in addition to, and not in lieu of, any other limitation that may already or in the future be in effect and the attribute reduction that may result from CODI.

3.      Excess Loss Accounts

Generally, within a consolidated group, a corporation's basis in the stock of a subsidiary corporation is (a) increased by the income of such subsidiary and any contributions to such subsidiary and (b) decreased by any losses of such subsidiary which are used by the group and by any distributions from such subsidiary. If total net reductions exceed the parent's initial basis in the subsidiary stock, that excess is called an "excess loss account" and is treated as negative basis. The consolidated group must recognize income equal to an excess loss account in a subsidiary's stock in certain events, including (i) on the subsidiary's recognition of CODI (discussed above) where the CODI is excluded from income and the consolidated group does not reduce its Tax Attributes by the amount of the excluded CODI, and (ii) if the stock of the subsidiary is treated as disposed of for no consideration. It is possible that a Debtor will recognize excluded CODI in excess of available Tax Attributes and that there could be an excess loss account in the stock of that Debtor. In that case, the Debtors will recognize taxable income in the amount of such excess CODI, but not to exceed the excess loss account.

**B.      Consequences to Claims Holders**

1.      Gain or Loss

A Holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtor or included in income by the Holder of the Allowed Claim. *See* Article IX.B.3—"Allocation of Plan Distributions between Principal and Interest." A Holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received). The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Holder of the Claim, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the Holder has previously claimed a bad debt deduction with respect to the Claim, and the Holder's holding period of the Claim. Subject to the "market discount" rules described

below, if the Claim in the creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will generally constitute long-term capital gain or loss if the Holder of the Claim held such Claim for longer than one year or short-term capital gain or loss if the Holder of the Claim held such Claim for less than one year. Long-term capital gains of non-corporate holders are taxed at preferential rates, and capital losses are subject to limitations on deductibility.

A Holder of an Allowed Claim who receives, in respect of its Claim, an amount that is less than its tax basis in such Claim may be entitled to a bad debt deduction if either: (a) the Holder is a corporation; or (b) the Claim constituted (i) a debt created or acquired (as the case may be) in connection with a trade or business of the Holder or (ii) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of its Claim may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Claim.

Holders of Claims who were not previously required to include any accrued but unpaid interest with respect to their claim in their gross income may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.  Whether such losses qualify as ordinary losses under the Tax Code is unclear.

2.    Market Discount

The market discount provisions of the Tax Code may apply to Holders of Claims. Generally, if a Holder of a Claim purchased the Claim at a price less than such Claim's principal amount, the difference would constitute "market discount" for U.S. federal income tax purposes. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having an original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount. Any gain recognized by such Holder on the receipt of Cash in respect of its Claim would be treated as ordinary income to the extent of such accrued but unrecognized market discount.

3.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, the Debtors intend to take the position that, for income tax purposes, such distribution shall be allocated to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest. No assurances can be made in this regard. If, contrary to the Debtors' intended position, such a

distribution were treated as being allocated first to accrued but unpaid interest, a Holder of such an Allowed Claim would realize ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder otherwise realized a loss as a result of the Plan. Conversely, a Holder generally would recognize a deductible loss to the extent that any accrued interest was previously included in its gross income and was not paid in full. To the extent that any portion of the distribution is treated as interest, Holders may be required to provide certain tax information in order to avoid the withholding of taxes.

4.      Ownership of New Pioneer Units

Any distribution made on New Pioneer Units, will constitute dividends for U.S. federal income tax purposes to the extent of such company's current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such company's current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its New Pioneer Units. Any such distribution in excess of the Holder's basis in its shares of such company (determined on a share-by-share basis) generally will be treated as capital gain. Dividends paid to Holders that are corporations generally will be eligible for the dividends-received deduction so long as Reorganized Pioneer has sufficient earnings and profits, subject to certain holding period requirements. A Holder generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Pioneer Units received in an amount equal to the difference between (a) the Holder's adjusted tax basis in the New Pioneer Units and (b) the sum of the cash plus the fair market value of any property received from such disposition. A reduced tax rate on long-term capital gain may apply to non-corporate holders. The deductibility of capital losses is subject to certain limitations under the Tax Code.

5.      Exercise, Sale or Other Disposition, or Expiration of Warrants

A Holder that exercises its Warrant to acquire shares of New Pioneer Units generally will not be required to recognize income, gain or loss upon exercise of such right. Such Holder's tax basis in shares of New Pioneer Units received upon the exercise of such Warrant will be equal to the Holder's tax basis in such Warrant plus the exercise price paid by the Holder. Generally, a Holder's holding period in the shares of New Pioneer Units will commence on the day after the date received. If a Holder allows its Warrant to expire unexercised, such Holder will recognize capital loss equal to its basis in the Warrant. Under Section 305 of the Code, if certain adjustments are made (or not made) to the number of shares to be issued upon the exercise of a Warrant or to the Warrant's exercise price, a Holder may be deemed to have received a constructive distribution with respect to the Warrant, which could result in adverse consequences for the Holder, including the inclusion of dividend income. The rules governing constructive distributions are complex and Holders are urged to consult their tax advisors on the tax consequences of any such constructive distribution.

C.      **FATCA**

Legislation commonly referred to as "FATCA" generally imposes withholding of 30% on payments of dividends on the New Pioneer Units to "foreign financial institutions" (which is broadly defined for this purpose and in general includes investment vehicles) and certain other non-U.S. entities unless various U.S. information reporting and due diligence requirements (generally relating to ownership by U.S. persons of interests in or accounts with those entities) have been satisfied, or an exemption applies. An intergovernmental agreement between the United States and the non-U.S. entity's jurisdiction may modify these requirements. If FATCA withholding is imposed, a beneficial owner that is not a foreign financial institution generally will be entitled to a refund of any amounts withheld by filing a U.S. federal income tax return (which may entail significant administrative burden). Holders are urged to consult their tax advisors regarding the effects of FATCA.

D.      **Information Reporting and Backup Withholding**

Certain payments, including the payments with respect to Claims or Interests pursuant to the Plan, may be subject to information reporting to the IRS. Moreover, under certain circumstances, Holders of Claims may be subject to "backup withholding" at the applicable rate. Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds.  Each Holder is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

E.      **Importance of Obtaining Professional Tax Assistance**

The foregoing discussion is intended only as a summary of certain tax consequences of the plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice.  The tax consequences are in many cases uncertain and may vary depending on a Holder's particular circumstances. Accordingly, Holders are urged to consult their tax advisors about the federal, state and local, and applicable foreign income and other tax consequences of the Plan.

## ARTICLE IX

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include:

(a) continuation of the pending Chapter 11 Cases; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## A.  Continuation of the Bankruptcy Cases

If the Debtors remain in chapter 11, they could continue to operate their business and manage their properties as debtors-in-possession, but would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as a going concern in protracted chapter 11 cases. In particular, the Debtors could have difficulty sustaining the high costs and the erosion of vendor and customer confidence that may be caused if the Debtors remain chapter 11 debtors-in-possession and gaining access to sufficient liquidity to allow them to continue their operations as a going concern.

## B.  Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a chapter 11 plan has expired, any other party-in-interest in the Chapter 11 Cases) could attempt to propose a different plan or plans. Such plans might involve either a reorganization and continuation of the Debtors' remaining business, or an orderly liquidation of the Debtors' assets, or a combination of both. The Debtors, however, submit that the Plan, as described herein, enables their creditors and interest holders to realize the most vale under the circumstances.

## C.  Liquidation Under Chapter 7 of the Bankruptcy Code

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under section 1129(a) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which event a trustee (or trustees) would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. A chapter 7 trustee, who would lack the Debtors' knowledge of their affairs, would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Debtors' estates. If a trustee is (or trustees are) appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, all creditors holding Claims entitled to distributions may receive distributions of a lesser value on account of their Allowed Claims and likely would have to wait a longer period of time to receive such distributions. A liquidation under chapter 7 likely would result in smaller distributions made to creditors than that provided for in the Plan because of a number of factors, including, but not limited to: (a) additional Administrative Claims generated by conversion to a chapter 7 case, (b) the administrative costs of liquidation, (c) loss of value from remaining sales in the pipeline caused by, among other things, business discontinuity and loss of employee knowledge, (d) associated delays in connection with a chapter 7 liquidation, (e) the low likelihood that recoveries on assets (including litigation assets) will be maximized in a chapter 7 case, and (f) additional Claims, some of which would be entitled to priority, which would be generated during the chapter 7 liquidation process.

The Liquidation Analysis is premised upon a hypothetical liquidation in chapter 7 cases. In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to

which such assets are subject to liens and security interests. Based on these analyses, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the Debtors' opinion, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford Holders of Claims and Interests as great a realization potential as does the Plan.

## ARTICLE X

## RECOMMENDATION AND CONCLUSION

[This Disclosure Statement was approved by the Court after notice and a hearing. The Court has determined that this Disclosure Statement contains information adequate to permit holders of Claims to make an informed judgment about the Plan. Such approval, however, does not mean that the Court recommends either acceptance or rejection of the Plan.]

The Debtors believe that confirmation and consummation of the Plan is in the best interests of the Debtors, their Estates, and their creditors. The Plan provides for an equitable distribution to creditors. The Debtors believe that any alternative to confirmation of the Plan could result in significant delay, litigation, and additional costs, as well as a reduction in the distributions to Holders of Claims in certain Classes. Consequently, the Debtors urge all eligible Holders of Impaired Claims to vote to ACCEPT the Plan, and to complete and return their Ballots so that they will be RECEIVED by the Voting Agent on or before the Voting Deadline.

Dated:  March 25, 2019
        New York, New York

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP


*/s/ James J. Mazza, Jr.*
Paul D. Leake
Jason N. Kestecher
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000


– and –


James J. Mazza, Jr.
Justin M. Winerman
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411


*Counsel to Debtors and Debtors-in-Possession*

**EXHIBIT A**

**Joint Plan of Reorganization of Trident Holding Company, LLC and Its Debtor Affiliates**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRIDENT HOLDING COMPANY, LLC, *et al.*,** | **Case No. 19-10384 (SHL)** |
| Debtors.[1] | **(Jointly Administered)** |

## JOINT PLAN OF REORGANIZATION OF TRIDENT HOLDING COMPANY, LLC AND ITS DEBTOR AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

James J. Mazza, Jr.
Justin M. Winerman
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700

Paul D. Leake
Jason N. Kestecher
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000

*Attorneys for the Debtors and Debtors-in-Possession*

Dated:        March 25, 2019

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Trident Holding Company, LLC (6396); American Diagnostics Services, Inc. (2771); Community Mobile Diagnostics, LLC (9341); Community Mobile Ultrasound, LLC (3818); Diagnostic Labs Holdings, LLC (8024); FC Pioneer Holding Company, LLC (6683); JLMD Manager, LLC (8470); Kan-Di-Ki LLC (6100); Main Street Clinical Laboratory, Inc. (0907); MDX-MDL Holdings, LLC (2605); MetroStat Clinical Laboratory – Austin, Inc. (4366); MX Holdings, LLC (8869); MX USA, LLC (4885); New Trident Holdcorp, Inc. (4913); Rely Radiology Holdings, LLC (3284); Schryver Medical Sales and Marketing, LLC (9620); Symphony Diagnostic Services No. 1, LLC (8980); Trident Clinical Services Holdings, Inc. (6262); Trident Clinical Services Holdings, LLC (1255); TridentUSA Foot Care Services LLC (3787); TridentUSA Mobile Clinical Services, LLC (0334); TridentUSA Mobile Infusion Services, LLC (5173); U.S. Lab & Radiology, Inc. (4988). The address of the Debtors' corporate headquarters is 930 Ridgebrook Road, 3rd Floor, Sparks, MD 21152.

