SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Jason N. Kestecher
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

– and –

James J. Mazza, Jr. (admitted *pro hac vice*)
Justin M. Winerman (admitted *pro hac vice*)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel to Debtors and Debtors-in-Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRIDENT HOLDING COMPANY, LLC,** *et al.*, | **Case No. 19-10384 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |
| | **Related Docket Nos. 252, 346, 386, 630** |

## NOTICE OF FILING OF SECOND MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION OF TRIDENT HOLDING COMPANY, LLC AND ITS DEBTOR AFFILIATES

PLEASE TAKE NOTICE that, on March 25, 2019, the debtors and debtors-in-

possession in the above-captioned jointly administered bankruptcy cases (collectively, the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Trident Holding Company, LLC (6396); American Diagnostics Services, Inc. (2771); Community Mobile Diagnostics, LLC (9341); Community Mobile Ultrasound, LLC (3818); Diagnostic Labs Holdings, LLC (8024); FC Pioneer Holding Company, LLC (6683); JLMD Manager, LLC (8470); Kan-Di-Ki LLC (6100); Main Street Clinical Laboratory, Inc. (0907); MDX-MDL Holdings, LLC (2605); MetroStat Clinical Laboratory – Austin, Inc. (4366); MX Holdings, LLC (8869); MX USA, LLC (4885); New Trident Holdcorp, Inc. (4913); Rely Radiology Holdings, LLC (3284); Schryver Medical Sales and Marketing, LLC (9620); Symphony Diagnostic Services No. 1, LLC (8980); Trident Clinical Services Holdings, Inc. (6262); Trident Clinical Services Holdings, LLC (1255); TridentUSA Foot Care Services LLC (3787); TridentUSA Mobile Clinical Services, LLC (0334); TridentUSA Mobile Infusion Services, LLC (5173); U.S. Lab & Radiology, Inc. (4988). The address of the Debtors' corporate headquarters is 930 Ridgebrook Road, 3rd Floor, Sparks, MD 21152.

"**Debtors**") filed the *Joint Plan of Reorganization of Trident Holding Company, LLC and Its Debtor Affiliates* [Docket No. 252] (the "**Plan**").

PLEASE TAKE FURTHER NOTICE that, on April 29, 2019, the Debtors filed the *Amended Joint Plan of Reorganization of Trident Holding Company, LLC and Its Debtor Affiliates* [Docket No. 346].

PLEASE TAKE FURTHER NOTICE that, on May 8, 2019, the Debtors filed the *Second Amended Joint Plan of Reorganization of Trident Holding Company, LLC and Its Debtor Affiliates* (Solicitation Version) [Docket No. 386] (the "**Second Amended Plan**").

PLEASE TAKE FURTHER NOTICE that, on July 3, 2019, the Debtors filed the *Modified Second Amended Joint Plan of Reorganization of Trident Holding Company, LLC and Its Debtor Affiliates* [Docket No. 630] (the "**Modified Second Amended Plan**").

PLEASE TAKE FURTHER NOTICE that the Debtors have made additional modifications to the Modified Second Amended Plan (the "**Second Modified Second Amended Plan**"), a copy of which is attached hereto as **Exhibit 1**.

PLEASE TAKE FURTHER NOTICE that a blackline version of the Second Modified Second Amended Plan is attached hereto as **Exhibit 2,** which blackline reflects revisions from the Modified Second Amended Plan.  The blackline Second Modified Second Amended Plan pages only are attached hereto as **Exhibit 3.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Dated: September 5, 2019
       New York, New York

                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                          */s/ James J. Mazza, Jr.*
                          Paul D. Leake
                          Jason N. Kestecher
                          Four Times Square
                          New York, New York 10036-6522
                          Telephone: (212) 735-3000
                          Fax: (212) 735-2000

                          – and –

                          James J. Mazza, Jr. (admitted *pro hac vice*)
                          Justin M. Winerman (admitted *pro hac vice*)
                          155 North Wacker Drive
                          Chicago, Illinois 60606-1720
                          Telephone: (312) 407-0700
                          Fax: (312) 407-0411

                          *Counsel to Debtors and Debtors-in-Possession*

3

## **EXHIBIT 1**

**Second Modified Second Amended Plan**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRIDENT HOLDING COMPANY, LLC, *et al.*,** | **Case No. 19-10384 (SHL)** |
| **Debtors.[1]** | **(Jointly Administered)** |

**SECOND MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION OF TRIDENT HOLDING COMPANY, LLC AND ITS DEBTOR AFFILIATES**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

James J. Mazza, Jr.
Justin M. Winerman
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700

Paul D. Leake
Jason N. Kestecher
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000

*Attorneys for the Debtors and Debtors-in-Possession*

Dated:        September 5, 2019

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Trident Holding Company, LLC (6396); American Diagnostics Services, Inc. (2771); Community Mobile Diagnostics, LLC (9341); Community Mobile Ultrasound, LLC (3818); Diagnostic Labs Holdings, LLC (8024); FC Pioneer Holding Company, LLC (6683); JLMD Manager, LLC (8470); Kan-Di-Ki LLC (6100); Main Street Clinical Laboratory, Inc. (0907); MDX-MDL Holdings, LLC (2605); MetroStat Clinical Laboratory – Austin, Inc. (4366); MX Holdings, LLC (8869); MX USA, LLC (4885); New Trident Holdcorp, Inc. (4913); Rely Radiology Holdings, LLC (3284); Schryver Medical Sales and Marketing, LLC (9620); Symphony Diagnostic Services No. 1, LLC (8980); Trident Clinical Services Holdings, Inc. (6262); Trident Clinical Services Holdings, LLC (1255); TridentUSA Foot Care Services LLC (3787); TridentUSA Mobile Clinical Services, LLC (0334); TridentUSA Mobile Infusion Services, LLC (5173); U.S. Lab & Radiology, Inc. (4988). The address of the Debtors' corporate headquarters is 930 Ridgebrook Road, 3rd Floor, Sparks, MD 21152.

# TABLE OF CONTENTS

**Page**

Article I

DEFINITIONS, RULES OF
INTERPRETATION, AND COMPUTATION OF TIME

A.      Scope of Definitions ................................................................1
B.      Definitions..............................................................................1
C.      Rules of Interpretation ...........................................................22
D.      Computation Of Time .............................................................22
E.      References to Monetary Figures ..............................................22
F.      Certain Consent Rights ..........................................................22
G.      Exhibits ..................................................................................23

Article II

ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

2.1     Administrative Claims ............................................................23
2.2     DIP Facility Claims.................................................................24
2.3     Professional Claims ...............................................................24
2.4     Priority Tax Claims.................................................................25

Article III

CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

3.1     Classification of Claims and Interests....................................25

Article IV

PROVISIONS FOR TREATMENT
OF CLAIMS AND INTERESTS

4.1     Priority First Lien Claims .......................................................28
4.2     First Lien Claims....................................................................28
4.3     Second Lien Claims ...............................................................29
4.4     Other Secured Claims ............................................................30
4.5     Other Priority Claims .............................................................31
4.6     Operating Company General Unsecured Claims .....................31
4.7     Holding Company General Unsecured Claims.........................31
4.8     Intercompany Claims .............................................................32
4.9     Other Subordinated Claims....................................................32
4.10    Interests in Debtor Subsidiaries ............................................32
4.11    Interests in Pioneer................................................................33

i

Article V

ACCEPTANCE

5.1    Classes Entitled to Vote ................................................................33
5.2    Acceptance by Impaired Classes ....................................................33
5.3    Elimination of Classes ...................................................................34
5.4    Special Provision Governing Unimpaired Claims ...........................34
5.5    Deemed Acceptance if No Votes Cast .............................................34
5.6    Cramdown .....................................................................................34

Article VI

MEANS FOR IMPLEMENTATION OF THE PLAN

6.1    No Substantive Consolidation ........................................................34
6.2    General Settlement of Claims and Interests ....................................34
6.3    Restructuring Transactions. ...........................................................34
6.4    Sources of Cash for Plan Distribution ...........................................35
6.5    Exit Liquidity Facility ...................................................................36
6.6    Exit Term Loan Facility .................................................................36
6.7    New First Lien Facility ..................................................................36
6.8    Authorization, Issuance, and Distribution of New Pioneer Units .........36
6.9    Operating Company General Unsecured Claims Cash Pool ...............36
6.10   GUC Administrator Account. .........................................................37
6.11   Exemptions from Securities Act Registration Requirements .............37
6.12   Cancellation of Existing Securities and Agreements ........................38
6.13   Issuance and Distribution of New Securities; Execution of Plan
       Documents ....................................................................................38
6.14   Continued Corporate Existence ......................................................38
6.15   New Corporate Governance Documents ..........................................39
6.16   Directors, LLC Managers, and Officers of Reorganized Debtors .......39
6.17   Corporate Action ...........................................................................39
6.18   Effectuating Documents; Further Transactions ...............................40
6.19   Employment, Retirement, Indemnification, and Other Agreements and
       Employee Compensation Programs .................................................40
6.20   Preservation Of Causes Of Action .................................................41
6.21   Reservation of Rights .....................................................................41
6.22   Exemption from Certain Transfer Taxes and Recording Fees ............42
6.23   Insured Claims ..............................................................................42
6.24   Intercompany Account Settlement. ................................................42
6.25   Closing of Chapter 11 Cases. ........................................................42
6.26   Private Company ...........................................................................42

ii

## Article VII

### UNEXPIRED LEASES AND EXECUTORY CONTRACTS

7.1    Rejection of Executory Contracts and Unexpired Leases........................................42
7.2    Assumption of Executory Contracts and Unexpired Leases..................................44
7.3    Insurance Policies ....................................................................................................44
7.4    Cure Procedures and Payments Related to Assumption of Executory
       Contracts and Unexpired Leases.............................................................................46
7.5    Contracts, Intercompany Contracts, and Leases Entered into After the
       Petition Date.............................................................................................................48
7.6    General Reservation of Rights ................................................................................48

## Article VIII

### PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

8.1    Determination Of Claims and Interests..................................................................48
8.2    GUC Administrator...................................................................................................49
8.3    Claims Administration Responsibility....................................................................49
8.4    Objections to Claims.................................................................................................50
8.5    Disallowance of Claims ............................................................................................50
8.6    Estimation of Claims.................................................................................................50
8.7    No Interest on Claims ...............................................................................................51
8.8    Amendments to Claims.............................................................................................51

## Article IX

### PROVISIONS GOVERNING DISTRIBUTIONS

9.1    Time of Distributions................................................................................................51
9.2    Distribution Agent ....................................................................................................51
9.3    Currency.....................................................................................................................51
9.4    Distributions on Account of Claims Allowed as of the Effective Date................51
9.5    Distributions on Account of Claims Allowed After the Effective Date ...............52
9.6    Delivery Of Distributions ........................................................................................53
9.7    Accrual of Dividends and Other Rights.................................................................55
9.8    Compliance Matters ..................................................................................................55
9.9    Claims Paid or Payable by Third Parties ..............................................................55
9.10   Setoffs ........................................................................................................................56
9.11   Allocation of Plan Distributions Between Principal and Interest ........................56

## Article X

### EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

10.1   Vesting of Assets .......................................................................................................56
10.2   Discharge of the Debtors ..........................................................................................57
10.3   Release by Debtors ....................................................................................................57

iii

10.4    Release by Holders of Claims .................................................................................58
10.5    Exculpation and Limitation of Liability ...............................................................59
10.6    Exclusions and Limitations on Exculpation, Indemnification, and Releases ........59
10.7    Injunction ..............................................................................................................59
10.8    Subordination Rights ............................................................................................60
10.9    Protection Against Discriminatory Treatment ......................................................61
10.10   Recoupment ...........................................................................................................61
10.11   Release of Liens .....................................................................................................61
10.12   Reimbursement or Contribution ...........................................................................61

Article XI

CONDITIONS PRECEDENT

11.1    Conditions to Confirmation ..................................................................................62
11.2    Conditions to the Effective Date of the Plan ........................................................62
11.3    Waiver of Conditions Precedent ...........................................................................63
11.4    Notice of Effective Date .......................................................................................63
11.5    Effect of Non-Occurrence of Conditions to Consummation ................................63

Article XII

RETENTION OF JURISDICTION

Article XIII

MISCELLANEOUS PROVISIONS

13.1    Binding Effect .......................................................................................................66
13.2    Payment of Statutory Fees ....................................................................................66
13.3    Modification and Amendments ..............................................................................66
13.4    Confirmation of the Plan .......................................................................................66
13.5    Additional Documents ...........................................................................................66
13.6    Dissolution of Creditors' Committee ....................................................................67
13.7    Request for Expedited Determination of Taxes ....................................................67
13.8    Revocation, Withdrawal, or Non-Consummation .................................................67
13.9    Notices ...................................................................................................................67
13.10   Term of Injunctions or Stays .................................................................................69
13.11   Governing Law .......................................................................................................69
13.12   Entire Agreement ...................................................................................................69
13.13   Severability ............................................................................................................69
13.14   No Waiver or Estoppel ...........................................................................................70
13.15   Conflicts .................................................................................................................70

# EXHIBITS[2]

| | |
|---|---|
| **Exhibit 2.1** | **Administrative Claim Request Form** |
| **Exhibit 6.6** | **Exit Term Loan Facility Credit Agreement** |
| **Exhibit 6.15** | **Pioneer LLC Agreement** |
| **Exhibit 6.20** | **Retained Causes of Action** |
| **Exhibit 7.1** | **Assumed Executory Contracts and Unexpired Leases** |

---

[2]    The Exhibits have been filed with the Plan Supplement, as has been, and may be further, amended, modified, and/or supplemented.

## INTRODUCTION

Trident Holding Company, LLC and certain of its affiliates, the debtors and debtors in possession (collectively, the "Company") in the above-captioned cases (the "Chapter 11 Cases"), hereby propose this joint plan (this "Plan") for the resolution of the outstanding Claims and Interests.  Capitalized terms used herein shall have the meanings ascribed to them in Article I.B of this Plan.

The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a Holder of a Claim or Interest until a disclosure statement has been approved by the Bankruptcy Court and distributed to Holders of Claims and Interests.  The Disclosure Statement relating to this Plan was approved by the Bankruptcy Court on [  ], 2019 and has been made available to all parties whose votes are being solicited.  The Disclosure Statement contains, among other things, a discussion of the Debtors' history, business, properties and operations, risk factors associated with the business and Plan, a summary and analysis of this Plan, a summary and analysis of the settlements contained in the Plan, and certain related matters.

**ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XIII of this Plan, the Debtors expressly reserve their rights to alter, amend, modify, revoke, or withdraw this Plan, one or more times, prior to this Plan's substantial consummation.

## ARTICLE I

## DEFINITIONS, RULES OF
## INTERPRETATION, AND COMPUTATION OF TIME

### A.    Scope of Definitions

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I.B of this Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### B.    Definitions

**1.1**    "**Accepting Class**" means a Class that votes to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

1

**1.2**    "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, Section 503(b)(9) Claims, DIP Facility Claims, Professional Claims, and all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court.

**1.3**    "**Administrative Claim Request Form**" means the form to be included in the Plan Supplement for submitting Administrative Claims requests.

**1.4**    "**Administrative Claims Bar Date**" means the deadline for filing proofs of or requests for payment of Administrative Claims, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to (i) the DIP Facility Claims and Professional Claims, which shall be subject to the provisions of Articles 2.2 and 2.3 hereof, as applicable, and (ii) Section 503(b)(9) Claims, which shall be subject to the Bar Date Order.

**1.5**    "**Affiliates**" has the meaning ascribed to such term by section 101(2) of the Bankruptcy Code.

**1.6**    "**Allowed**" means, for distribution purposes, a Claim or Interest, or any portion thereof, or a particular Class of Claims or Interests (a) that has been allowed by a Final Order of the Bankruptcy Court (or such other court as the Reorganized Debtor and the Holder of such Claim or Interest agree may adjudicate such Claim or Interest and objections thereto), (b) which is not the subject of a proof of Claim timely filed with the Bankruptcy Court and is Scheduled as liquidated and noncontingent, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, but only to the extent such Claim is Scheduled as liquidated and noncontingent, (c) for which a proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which (i) no objection to its allowance has been filed within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court, (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order of the Bankruptcy Court, or, (iii) following the Effective Date, with respect to Operating Company General Unsecured Claims, as otherwise may be determined by the GUC Administrator, or (d) that is expressly allowed in a liquidated amount pursuant to this Plan.

**1.7**    "**Annual Incentive Plan**" means the Company's annual ordinary course incentive plan.

**1.8**    "**Ares**" means Ares Capital Corporation.

2

**1.9** "**Assumption and Rejection Procedures**" means the expedited procedures for the Debtors to assume or reject Executory Contracts and Unexpired Leases pursuant to the Bankruptcy Court's order dated March 8, 2019 (Docket No. 171).

**1.10** "**Audax Debt Funds**" means, collectively, Audax Credit Opportunities Offshore Ltd., Audax Senior Loan Fund SPV LLC, and Audax Management Company (NY), LLC, for itself, and as agent on behalf of CMFG Life Insurance Company and Trustees of the Estate of Bernice Pauahi Bishop d/b/a Kamehameha Schools.

**1.11** "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors and their recovery, subordination, or other remedies that may be brought by and on behalf of the Debtors and their estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under section 502, 544, 545, 547, 548, 550, 553, and 724(a) of the Bankruptcy Code.

**1.12** "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the date hereof but, with respect to amendments to the Bankruptcy Code subsequent to commencement of the Chapter 11 Cases, only to the extent that such amendments were made expressly applicable to bankruptcy cases which were filed as of the enactment of such amendments.

**1.13** "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

**1.14** "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

**1.15** "**Bar Date**" means the deadlines set by the Bankruptcy Court pursuant to the Bar Date Order or other Final Order for filing proofs of claim in the Chapter 11 Cases, as the context may require.

**1.16** "**Bar Date Order**" means the order entered by the Bankruptcy Court on March 28, 2019 (Docket No. 267) and any subsequent order supplementing such order or relating thereto.

**1.17** "**Business Day**" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York City.

**1.18** "**Capital Raising Transaction**" means, to the extent reasonably necessary in the Debtors' business judgment and with the consent of the Priority First Lien Administrative Agent, a capital-raising or liquidity-generating transaction arranged by the Priority First Lien Administrative Agent to provide the Debtors with sufficient capital (whether in the form of exit

3

financing or otherwise) to allow for the implementation and effectiveness of the Plan, on terms and conditions reasonably acceptable to the Debtors.

1.19    "**Cash**" means legal tender of the United States of America and equivalents thereof.

1.20    "**Causes of Action**" means any and all actions, claims, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable, in contract or in tort, directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, including any Avoidance Action, and actions against any Entity for failure to pay for products or services provided or rendered by any Debtor, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.21    "**Certificate**" means any instrument evidencing a Claim or an Interest.

1.22    "**Chapter 11 Cases**" means the voluntary cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, which are being jointly administered and are currently pending before the Bankruptcy Court under Case No. 19-10384 (SHL).

1.23    "**Claim**" means a claim against the Debtors, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, or an Administrative Claim, as applicable.

1.24    "**Claims and Solicitation Agent**" means Epiq Corporate Restructuring LLC.

1.25    "**Claims Objection Deadline**" means, as applicable (except for Administrative Claims), (a) the day that is the later of the first Business Day that is at least 180 days after the Effective Date or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors or the GUC Administrator (solely as to the Operating Company General Unsecured Claims) without further notice to parties-in-interest.

1.26    "**Class**" means a category of Holders of Claims or Interests classified together pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, as described in Article III of this Plan.

1.27    "**Confirmation**" means the entry, within the meaning of Bankruptcy Rules 5003 and 9012, of the Confirmation Order, subject to all conditions specified in Article 11.1 having been satisfied or waived, in accordance with the terms herein.

4

**1.28** "**Confirmation Date**" means the date on which Confirmation occurs.

**1.29** "**Confirmation Hearing**" means the hearing before the Bankruptcy Court held under section 1128 of the Bankruptcy Code to consider confirmation of the Plan and related matters as such hearing may be adjourned or continued from time to time.

**1.30** "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

**1.31** "**Cortland Settlement Agreement**" means those certain Mutual Release and Covenant Not to Sue Agreements, entered into as of June 24, 2019, by and among (a) Cortland Capital Market Services, LLC, solely in its capacity as First Lien Administrative Agent, (b) Solar Senior Capital Ltd., (c) Monroe Capital CLO 2014-1, Ltd., (d) MJX Asset Management LLC, (e) Ivy Hill, (f) ING Capital, LLC, (g) BlueMountain CLO 2012-2 Ltd, (h) BlueMountain CLO 2013-1 Ltd, (i) BlueMountain CLO 2013-2 Ltd., (j) BlueMountain CLO 2013-3 Ltd., (k) WhiteHorse VII, Ltd, (*l*) Marathon CLO V LTD, (m) Marathon CLO VI LTD, (n) Marathon CLO VII LTD, (o) PennantPark Floating Rate Funding I, LLC, (p) PennantPark Floating Rate Capital Ltd., (q) VSS Fund, LP, (r) Cetus Capital III, LP, (s) Littlejohn Opportunities Master Fund LP, (t) OFM II, LP, (u) the Priority First Lien Administrative Agent, and (v) the Priority First Lien Lenders, pursuant to which the Existing 1L Releasing Parties (as defined therein) agreed to release the Priority First Lien Parties, the Debtors, the Reorganized Debtors and certain related persons effective upon the Effective Date.

**1.32** "**Creditor**" has the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

**1.33** "**Creditors' Committee**" means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on February 20, 2019, as may be reconstituted from time to time.

**1.34** "**Cure**" means the payment or other honoring of all obligations required to be paid or honored in connection with assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an Executory Contract or Unexpired Lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.35** "**Cure Notice**" means the notice of proposed Cure amount provided to counterparties to assumed Executory Contracts or Unexpired Leases pursuant to Article 7.4 of the Plan.

**1.36** "**Cure Objection Deadline**" means the deadline for filing objections to a Cure Notice or proposed Cure, which shall be on or before fourteen (14) days after the applicable counterparty was served with a Cure Notice.

**1.37** "**Debtor Group**" has the meaning ascribed to such term in <u>Article 3.1</u>.

**1.38** "**Debtor Group B**" means Trident Holding Company, LLC.

**1.39** "**Debtor Group C**" means, collectively, the following Debtors: American Diagnostics Services, Inc.; Community Mobile Diagnostics, LLC; Community Mobile Ultrasound, LLC; Diagnostic Labs Holdings, LLC; JLMD Manager, LLC; Kan-Di-Ki LLC; Main Street Clinical Laboratory, Inc.; MDX-MDL Holdings, LLC; MetroStat Clinical Laboratory – Austin, Inc.; MX Holdings, LLC; MX USA, LLC; New Trident Holdcorp, Inc.; Rely Radiology Holdings, LLC; Schryver Medical Sales and Marketing, LLC; Symphony Diagnostic Services No. 1, LLC; Trident Clinical Services Holdings, Inc.; Trident Clinical Services Holdings, LLC; TridentUSA Foot Care Services LLC; TridentUSA Mobile Clinical Services, LLC; TridentUSA Mobile Infusion Services, LLC; and U.S. Lab & Radiology, Inc.

**1.40** "**Debtor Subsidiaries**" means each Debtor that is a direct or indirect subsidiary of Pioneer.

**1.41** "**Debtors**" means, collectively, Trident Holding Company, LLC; American Diagnostics Services, Inc.; Community Mobile Diagnostics, LLC; Community Mobile Ultrasound, LLC; Diagnostic Labs Holdings, LLC; FC Pioneer Holding Company, LLC; JLMD Manager, LLC; Kan-Di-Ki LLC; Main Street Clinical Laboratory, Inc.; MDX-MDL Holdings, LLC; MetroStat Clinical Laboratory – Austin, Inc.; MX Holdings, LLC; MX USA, LLC; New Trident Holdcorp, Inc.; Rely Radiology Holdings, LLC; Schryver Medical Sales and Marketing, LLC; Symphony Diagnostic Services No. 1, LLC; Trident Clinical Services Holdings, Inc.; Trident Clinical Services Holdings, LLC; TridentUSA Foot Care Services LLC; TridentUSA Mobile Clinical Services, LLC; TridentUSA Mobile Infusion Services, LLC; and U.S. Lab & Radiology, Inc.

**1.42** "**DIP Agent**" means Silver Point Finance, LLC, in its capacity as administrative agent for the DIP Lenders pursuant to the DIP Credit Agreement.

**1.43** "**DIP Credit Agreement**" means that certain Senior Secured Superpriority Debtor in Possession Credit Agreement, between New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, the DIP Lenders, the DIP Agent and the other parties thereto, dated as of February 11, 2019, as has been or may be amended, restated, supplemented or otherwise modified from time to time.

**1.44** "**DIP Documents**" means all "Loan Documents" (as defined in the DIP Credit Agreement).

**1.45** "**DIP Facility**" means the debtor-in-possession senior secured financing facility, consisting of a term loan facility, provided to the Debtors by the DIP Lenders pursuant to the DIP Credit Agreement or the other DIP Documents (as defined in the DIP Facility Order) as authorized by the Bankruptcy Court pursuant to the DIP Facility Order.

**1.46** "**DIP Facility Claim**" means any Claim arising under, derived from, based upon, on account of or as a result of the DIP Facility.

**1.47** "**DIP Facility Order**" means, collectively, (a) the interim order that was entered by the Bankruptcy Court on February 12, 2019 (Docket No. 41), and (b) the final order that was entered by the Bankruptcy Court on March 8, 2019 (Docket No. 166), authorizing and approving the DIP Facility and the agreements related thereto, in each case as amended or modified in accordance with the terms thereof. The term "DIP Facility Order" includes any and all annexes or exhibits attached thereto.

**1.48** "**DIP Lenders**" means the financial institutions or entities from time to time party to the DIP Credit Agreement as lenders.

**1.49** "**Disallowed**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, or as provided in this Plan, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

**1.50** "**Disclosure Statement**" means the disclosure statement or any supplements thereto that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time in accordance with the terms therein, all as approved by an order of the Bankruptcy Court pursuant to sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3017.

**1.51** "**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto.

**1.52** "**Disputed**" means with respect to a Claim, (a) any Claim as to which any Debtor, the GUC Administrator, or other parties-in-interest in accordance with applicable law have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by any Debtor, the GUC Administrator, or other parties-in-interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

**1.53** "**Distribution Agent**" means Bankruptcy Management Solutions, Inc. d/b/a Stretto.

**1.54** "**Distribution Date**" means the date selected by the Reorganized Debtors, in their sole discretion, upon which distributions to Holders of Allowed Claims entitled to receive distributions under this Plan shall commence.

**1.55** "**Distribution Record Date**" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which shall be (a) ten (10) Business Days after entry of the Confirmation Order or (b) such other date as designated by an order of the Bankruptcy Court.

**1.56** "**Effective Date**" means the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the effectiveness of this Plan specified in <u>Article 11.2</u>, have been satisfied, or, if capable of being waived in accordance with the terms herein, waived, which date shall be specified in a notice filed by the Reorganized Debtors with the Bankruptcy Court.

**1.57** "**Entity**" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

**1.58** "**Equity Security**" has the meaning ascribed to such term in section 101(16) of the Bankruptcy Code.

**1.59** "**Escrow Agent**" means Ankura Trust Company LLC in its capacity as escrow agent for the Holdback Escrow Account.

**1.60** "**Estates**" means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

**1.61** "**Exculpated Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' (1) current financial advisors, attorneys, accountants, investment bankers, representatives, and other professionals; (2) current employees, consultants, Affiliates, officers, managers and directors, including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; (i) the Creditors' Committee and each of its members; (j) the First Lien Administrative Agent; (k) Capital Finance Opportunities 1701C, LLC; (*l*)  with respect to each of the foregoing entities in clauses (a) through (k), each of their current and former Affiliates; and (m) with respect to each of the foregoing entities in clauses (a) through (*l*), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, direct and indirect partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.62    "**Executory Contract**" means any contract to which any Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.63    "**Exhibit**" means an exhibit annexed either to this Plan, contained in the Plan Supplement, or annexed as an appendix to the Disclosure Statement.

1.64    "**Exit Liquidity Facility**" means a senior secured asset-based lending, receivables, or similar facility with revolving commitments in an aggregate amount not to exceed the difference between $10 million and the greater of (a) the Debtors' projected available cash and Cash Equivalents (as defined in the DIP Credit Agreement) on the Effective Date, or (b) the Debtors' projected available cash and Cash Equivalents 60 days following the Effective Date, on terms and conditions reasonably acceptable to the Priority First Lien Administrative Agent, which shall be senior in lien priority to the Exit Term Loan Facility and New First Lien Facility with respect to the Debtors' and Reorganized Debtors' accounts receivable and inventory assets.

1.65    "**Exit Term Loan Facility**" means an exit term loan credit facility in an aggregate principal amount equal to the sum of $50 million to be provided to the Reorganized Debtors by the Exit Term Loan Facility Lenders on the Effective Date pursuant to the Exit Term Loan Facility Documents and (b) up to $30 million to be provided to the Reorganized Debtors by the Priority First Lien Parties (or their designee) on the Effective Date as a Capital Raising Transaction, all of which shall be senior in lien priority to the New First Lien Facility.

1.66    "**Exit Term Loan Facility Agent**" means the administrative agent under the Exit Term Loan Facility Documents, and its successors and assigns in such capacity, or any replacement agent appointed pursuant to the terms of the Exit Term Loan Facility Documents.

1.67    "**Exit Term Loan Facility Credit Agreement**" means that certain term loan credit agreement, annexed hereto as <u>Exhibit 6.6</u>, which shall be effective on the Effective Date, by and among certain of the Reorganized Debtors, the Exit Term Loan Facility Agent, and the Exit Term Loan Facility Lenders, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time, which shall have lien priority over all other indebtedness of the Reorganized Debtors (other than, if applicable, the Exit Liquidity Facility), shall have a maturity date of seven years after the Effective Date and shall bear interest at a rate of LIBOR *plus* 7.5% per annum payable-in-kind; provided that the Reorganized Debtors shall have the ability at any time to elect to pay interest at a rate of LIBOR *plus* 7% per annum payable in cash for any period.

1.68    "**Exit Term Loan Facility Lenders**" means the lenders under the Exit Term Loan Facility Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the Exit Term Loan Facility Credit Agreement.

1.69    "**Exit Term Loan Facility Documents**" means, collectively, the Exit Term Loan Facility Credit Agreement and all other "Loan Documents" as defined therein, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documents) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall be, to the extent applicable.

**1.70**    "**Face Amount**" means, (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Holder of a Claim in any proof of Claim, or amendment thereof in accordance with applicable law, timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, or the amount estimated for such Claim in an order of the Bankruptcy Court, and (b) when used in reference to an Allowed Claim or Allowed Interest, the allowed amount of such Claim or Interest.  If none of the foregoing applies, the Face Amount of the Claim shall be zero ($0) dollars.

**1.71**    "**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

**1.72**    "**Final Order**" means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, is in full force and effect, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors or Reorganized Debtors, as applicable, reserve the right to waive any appeal period for an order or judgment to become a Final Order.

**1.73**    "**First Lien Administrative Agent**" means Cortland Capital Market Services LLC, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the First Lien Credit Agreement.

**1.74**    "**First Lien Claims**" means any and all Claims held by the First Lien Lenders against the Debtors arising under, relating to, or in connection with the First Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in an aggregate amount of $219,815,899.97.

**1.75**    "**First Lien Classes**" means, collectively, Class 2B and Class 2C.

**1.76**    "**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of July 31, 2013, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the First Lien Administrative Agent, and the various lenders party thereto from time to time,  as has been or it may be amended, supplemented, amended and restated, or otherwise modified from time to time.

    **1.77**    "**First Lien Credit Documents**" means the First Lien Credit Agreement, together with all other "Loan Documents" (as defined in the First Lien Credit Agreement).

    **1.78**    "**First Lien Lenders**" means the "Lenders" as defined in the First Lien Credit Agreement.

    **1.79**    "**General Unsecured Claim**" means any Claim that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Priority First Lien Claim, First Lien Claim, Second Lien Claim, PIK Notes Claim, Other Secured Claim, Other Priority Claim, Intercompany Claim, or Other Subordinated Claim.  Without limiting the foregoing, General Unsecured Claims include all Rejection Damages Claims that are not Allowed Section 503(b)(9) Claims.

    **1.80**    "**Governmental Unit**" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

    **1.81**    "**GUC Administrator**" means the person appointed by the Creditors' Committee in accordance with Article 8.2 of the Plan.

    **1.82**    "**GUC Administrator Account**" means a segregated account to be funded on or prior to the Effective Date in accordance with Article 6.10 of the Plan.

    **1.83**    "**GUC Administrator Costs**" means the reasonable costs and expenses of the GUC Administrator, including reasonable professionals' fees and expenses, which, for the avoidance of doubt, shall be paid by the Debtors or Reorganized Debtors in an amount not to exceed $250,000.

    **1.84**    "**Healthcare Liability Policies**" means the healthcare liability Insurance Contracts, for the terms July 2013 through June 30, 2019, issued by American Casualty Company of Reading, Pennsylvania, Transportation Insurance Company, and/or Continental Insurance Company, as insurer.

    **1.85**    "**Holdback Escrow Account**" means the interest-bearing escrow account into which Cash equal to the Holdback Escrow Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims (as Allowed pursuant to the terms of this Plan) to the extent not previously paid or disallowed.

    **1.86**    "**Holdback Escrow Amount**" means the sum of (a) the aggregate amounts withheld by the Debtors as of the Confirmation Date as a holdback on payment of Professional Claims pursuant to the Professional Fee Order, and (b) twenty (20) percent of that portion of the unbilled fees of Professionals estimated pursuant to Article 2.3(c) of the Plan attributable to fees incurred as of the Confirmation Date; provided, however, that if a Professional does not provide an estimate pursuant to Article 2.3(c), the Debtors may estimate the unbilled fees of such Professional incurred as of the Confirmation Date, and the sum of provision (a) above and the total amount so estimated shall comprise the Holdback Escrow Amount.

**1.87** "**Holding Companies**" means FC Pioneer Holding Company, LLC and Trident Holding Company, LLC.

**1.88** "**Holding Company General Unsecured Claims**" means the General Unsecured Claims and the PIK Notes Claims against the Holding Companies.

**1.89** "**Holder**" means a holder of a Claim against or Interest in the Debtors.

**1.90** "**Impaired**" means impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.91** "**Initial Distribution Date**" means, with respect to all Claims other than Operating Company General Unsecured Claims, the date selected by the Reorganized Debtors, in their sole discretion, upon which distributions to Holders of Allowed Claims entitled to receive distributions under this Plan shall commence.

**1.92** "**Insurance Contract**" has the meaning ascribed to it in Article 7.3 of this Plan.

**1.93** "**Insured Claims**" has the meaning ascribed to it in Article 7.3 of this Plan.

**1.94** "**Intercompany Claim**" means a Claim or a Cause of Action by a Debtor against another Debtor.

**1.95** "**Interest**" means any Equity Security, common stock, equity, ownership, profit interest, unit, or share in a Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in a Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, vested, transferrable, preferred, common, voting, or denominated "stock" or a similar security, existing immediately prior to the Effective Date.

**1.96** "**Ivy Hill**" means, collectively, Ivy Hill Middle Market Credit Fund IV, Ltd., Ivy Hill Middle Market Credit Fund V, Ltd., Ivy Hill Middle Market Credit Fund VII, Ltd., Ivy Hill Middle Market Credit Fund IX, Ltd., Ivy Hill Middle Market Credit Fund X, Ltd., Private Debt Strategies Fund IV L.P., and Ivy Hill Asset Management, L.P..

**1.97** "**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued, or promulgated by any Governmental Unit.

**1.98** "**Legacy Workers Compensation Policies**" means those large casualty workers' compensation and employers' liability Insurance Contracts, for the terms December 2011 through July 2018, issued by American Casualty Company of Reading, Pennsylvania, Transportation Insurance Company, and/or Continental Insurance Company, as insurer.

**1.99** "**Legal Proceeding**" means legal, governmental, administrative, judicial, or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, notices of noncompliance or violation, or proceedings.

**1.100** "**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

**1.101** "**Management Incentive Plan**" means the post-Effective Date management equity incentive plan, which shall provide for, among other things, not to exceed 10% of the equity, options, restricted stock units, or other equity instruments in Reorganized Pioneer, issued at plan value, to be reserved for current and future officers and employees of the Reorganized Debtors (excluding any such equity, options, restricted stock units, or other equity instruments granted to the non-executive members of the New Pioneer Board), with awards and terms and conditions thereunder determined by the New Pioneer Board, except as otherwise set forth in the Plan Supplement. For the avoidance of doubt, the Reorganized Debtors shall have the right to set additional equity awards for the benefit of members of the New Boards following the Effective Date.

**1.102** "**Minimum Liquidity Condition Precedent**" has the meaning ascribed to such term in Article 11.2.

**1.103** "**New Boards**" means the initial boards of directors of the Reorganized Debtors, which shall as of the Effective Date consist of members selected by the Priority First Lien Administrative Agent and shall be as set forth in the Plan Supplement or as announced on the record during the Confirmation Hearing.

**1.104** "**New First Lien Facility**" means a new first lien term loan facility in an aggregate principal amount of $105 million to be provided to the Reorganized Debtors by the New First Lien Facility Lenders on the Effective Date pursuant to the New First Lien Credit Agreement, which shall be junior in lien priority to the Exit Term Loan Facility.

**1.105** "**New First Lien Facility Agent**" means the administrative agent under the New First Lien Facility Documents, and its successors and assigns in such capacity, or any replacement agent appointed pursuant to the terms of the New First Lien Facility Documents.

**1.106** "**New First Lien Credit Agreement**" means that certain term loan credit agreement, which shall be effective on the Effective Date, by and among certain of the Reorganized Debtors, the New First Lien Facility Agent, and the New First Lien Facility Lenders, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time, the material terms of which shall be substantially identical to those in the Priority First Lien Credit Agreement, except that the maturity date shall be seven years after the Effective Date and the term loans under the New First Lien Facility shall bear interest at a rate of LIBOR *plus* 7.5% per annum payable-in-kind; provided that the Reorganized Debtors shall have the ability at any time to elect to pay interest at a rate of LIBOR *plus* 7% per annum payable in cash for any period.

**1.107** "**New First Lien Facility Documents**" means, collectively, the New First Lien Credit Agreement and all other "Loan Documents" as defined therein, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documents) (in each case, as amended, restated, modified, or supplemented from time to time).

**1.108** "**New First Lien Facility Lenders**" means the lenders under the New First Lien Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the New First Lien Credit Agreement.

**1.109** "**New Pioneer Board**" means the initial board of managers of Reorganized Pioneer, which shall as of the Effective Date consist of members selected by the Priority First Lien Administrative Agent and shall be as set forth in the Plan Supplement or as announced on the record during the Confirmation Hearing; provided, to the extent designated by the Priority First Lien Administrative Agent, another of the New Boards may exercise the rights of the New Pioneer Board hereunder.

**1.110** "**New Pioneer Units**" means the Class A limited liability company units of Reorganized Pioneer as provided under the Pioneer LLC Agreement.

**1.111** "**Old Pioneer Units**" means limited liability company interests represented by units of FC Pioneer Holding Company, LLC of any other such interests that are authorized, issued, and outstanding prior to the Effective Date.

**1.112** "**Old Securities**" means, collectively, the Original PIK Notes, the Tranched PIK Notes, and Old Pioneer Units, and all options, warrants, rights, and other instruments evidencing an ownership interest in Pioneer (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise to acquire any of the foregoing.

**1.113** "**Operating Companies**" means, collectively, all the Debtors that are not Holding Companies.

**1.114** "**Operating Company General Unsecured Claims**" means the General Unsecured Claims against the Operating Companies.

**1.115** "**Operating Company General Unsecured Claims Cash Pool**" means $950,000 of Cash plus any net property or proceeds received by the Debtors or Reorganized Debtors in connection with the pursuit of any claims under section 547 of the Bankruptcy Coe against the Specified Parties.

**1.116** "**Operating Company General Unsecured Claims Cash Pool Account**" means a segregated account to be funded on or prior to the Effective Date in accordance with Article 6.9.

**1.117** "**Operating Company General Unsecured Class**" means Class 6C.

**1.118** "**Operating Company General Unsecured Claims Distribution Date**" means, solely with respect to Operating Company General Unsecured Claims, the date or dates selected by the GUC Administrator, in its sole discretion, upon which distributions to Holders of Allowed Operating Company General Unsecured Claims entitled to receive distributions under this Plan shall occur.

14

**1.119** "**Ordinary Course Professionals Order**" means the Bankruptcy Court's Order Authorizing Debtors To Employ And Pay Professionals Utilized In The Ordinary Course Of Business (Docket No. 180).

**1.120** "**Original PIK Notes**" means those certain promissory notes issued pursuant to the Original PIK Notes Investment Agreement.

**1.121** "**Original PIK Notes Investment Agreement**" means the Investment Agreement, dated as of December 9, 2016, by and among Pioneer, as borrower, the Original PIK Notes Investor Representative, and the other noteholders party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

**1.122** "**Original PIK Notes Investor Representative**" means GCM Saint Paul SPV, LLC, in its capacity as investor representative under the Original PIK Notes Investment Agreement.

**1.123** "**Other Priority Claim**" means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a) of the Bankruptcy Code.

**1.124** "**Other Secured Claim**" means any Secured Claim other than the following: (a) a DIP Facility Claim; (b) a Priority First Lien Claim; (c) a First Lien Claim; or (d) a Second Lien Claim.

**1.125** "**Other Subordinated Claim**" means any Claim against the Debtors that is subject to subordination under section 510(b) or (c) of the Bankruptcy Code, whether arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, or otherwise, which Claim shall be subordinated to all Claims or Interests that are senior to or equal to the Claim or Interest represented by such security.

**1.126** "**Periodic Distribution Date**" means, with respect to all Claims other than Operating Company General Unsecured Claims, as applicable, (a) the Distribution Date, as to the first distribution made by the Distribution Agent, and (b) thereafter, such Business Days selected by the Reorganized Debtors in their reasonable discretion, which shall be no less frequent than once every three (3) months unless otherwise determined by the New Board.

**1.127** "**Person**" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

**1.128** "**Petition Date**" means February 10, 2019.

**1.129** "**PIK Notes**" means, collectively, the Original PIK Notes and the Tranched PIK Notes.

**1.130** "**PIK Notes Claim**" means any Claim arising from, or related to, the PIK Notes.

15

1.131   "**Pioneer**" means FC Pioneer Holding Company, LLC.

1.132   "**Pioneer LLC Agreement**" means the amended and restated limited liability company agreement of Pioneer to be effective as of the Effective Date, the form and substance of which shall be included in the Plan Supplement.

1.133   "**Plan**" means this joint plan of reorganization for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as may be modified in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms herein, including the Plan Supplement and all Exhibits, supplements, appendices, and schedules.

1.134   "**Plan Supplement**" means the supplement or supplements to the Plan containing certain Exhibits and documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court in accordance with the terms herein.

1.135   "**Plan Supplement Filing Date**" means the date on which the Plan Supplement shall be filed with the Bankruptcy Court, which date shall be at least seven days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice, so long as such date is prior to the Voting Deadline.

1.136   "**Plan Transaction Documents**" means all definitive documents and agreements to which the Debtors will be a party as contemplated by the Plan including, without limitation, (a) the Plan and any documentation or agreements related thereto, (b) the Confirmation Order and pleadings (but not declarations) in support of entry thereof, (c) the solicitation materials in respect of the Plan, the motion to approve the Disclosure Statement, and the Disclosure Statement Order, and (d) all documents that will comprise the Plan Supplements.

1.137   "**Priority First Lien Administrative Agent**" means Silver Point Finance, LLC, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the Priority First Lien Credit Agreement.

1.138   "**Priority First Lien Claims**" means any and all Claims held by the Priority First Lien Lenders against the Debtors arising under, relating to, or in connection with the Priority First Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in the aggregate amount of $259,387,485.15.

1.139   "**Priority First Lien Credit Agreement**" means that certain Priority First Lien Credit Agreement, dated as of April 30, 2018, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, Trident Holding Company, LLC, the Priority First Lien Administrative Agent, and the various lenders party thereto from time to time, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time.

1.140   "**Priority First Lien Credit Documents**" means the Priority First Lien Credit Agreement, together with all other "Loan Documents" (as defined in the Priority First Lien Credit Agreement).

16

1.141 "**Priority Intercreditor Agreement**" means the Priority/First Lien/Second Lien Intercreditor Agreement, dated as of April 30, 2018, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, Trident Holding Company, LLC, the other grantors party thereto, the Priority First Lien Administrative Agent, the First Lien Administrative Agent, and the Second Lien Administrative Agent.

1.142 "**Priority First Lien Lenders**" means the "Lenders" as defined in the Priority First Lien Credit Agreement.

1.143 "**Priority First Lien Parties**" means the Priority First Lien Lenders and the Priority First Lien Administrative Agent.

1.144 "**Priority Tax Claim**" means a Claim of a Governmental Unit entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

1.145 "**Pro Rata**" means, with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes at issue; provided, however, that for purposes of distributions to Holders of Allowed Operating Company General Unsecured Claims, Pro Rata shall apply on a consolidated basis.

1.146 "**Professional**" means any Entity (a) retained in the Chapter 11 Cases by separate Final Order pursuant to sections 327, 363, and 1103 of the Bankruptcy Code or otherwise; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; provided, however, that Professional does not include any Entity retained pursuant to the Ordinary Course Professionals Order.

1.147 "**Professional Claim**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Confirmation Date.

1.148 "**Professional Fee Order**" means the order entered by the Bankruptcy Court on March 8, 2019, authorizing the interim payment of Professional Claims subject to the Holdback Escrow Amount (Docket No. 172).

1.149 "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claim Holder so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claim Holder to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Claim Holder for any damages incurred as a result of any reasonable reliance by such Claim Holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claim Holder; provided, however, that any

contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

      1.150  "**Rejection Damages Claim**" means any Claim on account of the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

      1.151  "**Released Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' (1) current financial advisors, attorneys, accountants, investment bankers, representatives, and other professionals (collectively, the "**Debtor Professionals**"); (2) current employees, consultants, Affiliates, officers, managers and directors, including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; (i) the Creditors' Committee and each of its members; (j) Ares; (k) Ivy Hill; (*l*) the Audax Debt Funds; (m) Capital Finance Opportunities 1701C, LLC; (n) each of the parties to the Cortland Settlement Agreement; (o) with respect to each of the foregoing entities in clauses (a) through (n), each of their current and former Affiliates; and (p) with respect to each of the foregoing entities in clauses (a) through (o), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, direct and indirect partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees; provided, that, the foregoing entities identified in clauses (j) through (n) (including clauses (o) and (p) with respect to such entities identified in clauses (j) through (n)) shall constitute Released Parties solely for the Debtor releases set forth in Article 10.3.

      1.152  "**Releasing Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and the Reorganized Debtors; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; (i) the Creditors' Committee and each of its members; (j) Ares; (k) Ivy Hill; (*l*) the Audax Debt Funds; (m) Capital Finance Opportunities 1701C, LLC; (n) each of the parties to the Cortland Settlement Agreement; (o) with respect to each of the foregoing parties under (a) through (n), each of their current and former affiliates; (p) with respect to each of the foregoing entities in clauses (a) through (o), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all

of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, direct and indirect partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees; (k) without limiting the foregoing, each holder of a Claim against or Interest in the Company that (1) voted to accept the Plan, (2) is deemed to accept the Plan and opted to provide a release, (3) is deemed to reject the Plan and opted to provide a release, (4) was solicited to vote to accept or reject the Plan but who did not vote either to accept or to reject the Plan and opted to provide a release, or (5) voted to reject the Plan and opted to provide a release; and (*l*) solely with respect to the Substantial Contribution / Indemnified Parties, and without limiting the foregoing, each holder of a Claim against or Interest in the Company.

1.153   "**Reorganized Debtors**" means the Debtors or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

1.154   "**Reorganized Pioneer**" means Pioneer or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

1.155   "**Restructuring Transactions**" has the meaning set forth in Article 6.3.

1.156   "**RSA**" means the Restructuring Support Agreement, dated as of February 10, 2019, by and between the Debtors, the Priority First Lien Lenders, and the Priority First Lien Administrative Agent, including any exhibits and schedules thereto.

1.157   "**Scheduled**" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

1.158   "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors pursuant to section 521 of the Bankruptcy Code, which incorporate by reference the global notes and statement of limitations, methodology, and disclaimer regarding the Debtors' schedules and statements, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or Final Orders of the Bankruptcy Court.

1.159   "**SEC**" means the United States Securities and Exchange Commission.

1.160   "**Second Lien Administrative Agent**" means Ares Capital Corporation, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the Second Lien Credit Agreement.

1.161   "**Second Lien Claims**" means any and all Claims held by the Second Lien Lenders against the Debtors arising under, relating to, or in connection with the Second Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in an aggregate amount of $175,567,909.46.

19

**1.162** "**Second Lien Classes**" means, collectively, Class 3B and Class 3C.

**1.163** "**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of July 31, 2013, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the Second Lien Administrative Agent, and the various lenders party thereto from time to time,  as has been or may be amended, supplemented, amended and restated, or otherwise modified from time to time.

**1.164** "**Second Lien Credit Documents**" means the Second Lien Credit Agreement, together with all other "Loan Documents" (as defined in the Second Lien Credit Agreement).

**1.165** "**Second Lien Lenders**" means the "Lenders" as defined in the Second Lien Credit Agreement.

**1.166** "**Section 503(b)(9) Claim**" means any Claim asserted under section 503(b)(9) of the Bankruptcy Code equal to the value of any goods received by the Debtors within 20 days before the Petition Date during which the goods have been sold to the Debtors in the Debtors' ordinary course of business.

**1.167** "**Secured Claim**" means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**1.168** "**Securities Act**" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the SEC promulgated thereunder.

**1.169** "**Security**" has the meaning ascribed to such term in section 2(a)(1) of the Securities Act.

**1.170** "**Settling Parties**" means, collectively, (i) the Creditors' Committee; (ii) the Priority First Lien Parties; (iii) Ares; (iv) Ivy Hill; (v) the Audax Debt Funds; (vi) the Debtors.

**1.171** "**Specified Executives**" means executives holding the positions of Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer.

**1.172** "**Specified Parties**" means any 10 of the following 16 parties identified by the Debtors in a Plan Supplement prior to the Confirmation Date: (1) Merchants Automotive Group; (2) Beckman Coulter Inc.; (3) Element Fleet Corporation; (4) Cardinal Health Medical Products & Svcs; (5) Verizon Wireless; (6) Gelco Corporation; (7) Sysmex America Inc.; (8) Bio-Rad Laboratories Inc.; (9) 3M Health Information Systems; (10) DSSI; (11) Liaison Technologies Inc.; (12) Esker Software Inc.; (13) Hinduja Global Solutions Inc.; (14) HGS EBOS LLC; (15) Data Media Associates LLC; (16) Sprint.

**1.173** "**Substantial Contribution / Indemnified Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' current employees, officers, managers and directors, including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; and (i) the successors and assigns, subsidiaries, affiliates, current officers, directors, principals, shareholders, members, partners, employees, agents, attorneys, investment bankers, and representatives of each of the foregoing (a) through (h).

**1.174** "**Tranched PIK Notes**" means those certain promissory notes issued pursuant to the Tranched PIK Notes Investment Agreement.

**1.175** "**Tranched PIK Notes Investment Agreement**" means the Investment Agreement, dated as of November 29, 2017, by and among Pioneer and Trident Holding Company, LLC, each as borrower, the Tranched PIK Notes Investor Representative, and the other noteholders party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

**1.176** "**Tranched PIK Notes Investor Representative**" means Revelstoke Capital Partners Fund I, L.P., in its capacity as investor representative under the Tranched PIK Notes Investment Agreement.

**1.177** "**Unclaimed Distribution**" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors (or the Distribution Agent, as the case may be), of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' request (or the Distribution Agent's request, as the case may be), for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

**1.178** "**Unexpired Lease**" means a lease of nonresidential real property to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**1.179** "**Unimpaired**" means, with respect to a Class of Claims, a Class of Claims that is not Impaired.

**1.180** "**Voting Deadline**" means June 6, 2019 at 4:00 p.m. prevailing Eastern time.

**1.181** "**Warrants**" means, on terms and conditions set forth in the Pioneer LLC Agreement and acceptable to the Priority First Lien Lenders, Class W units of Reorganized Pioneer exercisable for up to 5% of the New Pioneer Units, subject to dilution by the Management Incentive Plan, with an expiration date of eighteen (18) months after the Effective Date at a strike price equal to the price per share that would result in a full return on invested

capital to the Priority First Lien Lenders (inclusive of the full amount of the Priority First Lien Claims) calculated as of the Effective Date, with such strike price continuing to accrue at a rate of LIBOR *plus* 9.5% compounding quarterly.

## C.    Rules of Interpretation

For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) the words "current" or "currently" shall refer to the Confirmation Date; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control; (k) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control; (l) any immaterial effectuating provision may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan without further Final Order of the Bankruptcy Court; (m) to the extent that any right of any Entity (other than the Debtors or Reorganized Debtors) to consent to a matter, action or otherwise is unqualified, it shall be implied that such consent right may not be unreasonably withheld, conditioned, or delayed; and (n) references to "shares," "shareholders," "directors," shall also include "membership units," "members," "managers," and/or "officers" or other functional equivalents, as applicable, as such terms are defined under the applicable state corporations or comparable laws, as applicable.

## D.    Computation Of Time

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## E.    References to Monetary Figures

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## F.    Certain Consent Rights

Notwithstanding anything in the Plan to the contrary, any and all consent rights as set forth in the RSA with respect to the form and substance of the Plan, the Plan Supplement, and any Plan Transaction Documents shall be incorporated herein by this reference and fully enforceable as stated herein until such time as the RSA is terminated in accordance with its terms.

22

G.    **Exhibits**

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date. After the Plan Supplement Filing Date, copies of Exhibits may be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 (Attn: Paul Leake and Jason Kestecher), or Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Suite 2700, Chicago, Illinois 60606 (Attn: James J. Mazza, Jr. and Justin M. Winerman), counsel to the Debtors, or by downloading such exhibits from the Debtors' informational website at https://dm.epiq11.com/trident. To the extent any Exhibit is inconsistent with the terms of this Plan and unless otherwise provided for in the Confirmation Order, the terms of the Exhibit shall control as to the transactions contemplated thereby and the terms of this Plan shall control as to any Plan provision that may be required under the Exhibit.

## ARTICLE II

## ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

2.1    **Administrative Claims**. Except to the extent that the Debtors (or the Reorganized Debtors) and a Holder of an Allowed Administrative Claim agree to less favorable treatment, a Holder of an Allowed Administrative Claim (other than a DIP Facility Claim, which shall be subject to Article 2.2 of the Plan, a Professional Claim, which shall be subject to Article 2.3 of the Plan, or a Section 503(b)(9) Claim, which shall be subject to the Bar Date Order) shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the Effective Date, (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims, or (c) on such other date as agreed between the Debtors (or the Reorganized Debtors) and such Holder of an Allowed Administrative Claim; provided, however, that other than Holders of (i) DIP Facility Claims,   (ii) Professional Claims, (iii) Administrative Claims Allowed by an order of the Bankruptcy Court on or before the Effective Date, or (iv) Administrative Claims that are not Disputed and arose in the ordinary course of business and were paid or are to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, the Holder of any Administrative Claim shall have filed a proof of Claim form no later than the Administrative Claims Bar Date and such Claim shall have become an Allowed Claim. Except as otherwise provided herein and/or in the Bar Date Order and as set forth in Articles 2.2 or 2.3 of this Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in Exhibit 2.1, with the Claims and Solicitation Agent and served on counsel for the Debtors or the Reorganized Debtors by no later than the Administrative Claims Bar Date. After the Effective Date, the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval. In the event that the Reorganized Debtors object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim

23

**2.2    DIP Facility Claims**.  On the Effective Date, the DIP Facility Claims shall be Allowed in full, in the amount of $50 million (less any amounts paid prior to the Effective Date) plus all accrued and unpaid postpetition interest under the DIP Credit Agreement (and any unpaid fees, costs, and expenses). With the consent of the DIP Lenders as provided in the RSA, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Facility Claims, all outstanding DIP Facility Claims shall be automatically converted to and deemed to be obligations under the Exit Term Loan Facility Credit Agreement, and all Collateral (as such term is defined in the DIP Credit Agreement) that secures the obligations under the DIP Documents shall be reaffirmed, ratified, and shall automatically secure all obligations of the Reorganized Debtors under the Exit Term Loan Facility Credit Agreement.

**2.3    Professional Claims**.

(a)    **Final Fee Applications**.  All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Creditors' Committee must be filed no later than thirty (30) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, the Allowed amounts of all Professional Claims and expenses shall be determined by the Bankruptcy Court. The Professionals retained by the Creditors' Committee shall apply a 10% discount on all applicable fees and expenses in their request for payment of Professional Claims related to its investigation of the Prepetition Obligations and Prepetition Liens (each as defined in the DIP Facility Order) in excess of the Challenge Budget (as defined in the DIP Facility Order).  Any disputes regarding the calculation of the 10% discount on applicable fees and expenses shall be decided, after notice and a hearing, by the Bankruptcy Court.

(b)    **Payment of Interim Amounts.**  Subject to the Holdback Escrow Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed (and as to which there is no then-existing Court-mandated or Court-ordered prohibition on making payment).  To receive payment on the Effective Date for such unbilled fees and expenses incurred through the Effective Date that have not yet been billed pursuant to the Professional Fee Order, no later than two (2) days prior to the Effective Date, the Professionals (who, in the case of the Creditors' Committee, shall only be permitted to take the actions set forth in Article 13.6 after the Confirmation Date) shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors.  Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period, subject to any parties' right to object as set forth in the Professional Fee Order.

(c)    **Holdback Escrow Account**.  On the Effective Date, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals.  The Escrow Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtors, the Reorganized Debtors, or the Estates.  The remaining amount of Professional

24

Claims owing to the Professionals shall be paid to such Professionals by the Escrow Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court. When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors to be used by the Reorganized Debtors in accordance with the Plan.

(d)    **Post-Confirmation Date Retention**.    Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing and prosecuting or addressing any issues with respect to final fee applications).  The Creditors' Committee's Professionals may not be paid for services rendered after the Confirmation Date except to the extent set forth in Article 13.6.

**2.4    Priority Tax Claims**.  On the Effective Date, except to the extent that the Debtors (or Reorganized Debtors) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtors (or the Reorganized Debtors) and such Holder, <u>provided</u>, <u>however</u>, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the sole option of the Debtors, Cash in the aggregate amount of such Allowed Priority Tax Claim plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at a rate determined under applicable non-bankruptcy law, payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Allowed Priority Tax Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business as such obligations become due.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

### 3.1    Classification of Claims and Interests.

(a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of classes of Claims and Interests.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II above.

(b)    For administrative convenience, the Plan organizes the Debtors into groups (each a "Debtor Group") and assigns a letter to each Debtor Group and a number to each Class of Claims or Interests in each Debtor Group. Claims and Interests belonging to a Debtor Group consisting of more than one Debtor shall be deemed to be classified in a single Class for all purposes under the Bankruptcy Code, including voting. To the extent a Holder has a Claim that may be asserted against more than one Debtor in a Debtor Group, the vote of such Holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor in such Debtor Group. Notwithstanding this organizing principle, the Plan is a separate plan of reorganization or liquidation for each Debtor. Such groupings shall not affect any Debtor's status as a separate legal Entity, result in substantive consolidation of any Estates, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

(c)    For consistency, similarly designated Classes of Claims and Interests are assigned the same number across each Debtor Group. The Plan provides for a single Class 6C of Holders of Operating Company General Unsecured Claims without regard to Debtor entities at which such Holders hold their Claims. For purposes of distributions to Holders of Operating Company General Unsecured Claims, "Pro Rata" shall be determined where (x) the denominator is equal to all Allowed Operating Company General Unsecured Claims against all Debtors and (y) the numerator is equal to the amount of a particular Holder's Allowed Operating Company General Unsecured Claim. For voting purposes, the Debtors shall tabulate ballots for Holders of Operating Company General Unsecured Claims on a Debtor-by-Debtor basis and on aggregate basis without regard to particular Debtor entities and reserve the right to seek Confirmation of the Plan under any tabulation through accepting Classes or cramdown. Claims and Interests are classified as follows:

| Letter | Debtor Group |
|--------|--------------|
| A | **Ultimate Holding Company**<br>FC Pioneer Holding Company, LLC |
| B | **Intermediate Holding Company**<br>Trident Holding Company, LLC |
| C | **Operating Companies**<br>American Diagnostics Services, Inc.<br>Community Mobile Diagnostics, LLC<br>Community Mobile Ultrasound, LLC<br>Diagnostic Labs Holdings, LLC<br>JLMD Manager, LLC<br>Kan-Di-Ki LLC<br>Main Street Clinical Laboratory, Inc.<br>MDX-MDL Holdings, LLC<br>MetroStat Clinical Laboratory – Austin, |

| # | Designation |
|---|-------------|
| 1 | Priority First Lien Claims |
| 2 | First Lien Claims |
| 3 | Second Lien Claims |
| 4 | Other Secured Claims |
| 5 | Other Priority Claims |
| 6 | Operating Company General Unsecured Claims |
| 7 | Holding Company General Unsecured Claims |
| 8 | Intercompany Claims |
| 9 | Other Subordinated Claims |
| 10 | Interests in Debtor Subsidiaries |
| 11 | Interests in Pioneer |

26

| |
|---|
| Inc. |
| MX Holdings, LLC |
| MX USA, LLC |
| New Trident Holdcorp, Inc. |
| Rely Radiology Holdings, LLC |
| Schryver Medical Sales and Marketing, LLC |
| Symphony Diagnostic Services No. 1, LLC |
| Trident Clinical Services Holdings, Inc. |
| Trident Clinical Services Holdings, LLC |
| TridentUSA Foot Care Services LLC |
| TridentUSA Mobile Clinical Services, LLC |
| TridentUSA Mobile Infusion Services, LLC |
| U.S. Lab & Radiology, Inc. |

The classification of Claims and Interests (as applicable) under the Plan is as set forth below.

| Class(es) | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1B – 1C | Priority First Lien Claims | Impaired | Entitled to Vote |
| 2B – 2C | First Lien Claims | Impaired | Entitled to Vote |
| 3B – 3C | Second Lien Claims | Impaired | Entitled to Vote |
| 4A – 4C | Other Secured Claims | Unimpaired | Presumed to Accept |
| 5A – 5C | Other Priority Claims | Unimpaired | Presumed to Accept |
| 6C | Operating Company General Unsecured Claims | Impaired | Entitled to Vote |
| 7A – 7B | Holding Company General Unsecured Claims | Impaired | Deemed to Reject |
| 8A – 8C | Intercompany Claims | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 9A – 9C | Other Subordinated Claims | Impaired | Deemed to Reject |
| 10B – 10C | Interests in Debtor Subsidiaries | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |

| Class(es) | Claim or Interest | Status | Voting Rights |
|-----------|-------------------|--------|---------------|
| 11A | Interests in Pioneer | Impaired | Deemed to Reject |

## ARTICLE IV

## PROVISIONS FOR TREATMENT
## OF CLAIMS AND INTERESTS

### 4.1    Priority First Lien Claims (Classes 1B and 1C)

(a)    Classification: Classes 1B and 1C consist of all Allowed Priority First Lien Claims.

(b)    Allowance:  The Priority First Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $259,387,485.15.

(c)    Treatment: Except to the extent that a Holder of an Allowed Priority First Lien Claim agrees to a less favorable treatment or as otherwise provided herein, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Priority First Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority First Lien Claim shall receive its Pro Rata share and interest in (i) the New First Lien Facility, and (ii) 100% of the New Pioneer Units to be issued by Reorganized Pioneer, subject to dilution on account of the Warrants and the Management Incentive Plan.  All accrued and unpaid prepetition and post-petition interest due and payable to a Holder of an Allowed Priority First Lien Claim and payment by the Debtors of all fees and expenses of the Priority First Lien Administrative Agent shall be paid in accordance with the DIP Facility Order and Article 11.2(d) of this Plan, as applicable.

(d)    Voting: Classes 1B and 1C are Impaired and Holders of Allowed Priority First Lien Claims are entitled to vote to accept or reject the Plan.

### 4.2    First Lien Claims (Classes 2B and 2C)

(a)    Classification: Classes 2B and 2C consist of all Allowed First Lien Claims.

(b)    Allowance:  The First Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $219,815,899.97.

(c)    Treatment: Except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed First Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter:

(i)    *If the First Lien Classes and the Second Lien Classes are Accepting Classes*, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share

28

and interest in 4% of the Warrants; <u>provided</u> that Ares, the Audax Debt Funds, and Capital Finance Opportunities 1701C, LLC agree to waive all rights to any distribution on account of their First Lien Claims under the Plan and any Warrants otherwise distributable to those parties under the Plan, if any, shall be cancelled and not re-distributed to other Holders of Allowed First Lien Claims or any other Person.

(ii)     *If the First Lien Classes are Accepting Classes, but Second Lien Classes are not Accepting Classes*, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share and interest in 5% of the Warrants; <u>provided</u> that Ares, the Audax Debt Funds, and Capital Finance Opportunities 1701C, LLC agree to waive all rights to any distribution on account of their First Lien Claims under the Plan and any Warrants otherwise distributable to those parties under the Plan, if any, shall be cancelled and not re-distributed to other Holders of Allowed First Lien Claims or any other Person.

(iii)     *If the First Lien Classes are not Accepting Classes*, Holders of  Allowed First Lien Claims shall not receive any distributions on account of such Allowed First Lien Claims.

(d)     Voting: Classes 2B and 2C are Impaired and Holders of Allowed First Lien Claims are entitled to vote to accept or reject the Plan.

### 4.3     Second Lien Claims (Classes 3B and 3C)

(a)     Classification: Classes 3B and 3C consist of all Allowed Second Lien Claims.

(b)     Allowance:  The Second Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $175,567,909.46.

(c)     Treatment: Except to the extent that a Holder of an Allowed Second Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Second Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter:

(i)     *If the First Lien Classes and the Second Lien Classes are Accepting Classes*, each Holder of an Allowed Second Lien Claim shall receive its Pro Rata share and interest in 1% of the Warrants; <u>provided</u>, <u>however</u>, notwithstanding anything herein to the contrary, such treatment in no way affects the priority of distribution among creditors in Classes 3B and 3C, including with respect to any intercreditor agreements and other similar agreements or arrangements; <u>provided</u> that Ares, the Audax Debt Funds, and Capital Finance Opportunities 1701C, LLC agree to waive all rights to any distribution on account of their Second Lien Claims under the Plan and any Warrants otherwise distributable to those parties, if any under the Plan, shall be cancelled and not re-distributed to other Holders of Allowed Second Lien Claims or any other Person.

(ii)     *If the First Lien Classes or the Second Lien Classes are not Accepting Classes*, Holders of  Allowed Second Lien Claims shall not receive any distributions on account of such Allowed Second Lien Claims.

(d)    Voting: Classes 3B and 3C are Impaired and Holders of Allowed Second Lien Claims are entitled to vote to accept or reject the Plan.

**4.4    Other Secured Claims (Classes 4A – 4C)**

(a)    Classification: Classes 4A through 4C consist of all Allowed Other Secured Claims.

(b)    Treatment: Except as otherwise provided in and subject to Article 9.5 of this Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the option of the Debtors or the Reorganized Debtors and with the consent of the Priority First Lien Administrative Agent, as applicable:

(i)    have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, or otherwise have its Claim rendered Unimpaired, in each case in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default;

(ii)    be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Claim or as soon thereafter as reasonably practicable; or

(iii)    receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Other Secured Claim will have agreed upon in writing; or

(iv)    receive delivery of the collateral securing any such Allowed Other Secured Claim;

provided, that Allowed Other Secured Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.  Nothing in this Article 4.4 or elsewhere in this Plan shall preclude the Debtors (or the Reorganized Debtors) from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien allegedly securing an Allowed Other Secured Claim.

(c)    Voting: Classes 4A, 4B, and 4C are Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

### 4.5    Other Priority Claims (Classes 5A – 5C)

(a)    Classification: Classes 5A through 5C consist of all Allowed Other Priority Claims.

(b)    Treatment:  Except as otherwise provided in and subject to <u>Article 9.5</u> of this Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or on such other date as agreed between the Debtors (or the Reorganized Debtors), with the consent of the Priority First Lien Administrative Agent, and such Holder of an Allowed Other Priority Claim; <u>provided</u>, <u>however</u>, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(c)    Voting: Classes 5A, 5B, and 5C are Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

### 4.6    Operating Company General Unsecured Claims (Class 6C)

(a)    Classification: Class 6C consists of all Allowed Operating Company General Unsecured Claims.

(b)    Treatment: Except to the extent that a Holder of an Allowed Operating Company General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Operating Company General Unsecured Claim, each Holder of an Allowed Operating Company General Unsecured Claim shall receive its Pro Rata share and interest in the Operating Company General Unsecured Claims Cash Pool, <u>provided</u>, <u>that</u> the Settling Parties (other than the Creditors' Committee and its members) and Capital Finance Opportunities 1701C, LLC shall not receive their respective Pro Rata share and interest in the Operating Company General Unsecured Claims Cash Pool and such amounts shall be redistributed Pro Rata among the other Holders of Operating Company General Unsecured Claims.

(c)    Voting: Class 6C is Impaired and Holders of Allowed Operating Company General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.7    Holding Company General Unsecured Claims (Classes 7A – 7B)

(a)    Classification: Classes 7A and 7B consist of all Allowed Holding Company General Unsecured Claims.

(b)    Treatment: On the Effective Date, all of the Debtors' outstanding obligations under the Holding Company General Unsecured Claims shall be extinguished,

31

canceled, and discharged, and each Holder of a Holding Company General Unsecured Claim shall receive no distribution on account of such Claim.

(c)      Voting: Classes 7A and 7B are Impaired, and Holders of Allowed Holding Company General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Holding Company General Unsecured Claims are not entitled to vote to accept or reject the Plan.

### 4.8      Intercompany Claims (Classes 8A – 8C)

(a)      Classification:  Classes 8A through 8C consist of all Allowed Intercompany Claims.

(b)      Treatment: On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among any Affiliate of the Debtors shall be either reinstated, cancelled, released, or otherwise settled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent).

(c)      Voting: Classes 8A, 8B, and 8C are either:

(i)      Impaired, and Holders of Allowed applicable Class 8 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan; or

(ii)      Unimpaired, and Holders of Allowed applicable Class 8 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan.

### 4.9      Other Subordinated Claims (Classes 9A – 9C)

(a)      Classification:  Classes 9A through 9C consist of all Allowed Bankruptcy Code section 510(b) and (c) Claims.

(b)      Treatment: Holders of Allowed Other Subordinated Claims shall not receive any distributions on account of such Allowed Other Subordinated Claims.

(c)      Voting: Classes 9A, 9B, and 9C are Impaired, and Holders of Allowed Other Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Subordinated Claims are not entitled to vote to accept or reject the Plan.

### 4.10      Interests in Debtor Subsidiaries (Classes 10B – 10C)

(a)      Classification:    Classes 10B and 10C consist of all Allowed Interests in Debtor Subsidiaries.

(b)      Treatment:  On the Effective Date, all Allowed Interests in Debtor Subsidiaries shall be either reinstated or cancelled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent).  To the extent reinstated, Interests in Debtor Subsidiaries are Unimpaired solely to preserve the Debtors' corporate structure and Holders of those Interests shall not otherwise receive or retain any property on account of such Interests.

(c)      Voting: Classes 10B and 10C are either:

(i)      Impaired, and Holders of Allowed applicable Class 10 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 10 Claims are not entitled to vote to accept or reject the Plan; or

(ii)      Unimpaired, and Holders of Allowed applicable Class 10 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 10 Claims are not entitled to vote to accept or reject the Plan.

**4.11     Interests in Pioneer (Class 11A)**

(a)      Classification:  Class 11A consists of all Interests in Pioneer.

(b)      Treatment: On the Effective Date, Allowed Class 11A Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors.

(c)      Voting: Class 11A is Impaired, and Holders of Allowed Class 11A Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 11A Interests are not entitled to vote to accept or reject the Plan.

**ARTICLE V**

**<u>ACCEPTANCE</u>**

**5.1      Classes Entitled to Vote.**  Classes 1B, 1C, 2B, 2C, 3B, 3C, and 6C are entitled to vote to accept or reject this Plan.  By operation of law, Classes 4A – 4C, 5A – 5C, 7A, 7B, 8A – 8C, 10B – 10C, and 11A are either deemed to have accepted this Plan or to have rejected this Plan and are not entitled to vote.

**5.2      Acceptance by Impaired Classes.**  An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

33

**5.3      Elimination of Classes.**  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

**5.4      Special Provision Governing Unimpaired Claims**.  Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**5.5      Deemed Acceptance if No Votes Cast.**  If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, this Plan shall be deemed accepted by the Holders of such Claims in such Class.

**5.6      Cramdown.**    To the extent necessary, the Debtors shall request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify, amend, or withdraw this Plan, with respect to all Debtors or any individual Debtor, or group of Debtors to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1      No Substantive Consolidation**. The Plan is being proposed as a joint plan of reorganization for the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.  The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

**6.2      General Settlement of Claims and Interests**. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.

**6.3      Restructuring Transactions**.

(a)      On or after the Confirmation Date, with the consent of the Priority First Lien Administrative Agent, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, to otherwise simplify the overall corporate structure of the Debtors, or to organize certain of the Debtors under the laws of jurisdictions other than the laws of which such

34

Debtors currently are organized, which restructuring may include one or more mergers, consolidations, dispositions, liquidations, or dissolutions as may be determined by the Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Debtors vesting in one or more surviving, resulting, or acquiring Entities (collectively, the "Restructuring Transactions"). In addition, on or after the Confirmation Date, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect an assignment, transfer or contribution of Trident Holding Company LLC's rights and interests in (i) the approximate $6,162,254 of collateral trust assets (the "Wells Fargo Collateral Trust Funds") held by Wells Fargo Bank, NA, as trustee, and (ii) the related collateral trust agreement dated as of March 7, 2019, in each case, to its affiliate, Symphony Diagnostic Services No. 1, LLC.  The Wells Fargo Collateral Trust Funds shall continue to secure the obligations of Trident Holding Company, LLC, or its successor-in-interest, to Zurich American Insurance Company and its affiliates ("Zurich") and the posting of such collateral is approved under this Plan and shall not be voidable by any creditors of the Debtors. In each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting, or acquiring Entity shall perform the obligations of such Debtor pursuant to the Plan to satisfy the Allowed Claims against, or Allowed Interests in, such Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor shall perform such obligations.  The Restructuring Transactions may include a taxable transfer of substantially all or a part of the Debtors' assets or entities to a newly-formed entity (or an affiliate or subsidiary of such entity) formed and controlled by certain holders of Claims against the Debtors and, in such case, some or all of the New Pioneer Units and/or Warrants (and/or other interests) issued to holders of Claims pursuant to the Plan may comprise stock (and/or other interests) of such new entity (or an affiliate or subsidiary of such entity).

(b)     In effecting the Restructuring Transactions, with the consent of the Priority First Lien Administrative Agent, the Debtors shall be permitted to (i) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) file appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; (iv) engage in a taxable transfer of substantially all or a part of a Debtor's assets or subsidiary entities to a newly-formed entity (or an affiliate or subsidiary of such entity) formed and controlled by certain holders of Claims against such Debtor and, in such case, some or all of the equity (and/or other interests) issued to holders of Claims pursuant to the Plan may compromise stock (and/or other interests) of such new entity (or an affiliate or subsidiary of such entity); and (v) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

6.4     **Sources of Cash for Plan Distribution**. All Cash required for payments to be made under the Plan on the Effective Date shall be obtained first from Cash on hand,

second, if necessary, a Capital Raising Transaction, and third, if necessary and if no Capital Raising Transaction has been arranged, the Exit Liquidity Facility.

6.5    **Exit Liquidity Facility**.  With the reasonable consent of the Debtors, the Priority First Lien Administrative Agent may arrange for a Capital Raising Transaction to provide the Debtors with sufficient Cash to make payments required to be made under the Plan and to satisfy the Minimum Liquidity Condition Precedent.  If the Debtors reasonably determine an Exit Liquidity Facility is necessary to satisfy the Minimum Liquidity Condition Precedent and the Priority First Lien Administrative Agent elects not to arrange for a Capital Raising Transaction, the Debtors may arrange for an Exit Liquidity Facility, which shall be entered into on the Effective Date. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Liquidity Facility without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

6.6    **Exit Term Loan Facility**. On the Effective Date, all Allowed DIP Facility Claims, shall be automatically converted to and deemed to be obligations under the Exit Term Loan Facility Credit Agreement, and all Collateral (as such term is defined in the DIP Credit Agreement) that secures the obligations of the Reorganized Debtors under the DIP Documents shall be reaffirmed, ratified, and shall automatically secure all obligations under the Exit Term Loan Facility Credit Agreement; provided that (a) all accrued and unpaid interest on the DIP Facility Claims shall be paid in full in Cash on the Effective Date, and (b) all fees and expenses of the DIP Agent shall be paid in accordance with Article 11.2(d) of this Plan. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Term Loan Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

6.7    **New First Lien Facility**.  On the Effective Date, all Holders of Allowed Priority First Lien Claims shall receive their Pro Rata share and interest in the New First Lien Facility, which shall be junior in lien priority to the Exit Term Loan Facility. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New First Lien Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

6.8    **Authorization, Issuance, and Distribution of New Pioneer Units**.  On the Effective Date, Reorganized Pioneer shall authorize and issue the New Pioneer Units to Holders of Allowed Priority First Lien Claims.  Distribution of New Pioneer Units hereunder shall constitute issuance of 100% of such New Pioneer Units and in each case shall be deemed issued on the Effective Date, subject to dilution on account of the Warrants and the Management Incentive Plan.  The issuance of New Pioneer Units by Reorganized Pioneer is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.  All of the New Pioneer Units issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

6.9    **Operating Company General Unsecured Claims Cash Pool**.

(a)    On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and the Settling Parties (other than the Creditors' Committee)

36

shall fund the Operating Company General Unsecured Claims Cash Pool Account with Cash in an amount equal to the Operating Company General Unsecured Claims Cash Pool, which shall be held in trust for Pro Rata distributions on account of Allowed Operating Company General Unsecured Claims as provided herein. None of the Settling Parties shall amend any asserted Claims on account of any proceeds contributed to the Operating Company General Unsecured Claims Cash Pool. After the Effective Date, to the extent that the Reorganized Debtors receive net property or proceeds on account of claims asserted against the Specified Parties under section 547 of the Bankruptcy Code, the Reorganized Debtors shall contribute such net property or proceeds to the Operating Company General Unsecured Claims Cash Pool Account.

(b)    The Operating Company General Unsecured Claims Cash Pool Account (x) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors or their Estates, (y) shall be held in trust for the benefit of the Operating Company General Unsecured Claims Cash Pool by the GUC Administrator, who, subject to consultation with the Debtors, will be selected by the Creditors' Committee, to fund distributions as provided herein, and (z) shall not be encumbered by any Liens, Claims, or Interests in any way.

### 6.10    GUC Administrator Account.

(a)    On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and fund the GUC Administrator Account with Cash in the amount of $250,000, which shall be held in trust for the payment of GUC Administrator costs as provided herein.  The Debtors and the Reorganized Debtors shall have no further obligation or liability for the GUC Administrator's costs as provided herein upon the funding of the GUC Administrator Account pursuant to this Article.

(b)    The GUC Administrator Account (x) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors or their Estates, (y) shall be held in trust by the Debtors or Reorganized Debtors, as applicable, for the benefit of the GUC Administrator and his professionals and other employees, and (z) shall not be encumbered by any Liens, Claims, or Interests in any way.

### 6.11    Exemptions from Securities Act Registration Requirements.  Except with respect to the New Pioneer Units underlying the Management Incentive Plan, the Warrants and all New Pioneer Units issued under the Plan (including any units issued upon the exercise of the Warrants) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.  New Pioneer Units issued under the Plan (including any shares issued upon the exercise of the Warrants) in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The New Pioneer Units issued pursuant to section 1145 of the Bankruptcy Code (a) are not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any holder thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the New Pioneer Units from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b)

37

of section 1145 of the Bankruptcy Code.  New Pioneer Units issued to holders of Priority First Lien Claims and Warrants issued to holders of First Lien Claims and Second Lien Claims, in each case in exchange for such Claims, shall be issued in reliance on section 1145 of the Bankruptcy Code.  New Pioneer Units underlying the Management Incentive Plan will be issued pursuant to another available exemption from registration under the Securities Act and other applicable law.

### 6.12    Cancellation of Existing Securities and Agreements

(a)    Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Debtors, on the Effective Date, except to the extent otherwise provided in this Plan, all notes, instruments, Certificates, Old Securities and other documents evidencing or creating any indebtedness or obligation of or ownership in the Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged.  On the Effective Date, except to the extent otherwise provided in this Plan, all Interests in the Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged.

(b)    Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Article 6.12 shall be deemed null and void and shall be of no force and effect.

### 6.13    Issuance and Distribution of New Securities; Execution of Plan Documents.  Except as otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall issue and/or deliver all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan.

### 6.14    Continued Corporate Existence.

(a)    Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as separate entities, the Reorganized Debtors, with all the powers of a corporation or limited liability company under applicable law in the jurisdiction in which each respective Debtor is incorporated or formed and pursuant to its respective charter, bylaws, limited liability company agreement, partnership agreement or other organizational documents in effect prior to the Effective Date, except to the extent such organization documents are amended and restated by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

38

(b)    Except as otherwise provided in the Plan, the continued existence, operation, and ownership of Affiliates is a material component of the business of the Debtors and the Reorganized Debtors, as applicable, and, as set forth in <u>Article 10.1</u> of this Plan, all of the Debtors' equity interests and other property interests in such Affiliates shall vest in the Reorganized Debtors or their successors on the Effective Date.

**6.15    New Corporate Governance Documents**.    The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) of the Debtors, which documents shall be in form and substance acceptable to the Priority First Lien Administrative Agent, shall be adopted and amended in a form as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code (including Bankruptcy Code section 1123(a)(6)), with the form and substance of the Pioneer LLC Agreement set forth on <u>Exhibit 6.15</u>.    After the Effective Date, the Reorganized Debtors may amend and restate their respective certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) as permitted by applicable state corporation or business entity law and their respective charters and bylaws or other organizational documents.

**6.16    Directors, LLC Managers, and Officers of Reorganized Debtors**. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed member of Reorganized Debtors' initial board of directors (or other applicable governing body) (and, to the extent such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Plan Supplement or as announced on the record at the Confirmation Hearing.  The number of members of the New Boards and the identities thereof, and any senior officers of the Reorganized Debtors not presently serving in such capacity, shall be determined by the Priority First Lien Administrative Agent, but shall include the Chief Executive Officer of the Reorganized Debtors.

Except as otherwise provided in the Plan Supplement, the officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the Reorganized Debtors on and after the Effective Date.

Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

**6.17    Corporate Action**.  Each of the matters provided for under this Plan involving the corporate structure of the Debtors or the Reorganized Debtors or corporate action to be taken by or required of the Debtors or the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, managers, or directors of the Debtors or the Reorganized Debtors.  Such actions may include, (a) the adoption of the Pioneer LLC Agreement and any other new corporate governance documents, (b) the appointment of the New Boards, (c) the issuance and distribution of New Pioneer Units, and (d) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date).

39

**6.18    Effectuating Documents; Further Transactions**.    On and after the Effective Date, the Reorganized Debtors, and the officers thereof and members of the New Boards, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

**6.19    Employment, Retirement, Indemnification, and Other Agreements and Employee Compensation Programs**.

(a)    **Employment Agreements**.    All employment and compensation-related agreements between the Debtors and any persons who are directors, managers, officers, or employees of the Debtors immediately prior to the Effective Date, including any indemnification and severance obligations and guaranteed bonus amounts, and incentive compensation plans related thereto, shall be assumed.    The Debtors, with the consent of the Priority First Lien Administrative Agent with respect to Specified Executives, may also enter into new employment arrangements and/or change in control agreements with individuals who will serve as officers of the Reorganized Debtors after the Effective Date.    On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may adopt, approve, and authorize any new employment arrangements with respect to such officers of the Reorganized Debtors without further action, order, or approval of the New Boards.    To the extent any employment-related agreements contain a sale-related bonus, the Reorganized Debtors shall renegotiate such bonus in good faith based upon the Reorganized Debtors' capital structure.    On and after the Effective Date, Cash and bonus compensation and benefits shall be determined by the New Pioneer Board subject to the terms of the Plan Transaction Documents and any agreements being modified.

(b)    **Management Incentive Plan**.    After the Effective Date, equity grants under the Management Incentive Plan shall be reserved for directors, managers, officers, and employees of the Reorganized Debtors on terms determined by the New Pioneer Board.    The Reorganized Debtors shall have the right to set additional equity awards for the benefit of members of the New Pioneer Board after the Effective Date.

(c)    **Indemnification**.    For purposes of this Plan, the respective obligations of the Debtors to indemnify and reimburse any persons who are directors, managers, officers or employees of the Debtors immediately prior to the Effective Date, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable state or non-bankruptcy law, or specific agreements or any combination of the foregoing, shall survive confirmation of this Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on, or after the Petition Date, and each of the Reorganized Debtors shall be jointly and severally liable for the indemnification and/or reimbursement obligations of each of the Debtors.

(d)    **Other Incentive Plans and Employee Benefits**.  On and after the Effective Date, the Reorganized Debtors shall adopt, assume, and honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation, pursuant to the terms thereof or hereof, including any employee compensation plans, any incentive plan including the Annual Incentive Plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity from and after the Petition Date, and shall honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.  After the Effective Date, the Reorganized Debtors may amend or restate any program of the type described in this paragraph, in accordance with applicable law in the ordinary course of business subject to the terms of Plan Transaction Documents and the terms of the program being amended and restated.

**6.20    Preservation Of Causes Of Action**.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not released pursuant to Article 10.3 of this Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in Exhibit 6.20, and such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date.  The Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successor holding such rights of action.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.  For the avoidance of doubt, effective as of the Effective Date, all Persons will be deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims or causes of action whatsoever arising under section 547 of the Bankruptcy Code; provided, that such claims shall not be released and discharged against any Specified Party as set forth herein.**

**6.21    Reservation of Rights**. With respect to any Cause of Action that the Reorganized Debtors expressly abandon, if any, the Reorganized Debtors reserve all rights, including the right under Bankruptcy Code section 502(d) to use defensively the abandoned Causes of Action as a basis to object to all or any part of a claim against any of the Estates asserted by a creditor who obtains the benefit of the abandoned Cause of Action.  Except as set forth in Article 10.3 of this Plan, nothing contained in this Plan shall constitute or be deemed a waiver or abandonment of any Cause of Action that the Reorganized Debtors may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained

herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**6.22    Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.23    Insured Claims**. Notwithstanding anything to the contrary contained herein, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, provided, that, unless the Debtors and the Reorganized Debtors provide their express written consent, the Holders of such Claims shall not obtain payment from the insurers for the portion of any Claims (including, but not limited to, any deductible portion) covered by the Insurance Contracts if the payment of such portion shall require the Debtors or the Reorganized Debtors to reimburse the insurers for such payment, and (b) solely for the portion of such Claim that is not paid by the applicable insurance policy (including, but not limited to, any deductible portion that is not paid under the policy), receive the treatment provided for in this Plan for Allowed General Unsecured Claims.

**6.24    Intercompany Account Settlement.** The Debtors and the Reorganized Debtors, and their respective Affiliates will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.

**6.25    Closing of Chapter 11 Cases.** The Debtors or the Reorganized Debtors, as applicable, shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

**6.26    Private Company.** It is anticipated that the Reorganized Debtors shall be private companies as of the Effective Date and shall not register any of their respective equity with the SEC or list such equity on an exchange as of the Effective Date.

## ARTICLE VII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

### 7.1    Rejection of Executory Contracts and Unexpired Leases.

(a)    **Automatic Rejection**.  Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such

Executory Contract or Unexpired Lease: (i) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 7.1 of the Plan; (ii) has been previously assumed or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume or reject pending as of the Effective Date; (iv) is an Executory Contract related to any Intercompany Claim; or (v) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements herein.

(b)     **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**. Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

(c)     **Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases**. Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date or the effective date of rejection. Any proofs of Claim arising from the rejection of the Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

(d)     **Reservation of Rights**. Notwithstanding anything to the contrary herein, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved in the event that the Debtors (or the Reorganized Debtors) amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

**7.2    Assumption of Executory Contracts and Unexpired Leases**.  Upon the occurrence of the Effective Date, each Executory Contract or Unexpired Lease (other than Executory Contracts or Unexpired Leases that (a) have been previously rejected by the Debtors by Final Order of the Bankruptcy Court or have been rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date or (b) are the subject of a motion to reject pending as of the Effective Date) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in Exhibit 7.1 of the Plan shall be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Reorganized Debtors or their assignee in accordance with its terms, except as modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  With respect to each such Executory Contract and Unexpired Lease, the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contracts and Unexpired Leases may be conditioned upon the disposition of all issues with respect to such Cure.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

(a)    **Modifications, Amendments, Supplements, Restatements, or Other Agreements**. Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant hereunder.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)    **Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed**.  Any and all proofs of Claims based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including hereunder, except proofs of Claims asserting Cure amounts, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed and expunged from the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

**7.3    Insurance Policies**.

(a)    Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, confers Bankruptcy Court jurisdiction, grants an injunction or release, or requires a party to opt out of any releases): (a) (i) on the Effective Date, all insurance

44

policies to which any Debtor is a party as of the Effective Date (including any "tail policy"), other than the Legacy Workers Compensation Policies and the Healthcare Liability Policies, shall be deemed to be and treated as executory contracts and shall be assumed, or assumed and assigned, by the applicable Reorganized Debtors and shall continue as obligations of the Debtors or Reorganized Debtors in accordance with their respective terms (such assumed or assumed and assigned insurance policies and all agreements, documents or instruments relating thereto, the "**Insurance Contracts**"); (ii) the Legacy Workers Compensation Policies and the Healthcare Liability Policies shall be assumed by the applicable Reorganized Debtors in accordance with a stipulation and order (the "**Assumption Stipulation**") setting forth the deductible reimbursement and collateral adjustment obligations of the parties subsequent to the Effective Date; the assumption of the Legacy Workers Compensation Policies and the Healthcare Liability Policies is subject to and conditioned upon the finalization and approval of an Assumption Stipulation; (b) nothing shall alter, modify, amend, affect, impair, waive, or otherwise prejudice the legal, equitable or contractual rights, obligations, and defenses of the insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Insurance Contracts; any such rights and obligations shall be determined under the Insurance Contracts and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred, provided, however, that the Debtors or Reorganized Debtors, as applicable, shall retain the right to challenge any amounts owed under the Insurance Contracts in accordance with their terms; (c) nothing alters or modifies the duty, if any, that insurers have to pay claims covered by the Insurance Contracts and the insurers' right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor in accordance with the terms of the Insurance Contracts; (d) the Allowed Claims of the insurers arising (whether before or after the Effective Date) under the Insurance Contracts (i) shall be paid in full in the ordinary course of business regardless of whether such amounts are or shall become liquidated, due or paid before or after the Petition Date or the Effective Date, and (ii) shall not be discharged or released by the Plan or the Confirmation Order or any other order of the Bankruptcy Court; and (e) the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article X of the Plan, if and to the extent applicable, shall be deemed modified without further order of this Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable non-bankruptcy law to proceed with their claims; (II) the insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court consistent with applicable non-bankruptcy law, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by this Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) the insurers to collect from any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Contracts, in such order as the applicable insurer may determine; and (IV) the insurers to cancel any Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

45

(b)       The Debtors or the Reorganized Debtors, as the case may be, shall maintain their director and officers insurance policies and their employment practices liability policies providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors.

(c)       Notwithstanding anything in this Plan to the contrary, including but not limited to Articles 6, 7, 9, and 10 of the Plan, the allowance of any insurance claims in the Chapter 11 Case shall have no res judicata effect on any proceeding or litigation initiated in any other court as to said insurance claim, or any other claim, cross-claim, defense or cause of action arising from, relating to or otherwise implicating the facts and law at issue in such insurance claim.  Without limiting the generality of the foregoing, the allowance of an insurance claim shall have no preclusive effect with respect to any claim insured by an insurance policy in favor of the Debtors.

(d)       Notwithstanding anything in this Plan to the contrary, any applicable insurer shall have the right to appear and be heard in the Court on (i) any objection or other litigation pertaining to a claim insured by such insurer (such as but not limited to any of the insurance claims), as well as (ii) any proposed compromise or settlement of such insured claims (such as but not limited to any of the insurance claims).

(e)       Nothing in this Plan shall impair, reduce, enlarge, waive, modify or otherwise alter creditors' rights of recoupment, setoff and subrogation, and such rights are expressly preserved herein, and all defenses in connection therewith (including, but not limited to, those arising under the Bankruptcy Code).

**7.4     Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases**.  With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure.  Such Cure shall be satisfied by the Debtors or their assignee, if any, by payment of the Cure in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.  Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.  The Debtors shall serve a counterparty to an Executory Contract or Unexpired Lease to be assumed hereunder with evidence of adequate assurance upon such counterparty's written request to the Debtors' counsel.

If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section

365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

(a)    **Cure Notices**.    No later than seven (7) days prior to the Confirmation Hearing, and pursuant to the Assumption and Rejection Procedures, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption that will (i) list the applicable Cure, if any, (ii) describe the procedures for filing objections to the proposed assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, (iii) describe the procedures for filing objections to the proposed Cure of the applicable Executory Contract or Unexpired Lease, and (iv) explain the process by which related disputes will be resolved by the Bankruptcy Court.  If no objection is timely received, the non-Debtor party to the assumed contract shall be deemed to have consented to the assumption of the applicable Executory Contract or Unexpired Lease.

(b)    **Cure Objections**.    If a proper and timely objection to the Cure Notice or proposed Cure was filed by the Cure Objection Deadline, the Cure shall be equal to (i) the amount agreed to between the Debtors or Reorganized Debtors and the applicable counterparty, or, (ii) to the extent the Debtors or Reorganized Debtors and counterparty do not reach an agreement regarding any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. Objections, if any, to the proposed assumption and/or Cure must be in writing, filed with the Bankruptcy Court and served so that they are actually received by the Cure Objection Deadline.

(c)    **Hearing with Respect to Objections**.    If an objection to the proposed assumption and/or to the Cure is timely filed and received in accordance with the procedures set forth in Article 7.4(b), and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Debtors or Reorganized Debtors.  Objections to the proposed Cure amount or assumption of an Executory Contract or Unexpired Lease will not be treated as objections to Confirmation of the Plan.

(d)    **Reservation of Rights**.    Notwithstanding anything to the contrary herein, prior to the Confirmation Date, the Debtors may amend their decision with respect to the assumption of any Executory Contract or Unexpired Lease and provide a new notice amending

47

the information provided in the applicable notice, subject to the Assumption and Rejection Procedures, and shall serve such notice on the applicable counterparty; provided that the Debtors may amend such decision after the Confirmation Date with the consent of the applicable contract counterparty; provided, further, that notwithstanding anything to the contrary herein, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved with respect to any such amended decision or notice. Also notwithstanding anything to the contrary herein, in the case of an Executory Contract or Unexpired Lease designated for assumption that is the subject of a Cure objection which has not been resolved prior to the Confirmation Date, the Debtors may designate such Executory Contract or Unexpired Lease for rejection at any time prior to the payment of the Cure.

   **7.5 Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date**.  Contracts and leases entered into after the Petition Date by the Debtors, and any Executory Contracts and Unexpired Leases assumed by the Debtors, may be performed by the Reorganized Debtors in the ordinary course of business and in accordance with the terms of such Executory Contract or Unexpired Lease.

   **7.6 General Reservation of Rights**.  Neither the exclusion nor inclusion of any contract or lease on Exhibit 7.1 of the Plan, in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors, or any of its Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

**ARTICLE VIII**

**PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**

   **8.1 Determination Of Claims and Interests**.  Except as expressly provided in the Plan, after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article 6.20, except with respect to any Claim or Interest deemed Allowed under the Plan or pursuant to an order of the Bankruptcy Court.

   Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.  For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof) the time to appeal or seek review or

48

rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with this Plan.

Nothing contained in this Article 8.1 shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors (and, as the case may be, the GUC Administrator) may have against any Entity in connection with or arising out of any Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

**8.2    GUC Administrator**. The Creditors' Committee shall appoint, as of the Effective Date, a GUC Administrator with duties limited to (a) administering, disputing, objecting to, compromising, or otherwise resolving Operating Company General Unsecured Claims, including, without limitation, (i) filing, withdrawing, or litigating to judgment objections to Operating Company General Unsecured Claims, (ii) settling or compromising any Disputed Operating Company General Unsecured Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the claims register to reflect any such Claim resolutions without any further notice to or action, order, or approval by the Bankruptcy Court, (b) directing distributions to the Holders of Allowed Operating Company General Unsecured Claims as provided herein, and (c) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the foregoing duties. The GUC Administrator may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the duties as limited above, including any professionals retained in these Chapter 11 Cases, and the GUC Administrator Costs, including reasonable professional fees, shall be paid by the Debtors or Reorganized Debtors from the GUC Administrator Account in the ordinary course without further order of the Bankruptcy Court, provided that the Debtors or Reorganized Debtors shall not be required to reimburse such costs in excess of $250,000.

Immediately upon the resolution of all Operating Company General Unsecured Claims and the making of the final distribution to Holders of Allowed Operating Company General Unsecured Claims, the GUC Administrator shall be released and discharged of and from further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases.

**8.3    Claims Administration Responsibility**. After the Effective Date, other than as to Operating Company General Unsecured Claims, the Reorganized Debtors shall retain responsibility for (a) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors other than Operating Company General Unsecured Claims, including, without limitation, (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests, (ii) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, and (b) making distributions (if any) with respect to all Claims and Interests. With respect to Operating Company General Unsecured Claims, the GUC Administrator shall exercise all of the responsibilities set forth in this Article 8.3.

**8.4    Objections to Claims**.  Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors or the GUC Administrator without further notice to parties-in-interest).  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Reorganized Debtors or the GUC Administrator effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

**8.5    Disallowance of Claims**.  Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, the Creditors' Committee before the Effective Date, the GUC Administrator after the Effective Date, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors (or the GUC Administrator, as the case may be) allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and     (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**8.6    Estimation of Claims**.  Before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any purpose permitted thereunder, regardless of whether any party previously has objected to such Claim or Interest, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court has entered a Final Order estimating any contingent or unliquidated Claim for the express purpose of determining what amount of such Claim shall be allowed for purposes of distributions pursuant to section 502(c), that estimated amount shall, unless otherwise ordered by the Bankruptcy Court or agreed between the relevant parties, constitute a maximum limitation on the Allowed amount of such Claim for all purposes under the Plan (including for purposes of distributions), and the Reorganized Debtors or the GUC Administrator may, to the extent applicable, elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in

50

the Plan are cumulative and not necessarily exclusive of one another. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**8.7    No Interest on Claims**. Unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

**8.8    Amendments to Claims**. On or after the Bar Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE IX

## PROVISIONS GOVERNING DISTRIBUTIONS

**9.1    Time of Distributions**. Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan (other than on account of Operating Company General Unsecured Claims) shall be made on the later of (a) the Initial Distribution Date or (b) on the first Periodic Distribution Date that is at least 30 days after a Claim becomes Allowed; provided, however, that the Reorganized Debtors may, in their sole discretion, make one-time distributions on a date that is not a Periodic Distribution Date. Distributions on account of Operating Company General Unsecured Claims shall be made on the Operating Company General Unsecured Claims Distribution Date.

**9.2    Distribution Agent**. The Distribution Agent shall make all distributions required under this Plan except as set forth in Article 9.4 below.

**9.3    Currency**. Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal, National Edition* following the Effective Date.

**9.4    Distributions on Account of Claims Allowed as of the Effective Date**. Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims on the Initial Distribution Date, subject to the Reorganized Debtors' rights to object to Claims that have not been Allowed; provided, however, that (i) Allowed Administrative

51

Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Allowed Priority Tax Claims shall be paid in full in Cash on the Initial Distribution Date or in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(9)(c) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**9.5      Distributions on Account of Claims Allowed After the Effective Date**.

(a)      **No Distributions Pending Allowance**.  No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.  All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)      **Disputed Unsecured Claims Reserve**.  The GUC Administrator shall withhold and retain from the Operating Company General Unsecured Claims Cash Pool Account and establish and fund a segregated reserve with (i) an amount sufficient to pay Holders of Disputed Operating Company General Unsecured Claims the amount such Holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims, (ii) such lesser amount as estimated or otherwise ordered by the Bankruptcy Court, or (iii) such lesser amount as agreed to between the GUC Administrator and the Holders thereof (such account, the "**Disputed Operating Company General Unsecured Claims Reserve**").  As disputed claims are resolved pursuant to Article IX hereof, the GUC Administrator shall direct the Distribution Agent to make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.  Such distributions shall be made on the first Operating Company General Unsecured Claims Distribution Date that is at least thirty (30) days after the date on which such a Disputed Claim becomes an Allowed Claim.

(c)      **Tax Treatment of Disputed Unsecured Claims Reserve**.  All parties to the Plan shall (i) treat the Disputed Operating Company General Unsecured Claims Reserve as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 for U.S. federal income tax purposes, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for all federal, state, and local income tax purposes.  All taxes imposed on assets or income of such Disputed Operating Company General Unsecured Claims Reserve will be payable from the assets of the Disputed Operating Company General Unsecured Claims Reserve. The GUC Administrator shall have no duty, obligation, or responsibility to satisfy or otherwise comply with withholding, payment, and/or reporting requirements imposed by any federal, state, local, or foreign tax authority.

(d)      **Request for Expedited Determination of Taxes**.  The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Disputed Operating Company

General Unsecured Claims Reserve filed or to be filed for any and all taxable periods of such reserve.

(e)     **Distributions After Allowance**.  Payments and distributions to each respective Holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern distributions to such Holder of a Claim.  On the first Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable, that is at least 30 days following the date when a Disputed Claim becomes an Allowed Claim, the Distribution Agent shall distribute to the Holder of such Allowed Claim the distribution that such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law; provided, however, (i) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Disputed Claims that are Allowed Priority Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

(f)     **Special Rules for Distributions to Holders of Disputed Claims**. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class; provided, however, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law or this Plan.

**9.6     Delivery Of Distributions**.

(a)     **Record Date for Distributions**.  On the Distribution Record Date, the claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim or Interest is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practicable and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)     **Allowed Claims**.  Distributions to Holders of Allowed Claims shall be made by the Distribution Agent (i) at the addresses set forth on the proofs of claim filed

by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors or the Reorganized Debtors or the GUC Administrator, as applicable, have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, or (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address. The Debtors, the Reorganized Debtors, the GUC Administrator, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

(c)     **Undeliverable Distributions**.  If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent is notified of the then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable.  Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors (or, with respect to the Operating Company General Unsecured Claims, to the Operating Company General Unsecured Claims Cash Pool Account) until such distributions are claimed.

(d)     **Reversion**.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors (or, with respect to Operating Company General Unsecured Claims, to the Operating Company General Unsecured Claims Cash Pool Account) free of any restrictions thereon.  Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.

(e)     **De Minimis Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Distribution Agent shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date in question is or has a value less than $10,000; underlined provided that the Reorganized Debtors, the GUC Administrator, or the Distribution Agent, as applicable, shall make, or cause to be made, a distribution on a Periodic Distribution Date or an Operating Company General Unsecured Claims Distribution Date, as applicable, of less than $10,000 if the Reorganized Debtors, the GUC Administrator, or the Distribution Agent, as applicable, expect that such Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable, shall be the final Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable, does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

(f) **Fractional Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Distribution Agent shall not be required to make partial distributions or distributions of fractional shares of New Pioneer Units or distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fractional share of New Pioneer Units under the Plan would otherwise be called for, such fraction shall be deemed zero.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

9.7 **Accrual of Dividends and Other Rights**.  For purposes of determining the accrual of dividends or other rights after the Effective Date, New Pioneer Units shall be deemed distributed as of the Effective Date regardless of the date on which they are actually issued, dated, authenticated, or distributed; provided, however, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of New Pioneer Units actually take place.

9.8 **Compliance Matters**.  In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, to the extent applicable, the Debtors, Reorganized Debtors, and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

9.9 **Claims Paid or Payable by Third Parties**.

(a) **Claims Paid by Third Parties**.  The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Reorganized Debtors. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b) **Claims Payable by Insurers**.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with

55

respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy a Claim or otherwise settle an insured Claim, then immediately upon such insurers' payment, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Applicability of Insurance Contracts**.  Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contracts.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any of the Insurance Contracts, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**9.10    Setoffs**.  Except as otherwise expressly provided for in the Plan, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

**9.11    Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## ARTICLE X

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**10.1    Vesting of Assets**.  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Causes of Action) shall vest in the Reorganized Debtors which, unless otherwise indicated in the Plan, as Debtors, owned

such property or interest in property as of the Effective Date, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests.  As of and following the Effective Date, the Reorganized Debtors may operate their business and use, acquire, and dispose of property (subject to applicable law) and settle and compromise Claims, Interests, or Causes of Action without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

**10.2    Discharge of the Debtors.  Except as otherwise specifically provided in section 1141(d) of the Bankruptcy Code, this Plan or the Confirmation Order, and effective as of the Confirmation Date: (a) the distributions and rights that are provided in this Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, right, or Interest accepted this Plan; (b) the Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.**

**10.3    Release by Debtors.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Transaction Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Debtors' restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors, the Estates, all Affiliates or subsidiaries managed or controlled by the foregoing, and each of their predecessors, successors and assigns, subsidiaries, and Affiliates, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents,**

advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, from any and all Claims, Interests or causes of action whatsoever, including any derivative Claims asserted or that could have been asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business, financial or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the DIP Facility Order, the Plan, the RSA (including the term sheet attached thereto), the Plan Transaction Documents, or any related agreements, instruments, or other documents, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; <u>provided</u> that nothing in this Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.

As of the Effective Date, all Persons will be deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims or causes of action whatsoever arising under section 547 of the Bankruptcy Code; <u>provided</u>, <u>that</u> such claims shall not be released and discharged against any Specified Party unless (i) all Executory Contracts and Unexpired Leases with such Specified Party are assumed pursuant to section 365 of the Bankruptcy Code, or (ii) the Debtors or Reorganized Debtors specifically agree to release such claim against the Specified Party.

10.4    <u>Release by Holders of Claims</u>.  Effective as of the Effective Date, the Releasing Parties conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties and their respective property from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates,  any Claims or causes of action asserted on behalf of any Holder of any Claim or any Interest or that any Holder of a Claim or an Interest would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Debtors' restructuring, the Chapter 11 Cases, or the RSA, the purchase, sale, transfer or rescission of any debt, security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any

**Claim against or Interest in the Debtors that is treated in the Plan, the business, financial or contractual arrangements between the Debtors and any Released Party, the negotiation, formulation, or preparation of the Plan Transaction Documents or related agreements, instruments or other documents, including the DIP Facility Order, this Plan, the RSA (including the term sheet attached thereto), or any related agreements or instruments, or the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; <u>provided</u> that nothing in the Plan shall be construed to release the Released Parties from any claims based upon willful misconduct or intentional fraud as determined by a Final Order; <u>provided further</u> that, for the avoidance of doubt, nothing in this Plan nor in this <u>Article 10.4</u> shall release, or be construed to release, any of the Priority First Lien Parties or Capital Finance Opportunities 1701C, LLC from claims or causes of action to enforce the terms of the Capital Finance/Silver Point Settlement Agreement (as defined in <u>Article 11.2(c)</u>), or the assertion of any defenses in respect of same.**

**10.5    <u>Exculpation and Limitation of Liability</u>.    To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any act, omission, or other Claim in connection with, relating to, or arising out of: the Debtors' restructuring; the Chapter 11 Cases; the filing of the Chapter 11 Cases; formulation, preparation, dissemination, negotiation, pursuit, or filing of the Disclosure Statement, the RSA, the Plan Transaction Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, or the solicitation of votes for, or confirmation of, the Plan; the DIP Credit Agreement; the pursuit of Confirmation; the funding or pursuit of consummation of the Plan; the occurrence of the Effective Date; the administration, consummation, and implementation of the Plan or the property to be distributed under the Plan, including the issuance of securities under or in connection with the Plan and the distribution of property under the Plan and any other transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof; the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases; or the transactions in furtherance of or contemplated by any of the foregoing; except for intentional fraud or willful misconduct, as determined by a Final Order. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.**

**10.6    <u>Exclusions and Limitations on Exculpation, Indemnification, and Releases</u>.** Notwithstanding anything in this Plan to the contrary, no provision of this Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification, or release provision, shall modify, release, or otherwise limit the liability of any Entity not specifically released or exculpated hereunder or pursuant to an order of the Bankruptcy Court, including, without limitation, any Entity who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

**10.7    <u>Injunction</u>.    Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or**

**former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a Holder of a Claim against or Interest in the Company, all Entities that have held, hold, or may hold Claims against or Interests in the Company whether or not such parties have voted to accept or reject the Plan and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and causes of action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions in the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

### 10.8    Subordination Rights.

(a)    Except as otherwise provided in the Plan (including in Article 10.8(c) below), the allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise and all Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)    Except as otherwise provided in the Plan (including Plan Exhibits), the Confirmation Order, or another order of the Bankruptcy Court, the right of the Debtors or the Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination.  Unless the Plan (including Plan Exhibits) or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to this Article 10.8(b) unless ordered by the Bankruptcy Court.

(c)    Notwithstanding anything herein to the contrary, nothing in the Plan shall impair, prejudice, release, compromise or waive any rights, Claims, Causes of Action, defenses or remedies of any Holder of Priority First Lien Claims arising under the Priority Intercreditor Agreement against (i) any Holder of First Lien Claims unless the First Lien Classes are Accepting Classes, in which case the Holders of Priority First Lien Claims will solely waive any requirement that Holders of First Lien Claims turn over any recovery received pursuant to Article 4.2 of this Plan, or (ii) any Holder of Second Lien Claims unless the Second Lien Classes are Accepting Classes, in which case the Holders of Priority First Lien Claims will solely waive any requirement that Holders of Second Lien Claims turn over any recovery received pursuant to Article 4.3 of this Plan.

**10.9    Protection Against Discriminatory Treatment**.  Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another entity with whom such the Reorganized Debtors has been associated, solely because the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**10.10    Recoupment**.  In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**10.11    Release of Liens**.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and its successors and assigns.

**10.12    Reimbursement or Contribution**.  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such

Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has filed a noncontingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## ARTICLE XI

## CONDITIONS PRECEDENT

**11.1    Conditions to Confirmation**.  The following are conditions precedent to the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Article 11.3 of this Plan:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order.

**11.2    Conditions to the Effective Date of the Plan**.  The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 11.3 of this Plan:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be a Final Order;

(b)    the Bankruptcy Court shall have entered the Confirmation Order, and such order shall be a Final Order;

(c)    the Priority First Lien Parties and Capital Finance Opportunities 1701C, LLC shall have entered into and substantially consummated a settlement and release agreement  (the "**Capital Finance/Silver Point Settlement Agreement**")  in form and substance satisfactory to each of the Priority First Lien Administrative Agent and Capital Finance Opportunities 1701C, LLC;

(d)    the payment by the Debtors of all fees and expenses of the DIP Agent and Priority First Lien Administrative Agent, including Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey, Inc., and Fortgang Consulting LLC;

(e)    all Plan Transaction Documents shall be in form and substance satisfactory to the Priority First Lien Administrative Agent;

(f)    all conditions precedent set forth in the New First Lien Credit Agreement shall have been satisfied or waived pursuant to the terms thereof;

(g)    the organizational documents of the Reorganized Debtors as contemplated herein shall be in form and substance satisfactory to the Priority First Lien Administrative Agent, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws;

(h)    all authorizations, consents, certifications, regulatory approvals, rulings, no action letters, opinions, or other documents or actions required by any law, regulation, or order to be received or to occur in order to implement and effectuate the Plan on the Effective Date shall have been obtained (and evidence thereof shall have been delivered to the Priority First Lien Lender) or shall have occurred unless such failure will not have a material adverse effect on the Reorganized Debtors;

(i)    after occurrence of the Effective Date and payment of all amounts contemplated in connection therewith (including any Cure amounts), the Reorganized Debtors shall emerge with a minimum of $10 million of cash or cash equivalents, or shall reasonably expect to build to $10 million of cash or cash equivalents within 60 days of the Effective Date (the "**Minimum Liquidity Condition Precedent**");

(j)    the conditions precedent set forth in the Exit Term Loan Facility shall have been satisfied or waived;

(k)    the Debtors (or the Reorganized Debtors, as the case may be) establish and the Settling Parties (other than the Creditors' Committee) shall have funded the Operating Company General Unsecured Claims Cash Pool Account with Cash in an amount equal to the Operating Company General Unsecured Claims Cash Pool;

(l)    the Debtors (or the Reorganized Debtors, as the case may be) establish and shall have funded the GUC Administrator Account with Cash in an amount equal to $250,000;

(m)    all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full; and

(n)    Adversary Case Numbers 19-01142 and 19-01143 commenced against the Debtors in these Chapter 11 Cases shall have been resolved in a form and manner reasonably satisfactory to the Priority First Lien Administrative Agent.

**11.3    Waiver of Conditions Precedent**.  The conditions set forth in Articles 11.1 and 11.2 may be waived, in whole or in part, by agreement of (a) the Debtors and (b) the Priority First Lien Administrative Agent, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing, provided, that the consent of Capital Finance Opportunities 1701C, LLC shall be required to waive the condition set forth in Article 11.2(c).

**11.4    Notice of Effective Date**.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Article 11.2 of this Plan have been satisfied or waived pursuant to Article 11.3 of this Plan.

**11.5    Effect of Non-Occurrence of Conditions to Consummation**.  If prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action,

(b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XII

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall, to the fullest extent permissible under applicable law, have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

(a) resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors' amendment, modification, or supplement after the Effective Date, pursuant to Article VIII of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(b) adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, this Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(c) ensure that distributions to Holders of Allowed Claims are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d) allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(e) hear and determine or resolve any and all matters related to Causes of Action;

(f) enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

(g) issue and implement orders in aid of execution, implementation, or consummation of this Plan;

(h)     consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)     hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(j)     determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

(k)     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(l)     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan and disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

(m)     hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(n)     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     to adjudicate any claims against the Debtors' current or former directors, officers, employees, agents, attorneys, advisors or other representatives in connection with, arising from, or relating to the First Lien Credit Documents or the Second Lien Credit Documents or any amendments or consent solicitations with respect thereto;

(p)     resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

(q)     hear any other matter not inconsistent with the Bankruptcy Code;

(r)     hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including the dischargeability of any claim;

(s)     enter a Final Decree closing the Chapter 11 Cases;

(t)     enforce all orders previously entered by the Bankruptcy Court; and

(u)     hear and determine all matters relating to any Bankruptcy Code section 510(b) Claims.

All of the foregoing applies following the Effective Date; provided, that from the Confirmation Date through the Effective Date, in addition to the foregoing, the Bankruptcy Court shall retain jurisdiction with respect to all other matters of this Plan that were subject to its jurisdiction prior to the Confirmation Date; provided, further, that the Bankruptcy Court shall not have nor retain exclusive jurisdiction over any post-Effective Date agreement. Nothing contained herein shall be construed to increase, decrease or otherwise modify the independence, sovereignty, or jurisdiction of the Bankruptcy Court.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

**13.1    Binding Effect**. Upon the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

**13.2    Payment of Statutory Fees**. All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date. The Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed by entry of the Final Decree.

**13.3    Modification and Amendments**. The Debtors may alter, amend, or modify this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of this Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**13.4    Confirmation of the Plan**. The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to amend the Plan to any extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**13.5    Additional Documents**. On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

**13.6    Dissolution of Creditors' Committee**.  Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, and the members thereof (solely in their capacities as Creditors' Committee members) shall be released, exculpated, and discharged from all their duties relating to the Chapter 11 Cases in accordance with <u>Article X</u> hereof; <u>provided</u> that the Creditors' Committee shall continue to exist solely with respect to (i) any applications for Professional Fee Claims or expense reimbursements for members of such Committee including preparing same, objecting to same, defending same and attending any hearing with respect to same; (ii) any motions or other actions seeking enforcement or implementation of the provisions of this Plan, or the Confirmation Order; and (iii) any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition creditors, including, but not limited to, any cases, controversies, suits or disputes arising in connection with the consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order. Following the Effective Date, Professionals retained by the Creditors' Committee shall be entitled to reasonable compensation for services rendered in connection with the matters  identified in clauses (i) – (iii) and any such payments made in connection therewith shall be made without any further notice to or action, order, or approval of the Bankruptcy Court.

**13.7    Request for Expedited Determination of Taxes**.  The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Debtors filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

**13.8    Revocation, Withdrawal, or Non-Consummation**.

(a)    **Right to Revoke or Withdraw**.  The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.

(b)    **Effect of Withdrawal, Revocation, or Non-Consummation**.  If the Debtors revoke or withdraw this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan and any settlement or compromise approved as part of this Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be null and void in all respects.  In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**13.9    Notices**.  After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**If to the Debtors:**

c/o Trident Holding Company, LLC
930 Ridgebrook Rd., 3rd Floor
Sparks, MD 21152
Attn.: David F. Smith, III (david.smith@tridentusahealth.com)
Chief Financial Officer

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Attn:   Paul D. Leake
        Jason N. Kestecher

– and –

Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
Attn:   James J. Mazza, Jr.
        Justin M. Winerman

**If to the DIP Agent:**

Silver Point Finance, LLC
c/o Credit Administration Dept.
Attn: Joanna Holte
Two Greenwich Plaza
Greenwich, CT 06830
E-mail: Creditadmin@silverpointcapital.com
Phone: (203) 542-4230

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:   Robert A. Britton
        Christopher Hopkins

**If to the Office of the United States Trustee:**

Office of the United States Trustee for the Southern District of New York
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, New York   10014

Attn:   Brian Masumoto
        Shannon Scott

**If to the Creditors' Committee:**

Kilpatrick, Townsend, & Stockton LLP
1114 Avenue of the Americas
New York, NY 10036

Attn:   David M. Posner
        Gianfranco Finizio

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors and Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

      **13.10   Term of Injunctions or Stays**.  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

      **13.11   Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control).  Corporate governance matters shall be governed by the laws of the state of incorporation of the Reorganized Debtors.

      **13.12   Entire Agreement**.  Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

      **13.13   Severability**.  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be

affected, impaired, or invalidated by such holding, alteration, or interpretation.    The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (c) nonseverable and mutually dependent.

**13.14  No Waiver or Estoppel**.    Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other party, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

**13.15  Conflicts**.    In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of this Plan shall govern.    In the event that the provisions of the Plan and the provisions of the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

Dated: September 5, 2019

Respectfully submitted,

TRIDENT HOLDING COMPANY, LLC
AND ITS AFFILIATE DEBTORS


By: */s/ David F. Smith*
Name:  David F. Smith
Title:  Chief Financial Officer

## **EXHIBIT 2**

**Full Blackline Version of the Second Modified Second Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRIDENT HOLDING COMPANY, LLC,** *et al.*, | **Case No. 19-10384 (SHL)** |
| **Debtors.[1]** | **(Jointly Administered)** |

## <u>SECOND</u> MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION OF TRIDENT HOLDING COMPANY, LLC AND ITS DEBTOR AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

James J. Mazza, Jr.
Justin M. Winerman
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone:                    (312)                    407-0700

Paul                    D.                    Leake
Jason N. Kestecher
Four Times Square
New York, New York 10036-6522
Telephone:                    (212)                    735-3000

*Attorneys for the Debtors and Debtors-in-Possession*

Dated:        ~~July        3~~<u>September        5</u>,        2019

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Trident Holding Company, LLC (6396); American Diagnostics Services, Inc. (2771); Community Mobile Diagnostics, LLC (9341); Community Mobile Ultrasound, LLC (3818); Diagnostic Labs Holdings, LLC (8024); FC Pioneer Holding Company, LLC (6683); JLMD Manager, LLC (8470); Kan-Di-Ki LLC (6100); Main Street Clinical Laboratory, Inc. (0907); MDX-MDL Holdings, LLC (2605); MetroStat Clinical Laboratory – Austin, Inc. (4366); MX Holdings, LLC (8869); MX USA, LLC (4885); New Trident Holdcorp, Inc. (4913); Rely Radiology Holdings, LLC (3284); Schryver Medical Sales and Marketing, LLC (9620); Symphony Diagnostic Services No. 1, LLC (8980); Trident Clinical Services Holdings, Inc. (6262); Trident Clinical Services Holdings, LLC (1255); TridentUSA Foot Care Services LLC (3787); TridentUSA Mobile Clinical Services, LLC (0334); TridentUSA Mobile Infusion Services, LLC (5173); U.S. Lab & Radiology, Inc. (4988). The address of the Debtors' corporate headquarters is 930 Ridgebrook Road, 3rd Floor, Sparks, MD 21152.

Redline Atlantis - Plan of Reorganization 1715029v32 and Atlantis - Plan of Reorganization 1715029v42 9/5/2019 9:13:10 PM

# TABLE OF CONTENTS

**Page**

Article I

DEFINITIONS, RULES OF
INTERPRETATION, AND COMPUTATION OF TIME

A.    Scope of Definitions .................................................................... 1
B.    Definitions .................................................................................... 1
C.    Rules of Interpretation ........................................................... ~~20~~22
D.    Computation Of Time ............................................................. ~~20~~22
E.    References to Monetary Figures ............................................. ~~20~~22
F.    Certain Consent Rights .......................................................... ~~20~~22
G.    Exhibits ................................................................................... ~~20~~23

Article II

ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

2.1    Administrative Claims ........................................................... ~~21~~23
2.2    DIP Facility Claims ............................................................... ~~22~~24
2.3    Professional Claims ............................................................... ~~22~~24
2.4    Priority Tax Claims ............................................................... ~~23~~25

Article III

CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

3.1    Classification of Claims and Interests .................................. ~~23~~25

Article IV

PROVISIONS FOR TREATMENT
OF CLAIMS AND INTERESTS

4.1    Priority First Lien Claims ..................................................... ~~26~~28
4.2    First Lien Claims ................................................................... ~~26~~28
4.3    Second Lien Claims ............................................................... ~~27~~29
4.4    Other Secured Claims ............................................................ ~~27~~30
4.5    Other Priority Claims ............................................................ ~~28~~31
4.6    Operating Company General Unsecured Claims .................. ~~29~~31
4.7    Holding Company General Unsecured Claims .................... ~~29~~31
4.8    Intercompany Claims ............................................................. ~~29~~32
4.9    Other Subordinated Claims ................................................... ~~30~~32

i

4.10    Interests in Debtor Subsidiaries .............................................. 3032
4.11    Interests in Pioneer .............................................................. 3133

Article V

ACCEPTANCE

5.1    Classes Entitled to Vote ........................................................ 3133
5.2    Acceptance by Impaired Classes ............................................ 3133
5.3    Elimination of Classes .......................................................... 3134
5.4    Special Provision Governing Unimpaired Claims ...................... 3134
5.5    Deemed Acceptance if No Votes Cast ...................................... 3134
5.6    Cramdown ........................................................................... 3234

Article VI

MEANS FOR IMPLEMENTATION OF THE PLAN

6.1    No Substantive Consolidation ................................................ 3234
6.2    General Settlement of Claims and Interests .............................. 3234
6.3    Restructuring Transactions. ................................................... 3234
6.4    Sources of Cash for Plan Distribution ..................................... 3335
6.5    Exit Liquidity Facility .......................................................... 3336
6.6    Exit Term Loan Facility ........................................................ 3336
6.7    New First Lien Facility ......................................................... 3436
6.8    Authorization, Issuance, and Distribution of New Pioneer Units ... 3436
6.9    Operating Company General Unsecured Claims Cash Pool. .......... 3436
6.10    GUC Administrator Account. ................................................. 37
6.106.11    Exemptions from Securities Act Registration Requirements ... 3437
6.116.12    Cancellation of Existing Securities and Agreements .......... 3538
6.126.13    Issuance and Distribution of New Securities; Execution of Plan Documents ... 3538
6.136.14    Continued Corporate Existence .................................... 3538
6.146.15    New Corporate Governance Documents ......................... 3639
6.156.16    Directors, LLC Managers, and Officers of Reorganized Debtors ... 3639
6.166.17    Corporate Action ..................................................... 3639
6.176.18    Effectuating Documents; Further Transactions ............... 3640
6.186.19    Employment, Retirement, Indemnification, and Other Agreements and Employee Compensation
6.196.20    Preservation Of Causes Of Action ............................... 3841
6.206.21    Reservation of Rights ............................................... 3841
6.216.22    Exemption from Certain Transfer Taxes and Recording Fees ... 3842
6.226.23    Insured Claims ......................................................... 3942
6.236.24    Intercompany Account Settlement. ............................... 3942
6.246.25    Closing of Chapter 11 Cases. ..................................... 3942
6.256.26    Private Company. ..................................................... 3942

ii

Article VII

UNEXPIRED LEASES AND EXECUTORY CONTRACTS

7.1  Rejection of Executory Contracts and Unexpired Leases ............... ~~39~~42
7.2  Assumption of Executory Contracts and Unexpired Leases .......... ~~40~~44
7.3  Insurance Policies ............... ~~41~~44
7.4  Cure Procedures and Payments Related to Assumption of Executory Contracts
     and Unexpired Leases ............... ~~41~~46
7.5  Contracts, Intercompany Contracts, and Leases Entered into After the Petition
     Date ............... ~~43~~48
7.6  General Reservation of Rights ............... ~~43~~48

Article VIII

PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

8.1  Determination Of Claims and Interests ............... ~~43~~48
8.2  GUC Administrator ............... ~~44~~49
8.3  Claims Administration Responsibility ............... ~~44~~49
8.4  Objections to Claims ............... ~~45~~50
8.5  Disallowance of Claims ............... ~~45~~50
8.6  Estimation of Claims ............... ~~45~~50
8.7  No Interest on Claims ............... ~~46~~51
8.8  Amendments to Claims ............... ~~46~~51

Article IX

PROVISIONS GOVERNING DISTRIBUTIONS

9.1  Time of Distributions ............... ~~46~~51
9.2  Distribution Agent ............... ~~46~~51
9.3  Currency ............... ~~46~~51
9.4  Distributions on Account of Claims Allowed as of the Effective Date ....... ~~46~~51
9.5  Distributions on Account of Claims Allowed After the Effective Date ...... ~~47~~52
9.6  Delivery Of Distributions ............... ~~48~~53
9.7  Accrual of Dividends and Other Rights ............... ~~49~~55
9.8  Compliance Matters ............... ~~50~~55
9.9  Claims Paid or Payable by Third Parties ............... ~~50~~55
9.10 Setoffs ............... ~~50~~56
9.11 Allocation of Plan Distributions Between Principal and Interest ...... ~~51~~56

iii

Article X

EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

| 10.1 | Vesting of Assets | 5156 |
| 10.2 | Discharge of the Debtors | 5157 |
| 10.3 | Release by Debtors | 5257 |
| 10.4 | Release by Holders of Claims | 5358 |
| 10.5 | Exculpation and Limitation of Liability | 5359 |
| 10.6 | Exclusions and Limitations on Exculpation, Indemnification, and Releases | 5459 |
| 10.7 | Injunction | 5459 |
| 10.8 | Subordination Rights | 5560 |
| 10.9 | Protection Against Discriminatory Treatment | 5561 |
| 10.10 | Recoupment | 5661 |
| 10.11 | Release of Liens | 5661 |
| 10.12 | Reimbursement or Contribution | 5661 |

Article XI

CONDITIONS PRECEDENT

| 11.1 | Conditions to Confirmation | 5662 |
| 11.2 | Conditions to the Effective Date of the Plan | 5662 |
| 11.3 | Waiver of Conditions Precedent | 5763 |
| 11.4 | Notice of Effective Date | 5763 |
| 11.5 | Effect of Non-Occurrence of Conditions to Consummation | 5763 |

Article XII

RETENTION OF JURISDICTION

Article XIII

MISCELLANEOUS PROVISIONS

| 13.1 | Binding Effect | 6066 |
| 13.2 | Payment of Statutory Fees | 6066 |
| 13.3 | Modification and Amendments | 6066 |
| 13.4 | Confirmation of the Plan | 6066 |
| 13.5 | Additional Documents | 6066 |
| 13.6 | Dissolution of Creditors' Committee | 6067 |
| 13.7 | Request for Expedited Determination of Taxes | 6067 |
| 13.8 | Revocation, Withdrawal, or Non-Consummation | 6167 |
| 13.9 | Notices | 6167 |
| 13.10 | Term of Injunctions or Stays | 6269 |
| 13.11 | Governing Law | 6369 |

iv

13.12   Entire Agreement .................................................................. 6369
13.13   Severability ........................................................................... 6369
13.14   No Waiver or Estoppel ......................................................... 6370
13.15   Conflicts ................................................................................ 6370

v

**EXHIBITS**[2]

**Exhibit 2.1**            **Administrative Claim Request Form**
**Exhibit 6.6**            **Exit Term Loan Facility Credit Agreement**
**Exhibit ~~6.14~~6.15**            **Pioneer LLC Agreement**
**Exhibit ~~6.19~~6.20**            **Retained Causes of Action**
**Exhibit 7.1**            **Assumed Executory Contracts and Unexpired Leases**

---

[2]    The Exhibits ~~will be~~have been filed with the Plan Supplement, as has been, and may be further, amended, modified, and/or supplemented.

## INTRODUCTION

Trident Holding Company, LLC and certain of its affiliates, the debtors and debtors in possession (collectively, the "Company") in the above-captioned cases (the "Chapter 11 Cases"), hereby propose this joint plan (this "Plan") for the resolution of the outstanding Claims and Interests.  Capitalized terms used herein shall have the meanings ascribed to them in Article I.B of this Plan.

The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a Holder of a Claim or Interest until a disclosure statement has been approved by the Bankruptcy Court and distributed to Holders of Claims and Interests.  The Disclosure Statement relating to this Plan was approved by the Bankruptcy Court on [  ], 2019 and has been made available to all parties whose votes are being solicited.  The Disclosure Statement contains, among other things, a discussion of the Debtors' history, business, properties and operations, risk factors associated with the business and Plan, a summary and analysis of this Plan, a summary and analysis of the settlements contained in the Plan, and certain related matters.

**ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XIII of this Plan, the Debtors expressly reserve their rights to alter, amend, modify, revoke, or withdraw this Plan, one or more times, prior to this Plan's substantial consummation.

## ARTICLE I

### DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

**A.    Scope of Definitions**

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I.B of this Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

**B.    Definitions**

**1.1**    "**Accepting Class**" means a Class that votes to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

Redline Atlantis - Plan of Reorganization 1715029v32 and Atlantis - Plan of Reorganization 1715029v42 9/5/2019 9:13:10 PM

**1.2** "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, Section 503(b)(9) Claims, DIP Facility Claims, Professional Claims, and all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court.

**1.3** "**Administrative Claim Request Form**" means the form to be included in the Plan Supplement for submitting Administrative Claims requests.

**1.4** "**Administrative Claims Bar Date**" means the deadline for filing proofs of or requests for payment of Administrative Claims, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to (i) the DIP Facility Claims and Professional Claims, which shall be subject to the provisions of Articles 2.2 and 2.3 hereof, as applicable, and (ii) Section 503(b)(9) Claims, which shall be subject to the Bar Date Order.

**1.5** "**Affiliates**" has the meaning ascribed to such term by section 101(2) of the Bankruptcy Code.

**1.6** "**Allowed**" means, for distribution purposes, a Claim or Interest, or any portion thereof, or a particular Class of Claims or Interests (a) that has been allowed by a Final Order of the Bankruptcy Court (or such other court as the Reorganized Debtor and the Holder of such Claim or Interest agree may adjudicate such Claim or Interest and objections thereto), (b) which is not the subject of a proof of Claim timely filed with the Bankruptcy Court and is Scheduled as liquidated and noncontingent, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, but only to the extent such Claim is Scheduled as liquidated and noncontingent, (c) for which a proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which (i) no objection to its allowance has been filed within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court, (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order of the Bankruptcy Court, or, (iii) following the Effective Date, with respect to Operating Company General Unsecured Claims, as otherwise may be determined by the GUC Administrator, or (d) that is expressly allowed in a liquidated amount pursuant to this Plan.

**1.7** "**Annual Incentive Plan**" means the Company's annual ordinary course incentive plan.

**1.8** "**Ares**" means Ares Capital Corporation.

2

**1.9** "**Assumption and Rejection Procedures**" means the expedited procedures for the Debtors to assume or reject Executory Contracts and Unexpired Leases pursuant to the Bankruptcy Court's order dated March 8, 2019 (Docket No. 171).

**1.10** "**Audax Debt Funds**" means, collectively, Audax Credit Opportunities Offshore Ltd., Audax Senior Loan Fund SPV LLC, and Audax Management Company (NY), LLC, for itself, and as agent on behalf of CMFG Life Insurance Company and Trustees of the Estate of Bernice Pauahi Bishop d/b/a Kamehameha Schools.

**1.11** "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors and their recovery, subordination, or other remedies that may be brought by and on behalf of the Debtors and their estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under section 502, 544, 545, 547, 548, 550, 553, and 724(a) of the Bankruptcy Code.

**1.12** "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the date hereof but, with respect to amendments to the Bankruptcy Code subsequent to commencement of the Chapter 11 Cases, only to the extent that such amendments were made expressly applicable to bankruptcy cases which were filed as of the enactment of such amendments.

**1.13** "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

**1.14** "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

**1.15** "**Bar Date**" means the deadlines set by the Bankruptcy Court pursuant to the Bar Date Order or other Final Order for filing proofs of claim in the Chapter 11 Cases, as the context may require.

**1.16** "**Bar Date Order**" means the order entered by the Bankruptcy Court on March 28, 2019 (Docket No. 267) and any subsequent order supplementing such order or relating thereto.

**1.17** "**Business Day**" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York City.

**1.18** "**Capital Raising Transaction**" means, to the extent reasonably necessary in the Debtors' business judgment and with the consent of the Priority First Lien Administrative

3

Agent, a capital-raising or liquidity-generating transaction arranged by the Priority First Lien Administrative Agent to provide the Debtors with sufficient capital (whether in the form of exit financing or otherwise) to allow for the implementation and effectiveness of the Plan, on terms and conditions reasonably acceptable to the Debtors.

1.19    "**Cash**" means legal tender of the United States of America and equivalents thereof.

1.20    "**Causes of Action**" means any and all actions, claims, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable, in contract or in tort, directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, including any Avoidance Action, and actions against any Entity for failure to pay for products or services provided or rendered by any Debtor, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.21    "**Certificate**" means any instrument evidencing a Claim or an Interest.

1.22    "**Chapter 11 Cases**" means the voluntary cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, which are being jointly administered and are currently pending before the Bankruptcy Court under Case No. 19-10384 (SHL).

1.23    "**Claim**" means a claim against the Debtors, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, or an Administrative Claim, as applicable.

1.24    "**Claims and Solicitation Agent**" means Epiq Corporate Restructuring LLC.

1.25    "**Claims Objection Deadline**" means, as applicable (except for Administrative Claims), (a) the day that is the later of the first Business Day that is at least 180 days after the Effective Date or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors or the GUC Administrator (solely as to the Operating Company General Unsecured Claims) without further notice to parties-in-interest.

1.26    "**Class**" means a category of Holders of Claims or Interests classified together pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, as described in Article III of this Plan.

4

**1.27** "**Confirmation**" means the entry, within the meaning of Bankruptcy Rules 5003 and 9012, of the Confirmation Order, subject to all conditions specified in Article 11.1 having been satisfied or waived, in accordance with the terms herein.

**1.28** "**Confirmation Date**" means the date on which Confirmation occurs.

**1.29** "**Confirmation Hearing**" means the hearing before the Bankruptcy Court held under section 1128 of the Bankruptcy Code to consider confirmation of the Plan and related matters as such hearing may be adjourned or continued from time to time.

**1.30** "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

**1.31** "**Cortland Settlement Agreement**" means those certain Mutual Release and Covenant Not to Sue Agreements, entered into as of June 24, 2019, by and among (a) Cortland Capital Market Services, LLC, solely in its capacity as First Lien Administrative Agent, (b) Solar Senior Capital Ltd., (c) Monroe Capital CLO 2014-1, Ltd., (d) MJX Asset Management LLC, (e) Ivy Hill, (f) ING Capital, LLC, (g) BlueMountain CLO 2012-2 Ltd, (h) BlueMountain CLO 2013-1 Ltd, (i) BlueMountain CLO 2013-2 Ltd., (j) BlueMountain CLO 2013-3 Ltd., (k) WhiteHorse VII, Ltd, (*l*) Marathon CLO V LTD, (m) Marathon CLO VI LTD, (n) Marathon CLO VII LTD, (o) PennantPark Floating Rate Funding I, LLC, (p) PennantPark Floating Rate Capital Ltd., (q) VSS Fund, LP, (r) Cetus Capital III, LP, (s) Littlejohn Opportunities Master Fund LP, (t) OFM II, LP, (u) the Priority First Lien Administrative Agent, and (v) the Priority First Lien Lenders, pursuant to which the Existing 1L Releasing Parties (as defined therein) agreed to release the Priority First Lien Parties, the Debtors, the Reorganized Debtors and certain related persons effective upon the Effective Date.

**1.32** "**Creditor**" has the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

**1.33** "**Creditors' Committee**" means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on February 20, 2019, as may be reconstituted from time to time.

**1.34** "**Cure**" means the payment or other honoring of all obligations required to be paid or honored in connection with assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an Executory Contract or Unexpired Lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the

5

extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

1.35    "**Cure Notice**" means the notice of proposed Cure amount provided to counterparties to assumed Executory Contracts or Unexpired Leases pursuant to Article 7.4 of the Plan.

1.36    "**Cure Objection Deadline**" means the deadline for filing objections to a Cure Notice or proposed Cure, which shall be on or before fourteen (14) days after the applicable counterparty was served with a Cure Notice.

1.37    "**Debtor Group**" has the meaning ascribed to such term in Article 3.1.

1.38    "**Debtor Group B**" means Trident Holding Company, LLC.

1.39    "**Debtor Group C**" means, collectively, the following Debtors: American Diagnostics Services, Inc.; Community Mobile Diagnostics, LLC; Community Mobile Ultrasound, LLC; Diagnostic Labs Holdings, LLC; JLMD Manager, LLC; Kan-Di-Ki LLC; Main Street Clinical Laboratory, Inc.; MDX-MDL Holdings, LLC; MetroStat Clinical Laboratory – Austin, Inc.; MX Holdings, LLC; MX USA, LLC; New Trident Holdcorp, Inc.; Rely Radiology Holdings, LLC; Schryver Medical Sales and Marketing, LLC; Symphony Diagnostic Services No. 1, LLC; Trident Clinical Services Holdings, Inc.; Trident Clinical Services Holdings, LLC; TridentUSA Foot Care Services LLC; TridentUSA Mobile Clinical Services, LLC; TridentUSA Mobile Infusion Services, LLC; and U.S. Lab & Radiology, Inc.

1.40    "**Debtor Subsidiaries**" means each Debtor that is a direct or indirect subsidiary of Pioneer.

1.41    "**Debtors**" means, collectively, Trident Holding Company, LLC; American Diagnostics Services, Inc.; Community Mobile Diagnostics, LLC; Community Mobile Ultrasound, LLC; Diagnostic Labs Holdings, LLC; FC Pioneer Holding Company, LLC; JLMD Manager, LLC; Kan-Di-Ki LLC; Main Street Clinical Laboratory, Inc.; MDX-MDL Holdings, LLC; MetroStat Clinical Laboratory – Austin, Inc.; MX Holdings, LLC; MX USA, LLC; New Trident Holdcorp, Inc.; Rely Radiology Holdings, LLC; Schryver Medical Sales and Marketing, LLC; Symphony Diagnostic Services No. 1, LLC; Trident Clinical Services Holdings, Inc.; Trident Clinical Services Holdings, LLC; TridentUSA Foot Care Services LLC; TridentUSA Mobile Clinical Services, LLC; TridentUSA Mobile Infusion Services, LLC; and U.S. Lab & Radiology, Inc.

1.42    "**DIP Agent**" means Silver Point Finance, LLC, in its capacity as administrative agent for the DIP Lenders pursuant to the DIP Credit Agreement.

1.43    "**DIP Credit Agreement**" means that certain Senior Secured Superpriority Debtor in Possession Credit Agreement, between New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, the DIP

6

Lenders, the DIP Agent and the other parties thereto, dated as of February 11, 2019, as has been or may be amended, restated, supplemented or otherwise modified from time to time.

1.44    "**DIP Documents**" means all "Loan Documents" (as defined in the DIP Credit Agreement).

1.45    "**DIP Facility**" means the debtor-in-possession senior secured financing facility, consisting of a term loan facility, provided to the Debtors by the DIP Lenders pursuant to the DIP Credit Agreement or the other DIP Documents (as defined in the DIP Facility Order) as authorized by the Bankruptcy Court pursuant to the DIP Facility Order.

1.46    "**DIP Facility Claim**" means any Claim arising under, derived from, based upon, on account of or as a result of the DIP Facility.

1.47    "**DIP Facility Order**" means, collectively, (a) the interim order that was entered by the Bankruptcy Court on February 12, 2019 (Docket No. 41), and (b) the final order that was entered by the Bankruptcy Court on March 8, 2019 (Docket No. 166), authorizing and approving the DIP Facility and the agreements related thereto, in each case as amended or modified in accordance with the terms thereof.  The term "DIP Facility Order" includes any and all annexes or exhibits attached thereto.

1.48    "**DIP Lenders**" means the financial institutions or entities from time to time party to the DIP Credit Agreement as lenders.

1.49    "**Disallowed**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, or as provided in this Plan, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

1.50    "**Disclosure Statement**" means the disclosure statement or any supplements thereto that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time in accordance with the terms therein, all as approved by an order of the Bankruptcy Court pursuant to sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3017.

1.51    "**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto.

7

1.52    "**Disputed**" means with respect to a Claim, (a) any Claim as to which any Debtor, the GUC Administrator, or other parties-in-interest in accordance with applicable law have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by any Debtor, the GUC Administrator, or other parties-in-interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

1.53    "**Distribution Agent**" means ~~any Entity selected by the Debtors or the Reorganized Debtors, in their sole discretion, to make or facilitate distributions pursuant to this Plan.~~ Bankruptcy Management Solutions, Inc. d/b/a Stretto.

1.54    "**Distribution Date**" means the date selected by the Reorganized Debtors, in their sole discretion, upon which distributions to Holders of Allowed Claims entitled to receive distributions under this Plan shall commence.

1.55    "**Distribution Record Date**" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which shall be (a) ten (10) Business Days after entry of the Confirmation Order or (b) such other date as designated by an order of the Bankruptcy Court.

1.56    "**Effective Date**" means the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the effectiveness of this Plan specified in Article 11.2, have been satisfied, or, if capable of being waived in accordance with the terms herein, waived, which date shall be specified in a notice filed by the Reorganized Debtors with the Bankruptcy Court.

1.57    "**Entity**" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.58    "**Equity Security**" has the meaning ascribed to such term in section 101(16) of the Bankruptcy Code.

1.59    "**Escrow Agent**" means Ankura Trust Company LLC in its capacity as escrow agent for the Holdback Escrow Account.

~~1.59~~1.60    "**Estates**" means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

~~1.60~~1.61    "**Exculpated Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' (1) current financial advisors, attorneys, accountants, investment bankers, representatives, and other professionals; (2) current employees, consultants, Affiliates, officers,

8

managers and directors, including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; (i) the Creditors' Committee and each of its members; (j) the First Lien Administrative Agent; (k) Capital Finance Opportunities 1701C, LLC; (*l*) with respect to each of the foregoing entities in clauses (a) through (k), each of their current and former Affiliates; and (m) with respect to each of the foregoing entities in clauses (a) through (*l*), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, direct and indirect partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

        ~~1.61~~1.62        "**Executory Contract**" means any contract to which any Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

        ~~1.62~~1.63        "**Exhibit**" means an exhibit annexed either to this Plan, contained in the Plan Supplement, or annexed as an appendix to the Disclosure Statement.

        ~~1.63~~1.64        "**Exit Liquidity Facility**" means a senior secured asset-based lending, receivables, or similar facility with revolving commitments in an aggregate amount not to exceed the difference between $10 million and the greater of (a) the Debtors' projected available cash and Cash Equivalents (as defined in the DIP Credit Agreement) on the Effective Date, or (b) the Debtors' projected available cash and Cash Equivalents 60 days following the Effective Date, on terms and conditions reasonably acceptable to the Priority First Lien Administrative Agent, which shall be senior in lien priority to the Exit Term Loan Facility and New First Lien Facility with respect to the Debtors' and Reorganized Debtors' accounts receivable and inventory assets.

        ~~1.64~~1.65        "**Exit Term Loan Facility**" means an exit term loan credit facility in an aggregate principal amount equal to the sum of $50 million to be provided to the Reorganized Debtors by the Exit Term Loan Facility Lenders on the Effective Date pursuant to the Exit Term Loan Facility Documents~~.~~ and (b) up to $30 million to be provided to the Reorganized Debtors by the Priority First Lien Parties (or their designee) on the Effective Date as a Capital Raising Transaction, all of which shall be senior in lien priority to the New First Lien Facility.

        ~~1.65~~1.66        "**Exit Term Loan Facility Agent**" means the administrative agent under the Exit Term Loan Facility Documents, and its successors and assigns in such capacity, or any replacement agent appointed pursuant to the terms of the Exit Term Loan Facility Documents.

9

1.66**1.67**        "**Exit Term Loan Facility Credit Agreement**" means that certain term loan credit agreement, annexed hereto as Exhibit 6.6, which shall be effective on the Effective Date, by and among certain of the Reorganized Debtors, the Exit Term Loan Facility Agent, and the Exit Term Loan Facility Lenders, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time, which shall have lien priority over all other indebtedness of the Reorganized Debtors (other than, if applicable, the Exit Liquidity Facility), shall have a maturity date of five**seven** years after the Effective Date and shall bear interest at a rate of LIBOR *plus* 7.5% per annum payable-in-kind; provided that the Reorganized Debtors shall have the ability at any time to elect to pay interest at a rate of LIBOR *plus* 7% per annum payable in cash for any period.

1.67**1.68**        "**Exit Term Loan Facility Lenders**" means the lenders under the Exit Term Loan Facility Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the Exit Term Loan Facility Credit Agreement.

1.68**1.69**        "**Exit Term Loan Facility Documents**" means, collectively, the Exit Term Loan Facility Credit Agreement and all other "Loan Documents" as defined therein, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documents) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall be, to the extent applicable.

1.69**1.70**        "**Face Amount**" means, (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Holder of a Claim in any proof of Claim, or amendment thereof in accordance with applicable law, timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, or the amount estimated for such Claim in an order of the Bankruptcy Court, and (b) when used in reference to an Allowed Claim or Allowed Interest, the allowed amount of such Claim or Interest.  If none of the foregoing applies, the Face Amount of the Claim shall be zero ($0) dollars.

1.70**1.71**        "**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

1.71**1.72**        "**Final Order**" means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, is in full force and effect, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order

10

shall not prevent such order from being a Final Order; provided, further, that the Debtors or Reorganized Debtors, as applicable, reserve the right to waive any appeal period for an order or judgment to become a Final Order.

1.72 1.73 "**First Lien Administrative Agent**" means Cortland Capital Market Services LLC, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the First Lien Credit Agreement.

1.73 1.74 "**First Lien Claims**" means any and all Claims held by the First Lien Lenders against the Debtors arising under, relating to, or in connection with the First Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in an aggregate amount of $219,815,899.97.

1.74 1.75 "**First Lien Classes**" means, collectively, Class 2B and Class 2C.

1.75 1.76 "**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of July 31, 2013, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the First Lien Administrative Agent, and the various lenders party thereto from time to time, as has been or it may be amended, supplemented, amended and restated, or otherwise modified from time to time.

1.76 1.77 "**First Lien Credit Documents**" means the First Lien Credit Agreement, together with all other "Loan Documents" (as defined in the First Lien Credit Agreement).

1.77 1.78 "**First Lien Lenders**" means the "Lenders" as defined in the First Lien Credit Agreement.

1.78 1.79 "**General Unsecured Claim**" means any Claim that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Priority First Lien Claim, First Lien Claim, Second Lien Claim, PIK Notes Claim, Other Secured Claim, Other Priority Claim, Intercompany Claim, or Other Subordinated Claim. Without limiting the foregoing, General Unsecured Claims include all Rejection Damages Claims that are not Allowed Section 503(b)(9) Claims.

1.79 "**General Unsecured Claims Cash Pool**" means $950,000 of Cash plus any net property or proceeds received by the Debtors or Reorganized Debtors in connection with the pursuit of any claims under section 547 of the Bankruptcy Code against the Specified Parties.

1.80 "**General Unsecured Claims Cash Pool Account**" means a segregated account to be funded on or prior to the Effective Date in accordance with Article 6.9.

1.81 1.80 "**Governmental Unit**" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

11

1.82 1.81        "**GUC Administrator**" means the person appointed by the Creditors' Committee in accordance with Article 8.2 of the Plan.

1.82        "**GUC Administrator Account**" means a segregated account to be funded on or prior to the Effective Date in accordance with Article 6.10 of the Plan.

1.83        "**GUC Administrator Costs**" means the reasonable costs and expenses of the GUC Administrator, including reasonable professionals' fees and expenses, which, for the avoidance of doubt, shall be paid by the Debtors or Reorganized Debtors in an amount not to exceed $250,000.

1.84        "**Healthcare Liability Policies**" means the healthcare liability Insurance Contracts, for the terms July 2013 through June 30, 2019, issued by American Casualty Company of Reading, Pennsylvania, Transportation Insurance Company, and/or Continental Insurance Company, as insurer.

1.84 1.85        "**Holdback Escrow Account**" means the interest-bearing escrow account into which Cash equal to the Holdback Escrow Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims (as Allowed pursuant to the terms of this Plan) to the extent not previously paid or disallowed.

1.85 1.86        "**Holdback Escrow Amount**" means the sum of (a) the aggregate amounts withheld by the Debtors as of the Confirmation Date as a holdback on payment of Professional Claims pursuant to the Professional Fee Order, and (b) twenty (20) percent of that portion of the unbilled fees of Professionals estimated pursuant to Article 2.3(c) of the Plan attributable to fees incurred as of the Confirmation Date; provided, however, that if a Professional does not provide an estimate pursuant to Article 2.3(c), the Debtors may estimate the unbilled fees of such Professional incurred as of the Confirmation Date, and the sum of provision (a) above and the total amount so estimated shall comprise the Holdback Escrow Amount.

1.86 1.87        "**Holding Companies**" means FC Pioneer Holding Company, LLC and Trident Holding Company, LLC.

1.87 1.88        "**Holding Company General Unsecured Claims**" means the General Unsecured Claims and the PIK Notes Claims against the Holding Companies.

1.88 1.89        "**Holder**" means a holder of a Claim against or Interest in the Debtors.

1.89 1.90        "**Impaired**" means impaired within the meaning of section 1124 of the Bankruptcy Code.

1.91        "**Initial Distribution Date**" means, with respect to all Claims other than Operating Company General Unsecured Claims, the date selected by the Reorganized Debtors, in

their sole discretion, upon which distributions to Holders of Allowed Claims entitled to receive distributions under this Plan shall commence.

~~1.90~~1.92    "**Insurance Contract**" has the meaning ascribed to it in Article 7.3 of this Plan.

~~1.91~~1.93    "**Insured Claims**" has the meaning ascribed to it in Article 7.3 of this Plan.

~~1.92~~1.94    "**Intercompany Claim**" means a Claim or a Cause of Action by a Debtor against another Debtor.

~~1.93~~1.95    "**Interest**" means any Equity Security, common stock, equity, ownership, profit interest, unit, or share in a Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in a Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, vested, transferrable, preferred, common, voting, or denominated "stock" or a similar security, existing immediately prior to the Effective Date.

~~1.94~~1.96    "**Ivy Hill**" means, collectively, Ivy Hill Middle Market Credit Fund IV, Ltd., Ivy Hill Middle Market Credit Fund V, Ltd., Ivy Hill Middle Market Credit Fund VII, Ltd., Ivy Hill Middle Market Credit Fund IX, Ltd., Ivy Hill Middle Market Credit Fund X, Ltd., Private Debt Strategies Fund IV L.P., and Ivy Hill Asset Management, L.P..

~~1.95~~1.97    "**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued, or promulgated by any Governmental Unit.

1.98    "**Legacy Workers Compensation Policies**" means those large casualty workers' compensation and employers' liability Insurance Contracts, for the terms December 2011 through July 2018, issued by American Casualty Company of Reading, Pennsylvania, Transportation Insurance Company, and/or Continental Insurance Company, as insurer.

~~1.96~~1.99    "**Legal Proceeding**" means legal, governmental, administrative, judicial, or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, notices of noncompliance or violation, or proceedings.

~~1.97~~1.100    "**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

~~1.98~~1.101    "**Management Incentive Plan**" means the post-Effective Date management equity incentive plan, which shall provide for, among other things, not to exceed 10% of the equity, options, restricted stock units, or other equity instruments in Reorganized Pioneer, issued at plan value, to be reserved for current and future officers and employees of the Reorganized Debtors (excluding any such equity, options, restricted stock units, or other equity instruments granted to the non-executive members of the New Pioneer Board), with awards and terms and conditions thereunder determined by the New Pioneer Board, except as otherwise set

13

forth in the Plan Supplement. For the avoidance of doubt, the Reorganized Debtors shall have the right to set additional equity awards for the benefit of members of the New Boards following the Effective Date.

1.991.102    "**Minimum Liquidity Condition Precedent**" has the meaning ascribed to such term in Article 11.2.

1.1001.103    "**New Boards**" means the initial boards of directors of the Reorganized Debtors, which shall as of the Effective Date consist of members selected by the Priority First Lien Administrative Agent and shall be as set forth in the Plan Supplement or as announced on the record during the Confirmation Hearing.

1.1011.104    "**New First Lien Facility**" means a new first lien term loan facility in an aggregate principal amount of $105 million to be provided to the Reorganized Debtors by the New First Lien Facility Lenders on the Effective Date pursuant to the New First Lien Credit Agreement, which shall be junior in lien priority to the Exit Term Loan Facility.

1.1021.105    "**New First Lien Facility Agent**" means the administrative agent under the New First Lien Facility Documents, and its successors and assigns in such capacity, or any replacement agent appointed pursuant to the terms of the New First Lien Facility Documents.

1.1031.106    "**New First Lien Credit Agreement**" means that certain term loan credit agreement, which shall be effective on the Effective Date, by and among certain of the Reorganized Debtors, the New First Lien Facility Agent, and the New First Lien Facility Lenders, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time, the material terms of which shall be substantially identical to those in the Priority First Lien Credit Agreement, except that the maturity date shall be fiveseven years after the Effective Date and the term loans under the New First Lien Facility shall bear interest at a rate of LIBOR *plus* 7.5% per annum payable-in-kind; provided that the Reorganized Debtors shall have the ability at any time to elect to pay interest at a rate of LIBOR *plus* 7% per annum payable in cash for any period.

1.1041.107    "**New First Lien Facility Documents**" means, collectively, the New First Lien Credit Agreement and all other "Loan Documents" as defined therein, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documents) (in each case, as amended, restated, modified, or supplemented from time to time).

1.1051.108    "**New First Lien Facility Lenders**" means the lenders under the New First Lien Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the New First Lien Credit Agreement.

1.1061.109    "**New Pioneer Board**" means the initial board of managers of Reorganized Pioneer, which shall as of the Effective Date consist of members selected by the Priority First Lien Administrative Agent and shall be as set forth in the Plan Supplement or as

14

announced on the record during the Confirmation Hearing; provided, to the extent designated by the Priority First Lien Administrative Agent, another of the New Boards may exercise the rights of the New Pioneer Board hereunder.

1.1071.110    "**New Pioneer Units**" means the Class A limited liability company units of Reorganized Pioneer as provided under the Pioneer LLC Agreement.

1.1081.111    "**Old Pioneer Units**" means limited liability company interests represented by units of FC Pioneer Holding Company, LLC of any other such interests that are authorized, issued, and outstanding prior to the Effective Date.

1.1091.112    "**Old Securities**" means, collectively, the Original PIK Notes, the Tranched PIK Notes, and Old Pioneer Units, and all options, warrants, rights, and other instruments evidencing an ownership interest in Pioneer (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise to acquire any of the foregoing.

1.1101.113    "**Operating Companies**" means, collectively, all the Debtors that are not Holding Companies.

1.1111.114    "**Operating Company General Unsecured Claims**" means the General Unsecured Claims against the Operating Companies.

**1.115**    "**Operating Company General Unsecured Claims Cash Pool**" means $950,000 of Cash plus any net property or proceeds received by the Debtors or Reorganized Debtors in connection with the pursuit of any claims under section 547 of the Bankruptcy Coe against the Specified Parties.

**1.116**    "**Operating Company General Unsecured Claims Cash Pool Account**" means a segregated account to be funded on or prior to the Effective Date in accordance with Article 6.9.

1.1121.117    "**Operating Company General Unsecured Class**" means Class 6C.

**1.118**    "**Operating Company General Unsecured Claims Distribution Date**" means, solely with respect to Operating Company General Unsecured Claims, the date or dates selected by the GUC Administrator, in its sole discretion, upon which distributions to Holders of Allowed Operating Company General Unsecured Claims entitled to receive distributions under this Plan shall occur.

1.1131.119    "**Ordinary Course Professionals Order**" means the Bankruptcy Court's Order Authorizing Debtors To Employ And Pay Professionals Utilized In The Ordinary Course Of Business (Docket No. 180).

15

1.114**1.120**    "**Original PIK Notes**" means those certain promissory notes issued pursuant to the Original PIK Notes Investment Agreement.

1.115**1.121**    "**Original PIK Notes Investment Agreement**" means the Investment Agreement, dated as of December 9, 2016, by and among Pioneer, as borrower, the Original PIK Notes Investor Representative, and the other noteholders party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

1.116**1.122**    "**Original PIK Notes Investor Representative**" means GCM Saint Paul SPV, LLC, in its capacity as investor representative under the Original PIK Notes Investment Agreement.

1.117**1.123**    "**Other Priority Claim**" means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a) of the Bankruptcy Code.

1.118**1.124**    "**Other Secured Claim**" means any Secured Claim other than the following: (a) a DIP Facility Claim; (b) a Priority First Lien Claim; (c) a First Lien Claim; or (d) a Second Lien Claim.

1.119**1.125**    "**Other Subordinated Claim**" means any Claim against the Debtors that is subject to subordination under section 510(b) or (c) of the Bankruptcy Code, whether arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, or otherwise, which Claim shall be subordinated to all Claims or Interests that are senior to or equal to the Claim or Interest represented by such security.

1.120**1.126**    "**Periodic Distribution Date**" means, with respect to all Claims other than Operating Company General Unsecured Claims, as applicable, (a) the Distribution Date, as to the first distribution made by the Distribution Agent, and (b) thereafter, such Business Days selected by the Reorganized Debtors in their reasonable discretion, which shall be no less frequent than once every three (3) months unless otherwise determined by the New Board.

1.121**1.127**    "**Person**" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

1.122**1.128**    "**Petition Date**" means February 10, 2019.

1.123**1.129**    "**PIK Notes**" means, collectively, the Original PIK Notes and the Tranched PIK Notes.

1.124**1.130**    "**PIK Notes Claim**" means any Claim arising from, or related to, the PIK Notes.

1.125**1.131**    "**Pioneer**" means FC Pioneer Holding Company, LLC.

16

1.1261.132 "**Pioneer LLC Agreement**" means the amended and restated limited liability company agreement of Pioneer to be effective as of the Effective Date, the form and substance of which shall be included in the Plan Supplement.

1.1271.133 "**Plan**" means this joint plan of reorganization for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as may be modified in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms herein, including the Plan Supplement and all Exhibits, supplements, appendices, and schedules.

1.1281.134 "**Plan Supplement**" means the supplement or supplements to the Plan containing certain Exhibits and documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court in accordance with the terms herein.

1.1291.135 "**Plan Supplement Filing Date**" means the date on which the Plan Supplement shall be filed with the Bankruptcy Court, which date shall be at least seven days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice, so long as such date is prior to the Voting Deadline.

1.1301.136 "**Plan Transaction Documents**" means all definitive documents and agreements to which the Debtors will be a party as contemplated by the Plan including, without limitation, (a) the Plan and any documentation or agreements related thereto, (b) the Confirmation Order and pleadings (but not declarations) in support of entry thereof, (c) the solicitation materials in respect of the Plan, the motion to approve the Disclosure Statement, and the Disclosure Statement Order, and (d) all documents that will comprise the Plan Supplements.

1.1311.137 "**Priority First Lien Administrative Agent**" means Silver Point Finance, LLC, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the Priority First Lien Credit Agreement.

1.1321.138 "**Priority First Lien Claims**" means any and all Claims held by the Priority First Lien Lenders against the Debtors arising under, relating to, or in connection with the Priority First Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in the aggregate amount of $259,387,485.15.

1.1331.139 "**Priority First Lien Credit Agreement**" means that certain Priority First Lien Credit Agreement, dated as of April 30, 2018, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, Trident Holding Company, LLC, the Priority First Lien Administrative Agent, and the various lenders party thereto from time to time, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time.

17

**1.1341.140** "**Priority First Lien Credit Documents**" means the Priority First Lien Credit Agreement, together with all other "Loan Documents" (as defined in the Priority First Lien Credit Agreement).

**1.1351.141** "**Priority Intercreditor Agreement**" means the Priority/First Lien/Second Lien Intercreditor Agreement, dated as of April 30, 2018, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, Trident Holding Company, LLC, the other grantors party thereto, the Priority First Lien Administrative Agent, the First Lien Administrative Agent, and the Second Lien Administrative Agent.

**1.1361.142** "**Priority First Lien Lenders**" means the "Lenders" as defined in the Priority First Lien Credit Agreement.

**1.1371.143** "**Priority First Lien Parties**" means the Priority First Lien Lenders and the Priority First Lien Administrative Agent.

**1.1381.144** "**Priority Tax Claim**" means a Claim of a Governmental Unit entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.1391.145** "**Pro Rata**" means, with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes at issue; provided, however, that for purposes of distributions to Holders of Allowed Operating Company General Unsecured Claims, Pro Rata shall apply on a consolidated basis.

**1.1401.146** "**Professional**" means any Entity (a) retained in the Chapter 11 Cases by separate Final Order pursuant to sections 327, 363, and 1103 of the Bankruptcy Code or otherwise; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; provided, however, that Professional does not include any Entity retained pursuant to the Ordinary Course Professionals Order.

**1.1411.147** "**Professional Claim**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Confirmation Date.

**1.1421.148** "**Professional Fee Order**" means the order entered by the Bankruptcy Court on March 8, 2019, authorizing the interim payment of Professional Claims subject to the Holdback Escrow Amount (Docket No. 172).

**1.1431.149** "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claim Holder so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claim Holder to

18

demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Claim Holder for any damages incurred as a result of any reasonable reliance by such Claim Holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claim Holder; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

1.144**1.150**    "**Rejection Damages Claim**" means any Claim on account of the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

1.145**1.151**    "**Released Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' (1) current financial advisors, attorneys, accountants, investment bankers, representatives, and other professionals (collectively, the "**Debtor Professionals**"); (2) current employees, consultants, Affiliates, officers, managers and directors, including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; (i) the Creditors' Committee and each of its members; (j) Ares; (k) Ivy Hill; (l) the Audax Debt Funds; (m) Capital Finance Opportunities 1701C, LLC; (n) each of the parties to the Cortland Settlement Agreement; (o) with respect to each of the foregoing entities in clauses (a) through (n), each of their current and former Affiliates; and (p) with respect to each of the foregoing entities in clauses (a) through (o), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, direct and indirect partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees; provided, that, the foregoing entities identified in clauses (j) through (n) (including clauses (o) and (p) with respect to such entities identified in clauses (j) through (n)) shall constitute Released Parties solely for the Debtor releases set forth in Article 10.3.

1.146**1.152**    "**Releasing Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and the Reorganized Debtors; (b) the Priority

19

First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; (i) the Creditors' Committee and each of its members; (j) Ares; (k) Ivy Hill; (*l*) the Audax Debt Funds; (m) Capital Finance Opportunities 1701C, LLC; (n) each of the parties to the Cortland Settlement Agreement; (o) with respect to each of the foregoing parties under (a) through (n), each of their current and former affiliates; (p) with respect to each of the foregoing entities in clauses (a) through (o), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, direct and indirect partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees; (k) without limiting the foregoing, each holder of a Claim against or Interest in the Company that (1) voted to accept the Plan, (2) is deemed to accept the Plan and opted to provide a release, (3) is deemed to reject the Plan and opted to provide a release, (4) was solicited to vote to accept or reject the Plan but who did not vote either to accept or to reject the Plan and opted to provide a release, or (5) voted to reject the Plan and opted to provide a release; and (*l*) solely with respect to the Substantial Contribution / Indemnified Parties, and without limiting the foregoing, each holder of a Claim against or Interest in the Company.

~~1.147~~1.153    "**Reorganized Debtors**" means the Debtors or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

~~1.148~~1.154    "**Reorganized Pioneer**" means Pioneer or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

~~1.149~~1.155    "**Restructuring Transactions**" has the meaning set forth in Article 6.3.

~~1.150~~1.156    "**RSA**" means the Restructuring Support Agreement, dated as of February 10, 2019, by and between the Debtors, the Priority First Lien Lenders, and the Priority First Lien Administrative Agent, including any exhibits and schedules thereto.

~~1.151~~1.157    "**Scheduled**" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

~~1.152~~1.158    "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors pursuant to section 521 of the Bankruptcy Code, which incorporate by reference the global notes and statement of limitations, methodology, and disclaimer regarding the Debtors' schedules and statements, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or Final Orders of the Bankruptcy Court.

1.1531.159 "**SEC**" means the United States Securities and Exchange Commission.

1.1541.160 "**Second Lien Administrative Agent**" means Ares Capital Corporation, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the Second Lien Credit Agreement.

1.1551.161 "**Second Lien Claims**" means any and all Claims held by the Second Lien Lenders against the Debtors arising under, relating to, or in connection with the Second Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in an aggregate amount of $175,567,909.46.

1.1561.162 "**Second Lien Classes**" means, collectively, Class 3B and Class 3C.

1.1571.163 "**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of July 31, 2013, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the Second Lien Administrative Agent, and the various lenders party thereto from time to time, as has been or may be amended, supplemented, amended and restated, or otherwise modified from time to time.

1.1581.164 "**Second Lien Credit Documents**" means the Second Lien Credit Agreement, together with all other "Loan Documents" (as defined in the Second Lien Credit Agreement).

1.1591.165 "**Second Lien Lenders**" means the "Lenders" as defined in the Second Lien Credit Agreement.

1.1601.166 "**Section 503(b)(9) Claim**" means any Claim asserted under section 503(b)(9) of the Bankruptcy Code equal to the value of any goods received by the Debtors within 20 days before the Petition Date during which the goods have been sold to the Debtors in the Debtors' ordinary course of business.

1.1611.167 "**Secured Claim**" means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.1621.168 "**Securities Act**" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the SEC promulgated thereunder.

1.1631.169 "**Security**" has the meaning ascribed to such term in section 2(a)(1) of the Securities Act.

21

**1.164** **1.170** "**Settling Parties**" means, collectively, (i) the Creditors' Committee; (ii) the Priority First Lien Parties; (iii) Ares; (iv) Ivy Hill; (v) the Audax Debt Funds; (vi) the Debtors.

**1.165** **1.171** "**Specified Executives**" means executives holding the positions of Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer.

**1.166** **1.172** "**Specified Parties**" means any 10 of the following 16 parties identified by the Debtors in a Plan Supplement prior to the Confirmation Date: (1) Merchants Automotive Group; (2) Beckman Coulter Inc.; (3) Element Fleet Corporation; (4) Cardinal Health Medical Products & Svcs; (5) Verizon Wireless; (6) Gelco Corporation; (7) Sysmex America Inc.; (8) Bio-Rad Laboratories Inc.; (9) 3M Health Information Systems; (10) DSSI; (11) Liaison Technologies Inc.; (12) Esker Software Inc.; (13) Hinduja Global Solutions Inc.; (14) HGS EBOS LLC; (15) Data Media Associates LLC; (16) Sprint.

**1.167** **1.173** "**Substantial Contribution / Indemnified Parties"** means, collectively, each of the following in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' current employees, officers, managers and directors, including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; and (i) the successors and assigns, subsidiaries, affiliates, current officers, directors, principals, shareholders, members, partners, employees, agents, attorneys, investment bankers, and representatives of each of the foregoing (a) through (h).

**1.168** **1.174** "**Tranched PIK Notes**" means those certain promissory notes issued pursuant to the Tranched PIK Notes Investment Agreement.

**1.169** **1.175** "**Tranched PIK Notes Investment Agreement**" means the Investment Agreement, dated as of November 29, 2017, by and among Pioneer and Trident Holding Company, LLC, each as borrower, the Tranched PIK Notes Investor Representative, and the other noteholders party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

**1.170** **1.176** "**Tranched PIK Notes Investor Representative**" means Revelstoke Capital Partners Fund I, L.P., in its capacity as investor representative under the Tranched PIK Notes Investment Agreement.

**1.171** **1.177** "**Unclaimed Distribution**" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors (or the Distribution Agent, as the case may be), of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' request (or the

Distribution Agent's request, as the case may be), for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

1.172**1.178** "**Unexpired Lease**" means a lease of nonresidential real property to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.173**1.179** "**Unimpaired**" means, with respect to a Class of Claims, a Class of Claims that is not Impaired.

1.174**1.180** "**Voting Deadline**" means June 6, 2019 at 4:00 p.m. prevailing Eastern time.

1.175**1.181** "**Warrants**" means, on terms and conditions set forth in the Pioneer LLC Agreement and acceptable to the Priority First Lien Lenders, Class W units of Reorganized Pioneer exercisable for up to 5% of the New Pioneer Units, subject to dilution by the Management Incentive Plan, with an expiration date of eighteen (18) months after the Effective Date at a strike price equal to the price per share that would result in a full return on invested capital to the Priority First Lien Lenders (inclusive of the full amount of the Priority First Lien Claims) calculated as of the Effective Date, with such strike price continuing to accrue at a rate of LIBOR *plus* 9.5% compounding quarterly.

## C.    Rules of Interpretation

For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) the words "current" or "currently" shall refer to the Confirmation Date; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan, (hi) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (ij) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control; (jk) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control; (kl) any immaterial effectuating provision may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan without further Final Order of the Bankruptcy Court; (lm) to the extent that any right of any Entity (other than the Debtors or Reorganized Debtors) to consent to a matter, action or otherwise is unqualified, it shall be implied that such consent right may not be unreasonably withheld, conditioned, or delayed; and (mn) references to "shares," "shareholders," "directors," shall also include "membership units," "members," "managers," and/or "officers" or other

23

functional equivalents, as applicable, as such terms are defined under the applicable state corporations or comparable laws, as applicable.

**D.      Computation Of Time**

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

**E.      References to Monetary Figures**

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

**F.      Certain Consent Rights**

Notwithstanding anything in the Plan to the contrary, any and all consent rights as set forth in the RSA with respect to the form and substance of the Plan, the Plan Supplement, and any Plan Transaction Documents shall be incorporated herein by this reference and fully enforceable as stated herein until such time as the RSA is terminated in accordance with its terms.

**G.      Exhibits**

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date.  After the Plan Supplement Filing Date, copies of Exhibits may be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 (Attn: Paul Leake and Jason Kestecher), or Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Suite 2700, Chicago, Illinois 60606 (Attn: James J. Mazza, Jr. and Justin M. Winerman), counsel to the Debtors, or by downloading such exhibits from the Debtors' informational website at https://dm.epiq11.com/trident.  To the extent any Exhibit is inconsistent with the terms of this Plan and unless otherwise provided for in the Confirmation Order, the terms of the Exhibit shall control as to the transactions contemplated thereby and the terms of this Plan shall control as to any Plan provision that may be required under the Exhibit.

## ARTICLE II

## ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

**2.1      Administrative Claims**.  Except to the extent that the Debtors (or the Reorganized Debtors) and a Holder of an Allowed Administrative Claim agree to less favorable treatment, a Holder of an Allowed Administrative Claim (other than a DIP Facility Claim, which shall be subject to Article 2.2 of the Plan, a Professional Claim, which shall be subject to Article 2.3 of the Plan, or a Section 503(b)(9) Claim, which shall be subject to the Bar Date Order) shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such

24

Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the Effective Date, (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims, or (c) on such other date as agreed between the Debtors (or the Reorganized Debtors) and such Holder of an Allowed Administrative Claim; provided, however, that other than Holders of (i) DIP Facility Claims,  (ii) Professional Claims, (iii) Administrative Claims Allowed by an order of the Bankruptcy Court on or before the Effective Date, or (iv) Administrative Claims that are not Disputed and arose in the ordinary course of business and were paid or are to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, the Holder of any Administrative Claim shall have filed a proof of Claim form no later than the Administrative Claims Bar Date and such Claim shall have become an Allowed Claim. Except as otherwise provided herein and/or in the Bar Date Order and as set forth in Articles 2.2 or 2.3 of this Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in Exhibit 2.1, with the Claims and Solicitation Agent and served on counsel for the Debtors or the Reorganized Debtors by no later than the Administrative Claims Bar Date.  After the Effective Date, the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  In the event that the Reorganized Debtors object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim

      **2.2    DIP Facility Claims**.  On the Effective Date, the DIP Facility Claims shall be Allowed in full, in the amount of $50 million (less any amounts paid prior to the Effective Date) plus all accrued and unpaid postpetition interest under the DIP Credit Agreement (and any unpaid fees, costs, and expenses). With the consent of the DIP Lenders as provided in the RSA, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Facility Claims, all outstanding DIP Facility Claims shall be automatically converted to and deemed to be obligations under the Exit Term Loan Facility Credit Agreement, and all Collateral (as such term is defined in the DIP Credit Agreement) that secures the obligations under the DIP Documents shall be reaffirmed, ratified, and shall automatically secure all obligations of the Reorganized Debtors under the Exit Term Loan Facility Credit Agreement.

      **2.3    Professional Claims**.

          (a)    **Final Fee Applications**.    All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Creditors' Committee must be filed no later than ~~sixty~~thirty (~~60~~30) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, the Allowed amounts of all Professional Claims and expenses shall be determined by the Bankruptcy Court. The Professionals retained by the Creditors' Committee shall apply a 10% discount on all applicable fees and expenses in their request for payment of Professional Claims related to its investigation of the Prepetition Obligations and Prepetition Liens (each as defined in the DIP Facility Order) in

excess of the Challenge Budget (as defined in the DIP Facility Order).  Any disputes regarding the calculation of the 10% discount on applicable fees and expenses shall be decided, after notice and a hearing, by the Bankruptcy Court.

(b)    **Payment of Interim Amounts.**  Subject to the Holdback Escrow Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed (and as to which there is no then-existing Court-mandated or Court-ordered prohibition on making payment).  To receive payment on the Effective Date for such unbilled fees and expenses incurred through the Effective Date that have not yet been billed pursuant to the Professional Fee Order, no later than two (2) days prior to the Effective Date, the Professionals (who, in the case of the Creditors' Committee, shall only be permitted to take the actions set forth in Article 13.6 after the Confirmation Date) shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors.  Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period, subject to any parties' right to object as set forth in the Professional Fee Order.

(c)    **Holdback Escrow Account**.  On the Effective Date, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals.  The ~~Distribution~~Escrow Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtors, the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the ~~Distribution~~Escrow Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors to be used by the Reorganized Debtors in accordance with the Plan.

(d)    **Post-Confirmation Date Retention**.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing and prosecuting or addressing any issues with respect to final fee applications).  The Creditors' Committee's Professionals may not be paid for services rendered after the Confirmation Date except to the extent set forth in Article 13.6.

**2.4    Priority Tax Claims**.  On the Effective Date, except to the extent that the Debtors (or Reorganized Debtors) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim:
(a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtors (or the Reorganized Debtors) and such Holder, _provided_,

26

however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the sole option of the Debtors, Cash in the aggregate amount of such Allowed Priority Tax Claim plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at a rate determined under applicable non-bankruptcy law, payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Allowed Priority Tax Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business as such obligations become due.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

### 3.1    Classification of Claims and Interests.

(a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of classes of Claims and Interests. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II above.

(b)    For administrative convenience, the Plan organizes the Debtors into groups (each a "Debtor Group") and assigns a letter to each Debtor Group and a number to each Class of Claims or Interests in each Debtor Group. Claims and Interests belonging to a Debtor Group consisting of more than one Debtor shall be deemed to be classified in a single Class for all purposes under the Bankruptcy Code, including voting. To the extent a Holder has a Claim that may be asserted against more than one Debtor in a Debtor Group, the vote of such Holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor in such Debtor Group. Notwithstanding this organizing principle, the Plan is a separate plan of reorganization or liquidation for each Debtor. Such groupings shall not affect any Debtor's status as a separate legal Entity, result in substantive consolidation of any Estates, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

(c)    For consistency, similarly designated Classes of Claims and Interests are assigned the same number across each Debtor Group. The Plan provides for a single Class 6C of Holders of Operating Company General Unsecured Claims without regard to Debtor entities at which such Holders hold their Claims. For purposes of distributions to

27

Holders of Operating Company General Unsecured Claims, "Pro Rata" shall be determined where (x) the denominator is equal to all Allowed Operating Company General Unsecured Claims against all Debtors and (y) the numerator is equal to the amount of a particular Holder's Allowed Operating Company General Unsecured Claim. For voting purposes, the Debtors shall tabulate ballots for Holders of Operating Company General Unsecured Claims on a Debtor-by-Debtor basis and on aggregate basis without regard to particular Debtor entities and reserve the right to seek Confirmation of the Plan under any tabulation through accepting Classes or cramdown. Claims and Interests are classified as follows:

| Letter | Debtor Group |
|--------|--------------|
| A | **Ultimate Holding Company**<br>FC Pioneer Holding Company, LLC |
| B | **Intermediate Holding Company**<br>Trident Holding Company, LLC |
| C | **Operating Companies**<br>American Diagnostics Services, Inc.<br>Community Mobile Diagnostics, LLC<br>Community Mobile Ultrasound, LLC<br>Diagnostic Labs Holdings, LLC<br>JLMD Manager, LLC<br>Kan-Di-Ki LLC<br>Main Street Clinical Laboratory, Inc.<br>MDX-MDL Holdings, LLC<br>MetroStat Clinical Laboratory – Austin, Inc.<br>MX Holdings, LLC<br>MX USA, LLC<br>New Trident Holdcorp, Inc.<br>Rely Radiology Holdings, LLC<br>Schryver Medical Sales and Marketing, LLC<br>Symphony Diagnostic Services No. 1, LLC<br>Trident Clinical Services Holdings, Inc.<br>Trident Clinical Services Holdings, LLC<br>TridentUSA Foot Care Services LLC<br>TridentUSA Mobile Clinical Services, LLC<br>TridentUSA Mobile Infusion Services, LLC<br>U.S. Lab & Radiology, Inc. |

| # | Designation |
|---|-------------|
| 1 | Priority First Lien Claims |
| 2 | First Lien Claims |
| 3 | Second Lien Claims |
| 4 | Other Secured Claims |
| 5 | Other Priority Claims |
| 6 | Operating Company General Unsecured Claims |
| 7 | Holding Company General Unsecured Claims |
| 8 | Intercompany Claims |
| 9 | Other Subordinated Claims |
| 10 | Interests in Debtor Subsidiaries |
| 11 | Interests in Pioneer |

The classification of Claims and Interests (as applicable) under the Plan is as set forth below.

| Class(es) | Claim or Interest | Status | Voting Rights |
|-----------|-------------------|--------|---------------|
| 1B – 1C | Priority First Lien Claims | Impaired | Entitled to Vote |
| 2B – 2C | First Lien Claims | Impaired | Entitled to Vote |
| 3B – 3C | Second Lien Claims | Impaired | Entitled to Vote |
| 4A – 4C | Other Secured Claims | Unimpaired | Presumed to Accept |

28

| Class(es) | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 5A – 5C | Other Priority Claims | Unimpaired | Presumed to Accept |
| 6C | Operating Company General Unsecured Claims | Impaired | Entitled to Vote |
| 7A – 7B | Holding Company General Unsecured Claims | Impaired | Deemed to Reject |
| 8A – 8C | Intercompany Claims | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 9A – 9C | Other Subordinated Claims | Impaired | Deemed to Reject |
| 10AB – 10C | Interests in Debtor Subsidiaries | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 11A | Interests in Pioneer | Impaired | Deemed to Reject |

## ARTICLE IV

## PROVISIONS FOR TREATMENT
## OF CLAIMS AND INTERESTS

### 4.1    Priority First Lien Claims (Classes 1B and 1C)

(a)    Classification: Classes 1B and 1C consist of all Allowed Priority First Lien Claims.

(b)    Allowance:  The Priority First Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $259,387,485.15.

(c)    Treatment: Except to the extent that a Holder of an Allowed Priority First Lien Claim agrees to a less favorable treatment or as otherwise provided herein, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Priority First Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority First Lien Claim shall receive its Pro Rata share and interest in (i) the New First Lien Facility, and (ii) 100% of the New Pioneer Units to be issued by Reorganized Pioneer, subject to dilution on account of the Warrants and the Management Incentive Plan.  All accrued and unpaid prepetition and post-petition interest due and payable to a Holder of an Allowed Priority First Lien Claim and payment by the Debtors of all fees and expenses of the Priority First Lien Administrative Agent shall be paid in accordance with the DIP Facility Order and Article 11.2(ed) of this Plan, as applicable.

(d)    Voting: Classes 1B and 1C are Impaired and Holders of Allowed Priority First Lien Claims are entitled to vote to accept or reject the Plan.

### 4.2    First Lien Claims (Classes 2B and 2C)

(a)    Classification: Classes 2B and 2C consist of all Allowed First Lien Claims.

29

(b)    Allowance:  The First Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $219,815,899.97.

(c)    Treatment: Except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed First Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter:

(i)    *If the First Lien Classes and the Second Lien Classes are Accepting Classes*, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share and interest in 4% of the Warrants; <u>provided</u> that Ares, the Audax Debt Funds, and Capital Finance Opportunities 1701C, LLC agree to waive all rights to any distribution on account of their First Lien Claims under the Plan and any Warrants otherwise distributable to those parties under the Plan, if any, shall be cancelled and not re-distributed to other Holders of Allowed First Lien Claims or any other Person.

(ii)    *If the First Lien Classes are Accepting Classes, but Second Lien Classes are not Accepting Classes*, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share and interest in 5% of the Warrants; <u>provided</u> that Ares, the Audax Debt Funds, and Capital Finance Opportunities 1701C, LLC agree to waive all rights to any distribution on account of their First Lien Claims under the Plan and any Warrants otherwise distributable to those parties under the Plan, if any, shall be cancelled and not re-distributed to other Holders of Allowed First Lien Claims or any other Person.

(iii)    *If the First Lien Classes are not Accepting Classes*, Holders of  Allowed First Lien Claims shall not receive any distributions on account of such Allowed First Lien Claims.

(d)    Voting: Classes 2B and 2C are Impaired and Holders of Allowed First Lien Claims are entitled to vote to accept or reject the Plan.

**4.3    Second Lien Claims (Classes 3B and 3C)**

(a)    Classification: Classes 3B and 3C consist of all Allowed Second Lien Claims.

(b)    Allowance:  The Second Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $175,567,909.46.

(c)    Treatment: Except to the extent that a Holder of an Allowed Second Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Second Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter:

(i)    *If the First Lien Classes and the Second Lien Classes are Accepting Classes*, each Holder of an Allowed Second Lien Claim shall receive its Pro Rata

30

share and interest in 1% of the Warrants; <u>provided</u>, <u>however</u>, notwithstanding anything herein to the contrary, such treatment in no way affects the priority of distribution among creditors in Classes 3B and 3C, including with respect to any intercreditor agreements and other similar agreements or arrangements; <u>provided</u> that Ares, the Audax Debt Funds, and Capital Finance Opportunities 1701C, LLC agree to waive all rights to any distribution on account of their Second Lien Claims under the Plan and any Warrants otherwise distributable to those parties, if any under the Plan, shall be cancelled and not re-distributed to other Holders of Allowed Second Lien Claims or any other Person.

(ii)    ***If the First Lien Classes or the Second Lien Classes are not Accepting Classes***, Holders of  Allowed Second Lien Claims shall not receive any distributions on account of such Allowed Second Lien Claims.

(d)    Voting: Classes 3B and 3C are Impaired and Holders of Allowed Second Lien Claims are entitled to vote to accept or reject the Plan.

### 4.4    Other Secured Claims (Classes 4A – 4C)

(a)    Classification: Classes 4A through 4C consist of all Allowed Other Secured Claims.

(b)    Treatment: Except as otherwise provided in and subject to <u>Article 9.5</u> of this Plan, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Secured Claim, each such Holder of an Allowed Other Secured Claim shall, at the option of the Debtors or the Reorganized Debtors and with the consent of the Priority First Lien Administrative Agent, as applicable:

(i)    have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, or otherwise have its Claim rendered Unimpaired, in each case in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default;

(ii)    be paid in full in Cash in an amount equal to such Allowed Other Secured Claim, including postpetition interest, if any, on such Allowed Other Secured Claim required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later of (x) the Effective Date and (y) the date such Other Secured Claim becomes an Allowed Claim or as soon thereafter as reasonably practicable; or

(iii)    receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Other Secured Claim will have agreed upon in writing; or

(iv)      receive delivery of the collateral securing any such Allowed Other Secured Claim;

provided, that Allowed Other Secured Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.  Nothing in this Article 4.4 or elsewhere in this Plan shall preclude the Debtors (or the Reorganized Debtors) from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien allegedly securing an Allowed Other Secured Claim.

(c)      Voting: Classes 4A, 4B, and 4C are Unimpaired, and Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

### 4.5      Other Priority Claims (Classes 5A – 5C)

(a)      Classification: Classes 5A through 5C consist of all Allowed Other Priority Claims.

(b)      Treatment:  Except as otherwise provided in and subject to Article 9.5 of this Plan, and except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Other Priority Claim, each such Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or on such other date as agreed between the Debtors (or the Reorganized Debtors), with the consent of the Priority First Lien Administrative Agent, and such Holder of an Allowed Other Priority Claim; provided, however, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(c)      Voting: Classes 5A, 5B, and 5C are Unimpaired, and Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

### 4.6      Operating Company General Unsecured Claims (Class 6C)

(a)      Classification: Class 6C consists of all Allowed Operating Company General Unsecured Claims.

(b)      Treatment: Except to the extent that a Holder of an Allowed Operating Company General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Operating Company General Unsecured Claim, each Holder of an Allowed Operating

32

Company General Unsecured Claim shall receive its Pro Rata share and interest in the Operating Company General Unsecured Claims Cash Pool, provided, that the Settling Parties (other than the Creditors' Committee and its members) and Capital Finance Opportunities 1701C, LLC shall not receive their respective Pro Rata share and interest in the Operating Company General Unsecured Claims Cash Pool and such amounts shall be redistributed Pro Rata among the orderother Holders of Operating Company General Unsecured Claims.

(c)    Voting: Class 6C is Impaired and Holders of Allowed Operating Company General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.7    Holding Company General Unsecured Claims (Classes 7A – 7B)

(a)    Classification: Classes 7A and 7B consist of all Allowed Holding Company General Unsecured Claims.

(b)    Treatment: On the Effective Date, all of the Debtors' outstanding obligations under the Holding Company General Unsecured Claims shall be extinguished, canceled, and discharged, and each Holder of a Holding Company General Unsecured Claim shall receive no distribution on account of such Claim.

(c)    Voting: Classes 7A and 7B are Impaired, and Holders of Allowed - Holding Company General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Holding Company General Unsecured Claims are not entitled to vote to accept or reject the Plan.

### 4.8    Intercompany Claims (Classes 8A – 8C)

(a)    Classification:  Classes 8A through 8C consist of all Allowed Intercompany Claims.

(b)    Treatment: On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among any Affiliate of the Debtors shall be either reinstated, cancelled, released, or otherwise settled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent).

(c)    Voting: Classes 8A, 8B, and 8C are either:

(i)    Impaired, and Holders of Allowed applicable Class 8 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan; or

(ii)    Unimpaired, and Holders of Allowed applicable Class 8 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

33

Bankruptcy Code and, therefore, Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan.

### 4.9   Other Subordinated Claims (Classes 9A – 9C)

(a)   Classification:  Classes 9A through 9C consist of all Allowed Bankruptcy Code section 510(b) and (c) Claims.

(b)   Treatment: Holders of Allowed Other Subordinated Claims shall not receive any distributions on account of such Allowed Other Subordinated Claims.

(c)   Voting: Classes 9A, 9B, and 9C are Impaired, and Holders of Allowed Other Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Subordinated Claims are not entitled to vote to accept or reject the Plan.

### 4.10   Interests in Debtor Subsidiaries (Classes 10B – 10C)

(a)   Classification:  Classes 10B and 10C consist of all Allowed Interests in Debtor Subsidiaries.

(b)   Treatment:  On the Effective Date, all Allowed Interests in Debtor Subsidiaries shall be either reinstated or cancelled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent).  To the extent reinstated, Interests in Debtor Subsidiaries are Unimpaired solely to preserve the Debtors' corporate structure and Holders of those Interests shall not otherwise receive or retain any property on account of such Interests.

(c)   Voting: Classes 10B and 10C are either:

(i)   Impaired, and Holders of Allowed applicable Class 10 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 10 Claims are not entitled to vote to accept or reject the Plan; or

(ii)   Unimpaired, and Holders of Allowed applicable Class 10 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 10 Claims are not entitled to vote to accept or reject the Plan.

### 4.11   Interests in Pioneer (Class 11A)

(a)   Classification:  Class 11A consists of all Interests in Pioneer.

34

(b)    Treatment: On the Effective Date, Allowed Class 11A Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors.

(c)    Voting: Class 11A is Impaired, and Holders of Allowed Class 11A Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 11A Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE V

## ACCEPTANCE

**5.1    Classes Entitled to Vote.**  Classes 1B, 1C, 2B, 2C, 3B, 3C, and 6C are entitled to vote to accept or reject this Plan.  By operation of law, Classes 4A – 4C, 5A – 5C, 7A, 7B, 8A – 8C, 10AB – 10C, and 11A are either deemed to have accepted this Plan or to have rejected this Plan and are not entitled to vote.

**5.2    Acceptance by Impaired Classes.**  An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

**5.3    Elimination of Classes.**  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

**5.4    Special Provision Governing Unimpaired Claims**.  Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**5.5    Deemed Acceptance if No Votes Cast.**  If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, this Plan shall be deemed accepted by the Holders of such Claims in such Class.

**5.6    Cramdown.**  To the extent necessary, the Debtors shall request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify, amend, or withdraw this Plan, with respect to all Debtors or any individual Debtor, or group of Debtors to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

35

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1    No Substantive Consolidation**. The Plan is being proposed as a joint plan of reorganization for the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.  The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

**6.2    General Settlement of Claims and Interests**. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.

**6.3    Restructuring Transactions**.

(a)    On or after the Confirmation Date, with the consent of the Priority First Lien Administrative Agent, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, to otherwise simplify the overall corporate structure of the Debtors, or to organize certain of the Debtors under the laws of jurisdictions other than the laws of which such Debtors currently are organized, which restructuring may include one or more mergers, consolidations, dispositions, liquidations, or dissolutions as may be determined by the Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Debtors vesting in one or more surviving, resulting, or acquiring Entities (collectively, the "Restructuring Transactions"). In addition, on or after the Confirmation Date, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect an assignment, transfer or contribution of Trident Holding Company LLC's rights and interests in (i) the approximate $6,162,254 of collateral trust assets (the "Wells Fargo Collateral Trust Funds") held by Wells Fargo Bank, NA, as trustee, and (ii) the related collateral trust agreement dated as of March 7, 2019, in each case, to its affiliate, Symphony Diagnostic Services No. 1, LLC.  The Wells Fargo Collateral Trust Funds shall continue to secure the obligations of Trident Holding Company, LLC, or its successor-in-interest, to Zurich American Insurance Company and its affiliates ("Zurich") and the posting of such collateral is approved under this Plan and shall not be voidable by any creditors of the Debtors. In each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting, or acquiring Entity shall perform the obligations of such Debtor pursuant to the Plan to satisfy the Allowed Claims against, or Allowed Interests in, such Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor shall perform

36

such obligations.  The Restructuring Transactions may include a taxable transfer of substantially all or a part of the Debtors' assets or entities to a newly-formed entity (or an affiliate or subsidiary of such entity) formed and controlled by certain holders of Claims against the Debtors and, in such case, some or all of the New Pioneer Units and/or Warrants (and/or other interests) issued to holders of Claims pursuant to the Plan may comprise stock (and/or other interests) of such new entity (or an affiliate or subsidiary of such entity).

(b)      In effecting the Restructuring Transactions, with the consent of the Priority First Lien Administrative Agent, the Debtors shall be permitted to (i) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) file appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; (iv) engage in a taxable transfer of substantially all or a part of a Debtor's assets or subsidiary entities to a newly-formed entity (or an affiliate or subsidiary of such entity) formed and controlled by certain holders of Claims against such Debtor and, in such case, some or all of the equity (and/or other interests) issued to holders of Claims pursuant to the Plan may compromise stock (and/or other interests) of such new entity (or an affiliate or subsidiary of such entity); and (v) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

**6.4      Sources of Cash for Plan Distribution**. All Cash required for payments to be made under the Plan on the Effective Date shall be obtained first from Cash on hand, second, if necessary, a Capital Raising Transaction, and third, if necessary and if no Capital Raising Transaction has been arranged, the Exit Liquidity Facility.

**6.5      Exit Liquidity Facility**.  With the reasonable consent of the Debtors, the Priority First Lien Administrative Agent may arrange for a Capital Raising Transaction to provide the Debtors with sufficient Cash to make payments required to be made under the Plan and to satisfy the Minimum Liquidity Condition Precedent.  If the Debtors reasonably determine an Exit Liquidity Facility is necessary to satisfy the Minimum Liquidity Condition Precedent and the Priority First Lien Administrative Agent elects not to arrange for a Capital Raising Transaction, the Debtors may arrange for an Exit Liquidity Facility, which shall be entered into on the Effective Date. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Liquidity Facility without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

**6.6      Exit Term Loan Facility**. On the Effective Date, all Allowed DIP Facility Claims, shall be automatically converted to and deemed to be obligations under the Exit Term Loan Facility Credit Agreement, and all Collateral (as such term is defined in the DIP Credit Agreement) that secures the obligations of the Reorganized Debtors under the DIP Documents shall be reaffirmed, ratified, and shall automatically secure all obligations under the Exit Term

37

Loan Facility Credit Agreement; provided that (a) all accrued and unpaid interest on the DIP Facility Claims shall be paid in full in Cash on the Effective Date, and (b) all fees and expenses of the DIP Agent shall be paid in accordance with Article 11.2(d) of this Plan. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Term Loan Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

6.7    **New First Lien Facility**.  On the Effective Date, all Holders of Allowed Priority First Lien Claims shall receive their Pro Rata share and interest in the New First Lien Facility, which shall be junior in lien priority to the Exit Term Loan Facility. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New First Lien Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

6.8    **Authorization, Issuance, and Distribution of New Pioneer Units**.  On the Effective Date, Reorganized Pioneer shall authorize and issue the New Pioneer Units to Holders of Allowed Priority First Lien Claims.  Distribution of New Pioneer Units hereunder shall constitute issuance of 100% of such New Pioneer Units and in each case shall be deemed issued on the Effective Date, subject to dilution on account of the Warrants and the Management Incentive Plan.  The issuance of New Pioneer Units by Reorganized Pioneer is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.  All of the New Pioneer Units issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

6.9    **Operating Company General Unsecured Claims Cash Pool**.

(a)    On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and the Settling Parties (other than the Creditors' Committee) shall fund the Operating Company General Unsecured Claims Cash Pool Account with Cash in an amount equal to the Operating Company General Unsecured Claims Cash Pool, which shall be held in trust for Pro Rata distributions on account of Allowed Operating Company General Unsecured Claims as provided herein. None of the Settling Parties shall amend any asserted Claims on account of any proceeds contributed to the Operating Company General Unsecured Claims Cash Pool. After the Effective Date, to the extent that the Reorganized Debtors receive net property or proceeds on account of claims asserted against the Specified Parties under section 547 of the Bankruptcy Code, the Reorganized Debtors shall contribute such net property or proceeds to the Operating Company General Unsecured Claims Cash Pool Account.

(b)    The Operating Company General Unsecured Claims Cash Pool Account (x) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors or their Estates, (y) shall be held in trust ~~by an entity~~for the benefit of the Operating Company General Unsecured Claims Cash Pool by the GUC Administrator, who, subject to consultation with the Debtors, will be selected by the Creditors' Committee, to fund distributions as provided herein, and (z) shall not be encumbered by any Liens, Claims, or Interests in any way.

Redline Atlantis - Plan of Reorganization 1715029v32 and Atlantis - Plan of Reorganization 1715029v42 9/5/2019 9:13:10 PM

### 6.10    GUC Administrator Account.

(a)    On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and fund the GUC Administrator Account with Cash in the amount of $250,000, which shall be held in trust for the payment of GUC Administrator costs as provided herein.  The Debtors and the Reorganized Debtors shall have no further obligation or liability for the GUC Administrator's costs as provided herein upon the funding of the GUC Administrator Account pursuant to this Article.

(b)    The GUC Administrator Account (x) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors or their Estates, (y) shall be held in trust by the Debtors or Reorganized Debtors, as applicable, for the benefit of the GUC Administrator and his professionals and other employees, and (z) shall not be encumbered by any Liens, Claims, or Interests in any way.

### ~~6.10~~6.11    Exemptions from Securities Act Registration Requirements.

Except with respect to the New Pioneer Units underlying the Management Incentive Plan, the Warrants and all New Pioneer Units issued under the Plan (including any units issued upon the exercise of the Warrants) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.  New Pioneer Units issued under the Plan (including any shares issued upon the exercise of the Warrants) in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The New Pioneer Units issued pursuant to section 1145 of the Bankruptcy Code (a) are not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any holder thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the New Pioneer Units from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.  New Pioneer Units issued to holders of Priority First Lien Claims and Warrants issued to holders of First Lien Claims and Second Lien Claims, in each case in exchange for such Claims, shall be issued in reliance on section 1145 of the Bankruptcy Code.  New Pioneer Units underlying the Management Incentive Plan will be issued pursuant to another available exemption from registration under the Securities Act and other applicable law.

**6.116.12        Cancellation of Existing Securities and Agreements**

(a)        Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Debtors, on the Effective Date, except to the extent otherwise provided in this Plan, all notes, instruments, Certificates, Old Securities and other documents evidencing or creating any indebtedness or obligation of or ownership in the Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged.  On the Effective Date, except to the extent otherwise provided in this Plan, all Interests in the Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged.

(b)        Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Article 6.116.12 shall be deemed null and void and shall be of no force and effect.

**6.126.13        Issuance and Distribution of New Securities; Execution of Plan Documents**.  Except as otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall issue and/or deliver all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan.

**6.136.14        Continued Corporate Existence**.

(a)        Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as separate entities, the Reorganized Debtors, with all the powers of a corporation or limited liability company under applicable law in the jurisdiction in which each respective Debtor is incorporated or formed and pursuant to its respective charter, bylaws, limited liability company agreement, partnership agreement or other organizational documents in effect prior to the Effective Date, except to the extent such organization documents are amended and restated by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

(b)        Except as otherwise provided in the Plan, the continued existence, operation, and ownership of Affiliates is a material component of the business of the Debtors and the Reorganized Debtors, as applicable, and, as set forth in Article 10.1 of this Plan, all of the Debtors' equity interests and other property interests in such Affiliates shall vest in the Reorganized Debtors or their successors on the Effective Date.

40

**6.14~~6.15~~**    **New Corporate Governance Documents**.  The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) of the Debtors, which documents shall be in form and substance acceptable to the Priority First Lien Administrative Agent, shall be adopted and amended in a form as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code (including Bankruptcy Code section 1123(a)(6)), with the form and substance of the Pioneer LLC Agreement set forth on Exhibit ~~6.14~~6.15.  After the Effective Date, the Reorganized Debtors may amend and restate their respective certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) as permitted by applicable state corporation or business entity law and their respective charters and bylaws or other organizational documents.

**6.15~~6.16~~**    **Directors, LLC Managers, and Officers of Reorganized Debtors**.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed member of Reorganized Debtors' initial board of directors (or other applicable governing body) (and, to the extent such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Plan Supplement or as announced on the record at the Confirmation Hearing.  The number of members of the New Boards and the identities thereof, and any senior officers of the Reorganized Debtors not presently serving in such capacity, shall be determined by the Priority First Lien Administrative Agent, but shall include the Chief Executive Officer of the Reorganized Debtors.

Except as otherwise provided in the Plan Supplement, the officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the Reorganized Debtors on and after the Effective Date.

Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

**6.16~~6.17~~**    **Corporate Action**.  Each of the matters provided for under this Plan involving the corporate structure of the Debtors or the Reorganized Debtors or corporate action to be taken by or required of the Debtors or the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, managers, or directors of the Debtors or the Reorganized Debtors. Such actions may include, (a) the adoption of the Pioneer LLC Agreement and any other new corporate governance documents, (b) the appointment of the New Boards, (c) the issuance and distribution of New Pioneer Units, and (d) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date).

**6.17~~6.18~~**    **Effectuating Documents; Further Transactions**.  On and after the Effective Date, the Reorganized Debtors, and the officers thereof and members of the New Boards, shall be authorized to and may issue, execute, deliver, file, or record such contracts,

41

Securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

**6.186.19    Employment, Retirement, Indemnification, and Other Agreements and Employee Compensation Programs**.

(a)    **Employment Agreements**.    All employment and compensation-related agreements ~~of the Company as of the Petition~~between the Debtors and any persons who are directors, managers, officers, or employees of the Debtors immediately prior to the Effective Date, including any indemnification and severance obligations and guaranteed bonus amounts, and incentive compensation plans related thereto, shall be assumed.   The Debtors, with the consent of the Priority First Lien Administrative Agent with respect to Specified Executives, may also enter into new employment arrangements and/or change in control agreements with individuals who will serve as officers of the Reorganized Debtors after the Effective Date.   On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may adopt, approve, and authorize any new employment arrangements with respect to such officers of the Reorganized Debtors without further action, order, or approval of the New Boards.   To the extent any employment-related agreements contain a sale-related bonus, the Reorganized Debtors shall renegotiate such bonus in good faith based upon the Reorganized Debtors' capital structure.   On and after the Effective Date, Cash and bonus compensation and benefits shall be determined by the New Pioneer Board subject to the terms of the Plan Transaction Documents and any agreements being modified.

(b)    **Management Incentive Plan**.    After the Effective Date, equity grants under the Management Incentive Plan shall be reserved for directors, managers, officers, and employees of the Reorganized Debtors on terms determined by the New Pioneer Board.   The Reorganized Debtors shall have the right to set additional equity awards for the benefit of members of the New Pioneer Board after the Effective Date.

(c)    **Indemnification**.    For purposes of this Plan, the respective obligations of the Debtors to indemnify and reimburse any persons who are directors, managers, officers or employees of the Debtors immediately prior to the Effective Date, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable state or non-bankruptcy law, or specific agreements or any combination of the foregoing, shall survive confirmation of this Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on, or after the Petition Date, and each of the Reorganized Debtors shall be jointly and severally liable for the indemnification and/or reimbursement obligations of each of the Debtors.

(d)    **Other Incentive Plans and Employee Benefits**.    On and after the Effective Date, the Reorganized Debtors shall adopt, assume, and honor, in the ordinary course

42

of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation, pursuant to the terms thereof or hereof, including any employee compensation plans, any incentive plan including the Annual Incentive Plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity from and after the Petition Date, and shall honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date. After the Effective Date, the Reorganized Debtors may amend or restate any program of the type described in this paragraph, in accordance with applicable law in the ordinary course of business subject to the terms of Plan Transaction Documents and the terms of the program being amended and restated.

6.196.20    **Preservation Of Causes Of Action**. In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not released pursuant to Article 10.3 of this Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in Exhibit 6.196.20, and such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date. The Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successor holding such rights of action. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan. For the avoidance of doubt, effective as of the Effective Date, all Persons will be deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims or causes of action whatsoever arising under section 547 of the Bankruptcy Code; provided, that such claims shall not be released and discharged against any Specified Party as set forth herein.**

6.206.21    **Reservation of Rights**. With respect to any Cause of Action that the Reorganized Debtors expressly abandon, if any, the Reorganized Debtors reserve all rights, including the right under Bankruptcy Code section 502(d) to use defensively the abandoned Causes of Action as a basis to object to all or any part of a claim against any of the Estates asserted by a creditor who obtains the benefit of the abandoned Cause of Action. Except as set forth in Article 10.3 of this Plan, nothing contained in this Plan shall constitute or be deemed a waiver or abandonment of any Cause of Action that the Reorganized Debtors may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained

43

herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**6.21~~6.22**        **Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.22~~6.23**        **Insured Claims**. Notwithstanding anything to the contrary contained herein, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, provided, that, unless the Debtors and the Reorganized Debtors provide their express written consent, the Holders of such Claims shall not obtain payment from the insurers for the portion of any Claims (including, but not limited to, any deductible portion) covered by the Insurance Contracts if the payment of such portion shall require the Debtors or the Reorganized Debtors to reimburse the insurers for such payment, and (b) solely for the portion of such Claim that is not paid by the applicable insurance policy (including, but not limited to, any deductible portion that is not paid under the policy), receive the treatment provided for in this Plan for Allowed General Unsecured Claims.

**6.23~~6.24**        **Intercompany Account Settlement.** The Debtors and the Reorganized Debtors, and their respective Affiliates will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.

**6.24~~6.25**        **Closing of Chapter 11 Cases.** The Debtors or the Reorganized Debtors, as applicable, shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

**6.25~~6.26**        **Private Company.** It is anticipated that the Reorganized Debtors shall be private companies as of the Effective Date and shall not register any of their respective equity with the SEC or list such equity on an exchange as of the Effective Date.

# ARTICLE VII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**7.1    Rejection of Executory Contracts and Unexpired Leases**.

(a)    **Automatic Rejection**.  Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 7.1 of the Plan; (ii) has been previously assumed or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume or reject pending as of the Effective Date; (iv) is an Executory Contract related to any Intercompany Claim; or (v) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements herein.

(b)    **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**.  Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

(c)    **Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases**.  Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date or the effective date of rejection.  Any proofs of Claim arising from the rejection of the Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied,

45

released, and discharged, notwithstanding anything in the Schedules or a proof of Claim to the contrary.   All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

(d)     **Reservation of Rights**.  Notwithstanding anything to the contrary herein, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved in the event that the Debtors (or the Reorganized Debtors) amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

**7.2     Assumption of Executory Contracts and Unexpired Leases**.  Upon the occurrence of the Effective Date, each Executory Contract or Unexpired Lease (other than Executory Contracts or Unexpired Leases that (a) have been previously rejected by the Debtors by Final Order of the Bankruptcy Court or have been rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date or (b) are the subject of a motion to reject pending as of the Effective Date) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in <u>Exhibit 7.1</u> of the Plan shall be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Reorganized Debtors or their assignee in accordance with its terms, except as modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  With respect to each such Executory Contract and Unexpired Lease, the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contracts and Unexpired Leases may be conditioned upon the disposition of all issues with respect to such Cure.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

(a)     **Modifications, Amendments, Supplements, Restatements, or Other Agreements**.  Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant hereunder.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)     **Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed**.  Any and all proofs of Claims based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including hereunder, except proofs of Claims asserting Cure amounts, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed and expunged from

46

the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.3    Insurance Policies.

(a)    Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision in the Planthat purports to be preemptory or supervening, confers Bankruptcy Court jurisdiction, grants an injunction or release, or requires a party to opt out of any releases): (a) (i) on the Effective Date, all insurance policies to which any Debtor is a party as of the Effective Date (including any "tail policy"), other than the Legacy Workers Compensation Policies and the Healthcare Liability Policies, shall be deemed to be and treated as executory contracts and shall be assumed, or assumed and assigned, by the applicable Reorganized Debtors and shall continue as obligations of the Debtors or Reorganized Debtors in accordance with their respective terms.  All (such assumed or assumed and assigned insurance policies shall vest in the Reorganized Debtors, as applicable.and all agreements, documents or instruments relating thereto, the "**Insurance Contracts**"); (ii) the Legacy Workers Compensation Policies and the Healthcare Liability Policies shall be assumed by the applicable Reorganized Debtors in accordance with a stipulation and order (the "**Assumption Stipulation**") setting forth the deductible reimbursement and collateral adjustment obligations of the parties subsequent to the Effective Date; the assumption of the Legacy Workers Compensation Policies and the Healthcare Liability Policies is subject to and conditioned upon the finalization and approval of an Assumption Stipulation; (b) nothing shall alter, modify, amend, affect, impair, waive, or otherwise prejudice the legal, equitable or contractual rights, obligations, and defenses of the insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Insurance Contracts; any such rights and obligations shall be determined under the Insurance Contracts and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred, provided, however, that the Debtors or  Reorganized Debtors, as applicable, shall retain the right to challenge any amounts owed under the Insurance Contracts in accordance with their terms; (c) nothing alters or modifies the duty, if any, that insurers have to pay claims covered by the Insurance Contracts and the insurers' right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor in accordance with the terms of the Insurance Contracts; (d) the Allowed Claims of the insurers arising (whether before or after the Effective Date) under the Insurance Contracts (i) shall be paid in full in the ordinary course of business regardless of whether such amounts are or shall become liquidated, due or paid before or after the Petition Date or the Effective Date, and (ii) shall not be discharged or released by the Plan or the Confirmation Order or any other order of the Bankruptcy Court; and (e) the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article X of the Plan, if and to the extent applicable, shall be deemed modified without further order of this Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable non-bankruptcy law to proceed with their claims; (II) the insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy

47

Court consistent with applicable non-bankruptcy law, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by this Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) the insurers to collect from any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Contracts, in such order as the applicable insurer may determine; and (IV) the insurers to cancel any Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

(b)    The Debtors or the Reorganized Debtors, as the case may be, shall maintain their director and officers insurance policies and their employment practices liability policies providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors.

(c)    Notwithstanding anything in this Plan to the contrary, including but not limited to Articles 6, 7, 9, and 10 of the Plan, the allowance of any insurance claims in the Chapter 11 Case shall have no res judicata effect on any proceeding or litigation initiated in any other court as to said insurance claim, or any other claim, cross-claim, defense or cause of action arising from, relating to or otherwise implicating the facts and law at issue in such insurance claim.  Without limiting the generality of the foregoing, the allowance of an insurance claim shall have no preclusive effect with respect to any claim insured by an insurance policy in favor of the Debtors.

(d)    Notwithstanding anything in this Plan to the contrary, any applicable insurer shall have the right to appear and be heard in the Court on (i) any objection or other litigation pertaining to a claim insured by such insurer (such as but not limited to any of the insurance claims), as well as (ii) any proposed compromise or settlement of such insured claims (such as but not limited to any of the insurance claims).

(e)    Nothing in this Plan shall impair, reduce, enlarge, waive, modify or otherwise alter creditors' rights of recoupment, setoff and subrogation, and such rights are expressly preserved herein, and all defenses in connection therewith (including, but not limited to, those arising under the Bankruptcy Code).

**7.4    Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases**.  With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired

48

Leases," the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure. Such Cure shall be satisfied by the Debtors or their assignee, if any, by payment of the Cure in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court. Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure. The Debtors shall serve a counterparty to an Executory Contract or Unexpired Lease to be assumed hereunder with evidence of adequate assurance upon such counterparty's written request to the Debtors' counsel.

If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

(a)    **Cure Notices**. No later than seven (7) days prior to the Confirmation Hearing, and pursuant to the Assumption and Rejection Procedures, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption that will (i) list the applicable Cure, if any, (ii) describe the procedures for filing objections to the proposed assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, (iii) describe the procedures for filing objections to the proposed Cure of the applicable Executory Contract or Unexpired Lease, and (iv) explain the process by which related disputes will be resolved by the Bankruptcy Court. If no objection is timely received, the non-Debtor party to the assumed contract shall be deemed to have consented to the assumption of the applicable Executory Contract or Unexpired Lease.

(b)    **Cure Objections**. If a proper and timely objection to the Cure Notice or proposed Cure was filed by the Cure Objection Deadline, the Cure shall be equal to (i) the amount agreed to between the Debtors or Reorganized Debtors and the applicable counterparty, or, (ii) to the extent the Debtors or Reorganized Debtors and counterparty do not

49

reach an agreement regarding any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. Objections, if any, to the proposed assumption and/or Cure must be in writing, filed with the Bankruptcy Court and served so that they are actually received by the Cure Objection Deadline.

(c)    **Hearing with Respect to Objections**.  If an objection to the proposed assumption and/or to the Cure is timely filed and received in accordance with the procedures set forth in Article 7.4(b), and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Debtors or Reorganized Debtors.  Objections to the proposed Cure amount or assumption of an Executory Contract or Unexpired Lease will not be treated as objections to Confirmation of the Plan.

(d)    **Reservation of Rights**.  Notwithstanding anything to the contrary herein, prior to the Confirmation Date, the Debtors may amend their decision with respect to the assumption of any Executory Contract or Unexpired Lease and provide a new notice amending the information provided in the applicable notice, subject to the Assumption and Rejection Procedures, and shall serve such notice on the applicable counterparty; provided that the Debtors may amend such decision after the Confirmation Date with the consent of the applicable contract counterparty; provided, further, that notwithstanding anything to the contrary herein, all rights of the Debtors, the Reorganized Debtors, and any counterparty to any Executory Contract or Unexpired Lease are reserved with respect to any such amended decision or notice.  Also notwithstanding anything to the contrary herein, in the case of an Executory Contract or Unexpired Lease designated for assumption that is the subject of a Cure objection which has not been resolved prior to the Confirmation Date, the Debtors may designate such Executory Contract or Unexpired Lease for rejection at any time prior to the payment of the Cure.

**7.5    Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date**.  Contracts and leases entered into after the Petition Date by the Debtors, and any Executory Contracts and Unexpired Leases assumed by the Debtors, may be performed by the Reorganized Debtors in the ordinary course of business and in accordance with the terms of such Executory Contract or Unexpired Lease.

**7.6    General Reservation of Rights**.  Neither the exclusion nor inclusion of any contract or lease on Exhibit 7.1 of the Plan, in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors, or any of its Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

## ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

**8.1    Determination Of Claims and Interests**.  Except as expressly provided in the Plan, after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article 6.196.20, except with respect to any Claim or Interest deemed Allowed under the Plan or pursuant to an order of the Bankruptcy Court.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.  For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with this Plan.

Nothing contained in this Article 8.1 shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors (and, as the case may be, the GUC Administrator) may have against any Entity in connection with or arising out of any Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

**8.2    GUC Administrator**.  The Creditors' Committee shall appoint, as of the Effective Date, a GUC Administrator with duties limited to (a) administering, disputing, objecting to, compromising, or otherwise resolving Operating Company General Unsecured Claims reconciliation, allowance, and settlement, (b) making, including, without limitation, (i) filing, withdrawing, or litigating to judgment objections to Operating Company General Unsecured Claims, (ii) settling or compromising any Disputed Operating Company General Unsecured Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the claims register to reflect any such Claim resolutions without any further notice to or action, order, or approval by the Bankruptcy Court, (b) directing distributions to the Holders of Allowed Operating Company General Unsecured Claims as provided herein, and (c) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the foregoing duties.  The GUC Administrator may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the duties as limited above, including any professionals retained in these Chapter

51

11 Cases, and the GUC Administrator Costs, including reasonable professional fees, shall be paid by the Debtors or Reorganized Debtors <u>from the GUC Administrator Account</u> in the ordinary course without further order of the Bankruptcy Court, <u>provided</u> that the Debtors or Reorganized Debtors shall not be required to reimburse such costs in excess of $250,000.

<s>Upon</s>Immediately upon the resolution of all <s>disputed</s>Operating Company General Unsecured Claims and the making of the final distribution to Holders of Allowed Operating Company General Unsecured Claims, the GUC Administrator shall be released and discharged of and from further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases.

      **8.3    Claims Administration Responsibility**. After the Effective Date, other than as to Operating Company General Unsecured Claims, the Reorganized Debtors shall retain responsibility for (a) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors other than Operating Company General Unsecured Claims, including, without limitation, (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests <s>(other than Operating Company General Unsecured Claims)</s>, (ii) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court <s>(other than Operating Company General Unsecured Claims)</s>, and (iii) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court <s>(other than Operating Company General Unsecured Claims)</s>, and (b) making distributions (if any) with respect to all Claims and Interests <s>(other than Operating Company General Unsecured Claims)</s>. With respect to Operating Company General Unsecured Claims, the GUC Administrator shall exercise all of the responsibilities set forth in this <u>Article 8.3</u>.

      **8.4    Objections to Claims**.  Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors or the GUC Administrator without further notice to parties-in-interest).  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Reorganized Debtors or the GUC Administrator effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

      **8.5    Disallowance of Claims**. Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, the Creditors' Committee before the Effective Date, the GUC Administrator after the

Effective Date, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors (or the GUC Administrator, as the case may be) allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and     (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**8.6    Estimation of Claims**.  Before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any purpose permitted thereunder, regardless of whether any party previously has objected to such Claim or Interest, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court has entered a Final Order estimating any contingent or unliquidated Claim for the express purpose of determining what amount of such Claim shall be allowed for purposes of distributions pursuant to section 502(c), that estimated amount shall, unless otherwise ordered by the Bankruptcy Court or agreed between the relevant parties, constitute a maximum limitation on the Allowed amount of such Claim for all purposes under the Plan (including for purposes of distributions), and the Reorganized Debtors or the GUC Administrator may, to the extent applicable, elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.   Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**8.7    No Interest on Claims**.  Unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest.  Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

**8.8    Amendments to Claims**.  On or after the Bar Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

53

## ARTICLE IX

## PROVISIONS GOVERNING DISTRIBUTIONS

**9.1    Time of Distributions**.  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan (other than on account of Operating Company General Unsecured Claims) shall be made on the later of (a) the Initial Distribution Date or (b) on the first Periodic Distribution Date that is at least 30 days after a Claim becomes Allowed; provided, however, that the Reorganized Debtors may, in their sole discretion, make one-time distributions on a date that is not a Periodic Distribution Date. Distributions on account of Operating Company General Unsecured Claims shall be made on the Operating Company General Unsecured Claims Distribution Date.

**9.2    Distribution Agent**.  The Distribution Agent shall make all distributions required under this Plan except as set forth in Article 9.4 below.

**9.3    Currency**.  Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal, National Edition* following the Effective Date.

**9.4    Distributions on Account of Claims Allowed as of the Effective Date**. Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims on the Initial Distribution Date, subject to the Reorganized Debtors' rights to object to Claims that have not been Allowed; provided, however, that (i) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Allowed Priority Tax Claims shall be paid in full in Cash on the Initial Distribution Date or in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(9)(c) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**9.5    Distributions on Account of Claims Allowed After the Effective Date**.

(a)    **No Distributions Pending Allowance**.  No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined

54

by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.  All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)    **Disputed Unsecured Claims Reserve**.  The ~~Debtors or Reorganized Debtors, as applicable,~~GUC Administrator shall withhold and retain from the Operating Company General Unsecured Claims Cash Pool Account and establish and fund a segregated reserve with (i) an amount sufficient to pay Holders of Disputed Operating Company General Unsecured Claims the amount such Holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims, (ii) such lesser amount as estimated or otherwise ordered by the Bankruptcy Court, or (iii) such lesser amount as agreed to between the GUC Administrator and the Holders thereof (such account, the "**Disputed Operating Company General Unsecured Claims Reserve**").  As disputed claims are resolved pursuant to Article IX hereof, the GUC Administrator shall direct the Distribution Agent to make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.  Such distributions shall be made on the first ~~Periodic~~Operating Company General Unsecured Claims Distribution Date that is at least thirty (30) days after the date on which such a Disputed Claim becomes an Allowed Claim.

(c)    **Tax Treatment of Disputed Unsecured Claims Reserve**.  All parties to the Plan shall (i) treat the Disputed Operating Company General Unsecured Claims Reserve as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 for U.S. federal income tax purposes, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for all federal, state, and local income tax purposes.  All taxes imposed on assets or income of such Disputed Operating Company General Unsecured Claims Reserve will be payable from the assets of the Disputed Operating Company General Unsecured Claims Reserve. The GUC Administrator shall have no duty, obligation, or responsibility to satisfy or otherwise comply with withholding, payment, and/or reporting requirements imposed by any federal, state, local, or foreign tax authority.

(d)    **Request for Expedited Determination of Taxes**.  The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Disputed Operating Company General Unsecured Claims Reserve filed or to be filed for any and all taxable periods of such reserve.

(e)    **Distributions After Allowance**.  Payments and distributions to each respective Holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern distributions to such Holder of a Claim.  On the first Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable, that is at least 30 days following the date when a Disputed Claim becomes an Allowed Claim, the Distribution Agent shall distribute to the Holder of such Allowed Claim the distribution that such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law; provided, however, (i) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before

55

the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Disputed Claims that are Allowed Priority Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

(f)    **Special Rules for Distributions to Holders of Disputed Claims**. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class; provided, however, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law or this Plan.

### 9.6    Delivery Of Distributions.

(a)    **Record Date for Distributions**.  On the Distribution Record Date, the claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim or Interest is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practicable and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)    **Allowed Claims**.  Distributions to Holders of Allowed Claims shall be made by the Distribution Agent (i) at the addresses set forth on the proofs of claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors or the Reorganized Debtors or the GUC Administrator, as applicable, have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, or (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address.  The Debtors, the Reorganized Debtors, the GUC Administrator, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

(c)    **Undeliverable Distributions**.  If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent is notified of the then-current address of such

56

Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors (or, with respect to the Operating Company General Unsecured Claims, to the Operating Company General Unsecured Claims Cash Pool Account) until such distributions are claimed.

(d)    **Reversion**.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors (or, with respect to Operating Company General Unsecured Claims, to the Operating Company General Unsecured Claims Cash Pool Account) free of any restrictions thereon.  Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.

(e)    **De Minimis Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Distribution Agent shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date in question is or has a value less than $10,000; provided that the Reorganized Debtors, the GUC Administrator, or the Distribution Agent, as applicable, shall make, or cause to be made, a distribution on a Periodic Distribution Date or an Operating Company General Unsecured Claims Distribution Date, as applicable, of less than $10,000 if the Reorganized Debtors, the GUC Administrator, or the Distribution Agent, as applicable, expect that such Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable, shall be the final Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable, does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

(f)    **Fractional Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Distribution Agent shall not be required to make partial distributions or distributions of fractional shares of New Pioneer Units or distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fractional share of New Pioneer Units under the Plan would otherwise be called for, such fraction shall be deemed zero.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

**9.7    Accrual of Dividends and Other Rights**.  For purposes of determining the accrual of dividends or other rights after the Effective Date, New Pioneer Units shall be deemed distributed as of the Effective Date regardless of the date on which they are actually

57

issued, dated, authenticated, or distributed; provided, however, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of New Pioneer Units actually take place.

        **9.8    Compliance Matters**.  In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, to the extent applicable, the Debtors, Reorganized Debtors, and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

        **9.9    Claims Paid or Payable by Third Parties**.

        (a)    **Claims Paid by Third Parties**.  The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Reorganized Debtors. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

        (b)    **Claims Payable by Insurers**.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy a Claim or otherwise settle an insured Claim, then immediately upon such insurers' payment, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

        (c)    **Applicability of Insurance Contracts**.  Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contracts.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any of the Insurance Contracts, nor shall anything

58

contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**9.10    Setoffs**.  Except as otherwise expressly provided for in the Plan, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

**9.11    Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## ARTICLE X

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**10.1    Vesting of Assets**.  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Causes of Action) shall vest in the Reorganized Debtors which, unless otherwise indicated in the Plan, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests.  As of and following the Effective Date, the Reorganized Debtors may operate their business and use, acquire, and dispose of property (subject to applicable law) and settle and compromise Claims, Interests, or Causes of Action without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

**10.2    Discharge of the Debtors.  Except as otherwise specifically provided in section 1141(d) of the Bankruptcy Code, this Plan or the Confirmation Order, and**

59

effective as of the Confirmation Date: (a) the distributions and rights that are provided in this Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, right, or Interest accepted this Plan; (b) the Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

       **10.3**    **Release by Debtors**. As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Transaction Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Debtors' restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors, the Estates, all Affiliates or subsidiaries managed or controlled by the foregoing, and each of their predecessors, successors and assigns, subsidiaries, and Affiliates, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, from any and all Claims, Interests or causes of action whatsoever, including any derivative Claims asserted or that could have been asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, directly or indirectly, in any manner whatsoever, the

Debtors, the assets, liabilities, operations or business of the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business, financial or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the DIP Facility Order, the Plan, the RSA (including the term sheet attached thereto), the Plan Transaction Documents, or any related agreements, instruments, or other documents, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; **provided** that nothing in this Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.

As of the Effective Date, all Persons will be deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims or causes of action whatsoever arising under section 547 of the Bankruptcy Code; **provided, that** such claims shall not be released and discharged against any Specified Party unless (i) all Executory Contracts and Unexpired Leases with such Specified Party are assumed pursuant to section 365 of the Bankruptcy Code, or (ii) the Debtors or Reorganized Debtors specifically agree to release such claim against the Specified Party.

**10.4    Release by Holders of Claims.**  Effective as of the Effective Date, the Releasing Parties conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties and their respective property from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates,  any Claims or causes of action asserted on behalf of any Holder of any Claim or any Interest or that any Holder of a Claim or an Interest would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the assets, liabilities, operations or business of the Debtors, the Debtors' restructuring, the Chapter 11 Cases, or the RSA, the purchase, sale, transfer or rescission of any debt, security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Interest in the Debtors that is treated in the Plan, the business, financial or contractual arrangements between the Debtors and any Released Party, the negotiation, formulation, or preparation of the Plan Transaction Documents or related agreements, instruments or other documents, including the DIP Facility Order, this Plan, the RSA (including the term sheet attached thereto), or any related agreements or instruments, or the solicitation of votes with respect to the Plan, or any other act or omission, transaction,

61

agreement, event, or other occurrence taking place on or before the Effective Date; **provided** that nothing in the Plan shall be construed to release the Released Parties from any claims based upon willful misconduct or intentional fraud as determined by a Final Order**.; provided further that, for the avoidance of doubt, nothing in this Plan nor in this Article 10.4 shall release, or be construed to release, any of the Priority First Lien Parties or Capital Finance Opportunities 1701C, LLC from claims or causes of action to enforce the terms of the Capital Finance/Silver Point Settlement Agreement (as defined in Article 11.2(c)), or the assertion of any defenses in respect of same.**

**10.5    Exculpation and Limitation of Liability.    To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any act, omission, or other Claim in connection with, relating to, or arising out of: the Debtors' restructuring; the Chapter 11 Cases; the filing of the Chapter 11 Cases; formulation, preparation, dissemination, negotiation, pursuit, or filing of the Disclosure Statement, the RSA, the Plan Transaction Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, or the solicitation of votes for, or confirmation of, the Plan; the DIP Credit Agreement; the pursuit of Confirmation; the funding or pursuit of consummation of the Plan; the occurrence of the Effective Date; the administration, consummation, and implementation of the Plan or the property to be distributed under the Plan, including the issuance of securities under or in connection with the Plan and the distribution of property under the Plan and any other transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof; the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases; or the transactions in furtherance of or contemplated by any of the foregoing; except for intentional fraud or willful misconduct, as determined by a Final Order. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.**

**10.6    Exclusions and Limitations on Exculpation, Indemnification, and Releases**.  Notwithstanding anything in this Plan to the contrary, no provision of this Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification, or release provision, shall modify, release, or otherwise limit the liability of any Entity not specifically released or exculpated hereunder or pursuant to an order of the Bankruptcy Court, including, without limitation, any Entity who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

**10.7    Injunction.    Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

62

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a Holder of a Claim against or Interest in the Company, all Entities that have held, hold, or may hold Claims against or Interests in the Company whether or not such parties have voted to accept or reject the Plan and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and causes of action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions in the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

### 10.8    Subordination Rights.

(a)    Except as otherwise provided in the Plan (including in Article 10.8(c) below), the allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise and all Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)    Except as otherwise provided in the Plan (including Plan Exhibits), the Confirmation Order, or another order of the Bankruptcy Court, the right of the Debtors or the Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of

63

the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination.  Unless the Plan (including Plan Exhibits) or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to this Article 10.8(b) unless ordered by the Bankruptcy Court.

(c)     Notwithstanding anything herein to the contrary, nothing in the Plan shall impair, prejudice, release, compromise or waive any rights, Claims, Causes of Action, defenses or remedies of any Holder of Priority First Lien Claims arising under the Priority Intercreditor Agreement against (i) any Holder of First Lien Claims unless the First Lien Classes are Accepting Classes, in which case the Holders of Priority First Lien Claims will solely waive any requirement that Holders of First Lien Claims turn over any recovery received pursuant to Article 4.2 of this Plan, or (ii) any Holder of Second Lien Claims unless the Second Lien Classes are Accepting Classes, in which case the Holders of Priority First Lien Claims will solely waive any requirement that Holders of Second Lien Claims turn over any recovery received pursuant to Article 4.3 of this Plan.

**10.9    Protection Against Discriminatory Treatment**.  Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another entity with whom such the Reorganized Debtors has been associated, solely because the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**10.10    Recoupment**.  In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**10.11    Release of Liens**.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and its successors and assigns.

**10.12    Reimbursement or Contribution**.  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or  (2)

64

the relevant Holder of a Claim has filed a noncontingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## ARTICLE XI

## CONDITIONS PRECEDENT

**11.1    Conditions to Confirmation**.  The following are conditions precedent to the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Article 11.3 of this Plan:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order.

**11.2    Conditions to the Effective Date of the Plan**.   The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 11.3 of this Plan:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be a Final Order;

(b)    the Bankruptcy Court shall have entered the Confirmation Order, and such order shall be a Final Order;

(c)    the Priority First Lien Parties and Capital Finance Opportunities 1701C, LLC shall have entered into and substantially consummated a settlement and release agreement  (the "**Capital Finance/Silver Point Settlement Agreement**")  in form and substance satisfactory to each of the Priority First Lien Administrative Agent and Capital Finance Opportunities 1701C, LLC;

(d)    the payment by the Debtors of all fees and expenses of the DIP Agent and Priority First Lien Administrative Agent, including Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey, Inc., and Fortgang Consulting LLC;

(e)    all Plan Transaction Documents shall be in form and substance satisfactory to the Priority First Lien Administrative Agent;

(f)    all conditions precedent set forth in the New First Lien Credit Agreement shall have been satisfied or waived pursuant to the terms thereof;

(g)    the organizational documents of the Reorganized Debtors as contemplated herein shall be in form and substance satisfactory to the Priority First Lien Administrative Agent, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws;

(h)    all authorizations, consents, certifications, regulatory approvals, rulings, no action letters, opinions, or other documents or actions required by any law, regulation, or order to be received or to occur in order to implement and effectuate the Plan on the Effective Date shall have been obtained (and evidence thereof shall have been delivered to the Priority First Lien Lender) or shall have occurred unless such failure will not have a material adverse effect on the Reorganized Debtors;

(i)    after occurrence of the Effective Date and payment of all amounts contemplated in connection therewith (including any Cure amounts), the Reorganized Debtors shall emerge with a minimum of $10 million of cash or cash equivalents, or shall reasonably expect to build to $10 million of cash or cash equivalents within 60 days of the Effective Date (the "**Minimum Liquidity Condition Precedent**");

(j)    the conditions precedent set forth in the Exit Term Loan Facility shall have been satisfied or waived;

(k)    the Debtors (or the Reorganized Debtors, as the case may be) establish and the Settling Parties (other than the Creditors' Committee) shall have funded the Operating Company General Unsecured Claims Cash Pool Account with Cash in an amount equal to the Operating Company General Unsecured Claims Cash Pool;

(l)    the Debtors (or the Reorganized Debtors, as the case may be) establish and shall have funded the GUC Administrator Account with Cash in an amount equal to $250,000;

(lm)    all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full; and

(mn)    Adversary Case Numbers 19-01142 and 19-01143 commenced against the Debtors in these Chapter 11 Cases shall have been resolved in a form and manner reasonably satisfactory to the Priority First Lien Administrative Agent.

**11.3    Waiver of Conditions Precedent**.  The conditions set forth in Articles 11.1 and 11.2 may be waived, in whole or in part, by agreement of (a) the Debtors and (b) the Priority First Lien Administrative Agent, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing, provided, that the consent of Capital Finance Opportunities 1701C, LLC shall be required to waive the condition set forth in Article 11.2(c).

**11.4    Notice of Effective Date**.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Article 11.2 of this Plan have been satisfied or waived pursuant to Article 11.3 of this Plan.

**11.5    Effect of Non-Occurrence of Conditions to Consummation**.  If prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the

66

Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

# ARTICLE XII

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall, to the fullest extent permissible under applicable law, have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

(a)    resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors' amendment, modification, or supplement after the Effective Date, pursuant to Article VIII of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(b)    adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, this Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(c)    ensure that distributions to Holders of Allowed Claims are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)    allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(e)    hear and determine or resolve any and all matters related to Causes of Action;

67

(f)      enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

(g)      issue and implement orders in aid of execution, implementation, or consummation of this Plan;

(h)      consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)      hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(j)      determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

(k)      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(l)      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan and disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

(m)      hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(n)      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)      to adjudicate any claims against the Debtors' current or former directors, officers, employees, agents, attorneys, advisors or other representatives in connection with, arising from, or relating to the First Lien Credit Documents or the Second Lien Credit Documents or any amendments or consent solicitations with respect thereto;

(p)      resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

(q)      hear any other matter not inconsistent with the Bankruptcy Code;

(r)      hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including the dischargeability of any claim;

68

(s)     enter a Final Decree closing the Chapter 11 Cases;

(t)     enforce all orders previously entered by the Bankruptcy Court; and

(u)     hear and determine all matters relating to any Bankruptcy Code section 510(b) Claims.

All of the foregoing applies following the Effective Date; provided, that from the Confirmation Date through the Effective Date, in addition to the foregoing, the Bankruptcy Court shall retain jurisdiction with respect to all other matters of this Plan that were subject to its jurisdiction prior to the Confirmation Date; provided, further, that the Bankruptcy Court shall not have nor retain exclusive jurisdiction over any post-Effective Date agreement.  Nothing contained herein shall be construed to increase, decrease or otherwise modify the independence, sovereignty, or jurisdiction of the Bankruptcy Court.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

**13.1    Binding Effect**.  Upon the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

**13.2    Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed by entry of the Final Decree.

**13.3    Modification and Amendments**.  The Debtors may alter, amend, or modify this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date and prior to substantial consummation of this Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**13.4    Confirmation of the Plan**.  The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to amend the Plan to any extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

69

**13.5    Additional Documents**.  On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

**13.6    Dissolution of Creditors' Committee**.  Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, and the members thereof (solely in their capacities as Creditors' Committee members) shall be released, exculpated, and discharged from all their duties relating to the Chapter 11 Cases in accordance with Article X hereof; provided that the Creditors' Committee shall continue to exist solely with respect to (i) any applications for Professional Fee Claims or expense reimbursements for members of such Committee including preparing same, objecting to same, defending same and attending any hearing with respect to same; (ii) any motions or other actions seeking enforcement or implementation of the provisions of this Plan, or the Confirmation Order; and (iii) any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition creditors, including, but not limited to, any cases, controversies, suits or disputes arising in connection with the consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order. Following the Effective Date, Professionals retained by the Creditors' Committee shall be entitled to reasonable compensation for services rendered in connection with the matters  identified in clauses (i) – (iii) and any such payments made in connection therewith shall be made without any further notice to or action, order, or approval of the Bankruptcy Court.

**13.7    Request for Expedited Determination of Taxes**.  The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Debtors filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

**13.8    Revocation, Withdrawal, or Non-Consummation**.

(a)    **Right to Revoke or Withdraw**.  The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.

(b)    **Effect of Withdrawal, Revocation, or Non-Consummation**.  If the Debtors revoke or withdraw this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan and any settlement or compromise approved as part of this Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be null and void in all respects.  In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any

70

manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**13.9    Notices**.  After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**If to the Debtors:**

c/o          Trident          Holding          Company,          LLC
930          Ridgebrook          Rd.,          3rd          Floor
Sparks,                          MD                          21152
Attn.:    David    F.    Smith,    III    (david.smith@tridentusahealth.com)
Chief Financial Officer

with a copy to:

Skadden,          Arps,          Slate,          Meagher          &          Flom          LLP
Four                          Times                          Square
New          York,          New          York          10036
Attn:    Paul                          D.                          Leake
          Jason N. Kestecher

– and –

Skadden,          Arps,          Slate,          Meagher          &          Flom          LLP
155          North          Wacker          Drive,          Suite          2700
Chicago,                          Illinois                          60606
Attn:    James J. Mazza, Jr.
          Justin M. Winerman

**If to the DIP Agent:**

Silver Point Finance, LLC
c/o Credit Administration Dept.
Attn: Joanna Holte
Two Greenwich Plaza
Greenwich, CT 06830
E-mail: Creditadmin@silverpointcapital.com
Phone: (203) 542-4230

71

with                         a                    copy                    to:

Paul,        Weiss,       Rifkind,      Wharton       &        Garrison      LLP
1285            Avenue         of          the          Americas
New          York,          New          York          10019
Attn:   Robert                      A.                      Britton
~~Alexander N. Woolverton~~Christopher Hopkins

**If to the Office of the United States Trustee:**

Office  of  the  United  States  Trustee  for  the  Southern  District  of  New  York
U.S.               Federal                Office               Building
201            Varick            Street,         Suite            1006
New         York,        New         York             10014
Attn:   Brian                                      Masumoto
        Shannon Scott

**If to the Creditors' Committee:**

Kilpatrick,         Townsend,        &         Stockton         LLP
1114            Avenue          of           the         Americas
New York, NY 10036

Attn:   David                      M.                      Posner
        Gianfranco Finizio

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors and Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed                                                                              requests.

      **13.10   Term of Injunctions or Stays**.  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.   All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

      **13.11   Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan

(except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control).  Corporate governance matters shall be governed by the laws of the state of incorporation of the Reorganized Debtors.

**13.12  Entire Agreement**.  Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**13.13  Severability**.  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (c) nonseverable and mutually dependent.

**13.14  No Waiver or Estoppel**.  Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other party, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

**13.15  Conflicts**.  In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of this Plan shall govern.  In the event that the provisions of the Plan and the provisions of the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

73

Dated: ~~July 3~~September 5, 2019

Respectfully submitted,

TRIDENT HOLDING COMPANY, LLC
AND ITS AFFILIATE DEBTORS

By: */s/ David F. Smith*_____
Name:  David F. Smith
Title:  Chief Financial Officer

*Second Modified Second Amended Joint Plan of Reorganization of Trident Holding Company,
LLC, et al.*

~~1715029.31-NYCSR03A - MSW~~1715029.42-NYCSR03A - MSW
Redline Atlantis - Plan of Reorganization 1715029v32 and Atlantis - Plan of Reorganization
1715029v42 9/5/2019 9:13:10 PM

| Summary report: Litéra® Change-Pro TDC 10.1.0.400 Document comparison done on 9/5/2019 9:13:10 PM | |
|---|---|
| **Style name:** Option 3a Strikethrough Double Score No Moves | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** dm://NYCSR03A/1715029/32 | |
| **Description:** Atlantis - Plan of Reorganization | |
| **Modified DMS:** dm://NYCSR03A/1715029/42 | |
| **Description:** Atlantis - Plan of Reorganization | |
| **Changes:** | |
| Add | 379 |
| Delete | 303 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 3 |
| **Total Changes:** | 685 |

# EXHIBIT 3

**Blackline Pages Only of the Second Modified Second Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRIDENT HOLDING COMPANY, LLC,** *et al.*, | **Case No. 19-10384 (SHL)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## SECOND MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION OF TRIDENT HOLDING COMPANY, LLC AND ITS DEBTOR AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

James J. Mazza, Jr.
Justin M. Winerman
155 N. Wacker Dr.
Chicago, Illinois 60606-1720
Telephone:                    (312)                    407-0700

Paul                    D.                    Leake
Jason N. Kestecher
Four Times Square
New York, New York 10036-6522
Telephone:                    (212)                    735-3000

*Attorneys for the Debtors and Debtors-in-Possession*

Dated:        ~~July~~        ~~3~~September        5,        2019

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Trident Holding Company, LLC (6396); American Diagnostics Services, Inc. (2771); Community Mobile Diagnostics, LLC (9341); Community Mobile Ultrasound, LLC (3818); Diagnostic Labs Holdings, LLC (8024); FC Pioneer Holding Company, LLC (6683); JLMD Manager, LLC (8470); Kan-Di-Ki LLC (6100); Main Street Clinical Laboratory, Inc. (0907); MDX-MDL Holdings, LLC (2605); MetroStat Clinical Laboratory – Austin, Inc. (4366); MX Holdings, LLC (8869); MX USA, LLC (4885); New Trident Holdcorp, Inc. (4913); Rely Radiology Holdings, LLC (3284); Schryver Medical Sales and Marketing, LLC (9620); Symphony Diagnostic Services No. 1, LLC (8980); Trident Clinical Services Holdings, Inc. (6262); Trident Clinical Services Holdings, LLC (1255); TridentUSA Foot Care Services LLC (3787); TridentUSA Mobile Clinical Services, LLC (0334); TridentUSA Mobile Infusion Services, LLC (5173); U.S. Lab & Radiology, Inc. (4988). The address of the Debtors' corporate headquarters is 930 Ridgebrook Road, 3rd Floor, Sparks, MD 21152.

# TABLE OF CONTENTS

**Page**

Article I

## DEFINITIONS, RULES OF
## INTERPRETATION, AND COMPUTATION OF TIME

A.    Scope of Definitions ........................................................................1
B.    Definitions ........................................................................................1
C.    Rules of Interpretation ..............................................................~~20~~22
D.    Computation Of Time ...............................................................~~20~~22
E.    References to Monetary Figures ...............................................~~20~~22
F.    Certain Consent Rights .............................................................~~20~~22
G.    Exhibits .....................................................................................~~20~~23

Article II

## ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

2.1    Administrative Claims .............................................................~~21~~23
2.2    DIP Facility Claims .................................................................~~22~~24
2.3    Professional Claims ................................................................~~22~~24
2.4    Priority Tax Claims .................................................................~~23~~25

Article III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

3.1    Classification of Claims and Interests ....................................~~23~~25

Article IV

## PROVISIONS FOR TREATMENT
## OF CLAIMS AND INTERESTS

4.1    Priority First Lien Claims .......................................................~~26~~28
4.2    First Lien Claims ....................................................................~~26~~28
4.3    Second Lien Claims ................................................................~~27~~29
4.4    Other Secured Claims .............................................................~~27~~30
4.5    Other Priority Claims .............................................................~~28~~31
4.6    Operating Company General Unsecured Claims .....................~~29~~31
4.7    Holding Company General Unsecured Claims ........................~~29~~31
4.8    Intercompany Claims ..............................................................~~29~~32
4.9    Other Subordinated Claims .....................................................~~30~~32

i

4.10   Interests in Debtor Subsidiaries .......................................... 3032
4.11   Interests in Pioneer .......................................................... 3133

Article V

ACCEPTANCE

5.1   Classes Entitled to Vote ..................................................... 3133
5.2   Acceptance by Impaired Classes .......................................... 3133
5.3   Elimination of Classes ........................................................ 3134
5.4   Special Provision Governing Unimpaired Claims ................... 3134
5.5   Deemed Acceptance if No Votes Cast .................................. 3134
5.6   Cramdown .......................................................................... 3234

Article VI

MEANS FOR IMPLEMENTATION OF THE PLAN

6.1   No Substantive Consolidation ............................................. 3234
6.2   General Settlement of Claims and Interests .......................... 3234
6.3   Restructuring Transactions. ................................................ 3234
6.4   Sources of Cash for Plan Distribution .................................. 3335
6.5   Exit Liquidity Facility ......................................................... 3336
6.6   Exit Term Loan Facility ...................................................... 3336
6.7   New First Lien Facility ....................................................... 3436
6.8   Authorization, Issuance, and Distribution of New Pioneer Units ... 3436
6.9   Operating Company General Unsecured Claims Cash Pool. ..... 3436
6.10   GUC Administrator Account. ............................................. 37
6.106.11   Exemptions from Securities Act Registration Requirements ... 3437
6.116.12   Cancellation of Existing Securities and Agreements ... 3538
6.126.13   Issuance and Distribution of New Securities; Execution of Plan Documents ... 3538
6.136.14   Continued Corporate Existence ... 3538
6.146.15   New Corporate Governance Documents ... 3639
6.156.16   Directors, LLC Managers, and Officers of Reorganized Debtors ... 3639
6.166.17   Corporate Action ... 3639
6.176.18   Effectuating Documents; Further Transactions ... 3640
6.186.19   Employment, Retirement, Indemnification, and Other Agreements and Employee Compensation
6.196.20   Preservation Of Causes Of Action ... 3841
6.206.21   Reservation of Rights ... 3841
6.216.22   Exemption from Certain Transfer Taxes and Recording Fees ... 3842
6.226.23   Insured Claims ... 3942
6.236.24   Intercompany Account Settlement. ... 3942
6.246.25   Closing of Chapter 11 Cases. ... 3942
6.256.26   Private Company. ... 3942

ii

Article VII

UNEXPIRED LEASES AND EXECUTORY CONTRACTS

7.1    Rejection of Executory Contracts and Unexpired Leases ........................ 3942
7.2    Assumption of Executory Contracts and Unexpired Leases ...................... 4044
7.3    Insurance Policies ........................................................................ 4144
7.4    Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases ........................................................ 4146
7.5    Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date ........................................................................................ 4348
7.6    General Reservation of Rights ........................................................ 4348

Article VIII

PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

8.1    Determination Of Claims and Interests ............................................. 4348
8.2    GUC Administrator ....................................................................... 4449
8.3    Claims Administration Responsibility ............................................... 4449
8.4    Objections to Claims .................................................................... 4550
8.5    Disallowance of Claims ................................................................ 4550
8.6    Estimation of Claims .................................................................... 4550
8.7    No Interest on Claims ................................................................... 4651
8.8    Amendments to Claims .................................................................. 4651

Article IX

PROVISIONS GOVERNING DISTRIBUTIONS

9.1    Time of Distributions ................................................................... 4651
9.2    Distribution Agent ....................................................................... 4651
9.3    Currency .................................................................................... 4651
9.4    Distributions on Account of Claims Allowed as of the Effective Date ...... 4651
9.5    Distributions on Account of Claims Allowed After the Effective Date ...... 4752
9.6    Delivery Of Distributions .............................................................. 4853
9.7    Accrual of Dividends and Other Rights ............................................. 4955
9.8    Compliance Matters ..................................................................... 5055
9.9    Claims Paid or Payable by Third Parties ........................................... 5055
9.10   Setoffs ...................................................................................... 5056
9.11   Allocation of Plan Distributions Between Principal and Interest .............. 5156

iii

Article X

EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

| | | |
|---|---|---|
| 10.1 | Vesting of Assets | ~~51~~56 |
| 10.2 | Discharge of the Debtors | ~~51~~57 |
| 10.3 | Release by Debtors | ~~52~~57 |
| 10.4 | Release by Holders of Claims | ~~53~~58 |
| 10.5 | Exculpation and Limitation of Liability | ~~53~~59 |
| 10.6 | Exclusions and Limitations on Exculpation, Indemnification, and Releases | ~~54~~59 |
| 10.7 | Injunction | ~~54~~59 |
| 10.8 | Subordination Rights | ~~55~~60 |
| 10.9 | Protection Against Discriminatory Treatment | ~~55~~61 |
| 10.10 | Recoupment | ~~56~~61 |
| 10.11 | Release of Liens | ~~56~~61 |
| 10.12 | Reimbursement or Contribution | ~~56~~61 |

Article XI

CONDITIONS PRECEDENT

| | | |
|---|---|---|
| 11.1 | Conditions to Confirmation | ~~56~~62 |
| 11.2 | Conditions to the Effective Date of the Plan | ~~56~~62 |
| 11.3 | Waiver of Conditions Precedent | ~~57~~63 |
| 11.4 | Notice of Effective Date | ~~57~~63 |
| 11.5 | Effect of Non-Occurrence of Conditions to Consummation | ~~57~~63 |

Article XII

RETENTION OF JURISDICTION

Article XIII

MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| 13.1 | Binding Effect | ~~60~~66 |
| 13.2 | Payment of Statutory Fees | ~~60~~66 |
| 13.3 | Modification and Amendments | ~~60~~66 |
| 13.4 | Confirmation of the Plan | ~~60~~66 |
| 13.5 | Additional Documents | ~~60~~66 |
| 13.6 | Dissolution of Creditors' Committee | ~~60~~67 |
| 13.7 | Request for Expedited Determination of Taxes | ~~60~~67 |
| 13.8 | Revocation, Withdrawal, or Non-Consummation | ~~61~~67 |
| 13.9 | Notices | ~~61~~67 |
| 13.10 | Term of Injunctions or Stays | ~~62~~69 |
| 13.11 | Governing Law | ~~63~~69 |

iv

13.12   Entire Agreement ............................................................................... 6369
13.13   Severability ....................................................................................... 6369
13.14   No Waiver or Estoppel ...................................................................... 6370
13.15   Conflicts ............................................................................................ 6370

v

**EXHIBITS[2]**

**Exhibit 2.1**          **Administrative Claim Request Form**
**Exhibit 6.6**          **Exit Term Loan Facility Credit Agreement**
**Exhibit ~~6.14~~6.15**          **Pioneer LLC Agreement**
**Exhibit ~~6.19~~6.20**          **Retained Causes of Action**
**Exhibit 7.1**          **Assumed Executory Contracts and Unexpired Leases**

---

[2]   The Exhibits ~~will be~~have been filed with the Plan Supplement, as has been, and may be further, amended, modified, and/or supplemented.

Redline Atlantis - Plan of Reorganization 1715029v32 and Atlantis - Plan of Reorganization 1715029v42 9/5/2019 9:13:10 PM

Agent, a capital-raising or liquidity-generating transaction arranged by the Priority First Lien Administrative Agent to provide the Debtors with sufficient capital (whether in the form of exit financing or otherwise) to allow for the implementation and effectiveness of the Plan, on terms and conditions reasonably acceptable to the Debtors.

1.19    "**Cash**" means legal tender of the United States of America and equivalents thereof.

1.20    "**Causes of Action**" means any and all actions, claims, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable, in contract or in tort, directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, including any Avoidance Action, and actions against any Entity for failure to pay for products or services provided or rendered by any Debtor, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.21    "**Certificate**" means any instrument evidencing a Claim or an Interest.

1.22    "**Chapter 11 Cases**" means the voluntary cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, which are being jointly administered and are currently pending before the Bankruptcy Court under Case No. 19-10384 (SHL).

1.23    "**Claim**" means a claim against the Debtors, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, or an Administrative Claim, as applicable.

1.24    "**Claims and Solicitation Agent**" means Epiq Corporate Restructuring LLC.

1.25    "**Claims Objection Deadline**" means, as applicable (except for Administrative Claims), (a) the day that is the later of the first Business Day that is at least 180 days after the Effective Date or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors or the GUC Administrator (solely as to the Operating Company General Unsecured Claims) without further notice to parties-in-interest.

1.26    "**Class**" means a category of Holders of Claims or Interests classified together pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, as described in Article III of this Plan.

4

1.52    "**Disputed**" means with respect to a Claim, (a) any Claim as to which any Debtor, the GUC Administrator, or other parties-in-interest in accordance with applicable law have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by any Debtor, the GUC Administrator, or other parties-in-interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

1.53    "**Distribution Agent**" means ~~any Entity selected by the Debtors or the Reorganized Debtors, in their sole discretion, to make or facilitate distributions pursuant to this Plan.~~ Bankruptcy Management Solutions, Inc. d/b/a Stretto.

1.54    "**Distribution Date**" means the date selected by the Reorganized Debtors, in their sole discretion, upon which distributions to Holders of Allowed Claims entitled to receive distributions under this Plan shall commence.

1.55    "**Distribution Record Date**" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which shall be (a) ten (10) Business Days after entry of the Confirmation Order or (b) such other date as designated by an order of the Bankruptcy Court.

1.56    "**Effective Date**" means the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the effectiveness of this Plan specified in Article 11.2, have been satisfied, or, if capable of being waived in accordance with the terms herein, waived, which date shall be specified in a notice filed by the Reorganized Debtors with the Bankruptcy Court.

1.57    "**Entity**" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.58    "**Equity Security**" has the meaning ascribed to such term in section 101(16) of the Bankruptcy Code.

1.59    "**Escrow Agent**" means Ankura Trust Company LLC in its capacity as escrow agent for the Holdback Escrow Account.

~~1.59~~1.60    "**Estates**" means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

~~1.60~~1.61    "**Exculpated Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' (1) current financial advisors, attorneys, accountants, investment bankers, representatives, and other professionals; (2) current employees, consultants, Affiliates, officers,

8

managers and directors, including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; (i) the Creditors' Committee and each of its members; (j) the First Lien Administrative Agent; (k) Capital Finance Opportunities 1701C, LLC; (*l*) with respect to each of the foregoing entities in clauses (a) through (k), each of their current and former Affiliates; and (m) with respect to each of the foregoing entities in clauses (a) through (*l*), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, direct and indirect partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.61**1.62**    "**Executory Contract**" means any contract to which any Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.62**1.63**    "**Exhibit**" means an exhibit annexed either to this Plan, contained in the Plan Supplement, or annexed as an appendix to the Disclosure Statement.

1.63**1.64**    "**Exit Liquidity Facility**" means a senior secured asset-based lending, receivables, or similar facility with revolving commitments in an aggregate amount not to exceed the difference between $10 million and the greater of (a) the Debtors' projected available cash and Cash Equivalents (as defined in the DIP Credit Agreement) on the Effective Date, or (b) the Debtors' projected available cash and Cash Equivalents 60 days following the Effective Date, on terms and conditions reasonably acceptable to the Priority First Lien Administrative Agent, which shall be senior in lien priority to the Exit Term Loan Facility and New First Lien Facility with respect to the Debtors' and Reorganized Debtors' accounts receivable and inventory assets.

1.64**1.65**    "**Exit Term Loan Facility**" means an exit term loan credit facility in an aggregate principal amount equal to the sum of $50 million to be provided to the Reorganized Debtors by the Exit Term Loan Facility Lenders on the Effective Date pursuant to the Exit Term Loan Facility Documents, and (b) up to $30 million to be provided to the Reorganized Debtors by the Priority First Lien Parties (or their designee) on the Effective Date as a Capital Raising Transaction, all of which shall be senior in lien priority to the New First Lien Facility.

1.65**1.66**    "**Exit Term Loan Facility Agent**" means the administrative agent under the Exit Term Loan Facility Documents, and its successors and assigns in such capacity, or any replacement agent appointed pursuant to the terms of the Exit Term Loan Facility Documents.

9

**1.661.67**        "**Exit Term Loan Facility Credit Agreement**" means that certain term loan credit agreement, annexed hereto as Exhibit 6.6, which shall be effective on the Effective Date, by and among certain of the Reorganized Debtors, the Exit Term Loan Facility Agent, and the Exit Term Loan Facility Lenders, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time, which shall have lien priority over all other indebtedness of the Reorganized Debtors (other than, if applicable, the Exit Liquidity Facility), shall have a maturity date of ~~five~~seven years after the Effective Date and shall bear interest at a rate of LIBOR *plus* 7.5% per annum payable-in-kind; provided that the Reorganized Debtors shall have the ability at any time to elect to pay interest at a rate of LIBOR *plus* 7% per annum payable in cash for any period.

**1.671.68**        "**Exit Term Loan Facility Lenders**" means the lenders under the Exit Term Loan Facility Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the Exit Term Loan Facility Credit Agreement.

**1.681.69**        "**Exit Term Loan Facility Documents**" means, collectively, the Exit Term Loan Facility Credit Agreement and all other "Loan Documents" as defined therein, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documents) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall be, to the extent applicable.

**1.691.70**        "**Face Amount**" means, (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Holder of a Claim in any proof of Claim, or amendment thereof in accordance with applicable law, timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, or the amount estimated for such Claim in an order of the Bankruptcy Court, and (b) when used in reference to an Allowed Claim or Allowed Interest, the allowed amount of such Claim or Interest.  If none of the foregoing applies, the Face Amount of the Claim shall be zero ($0) dollars.

**1.701.71**        "**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

**1.711.72**        "**Final Order**" means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, is in full force and effect, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order

10

shall not prevent such order from being a Final Order; provided, further, that the Debtors or Reorganized Debtors, as applicable, reserve the right to waive any appeal period for an order or judgment to become a Final Order.

1.72 1.73    "**First Lien Administrative Agent**" means Cortland Capital Market Services LLC, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the First Lien Credit Agreement.

1.73 1.74    "**First Lien Claims**" means any and all Claims held by the First Lien Lenders against the Debtors arising under, relating to, or in connection with the First Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in an aggregate amount of $219,815,899.97.

1.74 1.75    "**First Lien Classes**" means, collectively, Class 2B and Class 2C.

1.75 1.76    "**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of July 31, 2013, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the First Lien Administrative Agent, and the various lenders party thereto from time to time, as has been or it may be amended, supplemented, amended and restated, or otherwise modified from time to time.

1.76 1.77    "**First Lien Credit Documents**" means the First Lien Credit Agreement, together with all other "Loan Documents" (as defined in the First Lien Credit Agreement).

1.77 1.78    "**First Lien Lenders**" means the "Lenders" as defined in the First Lien Credit Agreement.

1.78 1.79    "**General Unsecured Claim**" means any Claim that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Priority First Lien Claim, First Lien Claim, Second Lien Claim, PIK Notes Claim, Other Secured Claim, Other Priority Claim, Intercompany Claim, or Other Subordinated Claim. Without limiting the foregoing, General Unsecured Claims include all Rejection Damages Claims that are not Allowed Section 503(b)(9) Claims.

1.79    "General Unsecured Claims Cash Pool" means $950,000 of Cash plus any net property or proceeds received by the Debtors or Reorganized Debtors in connection with the pursuit of any claims under section 547 of the Bankruptcy Code against the Specified Parties.

1.80    "General Unsecured Claims Cash Pool Account" means a segregated account to be funded on or prior to the Effective Date in accordance with Article 6.9.

1.81 1.80    "**Governmental Unit**" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

11

1.82 1.81    "**GUC Administrator**" means the person appointed by the Creditors' Committee in accordance with Article 8.2 of the Plan.

1.82    "**GUC Administrator Account**" means a segregated account to be funded on or prior to the Effective Date in accordance with Article 6.10 of the Plan.

1.83    "**GUC Administrator Costs**" means the reasonable costs and expenses of the GUC Administrator, including reasonable professionals' fees and expenses, which, for the avoidance of doubt, shall be paid by the Debtors or Reorganized Debtors in an amount not to exceed $250,000.

1.84    "**Healthcare Liability Policies**" means the healthcare liability Insurance Contracts, for the terms July 2013 through June 30, 2019, issued by American Casualty Company of Reading, Pennsylvania, Transportation Insurance Company, and/or Continental Insurance Company, as insurer.

1.84 1.85    "**Holdback Escrow Account**" means the interest-bearing escrow account into which Cash equal to the Holdback Escrow Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims (as Allowed pursuant to the terms of this Plan) to the extent not previously paid or disallowed.

1.85 1.86    "**Holdback Escrow Amount**" means the sum of (a) the aggregate amounts withheld by the Debtors as of the Confirmation Date as a holdback on payment of Professional Claims pursuant to the Professional Fee Order, and (b) twenty (20) percent of that portion of the unbilled fees of Professionals estimated pursuant to Article 2.3(c) of the Plan attributable to fees incurred as of the Confirmation Date; provided, however, that if a Professional does not provide an estimate pursuant to Article 2.3(c), the Debtors may estimate the unbilled fees of such Professional incurred as of the Confirmation Date, and the sum of provision (a) above and the total amount so estimated shall comprise the Holdback Escrow Amount.

1.86 1.87    "**Holding Companies**" means FC Pioneer Holding Company, LLC and Trident Holding Company, LLC.

1.87 1.88    "**Holding Company General Unsecured Claims**" means the General Unsecured Claims and the PIK Notes Claims against the Holding Companies.

1.88 1.89    "**Holder**" means a holder of a Claim against or Interest in the Debtors.

1.89 1.90    "**Impaired**" means impaired within the meaning of section 1124 of the Bankruptcy Code.

1.91    "**Initial Distribution Date**" means, with respect to all Claims other than Operating Company General Unsecured Claims, the date selected by the Reorganized Debtors, in

their sole discretion, upon which distributions to Holders of Allowed Claims entitled to receive distributions under this Plan shall commence.

~~1.90~~1.92    "**Insurance Contract**" has the meaning ascribed to it in <u>Article 7.3</u> of this Plan.

~~1.91~~1.93    "**Insured Claims**" has the meaning ascribed to it in <u>Article 7.3</u> of this Plan.

~~1.92~~1.94    "**Intercompany Claim**" means a Claim or a Cause of Action by a Debtor against another Debtor.

~~1.93~~1.95    "**Interest**" means any Equity Security, common stock, equity, ownership, profit interest, unit, or share in a Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in a Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, vested, transferrable, preferred, common, voting, or denominated "stock" or a similar security, existing immediately prior to the Effective Date.

~~1.94~~1.96    "**Ivy Hill**" means, collectively, Ivy Hill Middle Market Credit Fund IV, Ltd., Ivy Hill Middle Market Credit Fund V, Ltd., Ivy Hill Middle Market Credit Fund VII, Ltd., Ivy Hill Middle Market Credit Fund IX, Ltd., Ivy Hill Middle Market Credit Fund X, Ltd., Private Debt Strategies Fund IV L.P., and Ivy Hill Asset Management, L.P..

~~1.95~~1.97    "**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued, or promulgated by any Governmental Unit.

1.98    "**Legacy Workers Compensation Policies**" means those large casualty workers' compensation and employers' liability Insurance Contracts, for the terms December 2011 through July 2018, issued by American Casualty Company of Reading, Pennsylvania, Transportation Insurance Company, and/or Continental Insurance Company, as insurer.

~~1.96~~1.99    "**Legal Proceeding**" means legal, governmental, administrative, judicial, or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, notices of noncompliance or violation, or proceedings.

~~1.97~~1.100    "**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

~~1.98~~1.101    "**Management Incentive Plan**" means the post-Effective Date management equity incentive plan, which shall provide for, among other things, not to exceed 10% of the equity, options, restricted stock units, or other equity instruments in Reorganized Pioneer, issued at plan value, to be reserved for current and future officers and employees of the Reorganized Debtors (excluding any such equity, options, restricted stock units, or other equity instruments granted to the non-executive members of the New Pioneer Board), with awards and terms and conditions thereunder determined by the New Pioneer Board, except as otherwise set

13

forth in the Plan Supplement. For the avoidance of doubt, the Reorganized Debtors shall have the right to set additional equity awards for the benefit of members of the New Boards following the Effective Date.

**1.99**1.102    "**Minimum Liquidity Condition Precedent**" has the meaning ascribed to such term in <u>Article 11.2</u>.

**1.100**1.103    "**New Boards**" means the initial boards of directors of the Reorganized Debtors, which shall as of the Effective Date consist of members selected by the Priority First Lien Administrative Agent and shall be as set forth in the Plan Supplement or as announced on the record during the Confirmation Hearing.

**1.101**1.104    "**New First Lien Facility**" means a new first lien term loan facility in an aggregate principal amount of $105 million to be provided to the Reorganized Debtors by the New First Lien Facility Lenders on the Effective Date pursuant to the New First Lien Credit Agreement, which shall be junior in lien priority to the Exit Term Loan Facility.

**1.102**1.105    "**New First Lien Facility Agent**" means the administrative agent under the New First Lien Facility Documents, and its successors and assigns in such capacity, or any replacement agent appointed pursuant to the terms of the New First Lien Facility Documents.

**1.103**1.106    "**New First Lien Credit Agreement**" means that certain term loan credit agreement, which shall be effective on the Effective Date, by and among certain of the Reorganized Debtors, the New First Lien Facility Agent, and the New First Lien Facility Lenders, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time, the material terms of which shall be substantially identical to those in the Priority First Lien Credit Agreement, except that the maturity date shall be ~~five~~seven years after the Effective Date and the term loans under the New First Lien Facility shall bear interest at a rate of LIBOR *plus* 7.5% per annum payable-in-kind; provided that the Reorganized Debtors shall have the ability at any time to elect to pay interest at a rate of LIBOR *plus* 7% per annum payable in cash for any period.

**1.104**1.107    "**New First Lien Facility Documents**" means, collectively, the New First Lien Credit Agreement and all other "Loan Documents" as defined therein, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documents) (in each case, as amended, restated, modified, or supplemented from time to time).

**1.105**1.108    "**New First Lien Facility Lenders**" means the lenders under the New First Lien Credit Agreement and each other party that becomes a lender thereunder from time to time in accordance with the terms of the New First Lien Credit Agreement.

**1.106**1.109    "**New Pioneer Board**" means the initial board of managers of Reorganized Pioneer, which shall as of the Effective Date consist of members selected by the Priority First Lien Administrative Agent and shall be as set forth in the Plan Supplement or as

14

announced on the record during the Confirmation Hearing; <u>provided</u>, to the extent designated by the Priority First Lien Administrative Agent, another of the New Boards may exercise the rights of the New Pioneer Board hereunder.

~~1.107~~1.110    "**New Pioneer Units**" means the Class A limited liability company units of Reorganized Pioneer as provided under the Pioneer LLC Agreement.

~~1.108~~1.111    "**Old Pioneer Units**" means limited liability company interests represented by units of FC Pioneer Holding Company, LLC of any other such interests that are authorized, issued, and outstanding prior to the Effective Date.

~~1.109~~1.112    "**Old Securities**" means, collectively, the Original PIK Notes, the Tranched PIK Notes, and Old Pioneer Units, and all options, warrants, rights, and other instruments evidencing an ownership interest in Pioneer (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise to acquire any of the foregoing.

~~1.110~~1.113    "**Operating Companies**" means, collectively, all the Debtors that are not Holding Companies.

~~1.111~~1.114    "**Operating Company General Unsecured Claims**" means the General Unsecured Claims against the Operating Companies.

1.115    "**Operating Company General Unsecured Claims Cash Pool**" means $950,000 of Cash plus any net property or proceeds received by the Debtors or Reorganized Debtors in connection with the pursuit of any claims under section 547 of the Bankruptcy Coe against the Specified Parties.

1.116    "**Operating Company General Unsecured Claims Cash Pool Account**" means a segregated account to be funded on or prior to the Effective Date in accordance with Article 6.9.

~~1.112~~1.117    "**Operating Company General Unsecured Class**" means Class 6C.

1.118    "**Operating Company General Unsecured Claims Distribution Date**" means, solely with respect to Operating Company General Unsecured Claims, the date or dates selected by the GUC Administrator, in its sole discretion, upon which distributions to Holders of Allowed Operating Company General Unsecured Claims entitled to receive distributions under this Plan shall occur.

~~1.113~~1.119    "**Ordinary Course Professionals Order**" means the Bankruptcy Court's Order Authorizing Debtors To Employ And Pay Professionals Utilized In The Ordinary Course Of Business (Docket No. 180).

15

1.1141.120    "**Original PIK Notes**" means those certain promissory notes issued pursuant to the Original PIK Notes Investment Agreement.

1.1151.121    "**Original PIK Notes Investment Agreement**" means the Investment Agreement, dated as of December 9, 2016, by and among Pioneer, as borrower, the Original PIK Notes Investor Representative, and the other noteholders party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

1.1161.122    "**Original PIK Notes Investor Representative**" means GCM Saint Paul SPV, LLC, in its capacity as investor representative under the Original PIK Notes Investment Agreement.

1.1171.123    "**Other Priority Claim**" means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a) of the Bankruptcy Code.

1.1181.124    "**Other Secured Claim**" means any Secured Claim other than the following: (a) a DIP Facility Claim; (b) a Priority First Lien Claim; (c) a First Lien Claim; or (d) a Second Lien Claim.

1.1191.125    "**Other Subordinated Claim**" means any Claim against the Debtors that is subject to subordination under section 510(b) or (c) of the Bankruptcy Code, whether arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, or otherwise, which Claim shall be subordinated to all Claims or Interests that are senior to or equal to the Claim or Interest represented by such security.

1.1201.126    "**Periodic Distribution Date**" means, with respect to all Claims other than Operating Company General Unsecured Claims, as applicable, (a) the Distribution Date, as to the first distribution made by the Distribution Agent, and (b) thereafter, such Business Days selected by the Reorganized Debtors in their reasonable discretion, which shall be no less frequent than once every three (3) months unless otherwise determined by the New Board.

1.1211.127    "**Person**" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

1.1221.128    "**Petition Date**" means February 10, 2019.

1.1231.129    "**PIK Notes**" means, collectively, the Original PIK Notes and the Tranched PIK Notes.

1.1241.130    "**PIK Notes Claim**" means any Claim arising from, or related to, the PIK Notes.

1.1251.131    "**Pioneer**" means FC Pioneer Holding Company, LLC.

16

~~1.126~~1.132   "**Pioneer LLC Agreement**" means the amended and restated limited liability company agreement of Pioneer to be effective as of the Effective Date, the form and substance of which shall be included in the Plan Supplement.

~~1.127~~1.133   "**Plan**" means this joint plan of reorganization for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as may be modified in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms herein, including the Plan Supplement and all Exhibits, supplements, appendices, and schedules.

~~1.128~~1.134   "**Plan Supplement**" means the supplement or supplements to the Plan containing certain Exhibits and documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court in accordance with the terms herein.

~~1.129~~1.135   "**Plan Supplement Filing Date**" means the date on which the Plan Supplement shall be filed with the Bankruptcy Court, which date shall be at least seven days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice, so long as such date is prior to the Voting Deadline.

~~1.130~~1.136   "**Plan Transaction Documents**" means all definitive documents and agreements to which the Debtors will be a party as contemplated by the Plan including, without limitation, (a) the Plan and any documentation or agreements related thereto, (b) the Confirmation Order and pleadings (but not declarations) in support of entry thereof, (c) the solicitation materials in respect of the Plan, the motion to approve the Disclosure Statement, and the Disclosure Statement Order, and (d) all documents that will comprise the Plan Supplements.

~~1.131~~1.137   "**Priority First Lien Administrative Agent**" means Silver Point Finance, LLC, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the Priority First Lien Credit Agreement.

~~1.132~~1.138   "**Priority First Lien Claims**" means any and all Claims held by the Priority First Lien Lenders against the Debtors arising under, relating to, or in connection with the Priority First Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in the aggregate amount of $259,387,485.15.

~~1.133~~1.139   "**Priority First Lien Credit Agreement**" means that certain Priority First Lien Credit Agreement, dated as of April 30, 2018, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, Trident Holding Company, LLC, the Priority First Lien Administrative Agent, and the various lenders party thereto from time to time, as it may be amended, supplemented, amended and restated, or otherwise modified from time to time.

17

**1.134~~1.140~~** "**Priority First Lien Credit Documents**" means the Priority First Lien Credit Agreement, together with all other "Loan Documents" (as defined in the Priority First Lien Credit Agreement).

**1.135~~1.141~~** "**Priority Intercreditor Agreement**" means the Priority/First Lien/Second Lien Intercreditor Agreement, dated as of April 30, 2018, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, Trident Holding Company, LLC, the other grantors party thereto, the Priority First Lien Administrative Agent, the First Lien Administrative Agent, and the Second Lien Administrative Agent.

**1.136~~1.142~~** "**Priority First Lien Lenders**" means the "Lenders" as defined in the Priority First Lien Credit Agreement.

**1.137~~1.143~~** "**Priority First Lien Parties**" means the Priority First Lien Lenders and the Priority First Lien Administrative Agent.

**1.138~~1.144~~** "**Priority Tax Claim**" means a Claim of a Governmental Unit entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**1.139~~1.145~~** "**Pro Rata**" means, with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes at issue; provided, however, that for purposes of distributions to Holders of Allowed Operating Company General Unsecured Claims, Pro Rata shall apply on a consolidated basis.

**1.140~~1.146~~** "**Professional**" means any Entity (a) retained in the Chapter 11 Cases by separate Final Order pursuant to sections 327, 363, and 1103 of the Bankruptcy Code or otherwise; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; provided, however, that Professional does not include any Entity retained pursuant to the Ordinary Course Professionals Order.

**1.141~~1.147~~** "**Professional Claim**" means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Confirmation Date.

**1.142~~1.148~~** "**Professional Fee Order**" means the order entered by the Bankruptcy Court on March 8, 2019, authorizing the interim payment of Professional Claims subject to the Holdback Escrow Amount (Docket No. 172).

**1.143~~1.149~~** "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claim Holder so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claim Holder to

18

demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Claim Holder for any damages incurred as a result of any reasonable reliance by such Claim Holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claim Holder; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

1.1441.150    "**Rejection Damages Claim**" means any Claim on account of the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

1.1451.151    "**Released Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' (1) current financial advisors, attorneys, accountants, investment bankers, representatives, and other professionals (collectively, the "**Debtor Professionals**"); (2) current employees, consultants, Affiliates, officers, managers and directors, including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; (i) the Creditors' Committee and each of its members; (j) Ares; (k) Ivy Hill; (*l*) the Audax Debt Funds; (m) Capital Finance Opportunities 1701C, LLC; (n) each of the parties to the Cortland Settlement Agreement; (o) with respect to each of the foregoing entities in clauses (a) through (n), each of their current and former Affiliates; and (p) with respect to each of the foregoing entities in clauses (a) through (o), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, direct and indirect partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees; provided, that, the foregoing entities identified in clauses (j) through (n) (including clauses (o) and (p) with respect to such entities identified in clauses (j) through (n)) shall constitute Released Parties solely for the Debtor releases set forth in Article 10.3.

1.1461.152    "**Releasing Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and the Reorganized Debtors; (b) the Priority

19

First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; (i) the Creditors' Committee and each of its members; (j) Ares; (k) Ivy Hill; (*l*) the Audax Debt Funds; (m) Capital Finance Opportunities 1701C, LLC; (n) each of the parties to the Cortland Settlement Agreement; (o) with respect to each of the foregoing parties under (a) through (n), each of their current and former affiliates; (p) with respect to each of the foregoing entities in clauses (a) through (o), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, managers, directors, principals, direct and indirect shareholders, direct and indirect members, direct and indirect partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, agents and other professionals, and such persons' respective heirs, executors, estates, servants and nominees; (k) without limiting the foregoing, each holder of a Claim against or Interest in the Company that (1) voted to accept the Plan, (2) is deemed to accept the Plan and opted to provide a release, (3) is deemed to reject the Plan and opted to provide a release, (4) was solicited to vote to accept or reject the Plan but who did not vote either to accept or to reject the Plan and opted to provide a release, or (5) voted to reject the Plan and opted to provide a release; and (*l*) solely with respect to the Substantial Contribution / Indemnified Parties, and without limiting the foregoing, each holder of a Claim against or Interest in the Company.

> ~~1.147~~1.153    "**Reorganized Debtors**" means the Debtors or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

> ~~1.148~~1.154    "**Reorganized Pioneer**" means Pioneer or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

> ~~1.149~~1.155    "**Restructuring Transactions**" has the meaning set forth in Article 6.3.

> ~~1.150~~1.156    "**RSA**" means the Restructuring Support Agreement, dated as of February 10, 2019, by and between the Debtors, the Priority First Lien Lenders, and the Priority First Lien Administrative Agent, including any exhibits and schedules thereto.

> ~~1.151~~1.157    "**Scheduled**" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

> ~~1.152~~1.158    "**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors pursuant to section 521 of the Bankruptcy Code, which incorporate by reference the global notes and statement of limitations, methodology, and disclaimer regarding the Debtors' schedules and statements, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or Final Orders of the Bankruptcy Court.

20

> 1.1531.159    "**SEC**" means the United States Securities and Exchange Commission.

> 1.1541.160    "**Second Lien Administrative Agent**" means Ares Capital Corporation, and its predecessors, successors and assigns, solely in its capacity as "Administrative Agent" pursuant to the Second Lien Credit Agreement.

> 1.1551.161    "**Second Lien Claims**" means any and all Claims held by the Second Lien Lenders against the Debtors arising under, relating to, or in connection with the Second Lien Credit Agreement, whether such Claims are Secured Claims or unsecured deficiency claims pursuant to section 506(a) of the Bankruptcy Code, and which Claims shall be Allowed for all purposes under this Plan in an aggregate amount of $175,567,909.46.

> 1.1561.162    "**Second Lien Classes**" means, collectively, Class 3B and Class 3C.

> 1.1571.163    "**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of July 31, 2013, by and among New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the Second Lien Administrative Agent, and the various lenders party thereto from time to time, as has been or may be amended, supplemented, amended and restated, or otherwise modified from time to time.

> 1.1581.164    "**Second Lien Credit Documents**" means the Second Lien Credit Agreement, together with all other "Loan Documents" (as defined in the Second Lien Credit Agreement).

> 1.1591.165    "**Second Lien Lenders**" means the "Lenders" as defined in the Second Lien Credit Agreement.

> 1.1601.166    "**Section 503(b)(9) Claim**" means any Claim asserted under section 503(b)(9) of the Bankruptcy Code equal to the value of any goods received by the Debtors within 20 days before the Petition Date during which the goods have been sold to the Debtors in the Debtors' ordinary course of business.

> 1.1611.167    "**Secured Claim**" means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

> 1.1621.168    "**Securities Act**" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the SEC promulgated thereunder.

> 1.1631.169    "**Security**" has the meaning ascribed to such term in section 2(a)(1) of the Securities Act.

21

1.164**1.170**    "**Settling Parties**" means, collectively, (i) the Creditors' Committee; (ii) the Priority First Lien Parties; (iii) Ares; (iv) Ivy Hill; (v) the Audax Debt Funds; (vi) the Debtors.

1.165**1.171**    "**Specified Executives**" means executives holding the positions of Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer.

1.166**1.172**    "**Specified Parties**" means any 10 of the following 16 parties identified by the Debtors in a Plan Supplement prior to the Confirmation Date: (1) Merchants Automotive Group; (2) Beckman Coulter Inc.; (3) Element Fleet Corporation; (4) Cardinal Health Medical Products & Svcs; (5) Verizon Wireless; (6) Gelco Corporation; (7) Sysmex America Inc.; (8) Bio-Rad Laboratories Inc.; (9) 3M Health Information Systems; (10) DSSI; (11) Liaison Technologies Inc.; (12) Esker Software Inc.; (13) Hinduja Global Solutions Inc.; (14) HGS EBOS LLC; (15) Data Media Associates LLC; (16) Sprint.

1.167**1.173**    "**Substantial Contribution / Indemnified Parties**" means, collectively, each of the following in their respective capacities as such: (a) the Debtors and all of the Debtors' and Reorganized Debtors' current employees, officers, managers and directors, including any such persons or entities retained pursuant to section 363 of the Bankruptcy Code; (b) the Priority First Lien Lenders; (c) the Priority First Lien Administrative Agent; (d) the Priority Lender Group (as defined in the RSA) and each of its members; (e) the Consenting Priority Lenders (as defined in the RSA); (f) the DIP Agent; (g) the DIP Lenders; (h) the administrative and collateral agents under the Priority First Lien Credit Agreement; and (i) the successors and assigns, subsidiaries, affiliates, current officers, directors, principals, shareholders, members, partners, employees, agents, attorneys, investment bankers, and representatives of each of the foregoing (a) through (h).

1.168**1.174**    "**Tranched PIK Notes**" means those certain promissory notes issued pursuant to the Tranched PIK Notes Investment Agreement.

1.169**1.175**    "**Tranched PIK Notes Investment Agreement**" means the Investment Agreement, dated as of November 29, 2017, by and among Pioneer and Trident Holding Company, LLC, each as borrower, the Tranched PIK Notes Investor Representative, and the other noteholders party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

1.170**1.176**    "**Tranched PIK Notes Investor Representative**" means Revelstoke Capital Partners Fund I, L.P., in its capacity as investor representative under the Tranched PIK Notes Investment Agreement.

1.171**1.177**    "**Unclaimed Distribution**" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors (or the Distribution Agent, as the case may be), of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' request (or the

22

Distribution Agent's request, as the case may be), for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

> 1.172**1.178** "**Unexpired Lease**" means a lease of nonresidential real property to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

> 1.173**1.179** "**Unimpaired**" means, with respect to a Class of Claims, a Class of Claims that is not Impaired.

> 1.174**1.180** "**Voting Deadline**" means June 6, 2019 at 4:00 p.m. prevailing Eastern time.

> 1.175**1.181** "**Warrants**" means, on terms and conditions set forth in the Pioneer LLC Agreement and acceptable to the Priority First Lien Lenders, Class W units of Reorganized Pioneer exercisable for up to 5% of the New Pioneer Units, subject to dilution by the Management Incentive Plan, with an expiration date of eighteen (18) months after the Effective Date at a strike price equal to the price per share that would result in a full return on invested capital to the Priority First Lien Lenders (inclusive of the full amount of the Priority First Lien Claims) calculated as of the Effective Date, with such strike price continuing to accrue at a rate of LIBOR *plus* 9.5% compounding quarterly.

## C.    **Rules of Interpretation**

> For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) the words "current" or "currently" shall refer to the Confirmation Date; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan, (hi) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (ij) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control; (jk) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control; (kl) any immaterial effectuating provision may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan without further Final Order of the Bankruptcy Court; (lm) to the extent that any right of any Entity (other than the Debtors or Reorganized Debtors) to consent to a matter, action or otherwise is unqualified, it shall be implied that such consent right may not be unreasonably withheld, conditioned, or delayed; and (mn) references to "shares," "shareholders," "directors," shall also include "membership units," "members," "managers," and/or "officers" or other

23

Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the Effective Date, (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims, or (c) on such other date as agreed between the Debtors (or the Reorganized Debtors) and such Holder of an Allowed Administrative Claim; provided, however, that other than Holders of (i) DIP Facility Claims,  (ii) Professional Claims, (iii) Administrative Claims Allowed by an order of the Bankruptcy Court on or before the Effective Date, or (iv) Administrative Claims that are not Disputed and arose in the ordinary course of business and were paid or are to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, the Holder of any Administrative Claim shall have filed a proof of Claim form no later than the Administrative Claims Bar Date and such Claim shall have become an Allowed Claim. Except as otherwise provided herein and/or in the Bar Date Order and as set forth in Articles 2.2 or 2.3 of this Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in Exhibit 2.1, with the Claims and Solicitation Agent and served on counsel for the Debtors or the Reorganized Debtors by no later than the Administrative Claims Bar Date.  After the Effective Date, the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  In the event that the Reorganized Debtors object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim

> **2.2    DIP Facility Claims**. On the Effective Date, the DIP Facility Claims shall be Allowed in full, in the amount of $50 million (less any amounts paid prior to the Effective Date) plus all accrued and unpaid postpetition interest under the DIP Credit Agreement (and any unpaid fees, costs, and expenses). With the consent of the DIP Lenders as provided in the RSA, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Facility Claims, all outstanding DIP Facility Claims shall be automatically converted to and deemed to be obligations under the Exit Term Loan Facility Credit Agreement, and all Collateral (as such term is defined in the DIP Credit Agreement) that secures the obligations under the DIP Documents shall be reaffirmed, ratified, and shall automatically secure all obligations of the Reorganized Debtors under the Exit Term Loan Facility Credit Agreement.

> **2.3    Professional Claims**.

> > (a)    **Final Fee Applications**.   All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Creditors' Committee must be filed no later than ~~sixty~~thirty (~~60~~30) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, the Allowed amounts of all Professional Claims and expenses shall be determined by the Bankruptcy Court. The Professionals retained by the Creditors' Committee shall apply a 10% discount on all applicable fees and expenses in their request for payment of Professional Claims related to its investigation of the Prepetition Obligations and Prepetition Liens (each as defined in the DIP Facility Order) in

25

excess of the Challenge Budget (as defined in the DIP Facility Order).  Any disputes regarding the calculation of the 10% discount on applicable fees and expenses shall be decided, after notice and a hearing, by the Bankruptcy Court.

(b)      **Payment of Interim Amounts.**  Subject to the Holdback Escrow Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed (and as to which there is no then-existing Court-mandated or Court-ordered prohibition on making payment).  To receive payment on the Effective Date for such unbilled fees and expenses incurred through the Effective Date that have not yet been billed pursuant to the Professional Fee Order, no later than two (2) days prior to the Effective Date, the Professionals (who, in the case of the Creditors' Committee, shall only be permitted to take the actions set forth in Article 13.6 after the Confirmation Date) shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors.  Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period, subject to any parties' right to object as set forth in the Professional Fee Order.

(c)      **Holdback Escrow Account**.  On the Effective Date, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals.  The ~~Distribution~~Escrow Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtors, the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the ~~Distribution~~Escrow Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors to be used by the Reorganized Debtors in accordance with the Plan.

(d)      **Post-Confirmation Date Retention**.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing and prosecuting or addressing any issues with respect to final fee applications).  The Creditors' Committee's Professionals may not be paid for services rendered after the Confirmation Date except to the extent set forth in Article 13.6.

**2.4      Priority Tax Claims**.  On the Effective Date, except to the extent that the Debtors (or Reorganized Debtors) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtors (or the Reorganized Debtors) and such Holder, _provided,_

26

| Class(es) | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 5A – 5C | Other Priority Claims | Unimpaired | Presumed to Accept |
| 6C | Operating Company General Unsecured Claims | Impaired | Entitled to Vote |
| 7A – 7B | Holding Company General Unsecured Claims | Impaired | Deemed to Reject |
| 8A – 8C | Intercompany Claims | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 9A – 9C | Other Subordinated Claims | Impaired | Deemed to Reject |
| 10AB – 10C | Interests in Debtor Subsidiaries | Impaired or Unimpaired | Deemed to Reject or Presumed to Accept |
| 11A | Interests in Pioneer | Impaired | Deemed to Reject |

## ARTICLE IV

## PROVISIONS FOR TREATMENT
## OF CLAIMS AND INTERESTS

### 4.1     Priority First Lien Claims (Classes 1B and 1C)

(a)     Classification: Classes 1B and 1C consist of all Allowed Priority First Lien Claims.

(b)     Allowance:  The Priority First Lien Claims are hereby Allowed against Debtor Group B and Debtor Group C for all purposes in the amount of $259,387,485.15.

(c)     Treatment: Except to the extent that a Holder of an Allowed Priority First Lien Claim agrees to a less favorable treatment or as otherwise provided herein, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Priority First Lien Claim, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority First Lien Claim shall receive its Pro Rata share and interest in (i) the New First Lien Facility, and (ii) 100% of the New Pioneer Units to be issued by Reorganized Pioneer, subject to dilution on account of the Warrants and the Management Incentive Plan.  All accrued and unpaid prepetition and post-petition interest due and payable to a Holder of an Allowed Priority First Lien Claim and payment by the Debtors of all fees and expenses of the Priority First Lien Administrative Agent shall be paid in accordance with the DIP Facility Order and Article 11.2(ed) of this Plan, as applicable.

(d)     Voting: Classes 1B and 1C are Impaired and Holders of Allowed Priority First Lien Claims are entitled to vote to accept or reject the Plan.

### 4.2     First Lien Claims (Classes 2B and 2C)

(a)     Classification: Classes 2B and 2C consist of all Allowed First Lien Claims.

Company General Unsecured Claim shall receive its Pro Rata share and interest in the Operating Company General Unsecured Claims Cash Pool, provided, that the Settling Parties (other than the Creditors' Committee and its members) and Capital Finance Opportunities 1701C, LLC shall not receive their respective Pro Rata share and interest in the Operating Company General Unsecured Claims Cash Pool and such amounts shall be redistributed Pro Rata among the orderother Holders of Operating Company General Unsecured Claims.

(c)     Voting: Class 6C is Impaired and Holders of Allowed Operating Company General Unsecured Claims are entitled to vote to accept or reject the Plan.

**4.7    Holding Company General Unsecured Claims (Classes 7A – 7B)**

(a)     Classification: Classes 7A and 7B consist of all Allowed Holding Company General Unsecured Claims.

(b)     Treatment: On the Effective Date, all of the Debtors' outstanding obligations under the Holding Company General Unsecured Claims shall be extinguished, canceled, and discharged, and each Holder of a Holding Company General Unsecured Claim shall receive no distribution on account of such Claim.

(c)     Voting: Classes 7A and 7B are Impaired, and Holders of Allowed - Holding Company General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Holding Company General Unsecured Claims are not entitled to vote to accept or reject the Plan.

**4.8    Intercompany Claims (Classes 8A – 8C)**

(a)     Classification:  Classes 8A through 8C consist of all Allowed Intercompany Claims.

(b)     Treatment: On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among any Affiliate of the Debtors shall be either reinstated, cancelled, released, or otherwise settled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent).

(c)     Voting: Classes 8A, 8B, and 8C are either:

(i)     Impaired, and Holders of Allowed applicable Class 8 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan; or

(ii)     Unimpaired, and Holders of Allowed applicable Class 8 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

33

Bankruptcy Code and, therefore, Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan.

### 4.9    Other Subordinated Claims (Classes 9A – 9C)

(a)    Classification:  Classes 9A through 9C consist of all Allowed Bankruptcy Code section 510(b) and (c) Claims.

(b)    Treatment: Holders of Allowed Other Subordinated Claims shall not receive any distributions on account of such Allowed Other Subordinated Claims.

(c)    Voting: Classes 9A, 9B, and 9C are Impaired, and Holders of Allowed Other Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Subordinated Claims are not entitled to vote to accept or reject the Plan.

### 4.10    Interests in Debtor Subsidiaries (Classes 10B – 10C)

(a)    Classification:  Classes 10B and 10C consist of all Allowed Interests in Debtor Subsidiaries.

(b)    Treatment:  On the Effective Date, all Allowed Interests in Debtor Subsidiaries shall be either reinstated or cancelled in the Debtors' discretion (with the reasonable consent of the Priority First Lien Administrative Agent).  To the extent reinstated, Interests in Debtor Subsidiaries are Unimpaired solely to preserve the Debtors' corporate structure and Holders of those Interests shall not otherwise receive or retain any property on account of such Interests.

(c)    Voting: Classes 10B and 10C are either:

(i)    Impaired, and Holders of Allowed applicable Class 10 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, such Holders of Allowed Class 10 Claims are not entitled to vote to accept or reject the Plan; or

(ii)    Unimpaired, and Holders of Allowed applicable Class 10 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Allowed Class 10 Claims are not entitled to vote to accept or reject the Plan.

### 4.11    Interests in Pioneer (Class 11A)

(a)    Classification:  Class 11A consists of all Interests in Pioneer.

34

(b)     Treatment: On the Effective Date, Allowed Class 11A Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors.

(c)     Voting: Class 11A is Impaired, and Holders of Allowed Class 11A Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 11A Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE V

## ACCEPTANCE

**5.1     Classes Entitled to Vote.**  Classes 1B, 1C, 2B, 2C, 3B, 3C, and 6C are entitled to vote to accept or reject this Plan.  By operation of law, Classes 4A – 4C, 5A – 5C, 7A, 7B, 8A – 8C, 10A~~B~~ – 10C, and 11A are either deemed to have accepted this Plan or to have rejected this Plan and are not entitled to vote.

**5.2     Acceptance by Impaired Classes.**  An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

**5.3     Elimination of Classes.**  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

**5.4     Special Provision Governing Unimpaired Claims**.  Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**5.5     Deemed Acceptance if No Votes Cast.**  If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, this Plan shall be deemed accepted by the Holders of such Claims in such Class.

**5.6     Cramdown.**  To the extent necessary, the Debtors shall request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify, amend, or withdraw this Plan, with respect to all Debtors or any individual Debtor, or group of Debtors to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

35

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1    No Substantive Consolidation**. The Plan is being proposed as a joint plan of reorganization for the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.  The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

**6.2    General Settlement of Claims and Interests**. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.

**6.3    Restructuring Transactions**.

(a)    On or after the Confirmation Date, with the consent of the Priority First Lien Administrative Agent, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, to otherwise simplify the overall corporate structure of the Debtors, or to organize certain of the Debtors under the laws of jurisdictions other than the laws of which such Debtors currently are organized, which restructuring may include one or more mergers, consolidations, dispositions, liquidations, or dissolutions as may be determined by the Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Debtors vesting in one or more surviving, resulting, or acquiring Entities (collectively, the "Restructuring Transactions"). In addition, on or after the Confirmation Date, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect an assignment, transfer or contribution of Trident Holding Company LLC's rights and interests in (i) the approximate $6,162,254 of collateral trust assets (the "Wells Fargo Collateral Trust Funds") held by Wells Fargo Bank, NA, as trustee, and (ii) the related collateral trust agreement dated as of March 7, 2019, in each case, to its affiliate, Symphony Diagnostic Services No. 1, LLC.  The Wells Fargo Collateral Trust Funds shall continue to secure the obligations of Trident Holding Company, LLC, or its successor-in-interest, to Zurich American Insurance Company and its affiliates ("Zurich") and the posting of such collateral is approved under this Plan and shall not be voidable by any creditors of the Debtors. In each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting, or acquiring Entity shall perform the obligations of such Debtor pursuant to the Plan to satisfy the Allowed Claims against, or Allowed Interests in, such Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor shall perform

36

Loan Facility Credit Agreement; provided that (a) all accrued and unpaid interest on the DIP Facility Claims shall be paid in full in Cash on the Effective Date, and (b) all fees and expenses of the DIP Agent shall be paid in accordance with Article 11.2(d) of this Plan. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Term Loan Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

6.7     **New First Lien Facility**.  On the Effective Date, all Holders of Allowed Priority First Lien Claims shall receive their Pro Rata share and interest in the New First Lien Facility, which shall be junior in lien priority to the Exit Term Loan Facility. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New First Lien Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

6.8     **Authorization, Issuance, and Distribution of New Pioneer Units**.  On the Effective Date, Reorganized Pioneer shall authorize and issue the New Pioneer Units to Holders of Allowed Priority First Lien Claims.  Distribution of New Pioneer Units hereunder shall constitute issuance of 100% of such New Pioneer Units and in each case shall be deemed issued on the Effective Date, subject to dilution on account of the Warrants and the Management Incentive Plan.  The issuance of New Pioneer Units by Reorganized Pioneer is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.  All of the New Pioneer Units issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

6.9     **Operating Company General Unsecured Claims Cash Pool**.

(a)     On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and the Settling Parties (other than the Creditors' Committee) shall fund the Operating Company General Unsecured Claims Cash Pool Account with Cash in an amount equal to the Operating Company General Unsecured Claims Cash Pool, which shall be held in trust for Pro Rata distributions on account of Allowed Operating Company General Unsecured Claims as provided herein. None of the Settling Parties shall amend any asserted Claims on account of any proceeds contributed to the Operating Company General Unsecured Claims Cash Pool. After the Effective Date, to the extent that the Reorganized Debtors receive net property or proceeds on account of claims asserted against the Specified Parties under section 547 of the Bankruptcy Code, the Reorganized Debtors shall contribute such net property or proceeds to the Operating Company General Unsecured Claims Cash Pool Account.

(b)     The Operating Company General Unsecured Claims Cash Pool Account (x) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors or their Estates, (y) shall be held in trust ~~by an entity~~for the benefit of the Operating Company General Unsecured Claims Cash Pool by the GUC Administrator, who, subject to consultation with the Debtors, will be selected by the Creditors' Committee, to fund distributions as provided herein, and (z) shall not be encumbered by any Liens, Claims, or Interests in any way.

38

### 6.10    GUC Administrator Account.

(a)    On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and fund the GUC Administrator Account with Cash in the amount of $250,000, which shall be held in trust for the payment of GUC Administrator costs as provided herein.  The Debtors and the Reorganized Debtors shall have no further obligation or liability for the GUC Administrator's costs as provided herein upon the funding of the GUC Administrator Account pursuant to this Article.

(b)    The GUC Administrator Account (x) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors or their Estates, (y) shall be held in trust by the Debtors or Reorganized Debtors, as applicable, for the benefit of the GUC Administrator and his professionals and other employees, and (z) shall not be encumbered by any Liens, Claims, or Interests in any way.

### 6.10 6.11    Exemptions from Securities Act Registration Requirements.

Except with respect to the New Pioneer Units underlying the Management Incentive Plan, the Warrants and all New Pioneer Units issued under the Plan (including any units issued upon the exercise of the Warrants) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.  New Pioneer Units issued under the Plan (including any shares issued upon the exercise of the Warrants) in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The New Pioneer Units issued pursuant to section 1145 of the Bankruptcy Code (a) are not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any holder thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the New Pioneer Units from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.  New Pioneer Units issued to holders of Priority First Lien Claims and Warrants issued to holders of First Lien Claims and Second Lien Claims, in each case in exchange for such Claims, shall be issued in reliance on section 1145 of the Bankruptcy Code.  New Pioneer Units underlying the Management Incentive Plan will be issued pursuant to another available exemption from registration under the Securities Act and other applicable law.

39

6.116.12    **Cancellation of Existing Securities and Agreements**

(a)    Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Debtors, on the Effective Date, except to the extent otherwise provided in this Plan, all notes, instruments, Certificates, Old Securities and other documents evidencing or creating any indebtedness or obligation of or ownership in the Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged.   On the Effective Date, except to the extent otherwise provided in this Plan, all Interests in the Debtors shall be cancelled, and the obligations in any way related thereto shall be fully satisfied, released, and discharged.

(b)    Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Article 6.116.12 shall be deemed null and void and shall be of no force and effect.

6.126.13    **Issuance and Distribution of New Securities; Execution of Plan Documents**.  Except as otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall issue and/or deliver all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan.

6.136.14    **Continued Corporate Existence**.

(a)    Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as separate entities, the Reorganized Debtors, with all the powers of a corporation or limited liability company under applicable law in the jurisdiction in which each respective Debtor is incorporated or formed and pursuant to its respective charter, bylaws, limited liability company agreement, partnership agreement or other organizational documents in effect prior to the Effective Date, except to the extent such organization documents are amended and restated by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

(b)    Except as otherwise provided in the Plan, the continued existence, operation, and ownership of Affiliates is a material component of the business of the Debtors and the Reorganized Debtors, as applicable, and, as set forth in Article 10.1 of this Plan, all of the Debtors' equity interests and other property interests in such Affiliates shall vest in the Reorganized Debtors or their successors on the Effective Date.

40

**6.14~~6.15~~**    **New Corporate Governance Documents**.  The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) of the Debtors, which documents shall be in form and substance acceptable to the Priority First Lien Administrative Agent, shall be adopted and amended in a form as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code (including Bankruptcy Code section 1123(a)(6)), with the form and substance of the Pioneer LLC Agreement set forth on Exhibit 6.14~~6.15~~.  After the Effective Date, the Reorganized Debtors may amend and restate their respective certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) as permitted by applicable state corporation or business entity law and their respective charters and bylaws or other organizational documents.

**6.15~~6.16~~**    **Directors, LLC Managers, and Officers of Reorganized Debtors**.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed member of Reorganized Debtors' initial board of directors (or other applicable governing body) (and, to the extent such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Plan Supplement or as announced on the record at the Confirmation Hearing.  The number of members of the New Boards and the identities thereof, and any senior officers of the Reorganized Debtors not presently serving in such capacity, shall be determined by the Priority First Lien Administrative Agent, but shall include the Chief Executive Officer of the Reorganized Debtors.

Except as otherwise provided in the Plan Supplement, the officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the Reorganized Debtors on and after the Effective Date.

Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

**6.16~~6.17~~**    **Corporate Action**.  Each of the matters provided for under this Plan involving the corporate structure of the Debtors or the Reorganized Debtors or corporate action to be taken by or required of the Debtors or the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, managers, or directors of the Debtors or the Reorganized Debtors.  Such actions may include, (a) the adoption of the Pioneer LLC Agreement and any other new corporate governance documents, (b) the appointment of the New Boards, (c) the issuance and distribution of New Pioneer Units, and (d) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date).

**6.17~~6.18~~**    **Effectuating Documents; Further Transactions**.  On and after the Effective Date, the Reorganized Debtors, and the officers thereof and members of the New Boards, shall be authorized to and may issue, execute, deliver, file, or record such contracts,

41

Securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

**6.186.19    Employment, Retirement, Indemnification, and Other Agreements and Employee Compensation Programs**.

(a)    **Employment Agreements**.  All employment and compensation-related agreements ~~of the Company as of the Petition~~between the Debtors and any persons who are directors, managers, officers, or employees of the Debtors immediately prior to the Effective Date, including any indemnification and severance obligations and guaranteed bonus amounts, and incentive compensation plans related thereto, shall be assumed.  The Debtors, with the consent of the Priority First Lien Administrative Agent with respect to Specified Executives, may also enter into new employment arrangements and/or change in control agreements with individuals who will serve as officers of the Reorganized Debtors after the Effective Date.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may adopt, approve, and authorize any new employment arrangements with respect to such officers of the Reorganized Debtors without further action, order, or approval of the New Boards.  To the extent any employment-related agreements contain a sale-related bonus, the Reorganized Debtors shall renegotiate such bonus in good faith based upon the Reorganized Debtors' capital structure.  On and after the Effective Date, Cash and bonus compensation and benefits shall be determined by the New Pioneer Board subject to the terms of the Plan Transaction Documents and any agreements being modified.

(b)    **Management Incentive Plan**.  After the Effective Date, equity grants under the Management Incentive Plan shall be reserved for directors, managers, officers, and employees of the Reorganized Debtors on terms determined by the New Pioneer Board.  The Reorganized Debtors shall have the right to set additional equity awards for the benefit of members of the New Pioneer Board after the Effective Date.

(c)    **Indemnification**.  For purposes of this Plan, the respective obligations of the Debtors to indemnify and reimburse any persons who are directors, managers, officers or employees of the Debtors immediately prior to the Effective Date, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable state or non-bankruptcy law, or specific agreements or any combination of the foregoing, shall survive confirmation of this Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on, or after the Petition Date, and each of the Reorganized Debtors shall be jointly and severally liable for the indemnification and/or reimbursement obligations of each of the Debtors.

(d)    **Other Incentive Plans and Employee Benefits**. On and after the Effective Date, the Reorganized Debtors shall adopt, assume, and honor, in the ordinary course

42

of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation, pursuant to the terms thereof or hereof, including any employee compensation plans, any incentive plan including the Annual Incentive Plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity from and after the Petition Date, and shall honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.  After the Effective Date, the Reorganized Debtors may amend or restate any program of the type described in this paragraph, in accordance with applicable law in the ordinary course of business subject to the terms of Plan Transaction Documents and the terms of the program being amended and restated.

6.196.20    **Preservation Of Causes Of Action**.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not released pursuant to Article 10.3 of this Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in Exhibit 6.196.20, and such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date.  The Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successor holding such rights of action. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.  For the avoidance of doubt, effective as of the Effective Date, all Persons will be deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims or causes of action whatsoever arising under section 547 of the Bankruptcy Code; provided, that such claims shall not be released and discharged against any Specified Party as set forth herein.**

6.206.21    **Reservation of Rights**. With respect to any Cause of Action that the Reorganized Debtors expressly abandon, if any, the Reorganized Debtors reserve all rights, including the right under Bankruptcy Code section 502(d) to use defensively the abandoned Causes of Action as a basis to object to all or any part of a claim against any of the Estates asserted by a creditor who obtains the benefit of the abandoned Cause of Action.  Except as set forth in Article 10.3 of this Plan, nothing contained in this Plan shall constitute or be deemed a waiver or abandonment of any Cause of Action that the Reorganized Debtors may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained

herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**6.216.22** **Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.226.23** **Insured Claims**. Notwithstanding anything to the contrary contained herein, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, provided, that, unless the Debtors and the Reorganized Debtors provide their express written consent, the Holders of such Claims shall not obtain payment from the insurers for the portion of any Claims (including, but not limited to, any deductible portion) covered by the Insurance Contracts if the payment of such portion shall require the Debtors or the Reorganized Debtors to reimburse the insurers for such payment, and (b) solely for the portion of such Claim that is not paid by the applicable insurance policy (including, but not limited to, any deductible portion that is not paid under the policy), receive the treatment provided for in this Plan for Allowed General Unsecured Claims.

**6.236.24** **Intercompany Account Settlement.** The Debtors and the Reorganized Debtors, and their respective Affiliates will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.

**6.246.25** **Closing of Chapter 11 Cases.** The Debtors or the Reorganized Debtors, as applicable, shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

**6.256.26** **Private Company.** It is anticipated that the Reorganized Debtors shall be private companies as of the Effective Date and shall not register any of their respective equity with the SEC or list such equity on an exchange as of the Effective Date.

44

the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.3    **Insurance Policies**.

(a)    Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision in the Planthat purports to be preemptory or supervening, confers Bankruptcy Court jurisdiction, grants an injunction or release, or requires a party to opt out of any releases): (a) (i) on the Effective Date, all insurance policies to which any Debtor is a party as of the Effective Date (including any "tail policy"), other than the Legacy Workers Compensation Policies and the Healthcare Liability Policies, shall be deemed to be and treated as executory contracts and shall be assumed, or assumed and assigned, by the applicable Reorganized Debtors and shall continue as obligations of the Debtors or Reorganized Debtors in accordance with their respective terms.  All (such assumed or assumed and assigned insurance policies shall vest in the Reorganized Debtors, as applicable.and all agreements, documents or instruments relating thereto, the "**Insurance Contracts**"); (ii) the Legacy Workers Compensation Policies and the Healthcare Liability Policies shall be assumed by the applicable Reorganized Debtors in accordance with a stipulation and order (the "**Assumption Stipulation**") setting forth the deductible reimbursement and collateral adjustment obligations of the parties subsequent to the Effective Date; the assumption of the Legacy Workers Compensation Policies and the Healthcare Liability Policies is subject to and conditioned upon the finalization and approval of an Assumption Stipulation; (b) nothing shall alter, modify, amend, affect, impair, waive, or otherwise prejudice the legal, equitable or contractual rights, obligations, and defenses of the insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Insurance Contracts; any such rights and obligations shall be determined under the Insurance Contracts and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred, provided, however, that the Debtors or  Reorganized Debtors, as applicable, shall retain the right to challenge any amounts owed under the Insurance Contracts in accordance with their terms; (c) nothing alters or modifies the duty, if any, that insurers have to pay claims covered by the Insurance Contracts and the insurers' right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor in accordance with the terms of the Insurance Contracts; (d) the Allowed Claims of the insurers arising (whether before or after the Effective Date) under the Insurance Contracts (i) shall be paid in full in the ordinary course of business regardless of whether such amounts are or shall become liquidated, due or paid before or after the Petition Date or the Effective Date, and (ii) shall not be discharged or released by the Plan or the Confirmation Order or any other order of the Bankruptcy Court; and (e) the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article X of the Plan, if and to the extent applicable, shall be deemed modified without further order of this Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable non-bankruptcy law to proceed with their claims; (II) the insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy

47

Court consistent with applicable non-bankruptcy law, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by this Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) the insurers to collect from any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Contracts, in such order as the applicable insurer may determine; and (IV) the insurers to cancel any Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

(b)     The Debtors or the Reorganized Debtors, as the case may be, shall maintain their director and officers insurance policies and their employment practices liability policies providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors.

(c)     Notwithstanding anything in this Plan to the contrary, including but not limited to Articles 6, 7, 9, and 10 of the Plan, the allowance of any insurance claims in the Chapter 11 Case shall have no res judicata effect on any proceeding or litigation initiated in any other court as to said insurance claim, or any other claim, cross-claim, defense or cause of action arising from, relating to or otherwise implicating the facts and law at issue in such insurance claim. Without limiting the generality of the foregoing, the allowance of an insurance claim shall have no preclusive effect with respect to any claim insured by an insurance policy in favor of the Debtors.

(d)     Notwithstanding anything in this Plan to the contrary, any applicable insurer shall have the right to appear and be heard in the Court on (i) any objection or other litigation pertaining to a claim insured by such insurer (such as but not limited to any of the insurance claims), as well as (ii) any proposed compromise or settlement of such insured claims (such as but not limited to any of the insurance claims).

(e)     Nothing in this Plan shall impair, reduce, enlarge, waive, modify or otherwise alter creditors' rights of recoupment, setoff and subrogation, and such rights are expressly preserved herein, and all defenses in connection therewith (including, but not limited to, those arising under the Bankruptcy Code).

**7.4    Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases**. With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired

48

## ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

**8.1    Determination Of Claims and Interests**.  Except as expressly provided in the Plan, after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article 6.196.20, except with respect to any Claim or Interest deemed Allowed under the Plan or pursuant to an order of the Bankruptcy Court.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.  For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with this Plan.

Nothing contained in this Article 8.1 shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors (and, as the case may be, the GUC Administrator) may have against any Entity in connection with or arising out of any Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

**8.2    GUC Administrator**.  The Creditors' Committee shall appoint, as of the Effective Date, a GUC Administrator with duties limited to (a) administering, disputing, objecting to, compromising, or otherwise resolving Operating Company General Unsecured Claims reconciliation, allowance, and settlement, (b) making, including, without limitation, (i) filing, withdrawing, or litigating to judgment objections to Operating Company General Unsecured Claims, (ii) settling or compromising any Disputed Operating Company General Unsecured Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the claims register to reflect any such Claim resolutions without any further notice to or action, order, or approval by the Bankruptcy Court, (b) directing distributions to the Holders of Allowed Operating Company General Unsecured Claims as provided herein, and (c) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the foregoing duties.  The GUC Administrator may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the duties as limited above, including any professionals retained in these Chapter

51

11 Cases, and the GUC Administrator Costs, including reasonable professional fees, shall be paid by the Debtors or Reorganized Debtors from the GUC Administrator Account in the ordinary course without further order of the Bankruptcy Court, provided that the Debtors or Reorganized Debtors shall not be required to reimburse such costs in excess of $250,000.

Upon Immediately upon the resolution of all disputed Operating Company General Unsecured Claims and the making of the final distribution to Holders of Allowed Operating Company General Unsecured Claims, the GUC Administrator shall be released and discharged of and from further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases.

      **8.3**    **Claims Administration Responsibility**. After the Effective Date, other than as to Operating Company General Unsecured Claims, the Reorganized Debtors shall retain responsibility for (a) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors other than Operating Company General Unsecured Claims, including, without limitation, (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests (other than Operating Company General Unsecured Claims), (ii) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court (other than Operating Company General Unsecured Claims), and (iii) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court (other than Operating Company General Unsecured Claims), and (b) making distributions (if any) with respect to all Claims and Interests (other than Operating Company General Unsecured Claims). With respect to Operating Company General Unsecured Claims, the GUC Administrator shall exercise all of the responsibilities set forth in this Article 8.3.

      **8.4**    **Objections to Claims**.  Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors or the GUC Administrator without further notice to parties-in-interest).  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Reorganized Debtors or the GUC Administrator effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

      **8.5**    **Disallowance of Claims**.  Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, the Creditors' Committee before the Effective Date, the GUC Administrator after the

52

Effective Date, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors (or the GUC Administrator, as the case may be) allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and    (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**8.6    Estimation of Claims**.    Before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any purpose permitted thereunder, regardless of whether any party previously has objected to such Claim or Interest, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection.    In the event that the Bankruptcy Court has entered a Final Order estimating any contingent or unliquidated Claim for the express purpose of determining what amount of such Claim shall be allowed for purposes of distributions pursuant to section 502(c), that estimated amount shall, unless otherwise ordered by the Bankruptcy Court or agreed between the relevant parties, constitute a maximum limitation on the Allowed amount of such Claim for all purposes under the Plan (including for purposes of distributions), and the Reorganized Debtors or the GUC Administrator may, to the extent applicable, elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.    All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.    Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**8.7    No Interest on Claims**.    Unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest.    Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

**8.8    Amendments to Claims**.    On or after the Bar Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

53

**ARTICLE IX**

**PROVISIONS GOVERNING DISTRIBUTIONS**

9.1    **Time of Distributions**.  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan (other than on account of Operating Company General Unsecured Claims) shall be made on the later of (a) the Initial Distribution Date or (b) on the first Periodic Distribution Date that is at least 30 days after a Claim becomes Allowed; provided, however, that the Reorganized Debtors may, in their sole discretion, make one-time distributions on a date that is not a Periodic Distribution Date. Distributions on account of Operating Company General Unsecured Claims shall be made on the Operating Company General Unsecured Claims Distribution Date.

9.2    **Distribution Agent**.  The Distribution Agent shall make all distributions required under this Plan except as set forth in Article 9.4 below.

9.3    **Currency**.  Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal, National Edition* following the Effective Date.

9.4    **Distributions on Account of Claims Allowed as of the Effective Date**. Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims on the Initial Distribution Date, subject to the Reorganized Debtors' rights to object to Claims that have not been Allowed; provided, however, that (i) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Allowed Priority Tax Claims shall be paid in full in Cash on the Initial Distribution Date or in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(9)(c) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

9.5    **Distributions on Account of Claims Allowed After the Effective Date**.

(a)    **No Distributions Pending Allowance**.  No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined

54

by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)    **Disputed Unsecured Claims Reserve**. The ~~Debtors or Reorganized Debtors, as applicable,~~ GUC Administrator shall withhold and retain from the Operating Company General Unsecured Claims Cash Pool Account and establish and fund a segregated reserve with (i) an amount sufficient to pay Holders of Disputed Operating Company General Unsecured Claims the amount such Holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims, (ii) such lesser amount as estimated or otherwise ordered by the Bankruptcy Court, or (iii) such lesser amount as agreed to between the GUC Administrator and the Holders thereof (such account, the "**Disputed Operating Company General Unsecured Claims Reserve**"). As disputed claims are resolved pursuant to Article IX hereof, the GUC Administrator shall direct the Distribution Agent to make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date. Such distributions shall be made on the first ~~Periodic~~ Operating Company General Unsecured Claims Distribution Date that is at least thirty (30) days after the date on which such a Disputed Claim becomes an Allowed Claim.

(c)    **Tax Treatment of Disputed Unsecured Claims Reserve**. All parties to the Plan shall (i) treat the Disputed Operating Company General Unsecured Claims Reserve as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 for U.S. federal income tax purposes, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for all federal, state, and local income tax purposes. All taxes imposed on assets or income of such Disputed Operating Company General Unsecured Claims Reserve will be payable from the assets of the Disputed Operating Company General Unsecured Claims Reserve. The GUC Administrator shall have no duty, obligation, or responsibility to satisfy or otherwise comply with withholding, payment, and/or reporting requirements imposed by any federal, state, local, or foreign tax authority.

(d)    **Request for Expedited Determination of Taxes**. The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Disputed Operating Company General Unsecured Claims Reserve filed or to be filed for any and all taxable periods of such reserve.

(e)    **Distributions After Allowance**. Payments and distributions to each respective Holder of a Claim on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with provisions of this Plan that govern distributions to such Holder of a Claim. On the first Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable, that is at least 30 days following the date when a Disputed Claim becomes an Allowed Claim, the Distribution Agent shall distribute to the Holder of such Allowed Claim the distribution that such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law; provided, however, (i) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before

55

the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Disputed Claims that are Allowed Priority Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

(f)     **Special Rules for Distributions to Holders of Disputed Claims**. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class; provided, however, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law or this Plan.

### 9.6    Delivery Of Distributions.

(a)     **Record Date for Distributions**.  On the Distribution Record Date, the claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim or Interest is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practicable and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)     **Allowed Claims**.  Distributions to Holders of Allowed Claims shall be made by the Distribution Agent (i) at the addresses set forth on the proofs of claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors or the Reorganized Debtors or the GUC Administrator, as applicable, have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, or (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address.  The Debtors, the Reorganized Debtors, the GUC Administrator, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

(c)     **Undeliverable Distributions**.  If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent is notified of the then-current address of such

56

Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors (or, with respect to the Operating Company General Unsecured Claims, to the Operating Company General Unsecured Claims Cash Pool Account) until such distributions are claimed.

(d)     **Reversion**.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors (or, with respect to Operating Company General Unsecured Claims, to the Operating Company General Unsecured Claims Cash Pool Account) free of any restrictions thereon.  Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.

(e)     **De Minimis Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Distribution Agent shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date in question is or has a value less than $10,000; provided that the Reorganized Debtors, the GUC Administrator, or the Distribution Agent, as applicable, shall make, or cause to be made, a distribution on a Periodic Distribution Date or an Operating Company General Unsecured Claims Distribution Date, as applicable, of less than $10,000 if the Reorganized Debtors, the GUC Administrator, or the Distribution Agent, as applicable, expect that such Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable, shall be the final Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date or Operating Company General Unsecured Claims Distribution Date, as applicable, does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

(f)     **Fractional Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Distribution Agent shall not be required to make partial distributions or distributions of fractional shares of New Pioneer Units or distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fractional share of New Pioneer Units under the Plan would otherwise be called for, such fraction shall be deemed zero.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

**9.7     Accrual of Dividends and Other Rights**.  For purposes of determining the accrual of dividends or other rights after the Effective Date, New Pioneer Units shall be deemed distributed as of the Effective Date regardless of the date on which they are actually

57

agreement, event, or other occurrence taking place on or before the Effective Date; **provided** that nothing in the Plan shall be construed to release the Released Parties from any claims based upon willful misconduct or intentional fraud as determined by a Final Order.**; provided further that, for the avoidance of doubt, nothing in this Plan nor in this Article 10.4 shall release, or be construed to release, any of the Priority First Lien Parties or Capital Finance Opportunities 1701C, LLC from claims or causes of action to enforce the terms of the Capital Finance/Silver Point Settlement Agreement (as defined in Article 11.2(c)), or the assertion of any defenses in respect of same.**

**10.5    Exculpation and Limitation of Liability.    To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any act, omission, or other Claim in connection with, relating to, or arising out of: the Debtors' restructuring; the Chapter 11 Cases; the filing of the Chapter 11 Cases; formulation, preparation, dissemination, negotiation, pursuit, or filing of the Disclosure Statement, the RSA, the Plan Transaction Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, or the solicitation of votes for, or confirmation of, the Plan; the DIP Credit Agreement; the pursuit of Confirmation; the funding or pursuit of consummation of the Plan; the occurrence of the Effective Date; the administration, consummation, and implementation of the Plan or the property to be distributed under the Plan, including the issuance of securities under or in connection with the Plan and the distribution of property under the Plan and any other transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof; the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases; or the transactions in furtherance of or contemplated by any of the foregoing; except for intentional fraud or willful misconduct, as determined by a Final Order. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.**

**10.6    Exclusions and Limitations on Exculpation, Indemnification, and Releases**. Notwithstanding anything in this Plan to the contrary, no provision of this Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification, or release provision, shall modify, release, or otherwise limit the liability of any Entity not specifically released or exculpated hereunder or pursuant to an order of the Bankruptcy Court, including, without limitation, any Entity who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

**10.7    Injunction.    Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

62

the relevant Holder of a Claim has filed a noncontingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## ARTICLE XI

## CONDITIONS PRECEDENT

**11.1    Conditions to Confirmation**.  The following are conditions precedent to the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Article 11.3 of this Plan:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order.

**11.2    Conditions to the Effective Date of the Plan**.    The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 11.3 of this Plan:

(a)    the Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be a Final Order;

(b)    the Bankruptcy Court shall have entered the Confirmation Order, and such order shall be a Final Order;

(c)    the Priority First Lien Parties and Capital Finance Opportunities 1701C, LLC shall have entered into and substantially consummated a settlement and release agreement  (the "**Capital Finance/Silver Point Settlement Agreement")**  in form and substance satisfactory to each of the Priority First Lien Administrative Agent and Capital Finance Opportunities 1701C, LLC;

(d)    the payment by the Debtors of all fees and expenses of the DIP Agent and Priority First Lien Administrative Agent, including Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey, Inc., and Fortgang Consulting LLC;

(e)    all Plan Transaction Documents shall be in form and substance satisfactory to the Priority First Lien Administrative Agent;

(f)    all conditions precedent set forth in the New First Lien Credit Agreement shall have been satisfied or waived pursuant to the terms thereof;

(g)    the organizational documents of the Reorganized Debtors as contemplated herein shall be in form and substance satisfactory to the Priority First Lien Administrative Agent, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws;

65

(h)    all authorizations, consents, certifications, regulatory approvals, rulings, no action letters, opinions, or other documents or actions required by any law, regulation, or order to be received or to occur in order to implement and effectuate the Plan on the Effective Date shall have been obtained (and evidence thereof shall have been delivered to the Priority First Lien Lender) or shall have occurred unless such failure will not have a material adverse effect on the Reorganized Debtors;

(i)    after occurrence of the Effective Date and payment of all amounts contemplated in connection therewith (including any Cure amounts), the Reorganized Debtors shall emerge with a minimum of $10 million of cash or cash equivalents, or shall reasonably expect to build to $10 million of cash or cash equivalents within 60 days of the Effective Date (the "**Minimum Liquidity Condition Precedent**");

(j)    the conditions precedent set forth in the Exit Term Loan Facility shall have been satisfied or waived;

(k)    the Debtors (or the Reorganized Debtors, as the case may be) establish and the Settling Parties (other than the Creditors' Committee) shall have funded the Operating Company General Unsecured Claims Cash Pool Account with Cash in an amount equal to the Operating Company General Unsecured Claims Cash Pool;

(l)    the Debtors (or the Reorganized Debtors, as the case may be) establish and shall have funded the GUC Administrator Account with Cash in an amount equal to $250,000;

(lm)    all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full; and

(mn)    Adversary Case Numbers 19-01142 and 19-01143 commenced against the Debtors in these Chapter 11 Cases shall have been resolved in a form and manner reasonably satisfactory to the Priority First Lien Administrative Agent.

**11.3    Waiver of Conditions Precedent**.  The conditions set forth in Articles 11.1 and 11.2 may be waived, in whole or in part, by agreement of (a) the Debtors and (b) the Priority First Lien Administrative Agent, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing, provided, that the consent of Capital Finance Opportunities 1701C, LLC shall be required to waive the condition set forth in Article 11.2(c).

**11.4    Notice of Effective Date**.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Article 11.2 of this Plan have been satisfied or waived pursuant to Article 11.3 of this Plan.

**11.5    Effect of Non-Occurrence of Conditions to Consummation**.  If prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the

66

with                          a                          copy                          to:

Paul,      Weiss,      Rifkind,      Wharton      &      Garrison      LLP
1285                Avenue                of                the                Americas
New            York,            New            York            10019
Attn:   Robert                          A.                          Britton
~~Alexander N. Woolverton~~Christopher Hopkins

**If to the Office of the United States Trustee:**

Office  of  the  United  States  Trustee  for  the  Southern  District  of  New  York
U.S.                  Federal                  Office                  Building
201            Varick            Street,            Suite            1006
New            York,            New            York            10014
Attn:   Brian                                                        Masumoto
       Shannon Scott

**If to the Creditors' Committee:**

Kilpatrick,            Townsend,            &            Stockton            LLP
1114                Avenue                of                the                Americas
New York, NY 10036

Attn:   David                          M.                          Posner
       Gianfranco Finizio

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors and Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed                                                                        requests.

   **13.10   Term of Injunctions or Stays**.  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.   All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

   **13.11   Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan

72

Dated: ~~July 3~~September 5, 2019

Respectfully submitted,

TRIDENT HOLDING COMPANY, LLC
AND ITS AFFILIATE DEBTORS

By: */s/ David F. Smith*_____
Name:  David F. Smith
Title:  Chief Financial Officer

*Second Modified Second Amended Joint Plan of Reorganization of Trident Holding Company,
LLC, et al.*

~~1715029.31-NYCSR03A - MSW~~1715029.42-NYCSR03A - MSW
Redline Atlantis - Plan of Reorganization 1715029v32 and Atlantis - Plan of Reorganization
1715029v42 9/5/2019 9:13:10 PM

| Summary report: Litéra® Change-Pro TDC 10.1.0.400 Document comparison done on 9/5/2019 9:13:10 PM | |
|---|---|
| **Style name:** Option 3a Strikethrough Double Score No Moves | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** dm://NYCSR03A/1715029/32 | |
| **Description:** Atlantis - Plan of Reorganization | |
| **Modified DMS:** dm://NYCSR03A/1715029/42 | |
| **Description:** Atlantis - Plan of Reorganization | |
| **Changes:** | |
| Add | 379 |
| Delete | 303 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 3 |
| **Total Changes:** | 685 |