# TABLE OF CONTENTS

**Page**

### Article I

### DEFINITIONS, RULES OF
### INTERPRETATION, AND COMPUTATION OF TIME

A.        Scope of Definitions ................................................................1
B.        Definitions.................................................................................1
C.        Rules of Interpretation ...........................................................19
D.        Computation Of Time ............................................................20
E.        References to Monetary Figures .............................................20
F.        Certain Consent Rights ..........................................................20
G.        Exhibits ...................................................................................20

### Article II

### ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

2.1       Administrative Claims ............................................................20
2.2       DIP Facility Claims.................................................................21
2.3       Professional Claims ................................................................21
2.4       Priority Tax Claims.................................................................22

### Article III

### CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

3.1       Classification of Claims and Interests....................................23

### Article IV

### PROVISIONS FOR TREATMENT
### OF CLAIMS AND INTERESTS

4.1       Priority First Lien Claims ......................................................25
4.2       First Lien Claims.....................................................................25
4.3       Second Lien Claims ................................................................26
4.4       Other Secured Claims .............................................................27
4.5       Other Priority Claims .............................................................28
4.6       General Unsecured Claims ......................................................28
4.7       PIK Note Claims .....................................................................28
4.8       Intercompany Claims ..............................................................29
4.9       Other Subordinated Claims.....................................................29
4.10      Interests in Debtor Subsidiaries .............................................30
4.11      Interests in Pioneer.................................................................30

i

## Article V

### ACCEPTANCE

5.1    Classes Entitled to Vote ........................................................................30
5.2    Acceptance by Impaired Classes ...........................................................30
5.3    Elimination of Classes ...........................................................................31
5.4    Special Provision Governing Unimpaired Claims .................................31
5.5    Deemed Acceptance if No Votes Cast ...................................................31
5.6    Cramdown ...............................................................................................31

## Article VI

### MEANS FOR IMPLEMENTATION OF THE PLAN

6.1    No Substantive Consolidation................................................................31
6.2    General Settlement of Claims and Interests...........................................31
6.3    Restructuring Transactions.....................................................................31
6.4    Sources of Cash for Plan Distribution ...................................................32
6.5    Exit Liquidity Facility............................................................................32
6.6    Exit Term Loan Facility..........................................................................33
6.7    New First Lien Facility ..........................................................................33
6.8    Authorization, Issuance, and Distribution of New Pioneer Units..........33
6.9    General Unsecured Claims Cash Pool. ...................................................33
6.10   Exemptions from Securities Act Registration Requirements .................33
6.11   Cancellation of Existing Securities and Agreements..............................34
6.12   Issuance and Distribution of New Securities; Execution of Plan
       Documents...............................................................................................34
6.13   Continued Corporate Existence ..............................................................34
6.14   New Corporate Governance Documents .................................................35
6.15   Directors, LLC Managers, and Officers of Reorganized Debtors ..........35
6.16   Corporate Action.....................................................................................35
6.17   Effectuating Documents; Further Transactions ......................................36
6.18   Employment, Retirement, Indemnification, and Other Agreements and
       Employee Compensation Programs.........................................................36
6.19   Preservation Of Causes Of Action .........................................................37
6.20   Reservation of Rights..............................................................................37
6.21   Exemption from Certain Transfer Taxes and Recording Fees.................38
6.22   Insured Claims ........................................................................................38
6.23   Intercompany Account Settlement...........................................................38
6.24   Closing of Chapter 11 Cases...................................................................38
6.25   Private Company......................................................................................38

## Article VII

### UNEXPIRED LEASES AND EXECUTORY CONTRACTS

7.1    Rejection of Executory Contracts and Unexpired Leases.......................38

7.2     Assumption of Executory Contracts and Unexpired Leases.................................39
7.3     Insurance Policies ......................................................................................40
7.4     Cure Procedures and Payments Related to Assumption of Executory
        Contracts and Unexpired Leases.................................................................41
7.5     Contracts, Intercompany Contracts, and Leases Entered into After the
        Petition Date..............................................................................................42
7.6     General Reservation of Rights ....................................................................42

## Article VIII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

8.1     Determination Of Claims and Interests.........................................................43
8.2     GUC Administrator.....................................................................................43
8.3     Claims Administration Responsibility ...........................................................44
8.4     Objections to Claims ...................................................................................44
8.5     Disallowance of Claims ...............................................................................44
8.6     Estimation of Claims...................................................................................44
8.7     No Interest on Claims ..................................................................................45
8.8     Amendments to Claims................................................................................45

## Article IX

## PROVISIONS GOVERNING DISTRIBUTIONS

9.1     Time of Distributions...................................................................................45
9.2     Distribution Agent ......................................................................................45
9.3     Currency.....................................................................................................45
9.4     Distributions on Account of Claims Allowed as of the Effective Date................46
9.5     Distributions on Account of Claims Allowed After the Effective Date ...............46
9.6     Delivery Of Distributions.............................................................................47
9.7     Accrual of Dividends and Other Rights .........................................................49
9.8     Compliance Matters ....................................................................................49
9.9     Claims Paid or Payable by Third Parties .......................................................49
9.10    Setoffs .......................................................................................................50
9.11    Allocation of Plan Distributions Between Principal and Interest .......................50

## Article X

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

10.1    Vesting of Assets ........................................................................................50
10.2    Discharge of the Debtors .............................................................................51
10.3    Release by Debtors .....................................................................................51
10.4    Release by Holders of Claims.......................................................................52
10.5    Exculpation and Limitation of Liability .........................................................52
10.6    Exclusions and Limitations on Exculpation, Indemnification, and Releases ........53
10.7    Injunction ..................................................................................................53
10.8    Subordination Rights ..................................................................................54

10.9    Protection Against Discriminatory Treatment ........................................................55
10.10   Recoupment .............................................................................................................55
10.11   Release of Liens .......................................................................................................55
10.12   Reimbursement or Contribution ..............................................................................55

## Article XI

## CONDITIONS PRECEDENT

11.1    Conditions to Confirmation ......................................................................................55
11.2    Conditions to the Effective Date of the Plan ...........................................................56
11.3    Waiver of Conditions Precedent ..............................................................................56
11.4    Notice of Effective Date ...........................................................................................57
11.5    Effect of Non-Occurrence of Conditions to Consummation ....................................57

## Article XII

## RETENTION OF JURISDICTION

## Article XIII

## MISCELLANEOUS PROVISIONS

13.1    Binding Effect ...........................................................................................................59
13.2    Payment of Statutory Fees .......................................................................................59
13.3    Modification and Amendments .................................................................................59
13.4    Confirmation of the Plan ..........................................................................................59
13.5    Additional Documents ..............................................................................................59
13.6    Dissolution of Creditors' Committee .......................................................................60
13.7    Request for Expedited Determination of Taxes .......................................................60
13.8    Revocation, Withdrawal, or Non-Consummation ....................................................60
13.9    Notices ......................................................................................................................60
13.10   Term of Injunctions or Stays ....................................................................................62
13.11   Governing Law ..........................................................................................................62
13.12   Entire Agreement ......................................................................................................62
13.13   Severability ...............................................................................................................62
13.14   No Waiver or Estoppel ..............................................................................................62
13.15   Conflicts ....................................................................................................................63

## EXHIBITS[2]

**Exhibit 2.1**          **Administrative Claim Request Form**

**Exhibit 6.6**          **Exit Term Loan Facility Credit Agreement**

**Exhibit 6.14**         **Pioneer LLC Agreement**

**Exhibit 6.19**         **Retained Causes of Action**

**Exhibit 7.1**          **Assumed Executory Contracts and Unexpired Leases**

---

[2]    The Exhibits will be filed with the Plan Supplement.

## INTRODUCTION

Trident Holding Company, LLC and certain of its affiliates, the debtors and debtors in possession (collectively, the "Company") in the above-captioned cases (the "Chapter 11 Cases"), hereby propose this joint plan (this "Plan") for the resolution of the outstanding Claims and Interests.  Capitalized terms used herein shall have the meanings ascribed to them in Article I.B of this Plan.

The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a Holder of a Claim or Interest until a disclosure statement has been approved by the Bankruptcy Court and distributed to Holders of Claims and Interests.  The Disclosure Statement relating to this Plan was approved by the Bankruptcy Court on [  ], 2019 and has been made available to all parties whose votes are being solicited.  The Disclosure Statement contains, among other things, a discussion of the Debtors' history, business, properties and operations, risk factors associated with the business and Plan, a summary and analysis of this Plan, a summary and analysis of the settlements contained in the Plan, and certain related matters.

**ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XIII of this Plan, the Debtors expressly reserve their rights to alter, amend, modify, revoke, or withdraw this Plan, one or more times, prior to this Plan's substantial consummation.

## ARTICLE I

## DEFINITIONS, RULES OF
## INTERPRETATION, AND COMPUTATION OF TIME

### A.    Scope of Definitions

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I.B of this Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### B.    Definitions

**1.1**    "**Accepting Class**" means a Class that votes to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

1

**1.2**    "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, Section 503(b)(9) Claims, DIP Facility Claims, Professional Claims, and all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court.

**1.3**    "**Administrative Claim Request Form**" means the form to be included in the Plan Supplement for submitting Administrative Claims requests.

**1.4**    "**Administrative Claims Bar Date**" means the deadline for filing proofs of or requests for payment of Administrative Claims, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to the DIP Facility Claims and Professional Claims, which shall be subject to the provisions of Articles 2.2 and 2.3 hereof, as applicable.

**1.5**    "**Affiliates**" has the meaning ascribed to such term by section 101(2) of the Bankruptcy Code.

**1.6**    "**Allowed**" means, for distribution purposes, a Claim or Interest, or any portion thereof, or a particular Class of Claims or Interests (a) that has been allowed by a Final Order of the Bankruptcy Court (or such other court as the Reorganized Debtor and the Holder of such Claim or Interest agree may adjudicate such Claim or Interest and objections thereto), (b) which is not the subject of a proof of Claim timely filed with the Bankruptcy Court and is Scheduled as liquidated and noncontingent, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, but only to the extent such Claim is Scheduled as liquidated and noncontingent, (c) for which a proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which (i) no objection to its allowance has been filed within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court, (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order of the Bankruptcy Court, or, (iii) following the Effective Date, with respect to General Unsecured Claims, as otherwise may be determined by the GUC Administrator, or (d) that is expressly allowed in a liquidated amount pursuant to this Plan.

**1.7**    "**Annual Incentive Plan**" means the Company's annual ordinary course incentive plan.

**1.8**    "**Assumption and Rejection Procedures**" means the expedited procedures for the Debtors to assume or reject Executory Contracts and Unexpired Leases pursuant to the Bankruptcy Court's order dated March 8, 2019 (Docket No. 171).

**1.9**    "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors and their

2

recovery, subordination, or other remedies that may be brought by and on behalf of the Debtors and their estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under section 502, 544, 545, 547, 548, 550, 553, and 724(a) of the Bankruptcy Code.

**1.10**   "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the date hereof but, with respect to amendments to the Bankruptcy Code subsequent to commencement of the Chapter 11 Cases, only to the extent that such amendments were made expressly applicable to bankruptcy cases which were filed as of the enactment of such amendments.

**1.11**   "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

**1.12**   "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

**1.13**   "**Bar Date**" means the deadlines set by the Bankruptcy Court pursuant to the Bar Date Order or other Final Order for filing proofs of claim in the Chapter 11 Cases, as the context may require.

**1.14**   "**Bar Date Order**" means the order entered by the Bankruptcy Court on [   ], 2019 (Docket No. [   ]) and any subsequent order supplementing such order or relating thereto.

**1.15**   "**Business Day**" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York City.

**1.16**   "**Capital Raising Transaction**" means, to the extent reasonably necessary in the Debtors' business judgment and with the consent of the Priority First Lien Administrative Agent, a capital-raising or liquidity-generating transaction arranged by the Priority First Lien Administrative Agent to provide the Debtors with sufficient capital (whether in the form of exit financing or otherwise) to allow for the implementation and effectiveness of the Plan, on terms and conditions reasonably acceptable to the Debtors.

**1.17**   "**Cash**" means legal tender of the United States of America and equivalents thereof.

**1.18**   "**Causes of Action**" means any and all actions, claims, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or

3

assertable, in contract or in tort, directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, including any Avoidance Action, and actions against any Entity for failure to pay for products or services provided or rendered by any Debtor, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.19    "**Certificate**" means any instrument evidencing a Claim or an Interest.

1.20    "**Chapter 11 Cases**" means the voluntary cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, which are being jointly administered and are currently pending before the Bankruptcy Court under Case No. 19-10384 (SHL).

1.21    "**Claim**" means a claim against the Debtors, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, or an Administrative Claim, as applicable.

1.22    "**Claims and Solicitation Agent**" means Epiq Corporate Restructuring LLC.

1.23    "**Claims Objection Deadline**" means, as applicable (except for Administrative Claims), (a) the day that is the later of the first Business Day that is at least 180 days after the Effective Date or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest.

1.24    "**Class**" means a category of Holders of Claims or Interests classified together pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, as described in Article III of this Plan.

1.25    "**Confirmation**" means the entry, within the meaning of Bankruptcy Rules 5003 and 9012, of the Confirmation Order, subject to all conditions specified in Article 11.1 having been satisfied or waived, in accordance with the terms herein.

1.26    "**Confirmation Date**" means the date on which Confirmation occurs.

1.27    "**Confirmation Hearing**" means the hearing before the Bankruptcy Court held under section 1128 of the Bankruptcy Code to consider confirmation of the Plan and related matters as such hearing may be adjourned or continued from time to time.

1.28    "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

1.29    "**Creditor**" has the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

**1.30** "**Creditors' Committee**" means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on February 20, 2019, as may be reconstituted from time to time.

**1.31** "**Cure**" means the payment or other honoring of all obligations required to be paid or honored in connection with assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an Executory Contract or Unexpired Lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.32** "**Cure Notice**" means the notice of proposed Cure amount provided to counterparties to assumed Executory Contracts or Unexpired Leases pursuant to Article 7.4 of the Plan.

**1.33** "**Cure Objection Deadline**" means the deadline for filing objections to a Cure Notice or proposed Cure, which shall be on or before fourteen (14) days after the applicable counterparty was served with a Cure Notice.

**1.34** "**D&O Insurance**" means [TO COME].

**1.35** "**Debtor Group**" has the meaning ascribed to such term in Article 3.1.

**1.36** "**Debtor Group B**" means Trident Holding Company, LLC.

**1.37** "**Debtor Group C**" means, collectively, the following Debtors: American Diagnostics Services, Inc.; Community Mobile Diagnostics, LLC; Community Mobile Ultrasound, LLC; Diagnostic Labs Holdings, LLC; JLMD Manager, LLC; Kan-Di-Ki LLC; Main Street Clinical Laboratory, Inc.; MDX-MDL Holdings, LLC; MetroStat Clinical Laboratory – Austin, Inc.; MX Holdings, LLC; MX USA, LLC; New Trident Holdcorp, Inc.; Rely Radiology Holdings, LLC; Schryver Medical Sales and Marketing, LLC; Symphony Diagnostic Services No. 1, LLC; Trident Clinical Services Holdings, Inc.; Trident Clinical Services Holdings, LLC; TridentUSA Foot Care Services LLC; TridentUSA Mobile Clinical Services, LLC; TridentUSA Mobile Infusion Services, LLC; and U.S. Lab & Radiology, Inc.

**1.38** "**Debtor Subsidiaries**" means each Debtor that is a direct or indirect subsidiary of Pioneer.

**1.39** "**Debtors**" means, collectively, Trident Holding Company, LLC; American Diagnostics Services, Inc.; Community Mobile Diagnostics, LLC; Community Mobile Ultrasound, LLC; Diagnostic Labs Holdings, LLC; FC Pioneer Holding Company, LLC; JLMD Manager, LLC; Kan-Di-Ki LLC; Main Street Clinical Laboratory, Inc.; MDX-MDL Holdings,

LLC; MetroStat Clinical Laboratory – Austin, Inc.; MX Holdings, LLC; MX USA, LLC; New Trident Holdcorp, Inc.; Rely Radiology Holdings, LLC; Schryver Medical Sales and Marketing, LLC; Symphony Diagnostic Services No. 1, LLC; Trident Clinical Services Holdings, Inc.; Trident Clinical Services Holdings, LLC; TridentUSA Foot Care Services LLC; TridentUSA Mobile Clinical Services, LLC; TridentUSA Mobile Infusion Services, LLC; and U.S. Lab & Radiology, Inc.

1.40    "**DIP Agent**" means Silver Point Finance, LLC, in its capacity as administrative agent for the DIP Lenders pursuant to the DIP Credit Agreement.

1.41    "**DIP Credit Agreement**" means that certain Senior Secured Superpriority Debtor in Possession Credit Agreement, between New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, the DIP Lenders, the DIP Agent and the other parties thereto, dated as of February 11, 2019, as has been or may be amended, restated, supplemented or otherwise modified from time to time.

1.42    "**DIP Documents**" means all "Loan Documents" (as defined in the DIP Credit Agreement).

1.43    "**DIP Facility**" means the debtor-in-possession senior secured financing facility, consisting of a term loan facility, provided to the Debtors by the DIP Lenders pursuant to the DIP Credit Agreement or the other DIP Documents (as defined in the DIP Facility Order) as authorized by the Bankruptcy Court pursuant to the DIP Facility Order.

1.44    "**DIP Facility Claim**" means any Claim arising under, derived from, based upon, on account of or as a result of the DIP Facility.

1.45    "**DIP Facility Order**" means, collectively, (a) the interim order that was entered by the Bankruptcy Court on February 12, 2019 (Docket No. 41), and (b) the final order that was entered by the Bankruptcy Court on March 8, 2019 (Docket No. 166), authorizing and approving the DIP Facility and the agreements related thereto, in each case as amended or modified in accordance with the terms thereof.  The term "DIP Facility Order" includes any and all annexes or exhibits attached thereto.

1.46    "**DIP Lenders**" means the financial institutions or entities from time to time party to the DIP Credit Agreement as lenders.

1.47    "**DIP Secured Parties**" has the meaning ascribed to the term "Secured Parties" in the DIP Credit Agreement.

1.48    "**Disallowed**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, or as provided in this Plan, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the

6

Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

1.49    "**Disclosure Statement**" means the disclosure statement or any supplements thereto that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time in accordance with the terms therein, all as approved by an order of the Bankruptcy Court pursuant to sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3017.

1.50    "**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto.

1.51    "**Disputed**" means with respect to a Claim, (a) any Claim as to which any Debtor or other parties-in-interest in accordance with applicable law have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by any Debtor, or other parties-in-interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

1.52    "**Distribution Agent**" means any Entity selected by the Debtors or the Reorganized Debtors, in their sole discretion, to make or facilitate distributions pursuant to this Plan.

1.53    "**Distribution Date**" means the date selected by the Reorganized Debtors, in their sole discretion, upon which distributions to Holders of Allowed Claims entitled to receive distributions under this Plan shall commence.

1.54    "**Distribution Record Date**" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which shall be (a) ten (10) Business Days after entry of the Confirmation Order or (b) such other date as designated by an order of the Bankruptcy Court.

1.55    "**Effective Date**" means the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the effectiveness of this Plan specified in Article 11.2, have been satisfied, or, if capable of being waived in accordance with the terms herein, waived, which date shall be specified in a notice filed by the Reorganized Debtors with the Bankruptcy Court.

1.56    "**Entity**" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.57    "**EPL Policy**" means [TO COME].

7

**1.58**    "**Equity Security**" has the meaning ascribed to such term in section 101(16) of the Bankruptcy Code.

**1.59**    "**Estates**" means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

**1.60**    "**Executory Contract**" means any contract to which any Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.61**    "**Exhibit**" means an exhibit annexed either to this Plan, contained in the Plan Supplement, or annexed as an appendix to the Disclosure Statement.

**1.62**    "**Exit Liquidity Facility**" means a senior secured asset-based lending, receivables, or similar facility with revolving commitments in an aggregate amount not to exceed the difference between $10 million and the greater of (a) the Debtors' projected available cash and Cash Equivalents (as defined in the DIP Credit Agreement) on the Effective Date, or (b) the Debtors' projected available cash and Cash Equivalents 60 days following the Effective Date, on terms and conditions reasonably acceptable to the Priority First Lien Administrative Agent, which shall be senior in lien priority to the Exit Term Loan Facility and New First Lien Facility with respect to the Debtors' and Reorganized Debtors' accounts receivable and inventory assets.

**1.63**    "**Exit Term Loan Facility**" means an exit term loan credit facility in an aggregate principal amount of $50 million to be provided to the Reorganized Debtors by the Exit Term Loan Facility Lenders on the Effective Date pursuant to the Exit Term Loan Facility Documents, which shall be senior in lien priority to the New First Lien Facility.

**1.64**    "**Exit Term Loan Facility Agent**" means the administrative agent under the Exit Term Loan Facility Documents, and its successors and assigns in such capacity, or any replacement agent appointed pursuant to the terms of the Exit Term Loan Facility Documents.

**1.65**    "**Exit Term Loan Facility Credit Agreement**" means that certain term loan credit agreement, annexed hereto as <u>Exhibit 6.6</u>, which shall be effective on the Effective Date, by and among certain of the Reorganized Debtors, the Exit Term Loan Facility Agent, and the Exit Term Loan Facility Lenders, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time, which shall have lien priority over all other indebtedness of the Reorganized Debtors (other than, if applicable, the Exit Liquidity Facility) and shall bear interest at a rate of LIBOR *plus* 7% per annum payable in Cash.

**1.66**    "**Exit Term Loan Facility Lenders**" means the lenders under the Exit Term Loan Facility Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the Exit Term Loan Facility Credit Agreement.

**1.67**    "**Exit Term Loan Facility Documents**" means, collectively, the Exit Term Loan Facility Credit Agreement and all other "Loan Documents" as defined therein, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documents) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall be, to the extent applicable.

**1.68**    "**Face Amount**" means, (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Holder of a Claim in any proof of Claim, or amendment thereof in accordance with applicable law, timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, or the amount estimated for such Claim in an order of the Bankruptcy Court, and (b) when used in reference to an Allowed Claim or Allowed Interest, the allowed amount of such Claim or Interest.  If none of the foregoing applies, the Face Amount of the Claim shall be zero ($0) dollars.

**1.69**    "**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

**1.70**    "**Final Order**" means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, is in full force and effect, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors or Reorganized Debtors, as applicable, reserve the right to waive any appeal period for an order or judgment to become a Final Order.

**1.71**    "**First Lien Administrative Agent**" means Cortland Capital Market Services LLC, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the First Lien Credit Agreement.

**1.72**    "**First Lien Claims**" means any and all Claims held by the First Lien Lenders against the Debtors arising under, relating to, or in connection with the First Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in an aggregate amount of $[219,815,899.97].

**1.73**    "**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of July 31, 2013, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the First Lien Administrative Agent, and the various lenders party thereto from time to time,  as has been or it may be amended, supplemented, amended and restated, or otherwise modified from time to time.

**1.74**    "**First Lien Credit Documents**" means the First Lien Credit Agreement, together with all other "Loan Documents" (as defined in the First Lien Credit Agreement).

**1.75** "**First Lien Lenders**" means the "Lenders" as defined in the First Lien Credit Agreement.

**1.76** "**First Lien Secured Parties**" means the "Secured Parties" as defined in the First Lien Credit Agreement.

**1.77** "**General Unsecured Claims Cash Pool**" means $100,000 of Cash.

**1.78** "**General Unsecured Claims Cash Pool Account**" means a segregated account to be funded on or prior to the Effective Date in accordance with Article 6.9.

**1.79** "**General Unsecured Claim**" means any Claim that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Priority First Lien Claim, First Lien Claim, Second Lien Claim, PIK Notes Claim, Other Secured Claim, Other Priority Claim, Intercompany Claim, or Other Subordinated Claim. Without limiting the foregoing, General Unsecured Claims include all Rejection Damages Claims that are not Allowed Section 503(b)(9) Claims.

**1.80** "**Governmental Unit**" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

**1.81** ["**GUC Administrator**" means the person appointed by the Creditors' Committee in accordance with Article 8.2 of the Plan.]

**1.82** ["**GUC Administrator Costs**" means the reasonable costs and expenses of the GUC Administrator, including reasonable professionals' fees and expenses, which, for the avoidance of doubt, shall solely be paid from the General Unsecured Claims Cash Pool.]

**1.83** "**Holdback Escrow Account**" means the interest-bearing escrow account into which Cash equal to the Holdback Escrow Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims (as Allowed pursuant to the terms of this Plan) to the extent not previously paid or disallowed.

**1.84** "**Holdback Escrow Amount**" means the sum of (a) the aggregate amounts withheld by the Debtors as of the Confirmation Date as a holdback on payment of Professional Claims pursuant to the Professional Fee Order, and (b) twenty (20) percent of that portion of the unbilled fees of Professionals estimated pursuant to Article 2.3(c) of the Plan attributable to fees incurred as of the Confirmation Date; provided, however, that if a Professional does not provide an estimate pursuant to Article 2.3(c), the Debtors may estimate the unbilled fees of such Professional incurred as of the Confirmation Date, and the sum of provision (a) above and the total amount so estimated shall comprise the Holdback Escrow Amount.

**1.85** "**Holder**" means a holder of a Claim against or Interest in the Debtors.

**1.86** "**Impaired**" means impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.87**    "**Insurance Contract**" has the meaning ascribed to it in <u>Article 7.3</u> of this Plan.

**1.88**    "**Insured Claims**" has the meaning ascribed to it in <u>Article 7.3</u> of this Plan.

**1.89**    "**Intercompany Claim**" means a Claim or a Cause of Action by a Debtor against another Debtor.

**1.90**    "**Interest**" means any Equity Security, common stock, equity, ownership, profit interest, unit, or share in a Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in a Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, vested, transferrable, preferred, common, voting, or denominated "stock" or a similar security, existing immediately prior to the Effective Date.

**1.91**    "**Investor Representatives**" means, collectively, the Original PIK Notes Investor Representative and the Tranched PIK Notes Investor Representative.

**1.92**    "**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued, or promulgated by any Governmental Unit.

**1.93**    "**Legal Proceeding**" means legal, governmental, administrative, judicial, or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, notices of noncompliance or violation, or proceedings.

**1.94**    "**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

**1.95**    "**Management Incentive Plan**" means the post-Effective Date management equity incentive plan, which shall provide for, among other things, not to exceed 10% of the equity, options, restricted stock units, or other equity instruments in Reorganized Pioneer, issued at plan value, to be reserved for current and future officers and employees of the Reorganized Debtors (excluding any such equity, options, restricted stock units, or other equity instruments granted to the non-executive members of the New Pioneer Board), with awards and terms and conditions thereunder determined by the New Pioneer Board, except as otherwise set forth in the Plan Supplement. For the avoidance of doubt, the Reorganized Debtors shall have the right to set additional equity awards for the benefit of members of the New Boards following the Effective Date.

**1.96**    "**Minimum Liquidity Condition Precedent**" has the meaning ascribed to such term in <u>Article 11.2</u>.

**1.97**    "**New Boards**" means the initial boards of directors of the Reorganized Debtors, which shall as of the Effective Date consist of members selected by the Priority First Lien Administrative Agent and shall be as set forth in the Plan Supplement or as announced on the record during the Confirmation Hearing.

**1.98**    "**New First Lien Facility**" means a new first lien term loan facility in an aggregate principal amount of $[105] million to be provided to the Reorganized Debtors by the New First Lien Facility Lenders on the Effective Date pursuant to the New First Lien Credit Agreement, which shall be junior in lien priority to the Exit Term Loan Facility.

**1.99**    "**New First Lien Facility Agent**" means the administrative agent under the New First Lien Facility Documents, and its successors and assigns in such capacity, or any replacement agent appointed pursuant to the terms of the New First Lien Facility Documents.

**1.100**    "**New First Lien Credit Agreement**" means that certain term loan credit agreement, which shall be effective on the Effective Date, by and among certain of the Reorganized Debtors, the New First Lien Facility Agent, and the New First Lien Facility Lenders, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time, the material terms of which shall be substantially identical to those in the Priority First Lien Credit Agreement, except that term loans under the New First Lien Facility shall bear interest at a rate of LIBOR *plus* 4% per annum payable in cash *plus* 3.5% per annum payable-in-kind; provided that the Reorganized Debtors shall have the ability at any time to elect to pay interest at a rate of LIBOR *plus* 7% per annum payable in cash for any period.

**1.101**    "**New First Lien Facility Documents**" means, collectively, the New First Lien Facility Credit Agreement and all other "Loan Documents" as defined therein, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documents) (in each case, as amended, restated, modified, or supplemented from time to time).

**1.102**    "**New First Lien Facility Lenders**" means the lenders under the New First Lien Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the New First Lien Credit Agreement.

**1.103**    "**New Pioneer Board**" means the initial board of managers of Reorganized Pioneer, which shall as of the Effective Date consist of members selected by the Priority First Lien Administrative Agent and shall be as set forth in the Plan Supplement or as announced on the record during the Confirmation Hearing.

**1.104**    "**New Pioneer Units**" means the Class A limited liability company units of Reorganized Pioneer as provided under the Pioneer LLC Agreement.

**1.105**    "**Old Pioneer Units**" means limited liability company interests represented by units of FC Pioneer Holding Company, LLC of any other such interests that are authorized, issued, and outstanding prior to the Effective Date.

**1.106**    "**Old Securities**" means, collectively, the Original PIK Notes, the Tranched PIK Notes, and Old Pioneer Units, and all options, warrants, rights, and other instruments evidencing an ownership interest in Pioneer (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise to acquire any of the foregoing.

**1.107** "**Ordinary Course Professionals Order**" means the Bankruptcy Court's Order Authorizing Debtors To Employ And Pay Professionals Utilized In The Ordinary Course Of Business (Docket No. 180).

**1.108** "**Original PIK Noteholder**" means the Holder of an Original PIK Note.

**1.109** "**Original PIK Notes**" means those certain promissory notes issued pursuant to the Original PIK Notes Investment Agreement.

**1.110** "**Original PIK Notes Investment Agreement**" means the Investment Agreement, dated as of December 9, 2016, by and among Pioneer, as borrower, the Original PIK Notes Investor Representative, and the other noteholders party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

**1.111** "**Original PIK Notes Investor Representative**" means GCM Saint Paul SPV, LLC, in its capacity as investor representative under the Original PIK Notes Investment Agreement.

**1.112** "**Other Priority Claim**" means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a) of the Bankruptcy Code.

**1.113** "**Other Secured Claim**" means any Secured Claim other than the following: (a) a DIP Facility Claim; (b) a Priority First Lien Claim; (c) a First Lien Claim; or (d) a Second Lien Claim.

**1.114** "**Other Subordinated Claim**" means any Claim against the Debtors that is subject to subordination under section 510(b) or (c) of the Bankruptcy Code, whether arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, or otherwise, which Claim shall be subordinated to all Claims or Interests that are senior to or equal to the Claim or Interest represented by such security.

**1.115** "**Periodic Distribution Date**" means, as applicable, (a) the Distribution Date, as to the first distribution made by the Distribution Agent, and (b) thereafter, such Business Days selected by the Reorganized Debtors in their reasonable discretion, which shall be no less frequent than once every three (3) months unless otherwise determined by the New Board.

**1.116** "**Person**" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

**1.117** "**Petition Date**" means February 10, 2019.

**1.118** "**PIK Notes**" means, collectively, the Original PIK Notes and the Tranched PIK Notes.

**1.119** "**PIK Notes Claim**" means any Claim arising from, or related to, the PIK Notes.

**1.120** "**Pioneer**" means FC Pioneer Holding Company, LLC.

**1.121** "**Pioneer LLC Agreement**" means the amended and restated limited liability company agreement of Pioneer to be effective as of the Effective Date, the form and substance of which shall be included in the Plan Supplement.

**1.122** "**Plan**" means this joint plan of reorganization for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as may be modified in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms herein, including the Plan Supplement and all Exhibits, supplements, appendices, and schedules.

**1.123** "**Plan Supplement**" means the supplement or supplements to the Plan containing certain Exhibits and documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court in accordance with the terms herein.

**1.124** "**Plan Supplement Filing Date**" means the date on which the Plan Supplement shall be filed with the Bankruptcy Court, which date shall be at least seven days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice, so long as such date is prior to the Voting Deadline.

**1.125** "**Plan Transaction Documents**" means all definitive documents and agreements to which the Debtors will be a party as contemplated by the Plan including, without limitation, (a) the Plan and any documentation or agreements related thereto, (b) the Confirmation Order and pleadings (but not declarations) in support of entry thereof, (c) the solicitation materials in respect of the Plan, the motion to approve the Disclosure Statement, and the Disclosure Statement Order, and (d) all documents that will comprise the Plan Supplements.

**1.126** "**Priority First Lien Administrative Agent**" means Silver Point Finance, LLC, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the Priority First Lien Credit Agreement.

**1.127** "**Priority First Lien Claims**" means any and all Claims held by the Priority First Lien Lenders against the Debtors arising under, relating to, or in connection with the Priority First Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in the aggregate amount of $[259,387,485.15].

**1.128** "**Priority First Lien Credit Agreement**" means that certain Priority First Lien Credit Agreement, dated as of April 30, 2018, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, Trident Holding Company, LLC, the Priority First Lien Administrative Agent, and the various lenders party thereto from time to time, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time.

14

**1.129** "**Priority First Lien Credit Documents**" means the Priority First Lien Credit Agreement, together with all other "Loan Documents" (as defined in the Priority First Lien Credit Agreement).

**1.130** "**Priority Intercreditor Agreement**" means the Priority/First Lien/Second Lien Intercreditor Agreement, dated as of April 30, 2018, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, Trident Holding Company, LLC, the other grantors party thereto, the Priority First Lien Administrative Agent, the First Lien Administrative Agent, and the Second Lien Administrative Agent.

**1.131** "**Priority First Lien Lenders**" means the "Lenders" as defined in the Priority First Lien Credit Agreement.

**1.132** "**Priority First Lien Secured Parties**" means the "Secured Parties" as defined in the Priority First Lien Credit Agreement.

**1.133** "**Priority Tax Claim**" means a Claim of a Governmental Unit entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.134** "**Pro Rata**" means, with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes at issue; provided, however, that for purposes of distributions to Holders of Allowed General Unsecured Claims, Pro Rata shall apply on a consolidated basis.

**1.135** "**Professional**" means any Entity (a) retained in the Chapter 11 Cases by separate Final Order pursuant to sections 327, 363, and 1103 of the Bankruptcy Code or otherwise; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; provided, however, that Professional does not include any Entity retained pursuant to the Ordinary Course Professionals Order.

**1.136** "**Professional Claim**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Confirmation Date.

**1.137** "**Professional Fee Order**" means the order entered by the Bankruptcy Court on March 8, 2019, authorizing the interim payment of Professional Claims subject to the Holdback Escrow Amount (Docket No. 172).

**1.138** "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claim Holder so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claim Holder to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim

as such maturity existed before such default; (iii) compensating the Claim Holder for any damages incurred as a result of any reasonable reliance by such Claim Holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claim Holder; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

      **1.139** "**Rejection Damages Claim**" means any Claim on account of the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

      **1.140** "**Released Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' (1) current financial advisors, attorneys, accountants, investment bankers, representatives, and other professionals (collectively, the "**Debtor Professionals**"); (2) current employees, consultants, Affiliates, officers, managers and directors, including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; (i) with respect to each of the foregoing entities in clauses (a) through (h), each of their current and former Affiliates; and (j) with respect to each of the foregoing entities in clauses (a) through (i), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, direct and indirect partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

      **1.141** "**Releasing Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and the Reorganized Debtors; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; (i) with respect to each of the foregoing parties under (a) through (h), each of their current and former affiliates; (j) with respect to each of the foregoing entities in clauses (a) through (i), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, direct and indirect partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management

companies, fund advisors, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees; and (k) without limiting the foregoing, each holder of a Claim against or Interest in the Company that (1) voted to accept the Plan, (2) is deemed to accept the Plan, (3) is deemed to reject the Plan and did not indicate that they opt to not grant the releases provided in the Plan, (4) was solicited to vote to accept or reject the Plan but who does not vote either to accept or to reject the Plan and, further, did not indicate that they opt to not grant the releases provided in the Plan, or (5) voted to reject the Plan and did not indicate that they opt to not grant the releases provided in the Plan.  For the avoidance of doubt, the Releasing Parties shall not include any holder of a Claim against or Interest in the Company that was entitled to vote on the Plan, voted to reject the Plan, and elected to opt-out of the releases provided for in the Plan.

1.142   "**Reorganized Debtors**" means the Debtors or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

1.143   "**Reorganized Pioneer**" means Pioneer or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

1.144   "**Restructuring Transactions**" has the meaning set forth in Article 6.3.

1.145   "**RSA**" means the Restructuring Support Agreement, dated as of February 10, 2019, by and between the Debtors, the Priority First Lien Lenders, and the Priority First Lien Administrative Agent, including any exhibits and schedules thereto.

1.146   "**Scheduled**" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

1.147   "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors pursuant to section 521 of the Bankruptcy Code, which incorporate by reference the global notes and statement of limitations, methodology, and disclaimer regarding the Debtors' schedules and statements, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or Final Orders of the Bankruptcy Court.

1.148   "**SEC**" means the United States Securities and Exchange Commission.

1.149   "**Second Lien Administrative Agent**" means Ares Capital Corporation, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the Second Lien Credit Agreement.

1.150   "**Second Lien Claims**" means any and all Claims held by the Second Lien Lenders against the Debtors arising under, relating to, or in connection with the Second Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in an aggregate amount of $[175,567,909.46].

**1.151** "**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of July 31, 2013, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the Second Lien Administrative Agent, and the various lenders party thereto from time to time,  as has been or may be amended, supplemented, amended and restated, or otherwise modified from time to time.

**1.152** "**Second Lien Credit Documents**" means the Second Lien Credit Agreement, together with all other "Loan Documents" (as defined in the Second Lien Credit Agreement).

**1.153** "**Second Lien Lenders**" means the "Lenders" as defined in the Second Lien Credit Agreement.

**1.154** "**Second Lien Secured Parties**" means the "Secured Parties" as defined in the Second Lien Credit Agreement.

**1.155** "**Section 503(b)(9) Claim**" means any Claim asserted under section 503(b)(9) of the Bankruptcy Code equal to the value of any goods received by the Debtors within 20 days before the Petition Date during which the goods have been sold to the Debtors in the Debtors' ordinary course of business.

**1.156** "**Secured Claim**" means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**1.157** "**Securities Act**" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the SEC promulgated thereunder.

**1.158** "**Security**" has the meaning ascribed to such term in section 2(a)(1) of the Securities Act.

**1.159** "**Specified Executives**" means executives holding the positions of Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer.

**1.160** "**Tranched PIK Noteholder**" means a Holder of a Tranched PIK Note.

**1.161** "**Tranched PIK Notes**" means those certain promissory notes issued pursuant to the Tranched PIK Notes Investment Agreement.

**1.162** "**Tranched PIK Notes Investment Agreement**" means the Investment Agreement, dated as of November 29, 2017, by and among Pioneer and Trident Holding Company, LLC, each as borrower, the Tranched PIK Notes Investor Representative, and the other noteholders party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

**1.163** "**Tranched PIK Notes Investor Representative**" means Revelstoke Capital Partners Fund I, L.P., in its capacity as investor representative under the Tranched PIK Notes Investment Agreement.

**1.164** "**Unclaimed Distribution**" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

**1.165** "**Unexpired Lease**" means a lease of nonresidential real property to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**1.166** "**Unimpaired**" means, with respect to a Class of Claims, a Class of Claims that is not Impaired.

**1.167** "**Voting Deadline**" means [  ], 2019 at 4:00 p.m. prevailing Eastern time.

**1.168** "**Warrants**" means, on terms and conditions set forth in the Pioneer LLC Agreement and acceptable to the Priority First Lien Lenders, Class W units of Reorganized Pioneer exercisable for up to 5% of the New Pioneer Units, subject to dilution by the Management Incentive Plan, with an expiration date of eighteen (18) months after the Effective Date at a strike price equal to the price per share that would result in a full return on invested capital to the Priority First Lien Lenders (inclusive of the full amount of the Priority First Lien Claims) calculated as of the Effective Date, with such strike price continuing to accrue at a rate of LIBOR *plus* 9.5% compounding quarterly.

## C.    Rules of Interpretation

For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control; (j) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control; (k) any immaterial effectuating provision may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose

and intent of the Plan without further Final Order of the Bankruptcy Court; (l) to the extent that any right of any Entity (other than the Debtors or Reorganized Debtors) to consent to a matter, action or otherwise is unqualified, it shall be implied that such consent right may not be unreasonably withheld, conditioned, or delayed; and (m) references to "shares," "shareholders," "directors," shall also include "membership units," "members," "managers," and/or "officers" or other functional equivalents, as applicable, as such terms are defined under the applicable state corporations or comparable laws, as applicable.

D.    **Computation Of Time**

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

E.    **References to Monetary Figures**

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.    **Certain Consent Rights**

Notwithstanding anything in the Plan to the contrary, any and all consent rights as set forth in the RSA with respect to the form and substance of the Plan, the Plan Supplement, and any Plan Transaction Documents shall be incorporated herein by this reference and fully enforceable as stated herein until such time as the RSA is terminated in accordance with its terms.

G.    **Exhibits**

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date. After the Plan Supplement Filing Date, copies of Exhibits may be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 (Attn: Paul Leake and Jason Kestecher), or Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Suite 2700, Chicago, Illinois 60606 (Attn: James J. Mazza, Jr. and Justin M. Winerman), counsel to the Debtors, or by downloading such exhibits from the Debtors' informational website at https://dm.epiq11.com/trident. To the extent any Exhibit is inconsistent with the terms of this Plan and unless otherwise provided for in the Confirmation Order, the terms of the Exhibit shall control as to the transactions contemplated thereby and the terms of this Plan shall control as to any Plan provision that may be required under the Exhibit.

## ARTICLE II

## ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

**2.1    Administrative Claims**. Except to the extent that the Debtors (or the Reorganized Debtors) and a Holder of an Allowed Administrative Claim agree to less favorable treatment, a Holder of an Allowed Administrative Claim (other than a DIP Facility Claim, which

shall be subject to Article 2.2 of the Plan, or a Professional Claim, which shall be subject to Article 2.3 of the Plan) shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the Effective Date, (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims, or (c) on such other date as agreed between the Debtors (or the Reorganized Debtors) and such Holder of an Allowed Administrative Claim; provided, however, that other than Holders of (i) DIP Facility Claims, (ii) Professional Claims, (iii) Administrative Claims Allowed by an order of the Bankruptcy Court on or before the Effective Date, or (iv) Administrative Claims that are not Disputed and arose in the ordinary course of business and were paid or are to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, the Holder of any Administrative Claim shall have filed a proof of Claim form no later than the Administrative Claims Bar Date and such Claim shall have become an Allowed Claim. Except as otherwise provided herein and as set forth in Articles 2.2 or 2.3 of this Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in Exhibit 2.1, with the Claims and Solicitation Agent and served on counsel for the Debtors or the Reorganized Debtors by no later than the Administrative Claims Bar Date.  After the Effective Date, the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  In the event that the Reorganized Debtors object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim

**2.2     DIP Facility Claims**.  On the Effective Date, the DIP Facility Claims shall be Allowed in full, in the amount of $50 million (less any amounts paid prior to the Effective Date) plus all accrued and unpaid postpetition interest under the DIP Credit Agreement (and any unpaid fees, costs, and expenses). With the consent of the DIP Lenders as provided in the RSA, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Facility Claims, all outstanding DIP Facility Claims shall be automatically converted to and deemed to be obligations under the Exit Term Loan Facility Credit Agreement, and all Collateral (as such term is defined in the DIP Credit Agreement) that secures the obligations under the DIP Documents shall be reaffirmed, ratified, and shall automatically secure all obligations of the Reorganized Debtors under the Exit Term Loan Facility Credit Agreement.

**2.3     Professional Claims**.

(a)     **Final Fee Applications**.  All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Creditors' Committee must be filed no later than sixty (60) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, the Allowed amounts of all Professional Claims and expenses shall be determined by the Bankruptcy Court.

(b)     **Payment of Interim Amounts.**  Subject to the Holdback Escrow Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts

owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed (and as to which there is no then-existing Court-mandated or Court-ordered prohibition on making payment).  To receive payment on the Effective Date for such unbilled fees and expenses incurred through the Effective Date that have not yet been billed pursuant to the Professional Fee Order, no later than two (2) days prior to the Effective Date, the Professionals (who, in the case of the Creditors' Committee, shall only be permitted to take the actions set forth in Article 13.6 after the Confirmation Date) shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors.  Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period, subject to any parties' right to object as set forth in the Professional Fee Order.

(c)    **Holdback Escrow Account**.  On the Effective Date, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals.  The Distribution Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtors, the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Distribution Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors to be used by the Reorganized Debtors in accordance with the Plan.

(d)    **Post-Confirmation Date Retention**.    Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing and prosecuting or addressing any issues with respect to final fee applications).  The Creditors' Committee's Professionals may not be paid for services rendered after the Confirmation Date.

**2.4    Priority Tax Claims**.  On the Effective Date, except to the extent that the Debtors (or Reorganized Debtors) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtors (or the Reorganized Debtors) and such Holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the sole option of the Debtors, Cash in the aggregate amount of such Allowed Priority Tax Claim plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at a rate determined under applicable non-bankruptcy law, payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Allowed Priority Tax Claim shall be

paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business as such obligations become due.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

### 3.1    Classification of Claims and Interests.

(a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of classes of Claims and Interests.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II above.

(b)    For administrative convenience, the Plan organizes the Debtors into groups (each a "Debtor Group") and assigns a letter to each Debtor Group and a number to each Class of Claims or Interests in each Debtor Group.  Claims and Interests belonging to a Debtor Group consisting of more than one Debtor shall be deemed to be classified in a single Class for all purposes under the Bankruptcy Code, including voting.  To the extent a Holder has a Claim that may be asserted against more than one Debtor in a Debtor Group, the vote of such Holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor in such Debtor Group.  Notwithstanding this organizing principle, the Plan is a separate plan of reorganization or liquidation for each Debtor.  Such groupings shall not affect any Debtor's status as a separate legal Entity, result in substantive consolidation of any Estates, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

(c)    For consistency, similarly designated Classes of Claims and Interests are assigned the same number across each Debtor Group.  The Plan provides for a single Class of Holders of General Unsecured Claims without regard to Debtor entities at which such Holders hold their Claims.  For purposes of distributions to Holders of General Unsecured Claims, "Pro Rata" shall be determined where (x) the denominator is equal to all Allowed General Unsecured Claims against all Debtors and (y) the numerator is equal to the amount of a particular Holder's Allowed General Unsecured Claim.  For voting purposes, the Debtors shall tabulate ballots for Holders of General Unsecured Claims both on a Debtor-by-Debtor basis and on aggregate basis without regard to particular Debtor entities and reserve the right to seek Confirmation of the Plan under either tabulation through accepting Classes or cramdown. Claims and Interests are classified as follows:

| Letter | Debtor Group |
|--------|--------------|
| A | **Ultimate Holding Company**<br>    FC Pioneer Holding Company, LLC |
| B | **Intermediate Holding Company**<br>    Trident Holding Company, LLC |
| C | **Operating Companies**<br>    American Diagnostics Services, Inc.<br>    Community Mobile Diagnostics, LLC<br>    Community Mobile Ultrasound, LLC<br>    Diagnostic Labs Holdings, LLC<br>    JLMD Manager, LLC<br>    Kan-Di-Ki LLC<br>    Main Street Clinical Laboratory, Inc.<br>    MDX-MDL Holdings, LLC<br>    MetroStat Clinical Laboratory – Austin, Inc.<br>    MX Holdings, LLC<br>    MX USA, LLC<br>    New Trident Holdcorp, Inc.<br>    Rely Radiology Holdings, LLC<br>    Schryver Medical Sales and Marketing, LLC<br>    Symphony Diagnostic Services No. 1, LLC<br>    Trident Clinical Services Holdings, Inc.<br>    Trident Clinical Services Holdings, LLC<br>    TridentUSA Foot Care Services LLC<br>    TridentUSA Mobile Clinical Services, LLC<br>    TridentUSA Mobile Infusion Services, LLC<br>    U.S. Lab & Radiology, Inc. |

| # | Designation |
|----|-------------|
| 1 | Priority First Lien Claims |
| 2 | First Lien Claims |
| 3 | Second Lien Claims |
| 4 | Other Secured Claims |
| 5 | Other Priority Claims |
| 6 | General Unsecured Claims |
| 7 | PIK Notes Claims |
| 8 | Intercompany Claims |
| 9 | Other Subordinated Claims |
| 10 | Interests in Debtor Subsidiaries |
| 11 | Interests in Pioneer |

The classification of Claims and Interests (as applicable) under the Plan is as set forth below.

| Class(es) | Claim or Interest | Status | Voting Rights |
|-----------|-------------------|--------|---------------|
| 1B – 1C | Priority First Lien Claims | Impaired | Entitled to Vote |
| 2B – 2C | First Lien Claims | Impaired | Entitled to Vote |
| 3B – 3C | Second Lien Claims | Impaired | Entitled to Vote |
| 4A – 4C | Other Secured Claims | Unimpaired | Presumed to Accept |

| Class(es) | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 5A – 5C | Other Priority Claims | Unimpaired | Presumed to Accept |
| 6A – 6C | General Unsecured Claims | Impaired | Entitled to Vote |
| 7A – 7B | PIK Notes Claims | Impaired | Deemed to Reject |
| 8A – 8C | Intercompany Claims | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 9A – 9C | Other Subordinated Claims | Impaired | Deemed to Reject |
| 10A – 10C | Interests in Debtor Subsidiaries | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 11A | Interests in Pioneer | Impaired | Deemed to Reject |

## ARTICLE IV

## PROVISIONS FOR TREATMENT
## OF CLAIMS AND INTERESTS

### 4.1    Priority First Lien Claims (Classes 1B and 1C)

(a)      Classification: Classes 1B and 1C consist of all Allowed Priority First Lien Claims.

(b)      Allowance:  The Priority First Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $[259,387,485.15].

(c)      Treatment: Except to the extent that a Holder of an Allowed Priority First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Priority First Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority First Lien Claim shall receive its Pro Rata share and interest in (i) the New First Lien Facility, and (ii) 100% of the New Pioneer Units to be issued by Reorganized Pioneer, subject to dilution on account of the Warrants and the Management Incentive Plan.

(d)      Voting: Classes 1B and 1C are Impaired and Holders of Allowed Priority First Lien Claims are entitled to vote to accept or reject the Plan.

### 4.2    First Lien Claims (Classes 2B and 2C)

(a)      Classification: Classes 2B and 2C consist of all Allowed First Lien Claims.

(b)    Allowance:  The First Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $219,815,899.97.

(c)    Treatment: Except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed First Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter:

(i)    *If each of Class 2B, Class 2C, Class 3B, and Class 3C are Accepting Classes*, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share and interest in 4% of the Warrants.

(ii)    *If each of Class 2B and Class 2C are Accepting Classes, but Class 3B and Class 3C are not Accepting Classes*, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share and interest in 5% of the Warrants.

(iii)    *If any of Class 2B or Class 2C are not Accepting Classes*, Holders of  Allowed First Lien Claims shall not receive any distributions on account of such Allowed First Lien Claims.

(d)    Voting: Classes 2B and 2C are Impaired and Holders of Allowed First Lien Claims are entitled to vote to accept or reject the Plan.

**4.3    Second Lien Claims (Classes 3B and 3C)**

(a)    Classification: Classes 3B and 3C consist of all Allowed Second Lien Claims.

(b)    Allowance:  The Second Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $[175,567,909.46].

(c)    Treatment: Except to the extent that a Holder of an Allowed Second Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Second Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter:

(i)    *If each of Class 2B, Class 2C, Class 3B, and Class 3C are Accepting Classes*, each Holder of an Allowed Second Lien Claim shall receive its Pro Rata share and interest in 1% of the Warrants.

(ii)    *If any of Class 2B, Class 2C, Class 3B, or Class 3C are not Accepting Classes*, Holders of  Allowed Second Lien Claims shall not receive any distributions on account of such Allowed Second Lien Claims.

(d)    Voting: Classes 3B and 3C are Impaired and Holders of Allowed Second Lien Claims are entitled to vote to accept or reject the Plan.

**4.4     Other Secured Claims (Classes 4A – 4C)**

(a)     Classification: Classes 4A through 4C consist of all Allowed Other Secured Claims.

(b)     Treatment: Except as otherwise provided in and subject to <u>Article 9.5</u> of this Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the option of the Debtors or the Reorganized Debtors and with the consent of the Priority First Lien Administrative Agent, as applicable:

(i)     have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, or otherwise have its Claim rendered Unimpaired, in each case in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default;

(ii)     be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Claim or as soon thereafter as reasonably practicable; or

(iii)     receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Other Secured Claim will have agreed upon in writing; or

(iv)     receive delivery of the collateral securing any such Allowed Other Secured Claim;

<u>provided</u>, that Allowed Other Secured Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.  Nothing in this <u>Article 4.4</u> or elsewhere in this Plan shall preclude the Debtors (or the Reorganized Debtors) from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien allegedly securing an Allowed Other Secured Claim.

(c)     Voting: Classes 4A, 4B, and 4C are Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

### 4.5    Other Priority Claims (Classes 5A – 5C)

(a)    Classification: Classes 5A through 5C consist of all Allowed Other Priority Claims.

(b)    Treatment:  Except as otherwise provided in and subject to <u>Article 9.5</u> of this Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or on such other date as agreed between the Debtors (or the Reorganized Debtors), with the consent of the Priority First Lien Administrative Agent, and such Holder of an Allowed Other Priority Claim; <u>provided</u>, <u>however</u>, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(c)    Voting: Classes 5A, 5B, and 5C are Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

### 4.6    General Unsecured Claims (Classes 6A – 6C)

(a)    Classification: Classes 6A through 6C consist of all Allowed General Unsecured Claims.

(b)    Treatment: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed General Unsecured Claim:

(i)    *If Class 6C is an Accepting Class*, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share and interest in the General Unsecured Claims Cash Pool.

(ii)    *If Class 6C is not an Accepting Class*, Holders of Allowed General Unsecured Claims shall not receive any distributions on account of such Allowed General Unsecured Claims.

(c)    Voting: Classes 6A, 6B, and 6C are Impaired and Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.7    PIK Note Claims (Classes 7A – 7B)

(a)    Classification: Classes 7A and 7B consist of all Allowed PIK Note Claims.

(b)    Treatment: On the Effective Date, all of the Debtors' outstanding obligations under the PIK Notes shall be extinguished, canceled, and discharged, and each Holder of a PIK Note Claim shall receive no distribution on account of such Claim.

(c)    Voting: Classes 7A and 7B are Impaired, and Holders of Allowed PIK Note Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed PIK Note Claims are not entitled to vote to accept or reject the Plan.

### 4.8    Intercompany Claims (Classes 8A – 8C)

(a)    Classification:  Classes 8A through 8C consist of all Allowed Intercompany Claims.

(b)    Treatment: On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among any Affiliate of the Debtors shall be either reinstated, cancelled, released, or otherwise settled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent).

(c)    Voting: Classes 8A, 8B, and 8C are either:

(i)    Impaired, and Holders of Allowed applicable Class 8 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan; or

(ii)    Unimpaired, and Holders of Allowed applicable Class 8 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan.

### 4.9    Other Subordinated Claims (Classes 9A – 9C)

(a)    Classification:  Classes 9A through 9C consist of all Allowed Bankruptcy Code section 510(b) and (c) Claims.

(b)    Treatment: Holders of Allowed Other Subordinated Claims shall not receive any distributions on account of such Allowed Other Subordinated Claims.

(c)    Voting: Classes 9A, 9B, and 9C are Impaired, and Holders of Allowed Other Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Other Subordinated Claims are not entitled to vote to accept or reject the Plan.

**4.10    Interests in Debtor Subsidiaries** (Classes 10B – 10C)

(a)    Classification:  Classes 10B and 10C consist of all Allowed Interests in Debtor Subsidiaries.

(b)    Treatment:  On the Effective Date, all Allowed Interests in Debtor Subsidiaries shall be either reinstated or cancelled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent).  To the extent reinstated, Interests in Debtor Subsidiaries are Unimpaired solely to preserve the Debtors' corporate structure and Holders of those Interests shall not otherwise receive or retain any property on account of such Interests.

(c)    Voting: Classes 10B and 10C are either:

(i)    Impaired, and Holders of Allowed applicable Class 10 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 10 Claims are not entitled to vote to accept or reject the Plan; or

(ii)    Unimpaired, and Holders of Allowed applicable Class 10 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 10 Claims are not entitled to vote to accept or reject the Plan.

**4.11    Interests in Pioneer** (Class 11A)

(a)    Classification:  Class 11A consists of all Interests in Pioneer.

(b)    Treatment: On the Effective Date, Allowed Class 11A Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors.

(c)    Voting: Class 11A is Impaired, and Holders of Allowed Class 11A Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 11A Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE V

## ACCEPTANCE

**5.1    Classes Entitled to Vote.**  Classes 1B, 1C, 2B, 2C, 3B, 3C, and 6A – 6C are entitled to vote to accept or reject this Plan.  By operation of law, Classes 4A – 4C, 5A – 5C, 7A, 7B, 8A – 8C, 10A – 10C, and 11A are either deemed to have accepted this Plan or to have rejected this Plan and are not entitled to vote.

**5.2    Acceptance by Impaired Classes.**  An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any Holder designated under section 1126(e)

30

of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

      **5.3**    **Elimination of Classes.**  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

      **5.4**    **Special Provision Governing Unimpaired Claims**.  Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

      **5.5**    **Deemed Acceptance if No Votes Cast.**  If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, this Plan shall be deemed accepted by the Holders of such Claims in such Class.

      **5.6**    **Cramdown.**  To the extent necessary, the Debtors shall request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify, amend, or withdraw this Plan, with respect to all Debtors or any individual Debtor, or group of Debtors to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

      **6.1**    **No Substantive Consolidation**. The Plan is being proposed as a joint plan of reorganization for the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.  The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

      **6.2**    **General Settlement of Claims and Interests**. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.

      **6.3**    **Restructuring Transactions**.

(a)     On or after the Confirmation Date, with the consent of the Priority First Lien Administrative Agent, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, to otherwise simplify the overall corporate structure of the Debtors, or to organize certain of the Debtors under the laws of jurisdictions other than the laws of which such Debtors currently are organized, which restructuring may include one or more mergers, consolidations, dispositions, liquidations, or dissolutions as may be determined by the Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Debtors vesting in one or more surviving, resulting, or acquiring Entities (collectively, the "Restructuring Transactions"). In each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting, or acquiring Entity shall perform the obligations of such Debtor pursuant to the Plan to satisfy the Allowed Claims against, or Allowed Interests in, such Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor shall perform such obligations.

(b)     In effecting the Restructuring Transactions, with the consent of the Priority First Lien Administrative Agent, the Debtors shall be permitted to (i) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) file appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

        **6.4     Sources of Cash for Plan Distribution**. All Cash required for payments to be made under the Plan on the Effective Date shall be obtained first from Cash on hand, second, if necessary, a Capital Raising Transaction, and third, if necessary and if no Capital Raising Transaction has been arranged, the Exit Liquidity Facility.

        **6.5     Exit Liquidity Facility**.  With the reasonable consent of the Debtors, the Priority First Lien Administrative Agent may arrange for a Capital Raising Transaction to provide the Debtors with sufficient Cash to make payments required to be made under the Plan and to satisfy the Minimum Liquidity Condition Precedent.  If the Debtors reasonably determine an Exit Liquidity Facility is necessary to satisfy the Minimum Liquidity Condition Precedent and the Priority First Lien Administrative Agent elects not to arrange for a Capital Raising Transaction, the Debtors may arrange for an Exit Liquidity Facility, which shall be entered into on the Effective Date. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Liquidity Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

**6.6     Exit Term Loan Facility**. On the Effective Date, all Allowed DIP Facility Claims, shall be automatically converted to and deemed to be obligations under the Exit Term Loan Facility Credit Agreement, and all Collateral (as such term is defined in the DIP Credit Agreement) that secures the obligations of the Reorganized Debtors under the DIP Documents shall be reaffirmed, ratified, and shall automatically secure all obligations under the Exit Term Loan Facility Credit Agreement. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Term Loan Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

**6.7     New First Lien Facility**.  On the Effective Date, all Holders of Allowed Priority First Lien Claims shall receive their Pro Rata share and interest in the New First Lien Facility, which shall be junior in lien priority to the Exit Term Loan Facility. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New First Lien Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

**6.8     Authorization, Issuance, and Distribution of New Pioneer Units**.  On the Effective Date, Reorganized Pioneer shall authorize and issue the New Pioneer Units to Holders of Allowed Priority First Lien Claims.  Distribution of New Pioneer Units hereunder shall constitute issuance of 100% of such New Pioneer Units and in each case shall be deemed issued on the Effective Date, subject to dilution on account of the Warrants and the Management Incentive Plan.  The issuance of New Pioneer Units by Reorganized Pioneer is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.  All of the New Pioneer Units issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

**6.9     General Unsecured Claims Cash Pool**.

(a)     On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and fund the General Unsecured Claims Cash Pool Account with Cash in an amount equal to the General Unsecured Claims Cash Pool, which shall be held in trust for (i) Pro Rata distributions on account of Allowed General Unsecured Claims as provided herein and (ii) GUC Administrator Costs.

(b)     The General Unsecured Claims Cash Pool Account (x) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors or their Estates, (y) shall be held in trust to fund distributions and pay GUC Administrator Costs as provided herein, and (z) shall not be encumbered by any Liens, Claims, or Interests in any way.

**6.10     Exemptions from Securities Act Registration Requirements**.  Except with respect to the New Pioneer Units underlying the Management Incentive Plan, the Warrants and all New Pioneer Units issued under the Plan (including any units issued upon the exercise of the Warrants) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.  New Pioneer Units issued under the Plan (including any shares issued upon the exercise of the Warrants) in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration

requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The New Pioneer Units issued pursuant to section 1145 of the Bankruptcy Code (a) are not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any holder thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the New Pioneer Units from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code. New Pioneer Units issued to holders of Priority First Lien Claims and Warrants issued to holders of First Lien Claims and Second Lien Claims, in each case in exchange for such Claims, shall be issued in reliance on section 1145 of the Bankruptcy Code. New Pioneer Units underlying the Management Equity Incentive Plan will be issued pursuant to another available exemption from registration under the Securities Act and other applicable law.

### 6.11    Cancellation of Existing Securities and Agreements

(a)    Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Debtors, on the Effective Date, except to the extent otherwise provided in this Plan, all notes, instruments, Certificates, Old Securities and other documents evidencing or creating any indebtedness or obligation of or ownership in the Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged. On the Effective Date, except to the extent otherwise provided in this Plan, all Interests in the Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged.

(b)    Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Article 6.11 shall be deemed null and void and shall be of no force and effect.

### 6.12    Issuance and Distribution of New Securities; Execution of Plan Documents. Except as otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall issue and/or deliver all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan.

### 6.13    Continued Corporate Existence.

(a)    Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as separate entities, the Reorganized Debtors, with all the powers of a corporation or limited liability company under applicable law in the jurisdiction in which each respective Debtor is incorporated or formed and pursuant to its respective charter, bylaws, limited liability company agreement, partnership agreement or other organizational documents in effect prior to the Effective Date, except to the extent such organization documents

are amended and restated by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

(b) Except as otherwise provided in the Plan, the continued existence, operation, and ownership of Affiliates is a material component of the business of the Debtors and the Reorganized Debtors, as applicable, and, as set forth in Article 10.1 of this Plan, all of the Debtors' equity interests and other property interests in such Affiliates shall vest in the Reorganized Debtors or their successors on the Effective Date.

**6.14    New Corporate Governance Documents**. The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) of the Debtors, which documents shall be in form and substance acceptable to the Priority First Lien Administrative Agent, shall be adopted and amended in a form as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code (including Bankruptcy Code section 1123(a)(6)), with the form and substance of the Pioneer LLC Agreement set forth on Exhibit 6.14. After the Effective Date, the Reorganized Debtors may amend and restate their respective certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) as permitted by applicable state corporation or business entity law and their respective charters and bylaws or other organizational documents.

**6.15    Directors, LLC Managers, and Officers of Reorganized Debtors**. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed member of Reorganized Debtors' initial board of directors (or other applicable governing body) (and, to the extent such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Plan Supplement or as announced on the record at the Confirmation Hearing. The number of members of the New Boards and the identities thereof, and any senior officers of the Reorganized Debtors not presently serving in such capacity, shall be determined by the Priority First Lien Administrative Agent, but shall include the Chief Executive Officer of the Reorganized Debtors.

Except as otherwise provided in the Plan Supplement, the officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the Reorganized Debtors on and after the Effective Date.

Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

**6.16    Corporate Action**. Each of the matters provided for under this Plan involving the corporate structure of the Debtors or the Reorganized Debtors or corporate action to be taken by or required of the Debtors or the Reorganized Debtors shall, as of the Effective

Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, managers, or directors of the Debtors or the Reorganized Debtors.  Such actions may include, (a) the adoption of the Pioneer LLC Agreement and any other new corporate governance documents, (b) the appointment of the New Boards, (c) the issuance and distribution of New Pioneer Units, and (d) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date).

> **6.17    Effectuating Documents; Further Transactions**.    On and after the Effective Date, the Reorganized Debtors, and the officers thereof and members of the New Boards, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

> **6.18    Employment, Retirement, Indemnification, and Other Agreements and Employee Compensation Programs**.

>> (a)    **Employment Agreements**.    All employment and compensation-related agreements of the Company as of the Petition Date, including any indemnification and severance obligations and guaranteed bonus amounts, and incentive compensation plans related thereto, shall be assumed.    The Debtors, with the consent of the Priority First Lien Administrative Agent with respect to Specified Executives, may also enter into new employment arrangements and/or change in control agreements with individuals who will serve as officers of the Reorganized Debtors after the Effective Date.    On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may adopt, approve, and authorize any new employment arrangements with respect to such officers of the Reorganized Debtors without further action, order, or approval of the New Boards.    To the extent any employment-related agreements contain a sale-related bonus, the Reorganized Debtors shall renegotiate such bonus in good faith based upon the Reorganized Debtors' capital structure.    On and after the Effective Date, Cash and bonus compensation and benefits shall be determined by the New Pioneer Board subject to the terms of the Plan Transaction Documents and any agreements being modified.

>> (b)    **Management Incentive Plan**.    After the Effective Date, equity grants under the Management Incentive Plan shall be reserved for directors, managers, officers, and employees of the Reorganized Debtors on terms determined by the New Pioneer Board.    The Reorganized Debtors shall have the right to set additional equity awards for the benefit of members of the New Pioneer Board after the Effective Date.

>> (c)    **Indemnification**.    For purposes of this Plan, the respective obligations of the Debtors to indemnify and reimburse any persons who are directors, managers, officers or employees of the Debtors immediately prior to the Effective Date, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable

state or non-bankruptcy law, or specific agreements or any combination of the foregoing, shall survive confirmation of this Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on, or after the Petition Date.

(d)     **Other Incentive Plans and Employee Benefits**.  On and after the Effective Date, the Reorganized Debtors shall adopt, assume, and honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation, pursuant to the terms thereof or hereof, including any employee compensation plans, any incentive plan including the Annual Incentive Plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity from and after the Petition Date, and shall honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.  After the Effective Date, the Reorganized Debtors may amend or restate any program of the type described in this paragraph, in accordance with applicable law in the ordinary course of business subject to the terms of Plan Transaction Documents and the terms of the program being amended and restated.

**6.19    Preservation Of Causes Of Action**.    In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not released pursuant to Article 10.3 of this Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in Exhibit 6.19, and such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date.  The Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successor holding such rights of action.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.   The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.**

**6.20    Reservation of Rights**. With respect to any Cause of Action that the Reorganized Debtors expressly abandon, if any, the Reorganized Debtors reserve all rights, including the right under Bankruptcy Code section 502(d) to use defensively the abandoned Causes of Action as a basis to object to all or any part of a claim against any of the Estates asserted by a creditor who obtains the benefit of the abandoned Cause of Action.  Except as set forth in Article 10.3 of this Plan, nothing contained in this Plan shall constitute or be deemed a waiver or abandonment of any Cause of Action that the Reorganized Debtors may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained

herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**6.21    Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.22    Insured Claims**. Notwithstanding anything to the contrary contained herein, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, and (b) solely for the portion of such Claim that is not paid by the applicable insurance policy, receive the treatment provided for in this Plan for Allowed General Unsecured Claims.

**6.23    Intercompany Account Settlement.** The Debtors and the Reorganized Debtors, and their respective Affiliates will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.

**6.24    Closing of Chapter 11 Cases.** The Debtors or the Reorganized Debtors, as applicable, shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

**6.25    Private Company.** It is anticipated that the Reorganized Debtors shall be private companies as of the Effective Date and shall not register any of their respective equity with the SEC or list such equity on an exchange as of the Effective Date.

## ARTICLE VII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**7.1    Rejection of Executory Contracts and Unexpired Leases**.

(a)    **Automatic Rejection**.  Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 7.1 of the Plan; (ii) has been previously assumed or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume or reject pending as

38

of the Effective Date; (iv) is an Executory Contract related to any Intercompany Claim; or (v) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements herein.

(b)    **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**.  Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

(c)    **Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases**.  Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date or the effective date of rejection.  Any proofs of Claim arising from the rejection of the Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

(d)    **Reservation of Rights**.  Notwithstanding anything to the contrary herein, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved in the event that the Debtors (or the Reorganized Debtors) amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

**7.2    Assumption of Executory Contracts and Unexpired Leases**.  Upon the occurrence of the Effective Date, each Executory Contract or Unexpired Lease (other than Executory Contracts or Unexpired Leases that (a) have been previously rejected by the Debtors by Final Order of the Bankruptcy Court or have been rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date or (b) are the subject of a motion to reject pending as of the Effective Date) listed on the

schedule of "Assumed Executory Contracts and Unexpired Leases" in <u>Exhibit 7.1</u> of the Plan shall be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Reorganized Debtors or their assignee in accordance with its terms, except as modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  With respect to each such Executory Contract and Unexpired Lease, the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contracts and Unexpired Leases may be conditioned upon the disposition of all issues with respect to such Cure.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

(a)    **Modifications, Amendments, Supplements, Restatements, or Other Agreements**.  Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant hereunder.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)    **Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed**.  Any and all proofs of Claims based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including hereunder, except proofs of Claims asserting Cure amounts, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed and expunged from the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

**7.3    Insurance Policies**.

(a)    Notwithstanding any other provision in the Plan, all insurance policies to which any Debtor is a party as of the Effective Date (including any "tail policy") shall be deemed to be and treated as executory contracts and shall be assumed, or assumed and assigned, by the applicable Reorganized Debtors and shall continue as obligations of the Debtors or Reorganized Debtors in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors, as applicable.

(b)    The Debtors or the Reorganized Debtors, as the case may be, shall maintain the D&O Insurance and the EPL Policy providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring

40

such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors.

**7.4    Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases**.    With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure.    Such Cure shall be satisfied by the Debtors or their assignee, if any, by payment of the Cure in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.    Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.    The Debtors shall serve a counterparty to an Executory Contract or Unexpired Lease to be assumed hereunder with evidence of adequate assurance upon such counterparty's written request to the Debtors' counsel.

If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.    The Debtors or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

(a)    **Cure Notices**.    No later than seven (7) days prior to the Confirmation Hearing, and pursuant to the Assumption and Rejection Procedures, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption that will (i) list the applicable Cure, if any, (ii) describe the procedures for filing objections to the proposed assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, (iii) describe the procedures for filing objections to the proposed Cure of the applicable Executory Contract or Unexpired Lease, and (iv) explain the process by which related disputes will be resolved by the Bankruptcy Court.    If no objection is timely received, the non-Debtor party to the assumed contract shall be deemed to have consented to the assumption of the applicable Executory Contract or Unexpired Lease.

41

(b)    **Cure Objections**.   If a proper and timely objection to the Cure Notice or proposed Cure was filed by the Cure Objection Deadline, the Cure shall be equal to (i) the amount agreed to between the Debtors or Reorganized Debtors and the applicable counterparty, or, (ii) to the extent the Debtors or Reorganized Debtors and counterparty do not reach an agreement regarding any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. Objections, if any, to the proposed assumption and/or Cure must be in writing, filed with the Bankruptcy Court and served so that they are actually received by the Cure Objection Deadline.

(c)    **Hearing with Respect to Objections**.   If an objection to the proposed assumption and/or to the Cure is timely filed and received in accordance with the procedures set forth in <u>Article 7.4(b)</u>, and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Debtors or Reorganized Debtors.   Objections to the proposed Cure amount or assumption of an Executory Contract or Unexpired Lease will not be treated as objections to Confirmation of the Plan.

(d)    **Reservation of Rights**.   Notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors may amend their decision with respect to the assumption of any Executory Contract or Unexpired Lease and provide a new notice amending the information provided in the applicable notice, subject to the Assumption and Rejection Procedures, and shall serve such notice on the applicable counterparty; <u>provided</u>, that notwithstanding anything to the contrary herein, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved with respect to any such amended decision or notice.   In the case of an Executory Contract or Unexpired Lease designated for assumption that is the subject of a Cure objection which has not been resolved prior to the Effective Date, the Debtors may designate such Executory Contract or Unexpired Lease for rejection at any time prior to the payment of the Cure.

**7.5    Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date**.   Contracts and leases entered into after the Petition Date by the Debtors, and any Executory Contracts and Unexpired Leases assumed by the Debtors, may be performed by the Reorganized Debtors in the ordinary course of business and in accordance with the terms of such Executory Contract or Unexpired Lease.

**7.6    General Reservation of Rights**.   Neither the exclusion nor inclusion of any contract or lease on <u>Exhibit 7.1</u> of the Plan, in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors, or any of its Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

## ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

**8.1** **Determination Of Claims and Interests**.  After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article 6.19, except with respect to any Claim or Interest deemed Allowed under the Plan or pursuant to an order of the Bankruptcy Court.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.  For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with this Plan.

Nothing contained in this Article 8.1 shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors may have against any Entity in connection with or arising out of any Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

**8.2** **GUC Administrator**.  If Class 6C votes to accept the Plan, the Creditors' Committee shall appoint, as of the Effective Date, a GUC Administrator with duties limited to (a) General Unsecured Claims reconciliation, allowance, and settlement, (b) making distributions to the Holders of Allowed General Unsecured Claims as provided herein, and (c) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the foregoing duties.  The GUC Administrator may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the duties as limited above, including any professionals retained in these Chapter 11 Cases, and the GUC Administrator Costs, including reasonable professional fees, shall be reimbursed solely from the General Unsecured Claims Cash Pool in the ordinary course without further order of the Bankruptcy Court.  Under no circumstances shall the Debtors or Reorganized Debtors have any liability for the GUC Administrator Costs.

Upon the resolution of all disputed General Unsecured Claims, the GUC Administrator shall be released and discharged of and from further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases.

43

**8.3    Claims Administration Responsibility**. After the Effective Date, the Reorganized Debtors shall retain responsibility for (a) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors other than General Unsecured Claims, including, without limitation, (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests (other than General Unsecured Claims), (ii) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court (other than General Unsecured Claims), and (iii) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court (other than General Unsecured Claims), and (b) making distributions (if any) with respect to all Claims and Interests (other than General Unsecured Claims). With respect to General Unsecured Claims, the GUC Administrator shall exercise all of the responsibilities set forth in this Article 8.3.

**8.4    Objections to Claims**.  Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors or the GUC Administrator without further notice to parties-in-interest).  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Reorganized Debtors or the GUC Administrator effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

**8.5    Disallowance of Claims**.  Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, the Creditors' Committee before the Effective Date, the GUC Administrator after the Effective Date, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and     (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**8.6    Estimation of Claims**.  Before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the

Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any purpose permitted thereunder, regardless of whether any party previously has objected to such Claim or Interest, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court has entered a Final Order estimating any contingent or unliquidated Claim for the express purpose of determining what amount of such Claim shall be allowed for purposes of distributions pursuant to section 502(c), that estimated amount shall, unless otherwise ordered by the Bankruptcy Court or agreed between the relevant parties, constitute a maximum limitation on the Allowed amount of such Claim for all purposes under the Plan (including for purposes of distributions), and the Reorganized Debtors or the GUC Administrator may, to the extent applicable, elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**8.7    No Interest on Claims**.  Unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest.  Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

**8.8    Amendments to Claims**.  On or after the Bar Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE IX

## PROVISIONS GOVERNING DISTRIBUTIONS

**9.1    Time of Distributions**.  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan shall be made on the later of (a) the Distribution Date or (b) on the first Periodic Distribution Date that is at least 30 days after a Claim becomes Allowed; _provided_, _however_, that the Reorganized Debtors may, in their sole discretion, make one-time distributions on a date that is not a Periodic Distribution Date.

**9.2    Distribution Agent**.  The Distribution Agent shall make all distributions required under this Plan except as set forth in Article 9.4 below.

**9.3    Currency**.  Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be

automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal, National Edition* following the Effective Date.

        **9.4**    **Distributions on Account of Claims Allowed as of the Effective Date**. Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims on the Distribution Date, subject to the Reorganized Debtors' rights to object to Claims that have not been Allowed; provided, however, that (i) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Allowed Priority Tax Claims shall be paid in full in Cash on the Distribution Date or in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(c) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

        **9.5**    **Distributions on Account of Claims Allowed After the Effective Date**.

        (a)    **No Distributions Pending Allowance**.  No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

        (b)    **Disputed Unsecured Claims Reserve**.  The Debtors or Reorganized Debtors, as applicable, shall withhold and retain from the General Unsecured Claims Cash Pool Account (i) an amount sufficient to pay Holders of Disputed General Unsecured Claims the amount such Holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims, (ii) such lesser amount as estimated or otherwise ordered by the Bankruptcy Court, or (iii) such lesser amount as agreed to between the GUC Administrator and the Holders thereof (such account, the "**Disputed Unsecured Claims Reserve**").  As disputed claims are resolved pursuant to Article IX hereof, the GUC Administrator shall direct the Distribution Agent to make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date. Such distributions shall be made on the first Periodic Distribution Date that is at least thirty (30) days after the date on which such a Disputed Claim becomes an Allowed Claim.

        (c)    **Tax Treatment of Disputed Unsecured Claims Reserve**.  All parties to the Plan shall (i) treat the Disputed Unsecured Claims Reserve as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 for U.S. federal income tax purposes, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for all federal, state, and local income tax purposes. All taxes imposed on assets or income of such

46

Disputed Unsecured Claims Reserve will be payable from the assets of the Disputed Unsecured Claims Reserve.

(d)     **Request for Expedited Determination of Taxes**.     The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Disputed Unsecured Claims Reserve filed or to be filed for any and all taxable periods of such reserve.

(e)     **Distributions After Allowance**.     Payments and distributions to each respective Holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern distributions to such Holder of a Claim.  On the first Periodic Distribution Date that is at least 30 days following the date when a Disputed Claim becomes an Allowed Claim, the Distribution Agent shall distribute to the Holder of such Allowed Claim the distribution that such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law; provided, however, (i) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Disputed Claims that are Allowed Priority Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

(f)     **Special Rules for Distributions to Holders of Disputed Claims**. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class; provided, however, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law or this Plan.

**9.6     Delivery Of Distributions**.

(a)     **Record Date for Distributions**.  On the Distribution Record Date, the claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim or Interest is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practicable and in any event only if the relevant

transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b) **Allowed Claims**. Distributions to Holders of Allowed Claims shall be made by the Distribution Agent (i) at the addresses set forth on the proofs of claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, or (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address. The Debtors, the Reorganized Debtors, GUC Administrator, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

(c) **Undeliverable Distributions**. If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent is notified of then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed.

(d) **Reversion**. Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors free of any restrictions thereon. Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.

(e) **De Minimis Distributions**. Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has a value less than $[10,000]; provided that the Reorganized Debtors shall make, or cause to be made, a distribution on a Periodic Distribution Date of less than $[10,000] if the Debtors expect that such Periodic Distribution Date shall be the final Periodic Distribution Date; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

(f) **Fractional Distributions**. Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, and the Distribution Agent shall not be required to make partial distributions or distributions of fractional shares of New Pioneer Units or distributions or payments of fractions of dollars. Whenever any payment or distribution of a fractional share of New Pioneer Units under the Plan would otherwise be called for, such fraction shall be deemed zero. Whenever any payment of Cash of a fraction of a dollar pursuant to the

Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

7.7 **Accrual of Dividends and Other Rights**. For purposes of determining the accrual of dividends or other rights after the Effective Date, New Pioneer Units shall be deemed distributed as of the Effective Date regardless of the date on which they are actually issued, dated, authenticated, or distributed; provided, however, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of New Pioneer Units actually take place.

7.8 **Compliance Matters**. In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, to the extent applicable, the Debtors, Reorganized Debtors, and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

7.9 **Claims Paid or Payable by Third Parties**.

(a) **Claims Paid by Third Parties**. The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Reorganized Debtors. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b) **Claims Payable by Insurers**. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy a Claim or otherwise settle an insured Claim, then immediately upon such insurers' payment, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Applicability of Insurance Contracts**.    Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contracts.   Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any of the Insurance Contracts, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**9.10    Setoffs**.    Except as otherwise expressly provided for in the Plan, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder.   In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

**9.11    Allocation of Plan Distributions Between Principal and Interest**.   To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## ARTICLE X

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**10.1    Vesting of Assets**.   Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Causes of Action) shall vest in the Reorganized Debtors which, unless otherwise indicated in the Plan, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests.   As of and following the Effective Date, the Reorganized Debtors may operate their business and use, acquire, and dispose of property (subject to applicable law) and settle and compromise Claims, Interests, or Causes of Action without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or

Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

**10.2    Discharge of the Debtors.  Except as otherwise specifically provided in section 1141(d) of the Bankruptcy Code, this Plan or the Confirmation Order, and effective as of the Confirmation Date: (a) the distributions and rights that are provided in this Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, right, or Interest accepted this Plan; (b) the Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.**

**10.3    Release by Debtors.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Transaction Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Debtors' restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors, the Estates, all Affiliates or subsidiaries managed or controlled by the foregoing, and each of their predecessors, successors and assigns, subsidiaries, and Affiliates, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, from any and all Claims, Interests or causes of action whatsoever, including any derivative Claims asserted or that could have been asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen,**

existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business, financial or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the DIP Facility Order, the Plan, the RSA (including the term sheet attached thereto), the Plan Transaction Documents, or any related agreements, instruments, or other documents, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; <u>provided</u> that nothing in this Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.

10.4   <u>Release by Holders of Claims</u>.  Effective as of the Effective Date, the Releasing Parties conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties and their respective property from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates,  any Claims or causes of action asserted on behalf of any Holder of any Claim or any Interest or that any Holder of a Claim or an Interest would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Debtors' restructuring, the Chapter 11 Cases, or the RSA, the purchase, sale, transfer or rescission of any debt, security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Interest in the Debtors that is treated in the Plan, the business, financial or contractual arrangements between the Debtors and any Released Party, the negotiation, formulation, or preparation of the Plan Transaction Documents or related agreements, instruments or other documents, including the DIP Facility Order, this Plan, the RSA (including the term sheet attached thereto), or any related agreements or instruments, or the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; <u>provided</u> that nothing in the Plan shall be construed to release the Released Parties  from any claims based upon willful misconduct or intentional fraud as determined by a Final Order.

10.5   <u>Exculpation and Limitation of Liability</u>.  To the maximum extent permitted by applicable law, no Released Party will have or incur, and each Released Party

is hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any act, omission, or other Claim in connection with, relating to, or arising out of: the Debtors' restructuring; the Chapter 11 Cases; the filing of the Chapter 11 Cases; formulation, preparation, dissemination, negotiation, pursuit, or filing of the Disclosure Statement, the RSA, the Plan Transaction Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, or the solicitation of votes for, or confirmation of, the Plan; the DIP Credit Agreement; the pursuit of Confirmation; the funding or pursuit of consummation of the Plan; the occurrence of the Effective Date; the administration, consummation, and implementation of the Plan or the property to be distributed under the Plan, including  the issuance of securities under or in connection with the Plan and the distribution of property under the Plan and any other transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof; the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases; or the transactions in furtherance of or contemplated by any of the foregoing; except for intentional fraud or willful misconduct, as determined by a Final Order. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.

       **10.6    Exclusions and Limitations on Exculpation, Indemnification, and Releases**.  Notwithstanding anything in this Plan to the contrary, no provision of this Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification, or release provision, shall modify, release, or otherwise limit the liability of any Entity not specifically released or exculpated hereunder or pursuant to an order of the Bankruptcy Court, including, without limitation, any Entity who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

       **10.7    <u>Injunction</u>.  Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a Holder of a Claim against or Interest in the Company, all Entities that have held, hold, or may hold Claims against or Interests in the Company whether or not such parties have voted to accept or reject the Plan and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and causes of action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by**

53

**any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions in the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

### 10.8    Subordination Rights.

(a)    Except as otherwise provided in the Plan (including in <u>Article 10.8(c)</u> below), the allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise and all Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)    Except as otherwise provided in the Plan (including Plan Exhibits), the Confirmation Order, or another order of the Bankruptcy Court, the right of the Debtors or the Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination. Unless the Plan (including Plan Exhibits) or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to this <u>Article 10.8(b)</u> unless ordered by the Bankruptcy Court.

(c)    Notwithstanding anything herein to the contrary, nothing in the Plan shall impair, prejudice, release, compromise or waive any rights, Claims, Causes of Action, defenses or remedies of any Holder of Priority First Lien Claims arising under the Priority Intercreditor Agreement against (i) any Holder of First Lien Claims unless both Class 2B and Class 2B are Accepting Classes, in which case the Holders of Priority First Lien Claims will solely waive any requirement that Holders of First Lien Claims turn over any recovery received pursuant to <u>Article 4.2</u> of this Plan, or (ii) any Holder of Second Lien Claims unless both Class 3B and Class 3C are Accepting Classes, in which case the Holders of Priority First Lien Claims

will solely waive any requirement that Holders of Second Lien Claims turn over any recovery received pursuant to Article 4.3 of this Plan.

**10.9   Protection Against Discriminatory Treatment**.  Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another entity with whom such the Reorganized Debtors has been associated, solely because the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**10.10   Recoupment**.  In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**10.11   Release of Liens**.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and its successors and assigns.

**10.12   Reimbursement or Contribution**.  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or  (2) the relevant Holder of a Claim has filed a noncontingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## ARTICLE XI

## CONDITIONS PRECEDENT

**11.1   Conditions to Confirmation**.  The following are conditions precedent to the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Article 11.3 of this Plan:

(a)   the Bankruptcy Court shall have entered the Disclosure Statement Order.

**11.2    Conditions to the Effective Date of the Plan**. The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 11.3 of this Plan:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be a Final Order;

(b)    the Bankruptcy Court shall have entered the Confirmation Order, and such order shall be a Final Order;

(c)    the payment by the Debtors of all fees and expenses of the DIP Agent and Priority First Lien Administrative Agent, including Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey, Inc., and Fortgang Consulting LLC;

(d)    all Plan Transaction Documents shall be in form and substance satisfactory to the Priority First Lien Administrative Agent;

(e)    all conditions precedent set forth in the New First Lien Credit Agreement shall have been satisfied or waived pursuant to the terms thereof;

(f)    the organizational documents of the Reorganized Debtors as contemplated herein shall be in form and substance satisfactory to the Priority First Lien Administrative Agent, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws;

(g)    all authorizations, consents, certifications, regulatory approvals, rulings, no action letters, opinions, or other documents or actions required by any law, regulation, or order to be received or to occur in order to implement and effectuate the Plan on the Effective Date shall have been obtained (and evidence thereof shall have been delivered to the Priority First Lien Lender) or shall have occurred unless such failure will not have a material adverse effect on the Reorganized Debtors;

(h)    after occurrence of the Effective Date and payment of all amounts contemplated in connection therewith (including any Cure Amounts), the Reorganized Debtors shall emerge with a minimum of $10 million of cash or cash equivalents, or shall reasonably expect to build to $10 million of cash or cash equivalents within 60 days of the Effective Date (the "**Minimum Liquidity Condition Precedent**"); and

(i)    all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

**11.3    Waiver of Conditions Precedent**. The conditions set forth in Articles 11.1 and 11.2 may be waived, in whole or in part, by agreement of (a) the Debtors and (b) the Priority First Lien Administrative Agent, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

**11.4    Notice of Effective Date**.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Article 11.2 of this Plan have been satisfied or waived pursuant to Article 11.3 of this Plan.

**11.5    Effect of Non-Occurrence of Conditions to Consummation**.  If prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

# ARTICLE XII

# RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall, to the fullest extent permissible under applicable law, have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

(a)    resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors' amendment, modification, or supplement after the Effective Date, pursuant to Article VIII of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(b)    adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, this Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(c)    ensure that distributions to Holders of Allowed Claims are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)    allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including

57

any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(e)    hear and determine or resolve any and all matters related to Causes of Action;

(f)    enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

(g)    issue and implement orders in aid of execution, implementation, or consummation of this Plan;

(h)    consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)    hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(j)    determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

(k)    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(l)    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan and disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

(m)    hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(n)    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)    resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

(p)    hear any other matter not inconsistent with the Bankruptcy Code;

(q)    hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including the dischargeability of any claim;

(r)    enter a Final Decree closing the Chapter 11 Cases;

(s)    enforce all orders previously entered by the Bankruptcy Court; and

(t)    hear and determine all matters relating to any Bankruptcy Code section 510(b) Claims.

All of the foregoing applies following the Effective Date; provided, that from the Confirmation Date through the Effective Date, in addition to the foregoing, the Bankruptcy Court shall retain jurisdiction with respect to all other matters of this Plan that were subject to its jurisdiction prior to the Confirmation Date; provided, further, that the Bankruptcy Court shall not have nor retain exclusive jurisdiction over any post-Effective Date agreement. Nothing contained herein shall be construed to increase, decrease or otherwise modify the independence, sovereignty, or jurisdiction of the Bankruptcy Court.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

**13.1    Binding Effect**. Upon the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

**13.2    Payment of Statutory Fees**. All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date. The Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed by entry of the Final Decree.

**13.3    Modification and Amendments**. The Debtors may alter, amend, or modify this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of this Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**13.4    Confirmation of the Plan**. The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to amend the Plan to any extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**13.5    Additional Documents**. On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute,

and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

**13.6    Dissolution of Creditors' Committee**.  Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, and the members thereof (solely in their capacities as Creditors' Committee members) shall be released, exculpated, and discharged from all their duties relating to the Chapter 11 Cases in accordance with Article X hereof.

**13.7    Request for Expedited Determination of Taxes**.  The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Debtors filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

**13.8    Revocation, Withdrawal, or Non-Consummation**.

(a)    **Right to Revoke or Withdraw**.  The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.

(b)    **Effect of Withdrawal, Revocation, or Non-Consummation**.  If the Debtors revoke or withdraw this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan and any settlement or compromise approved as part of this Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be null and void in all respects.  In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**13.9    Notices**.  After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**If to the Debtors:**

c/o Trident Holding Company, LLC
930 Ridgebrook Rd., 3rd Floor
Sparks, MD 21152
Attn.: David F. Smith, III (david.smith@tridentusahealth.com)
Chief Financial Officer

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square

New York, New York 10036
Attn: Paul D. Leake
Jason N. Kestecher

– and –

Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
Attn: James J. Mazza, Jr.
Justin M. Winerman

**If to the DIP Agent:**

Silver Point Finance, LLC
c/o Credit Administration Dept.
Attn: Joanna Holte
Two Greenwich Plaza
Greenwich, CT 06830
E-mail: Creditadmin@silverpointcapital.com
Phone: (203) 542-4230

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn: Robert A. Britton
Alexander N. Woolverton

**If to the Office of the United States Trustee:**

Office of the United States Trustee for the Southern District of New York
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, New York 10014
Attn: Brian Masumoto
Shannon Scott

**If to the Creditors' Committee:**

Kilpatrick, Townsend, & Stockton LLP
1114 Avenue of the Americas
New York, NY 10036

Attn:    David M. Posner
Gianfranco Finizio

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors and Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

**13.10    Term of Injunctions or Stays**. Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**13.11    Governing Law**. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control). Corporate governance matters shall be governed by the laws of the state of incorporation of the Reorganized Debtors.

**13.12    Entire Agreement**. Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**13.13    Severability**. If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (c) nonseverable and mutually dependent.

**13.14    No Waiver or Estoppel**. Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest

should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other party, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

**13.15   Conflicts**.  In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of this Plan shall govern.  In the event that the provisions of the Plan and the provisions of the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

Dated: March 25, 2019

Respectfully submitted,

TRIDENT HOLDING COMPANY, LLC
AND ITS AFFILIATE DEBTORS

By:_____
Name:  David F. Smith
Title:  Chief Financial Officer

1715029-NYCSR03A - MSW